UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                              MEMORANDUM & ORDER

        v.                                                 05-CR-0060 (NGG)

VINCENT BASCIANO

        Defendant.
----------------------------------------------------------X
GARAUFIS, United States District Judge.

        Defendant Vincent Basciano has moved pursuant to 28 U.S.C. § 2241 and the Bail Reform Act, 18 U.S.C. § 3142, for an order directing the government and the Bureau of Prisons to release him from administrative detention at the MCC facility in Manhattan into general population at MDC Brooklyn.[1]  The government has opposed this motion, countering that Basciano's determination to continue to run the Bonnano crime family and to order violent criminal acts from behind prison walls can be thwarted only by imposing upon him the most restrictive detention conditions available within the metropolitan New York area, thereby cutting him off from potential conduits through which he might send and receive messages, and thereby direct the activities of the Bonnano family.  For the reasons set forth below, Basciano is to be released from administrative detention forthwith under such restrictions as the government deems necessary to prevent him from communicating with other Bonnano family members and

---

[1] Basciano's co-defendants, Anthony Aiello and Dominick Cicale, also moved for release from administrative detention at MDC Brooklyn into general population.  Aiello was moved to general population prior to oral argument on his motion.  I ordered Cicale released from segregated housing on the record immediately following oral argument, effective upon the stipulation of the government and counsel for Cicale to separations and other restrictions intended to address the government's concerns.

associates.

I.      **Factual Background**

Basciano was taken into custody on November 19, 2004, after being superseded into the indictment in a related case, 03 Cr. 929. Basciano asserts, and the government does not dispute, that he was housed in "reception" on the eighth floor of MDC-Brooklyn from November 19 to December 3, 2004, and was not permitted any visitors or contact with other detainees during this time. Basciano was then released into general population, where he remained until he was reassigned to the Special Housing Unit ("SHU") on January 8, 2005. The instant indictment, which charges Basciano with the murder in aid of racketeering of Randolph Pizzolo and contains language indicating the government's belief that Basciano also conspired to murder a federal prosecutor, was then unsealed on January 26, 2005. Notably, the indictment does not charge Basciano or anyone else with that conspiracy. Basciano remained in the SHU at MDC-Brooklyn until March 13, 2005, when he was moved to Unit 10 South, also a designated SHU, at the MCC facility in Manhattan. Unit 10 South is considered to be the most secure housing available at any Bureau of Prisons ("BOP") facility in the New York City metropolitan area, and is generally reserved for terrorism suspects, detainees who have shown themselves to be a danger to other inmates and/or prison guards, and cooperating witnesses. Detainees in 10 South are confined to cells with blacked out windows 23 hours per day during the week, and round-the-clock on weekends. Despite representations from the government that the lights in the SHU can be turned off, Basciano asserts that the lights are left on 24 hours a day. (Basciano Br. at 4) Access to radios, and reading materials, including legal papers, appears in practice to be quite limited. (Id.) Meals are received on trays that are pushed through a narrow slot in the cell door. (Id.) Finally,

and perhaps most significantly, Basciano's contacts with other human beings have been sharply curtailed. He receives only one social visit per week, is not permitted to speak to anyone while in his cell, and his telephone privileges are described by his counsel as "nonexistent." (Id.) These are the conditions under which Basciano has lived for nearly four months, and under which the government proposes to keep him until his trial on this indictment. Because Basciano and his co-defendants are charged with death-eligible offenses, thus requiring a lengthy mitigation process before the Attorney General, it is highly unlikely that this case will go to trial before the Fall of 2006.

The government contends that these severe restrictions on Basciano's ability to interact with other people, both inside and outside the prison, are warranted because Basciano will continue to direct the affairs of the Bonnano family, including ordering acts of extreme violence, if he is not prevented from passing messages to other Bonnano family members and associates. In support of this position, the government has submitted under seal two consensual recordings which purport to capture two lengthy jailhouse conversations between Joseph Massino, the reputed boss of the Bonnano family, and Basciano, who is alleged to be the acting boss of the family, on January 3, 2005 and January 7, 2005, respectively. The topics discussed by the two men whose voices are heard on these recordings include various aspects of the continuing operations of the Bonnano family, including the methods they have employed to pass messages to operatives outside the prison. These methods include using family members, investigators, and attorneys to send and receive messages, and taking advantage of mob relationships with prison guards to make unmonitored phone calls. Basciano and Massino also returned repeatedly to the dual subjects of the indictment in the instant case, with Massino doggedly questioning

Basciano about his knowledge of the circumstances surrounding Pizzolo's death, and whether he had told anybody about an earlier, unrecorded, conversation between the two in which a proposal to harm a federal prosecutor apparently was raised.

## II.    Jurisdiction

The courts of this circuit consistently have held that a habeas petition is the appropriate vehicle for prisoners challenging their placement in pretrial administrative detention and seeking release into general population.  See Boudin v. Thomas, 732 F.2d 1107, 1111 (2d Cir. 1984); Giano v. Sullivan, 709 F.Supp. 1209, 1212 (S.D.N.Y. 1989); United States v. Felipe, 1996 WL 409181, at *1 n.2 (S.D.N.Y. July 19, 1996).  Basciano therefore appropriately addressed his request as a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  Accordingly, the statutory exhaustion requirement set forth under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, is not applicable here.  Carmona v. United States Bureau of Prisons, 243 F.3d 629, 634 (2d Cir. 2001).  However, the judicial exhaustion requirements that govern habeas proceedings still have force in this case.  Id.  Thus, a prisoner seeking to alter the conditions of his confinement must exhaust the administrative remedies provided by the Bureau of Prisons prior to seeking the court's intervention on his behalf.  Id. (citing Guida v. Nelson, 603 F.2d 261, 262 (2d Cir. 1979) (per curiam)).  Judicial exhaustion is not a jurisdictional requirement. Howard v. Headly, 72 F.Supp. 2d 118, 122 (E.D.N.Y. 1999).  Accordingly, the court may excuse exhaustion if it appears that an administrative appeal would be futile, or because the appeals process is shown to be inadequate to prevent irreparable harm to the defendant.  Howell v. Immigration and Naturalization Serv., 72 F.3d 288, 291 (2d Cir. 1995); Lyons v. United States Marshals, 840 F.2d 202, 204 (3d Cir. 1988).  The government can also waive its non-exhaustion

defense by failing to raise the issue to the court in a timely fashion.  <u>United States v. Rosario</u>, 164 F.3d 729, 732 (2d Cir. 1998).

The administrative review process established by the BOP allows "an inmate to seek formal review of a complaint which relates to any aspect of his imprisonment if less formal procedures have not resolved the matter." 28 C.F.R. § 542.10.  The procedure provides for an attempt at informal resolution, and the filing of a complaint if there is no informal resolution. 28 C.F.R. § 542.13(a)-(b).  If an inmate is not satisfied with the Warden's response, an appeal may be taken to the BOP Regional Director, and, if the inmate is not satisfied with the Regional Director's response, an appeal may be taken to the BOP General Counsel. 28 C.F.R. § 542.15.  If the Warden fails to respond within 15 calendar days to the detainee's appeal, that failure may be treated by the inmate as a denial. 28 C.F.R. § 542.14.  Notably, when a detainee is placed in administrative detention, the BOP's own regulations require the Warden to provide the detainee with a written explanation of his decision to isolate the detainee within 24 hours unless extraordinary circumstances prevail. 28 C.F.R. § 541.22(b).

Basciano has received no such written explanation from the Warden at either MDC-Brooklyn or MCC pertaining to his detention in the SHU.  Counsel for Basciano initiated the administrative review process at MCC by filing a Request for Administrative Remedy on April 1, 2005. (Basciano Br. at 6)  Basciano also pursued an informal resolution of his request pursuant to 28 C.F.R. § 542.13. (<u>Id.</u>)  This request was denied on April 7, 2005. (<u>Id.</u>)  Basciano then submitted a second Request for Administrative Remedy on April 11, 2005. (<u>Id.</u>)  At oral argument on May 2, 2005, MCC Staff Attorney Adam Johnson represented that the Warden's decision on Basciano's appeal was imminent.  As of the date of this order, the MCC still has not

acted on Basciano's appeal. In any case, it is clear that Basciano has not exhausted his administrative appeals. Even if the MCC were now to deny his April 11 request, Basciano would be entitled to two further rounds of appeals within the BOP, as provided for by 28 C.F.R. § 542.15.

However, I find that the government has waived its non-exhaustion defense to Basciano's petition, and therefore conclude that I may rule on the constitutional issue presented by Basciano's continued detention in the SHU at MCC. While recognizing that Basciano had made a comprehensive argument that the exhaustion doctrine should not bar this claim, the government casually stated in a footnote to its response brief that it would "focus on the merits of Basciano's motion" but "without in any way waiving the need for compliance with administrative procedures and exhaustion of remedies in this proceeding or any other." (Govt. Br. at 1, n.1) The government did not explain its theory of how it could excuse its own waiver of a potential non-exhaustion defense simply by declaring that it was not waiving that defense, but yet without raising an argument. There may be contexts in which a party may permissibly defer the imposition of a defense until a later time simply by noting the possibility that it could raise that defense. However, this highly time-sensitive circumstance clearly is not one of them. Since the government failed to present its non-exhaustion defense in its written submission or at oral argument, I now deem that defense waived.

Even if the government had not waived this defense, I would find exhaustion unnecessary in the circumstances of this case. Basciano has now been in the SHU for nearly four months without having received the administrative explanation for the conditions of his detention that he was entitled to receive within 24 hours. He has now gone 24 days without receiving an answer to

6

his request for relief from the Warden of the MCC despite the BOP's knowledge that Basciano was in the process of litigating this issue before me.  Clearly, the BOP has not addressed Basciano's request for relief in a timely fashion.  Basciano is thus faced with the prospect of perpetual detention without access to judicial review under circumstances that raise a serious and urgent constitutional question while the BOP fiddles.  Moreover, it is abundantly clear that the United States Attorney's Office, rather than the BOP, is the true source of Basciano's consignment to the SHU.  That Office has had ample opportunity to respond to Basciano's requests for relief both informally and before this court, and has done so in a comprehensive and reasoned fashion.  The administrative appeals process would thus, in the circumstances of this case, be an empty formality that would risk exposing Basciano to irreparable harm.  Accordingly, I would excuse Basciano from the judicial exhaustion requirement even if the government had not waived this argument.

**III.    Discussion**

The government contends that the recorded conversations between Massino and Basciano demonstrate the lengths to which Basciano is willing to go to maintain his lines of communication with, and thus his control over, the Bonnano crime family, his present detention notwithstanding.  Moreover, the goverment suggests that Basciano ordered the murder of Pizzolo while detained at MDC-Brooklyn, and also plotted to kill a federal prosecutor during his period of detention.  Reasoning that Basciano's words have the power to kill even from within a detention facility, and did in fact cause Pizzolo's death, the government asserts that in order to protect the community from Basciano, and thus fulfill the purposes of his pretrial detention, it must prevent Basciano's words from escaping the MCC by isolating Basciano from all potential

messengers. And the only way to accomplish this end, the government contends, is to place Basciano indefinitely in administrative detention.

Basciano counters that the government's concerns are greatly exaggerated, and thus that its response is wholly out of line with the threat allegedly posed by Basciano. First, Basciano asserts that it is factually impossible for him to have ordered Pizzolo's killing while in prison because Basciano had no contact with other prisoners and received no visitors from the time he entered MDC-Brooklyn until he was released into general population on December 3, 2004, two days after Pizzolo's death. Second, Basciano asserts that the recordings do not support the government's accusation that he was involved in a plot to kill the prosecutor. To the contrary, Basciano argues, the recordings illustrate that Basciano "wanted no part of a murder conspiracy to kill a government prosecutor." (Basciano Br. at 19). Finally, Basciano argues that the government's concerns about his ongoing willingness to pass messages can be sufficiently addressed by restricting his access to visitors and enforcing separation orders within the prison.

The controlling standard governing the restrictions that prison officials may place on pre-trial detainees was established by the Supreme Court in Bell v. Wolfish, 441 U.S. 520 (1979). In Wolfish, the Supreme Court held that since a pre-trial detainee has not been convicted, the Due Process Clause does not permit prison officials to subject him to "punishment." Id. at 537, n.16. In considering whether prison officials impermissibly are subjecting a prisoner to "punishment":

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pre-trial

> detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

Id. at 538-39.

In effect, the Wolfish court announced a two part-test: "[F]irst, the court must determine if the condition is specifically imposed for the purposes of punishment or for a legitimate governmental purpose, secondly, if evidence of punishment is lacking, this court must determine if the restriction is 'reasonably related' to a legitimate objective or constitutes an exaggerated response. If a reasonable relationship can be established, punishment is not present and the Due Process clause is not violated." Boudin v. Thomas, 533 F.Supp. 786, 788-89 (S.D.N.Y. 1982) (Duffy, J.). No evidence has been presented to this court indicating that the government's explicit purpose in placing Basciano in administrative detention is to punish him. Accordingly, I turn my attention to the second part of the Wolfish test, i.e., whether Basciano's indefinite placement in solitary confinement is reasonably related to a legitimate government objective.

The government's stated objective is clearly legitimate. The Bonnano crime family has been proven at a trial before me to be a violent criminal enterprise with longstanding ties to drug trafficking, extortion, labor corruption, illegal gambling, smuggling, witness tampering and other illegal activities. The leadership of that family has not hesitated to order murders to consolidate its own hold on power, to protect the organization's profits, or to avoid prosecution by government authorities. In short, the Bonnano crime family has sown extensive misery,

9

corruption and death in this District and elsewhere. Accordingly, the government's goal of hampering its operations by preventing its alleged chief from communicating with other members of the family about the organization's criminal activities is indisputably legitimate.

Thus, the ultimate question is whether the government's chosen means—the indefinite and solitary confinement of Basciano pending a trial that is unlikely to go forward for at least eighteen months—is reasonably related to its goal of preventing Basciano from continuing to plan or approve violent criminal conduct while in prison, as the government asserts he already has done in ordering Pizzolo's murder and conspiring to murder a federal prosecutor.

I hold that it is not. Indefinite detention in the SHU is an exceptionally harsh method of preventing a detainee from communicating with his alleged criminal associates. Accordingly, it must be reserved for the most extreme cases. In finding that the instant case does not present such circumstances, I in no way seek to diminish the seriousness of the allegations raised against Basciano or denigrate the government's interest in preventing individuals from furthering the activities of active criminal organizations while in pre-trial detention. However, on the record before me, I conclude that the government has not made a sufficient showing that Basciano was engaged in planning acts of violence while in pre-trial detention. Without that nexus to the institutional needs of the BOP or to the purposes of the Bail Reform Act, there is little or nothing that distinguishes Mr. Basciano from the hundreds of individuals in pre-trial detention who are accused of having committed violent acts <u>before</u> they were detained. Further, while the recordings clearly demonstrate Basciano's willingness to violate prison rules in order to communicate with other members of the Bonnano family, I find that those violations do not justify indefinite placement in administrative detention because the government has not linked

these infractions to discrete criminal planning or conduct of any kind.[2]

Taking the government's allegations concerning the Pizzolo murder first, my own review of the tape recordings reveals no indication by either party to the conversation, even drawing all inferences in favor of the government, that Basciano ordered Pizzolo's murder <u>after</u> he was detained on November 19, 2004.  Nor does the government appear to have an answer to Basciano's assertion that he had no opportunity to pass any message to anyone outside MDC-Brooklyn or to any other detainee from the time he was detained on November 19, 2004 until his release into general population on December 3, 2004, two days <u>after</u> the government alleges that Pizzolo was killed.  Therefore, the facts currently before the court suggest that if Basciano ordered Pizzolo murdered, he did so <u>before</u> he entered MDC-Brooklyn.  That allegation might well be sufficient to justify pre-trial detention.[3]  However, it is insufficient to justify detention under the harsh conditions present in the SHU.

Second, the tape recordings, standing alone, do not sufficiently substantiate the government's allegation that Basciano conspired to kill a federal prosecutor while in detention or at any other time.  According to my review of the tapes, the subject of whether to harm the prosecutor was raised by Massino several times during the two recorded conversations.  Each time the subject was raised, Basciano disclaimed any interest in pursuing or discussing any such

---

[2] In saying this, I express no view on whether or under what circumstances a pre-trial detainee may be placed in the SHU for a similar infraction for some definite period of time in accordance with the regulations of the detention facility.

[3] This court did not consider whether the charges in 05 Cr. 060, and the weight of the government's proof against Basciano as to those charges, required Basciano to be detained pending trial in accordance with the Bail Reform Act because Basciano had already been remanded to custody based on the charges against him in 03 Cr. 929.

objective. A reasonable listener could certainly infer from the recorded dialogue that an earlier conversation took place concerning someone's desire to harm the prosecutor. However, the tapes alone do not reveal whether it was Basciano who harbored that desire, whether it was discussed seriously or in jest, whether Basciano agreed to go along with the plan, or disavowed it from the beginning, or any other detail of the conversation. The government may well possess other evidence concerning this purported, and as yet uncharged, conspiracy. If it does, however, it has not presented it to this court for consideration. And as with the government's first ground for holding Basciano in the SHU, I find that the government may not place Basciano in indefinite administrative detention for committing the crimes for which he is charged under this indictment without more substantial proof that he committed these crimes while in pre-trial detention.

   Third, while I credit the government's concern that pre-trial detention in general population might prove to be an insufficient safeguard against Basciano's demonstrated determination to run the Bonnano family despite his present detention, in the absence of any proof that these violations of prison regulations caused or were intended to cause criminal activity, I am not persuaded that Basciano's indefinite detention in the SHU is warranted at this time. The foremost factor informing my conclusion is the reality that Basciano is a death-eligible defendant whose attorneys are now preparing to make a mitigation submission to the Attorney General. It is therefore of the utmost importance that Basciano be capable of working with his attorneys as they attempt to dissuade the Attorney General from seeking the death penalty against him. Yet Basciano's detention in the SHU presents both practical and psychological obstacles to this result. As a practical matter, the security restrictions in place in the SHU make it much more difficult for Basciano to have productive meetings with his counsel, as Basciano's attorneys have

credibly argued.  More importantly, it is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee.  See, e.g., Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997) ("Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effects, including increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilation, and suicidal impulses. . . . There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects.")  Taken together, the urgency of Basciano's need to marshal his legal defense in the hopes of avoiding a death-penalty trial and the likely effect of continued solitary confinement on Basciano's mental state require that the government reserve the "nuclear option" of indefinite solitary confinement until it is clear that less restrictive options have failed to constrain Basciano.

**IV.    Conclusion**

For the reasons set forth above, I find that Basciano's detention in the SHU is not reasonably related to the government's legitimate objective of curtailing Basciano's alleged criminal activities, and that less restrictive means of doing so are available to the government.  Accordingly, Basciano is to be released into general population forthwith under such restrictions as the government deems necessary to prevent him from communicating with other Bonnano family members and associates.  I pause to note, however, that this decision is subject to review if at any point in the future it becomes apparent that the government's fears about Basciano's

intentions to direct the affairs of the Bonnano family while detained, and in particular, to order the commission of violent acts, have become manifest.  Basciano is therefore strongly cautioned to abide by any restrictions or separation orders that are imposed upon him for the duration of his pre-trial detention.  Additionally, Basciano's request to be returned to MDC-Brooklyn is denied, as Basciano has no legally cognizable interest in being detained in Brooklyn rather than Manhattan.


SO ORDERED.


Dated: May 5, 2005                                           _____/s/_____
       Brooklyn, N.Y.                                        Nicholas G. Garaufis
                                                             United States District Judge