**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
**VINCENT BASCIANO,**

$\qquad\qquad\qquad$ **Petitioner,**

$\qquad\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ **PETITION FOR A WRIT**
$\qquad$ **- against -** $\qquad\qquad\qquad\qquad\qquad\qquad$ **OF HABEAS CORPUS**


**JERRY MARTINEZ, Warden,**
**Of The Metropolitan Correction Center,**

$\qquad\qquad\qquad\qquad\qquad$ **Respondent.**
--------------------------------------------------------------------X


**TO THE HONORABLE UNITED STATES JUDGE:**


$\qquad$ Petitioner, Vincent Basciano, is currently confined at the Metropolitan Correctional Center, in New York, New York. Through undersigned counsel and pursuant to the Constitution of the United States and **28 U.S.C. §2241**, Mr. Basciano petitions this Court to issue a Writ of Habeas Corpus and to order his release from the Special Administrative Measures (S.A.M.'s) and the Special Housing Unit (S.H.U.) and return him to the general prison population, on the grounds that his present confinement violates the Constitution and laws of the United States.


**A.$\qquad$JURISDICTION**

$\qquad$ 1.$\qquad$ This court has personal jurisdiction pursuant to **28 U.S.C. §2241(c)** because Mr. Basciano is in custody under or by color of the authority of the United States and is committed for trial before some court thereof; and because his present confinement and custody violates the Constitution and laws of the United States.


Law Office of James Kousouros

B.        **PREDICATE FACTS[1]**

*Basciano's Detainee Status Through August 2006*

1.        Despite the most serious of charges pending against him since 2004, including an indictment for which the potential sentence is the death penalty, Mr. Basciano remained in the general population at the Metropolitan Correctional Center (hereinafter "M.C.C.") as of August, 2006. In 2005, the government segregated him in the Special Housing Unit (hereinafter "S.H.U."), largely on the theory that his status in the general population allowed him to "continue to direct the affairs of the Bonnano family." In 2005, Basciano filed a motion challenging this placement.

2.        In **United States v. Basciano**, 369 F. Supp. 2d 344 (2005), this court ruled that under the then-extant circumstances, administrative detention was not warranted for Basciano. The articulated rationale for the court's order still resonates to the salient factors of ***this*** petition:

> The foremost factor informing my conclusion is the reality that Basciano is a ***death-eligible defendant whose attorneys are now preparing to make a mitigation submission to the Attorney General***. It is therefore of the utmost importance that Basciano be capable of working with his attorneys as they attempt to dissuade the Attorney General from seeking the death penalty against him. ***Yet Basciano's detention in the S.H.U. presents both practical and psychological obstacles to this result. As a practical matter, the security restrictions in place in the S.H.U. make it much more difficult for Basciano to have productive meetings with his counsel***, as Basciano's attorneys have credibly argued. More importantly, it is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee. [citations omitted][2]  Taken together, the urgency of Basciano's need to marshal his legal defense in the hopes of avoiding a death-penalty trial and the likely effect of continued solitary confinement on Basciano's mental state require that ***the government reserve the "nuclear option" of indefinite solitary confinement until it is clear that less restrictive options have failed to constrain Basciano***.

369 F. Supp. 2d at 352 (emphasis added)

Based on the court's decision, Basciano was returned to, and remained in general population from 2005 through August 2006.

Law Office of James Kousouros

*The Revelation Of The "Murder Plot"*

3.        According to the government, in April 2006, during the final stages of his first trial, Basciano provided a list to a fellow inmate within the context of a solicitation to have those enumerated murdered. The list included the names of "Greg Andres", "Judge [sic] Nickolas Garafis", "Dominick Cicale", "Tommy Lee" and "Lou Tartaglione".  The inmate to whom the list was provided did not disclose its contents to any government representative for more than two months. Approximately one month after the tender of this ostensible "hit list," the jury returned a verdict convicting Basciano of RICO offenses but was unable to agree on several predicate acts.

4.        On or about June 30, 2006, after more than two months of silence, the inmate contacted the government and disclosed the existence of the list and the alleged circumstances of its tender. Again, according to the government:

> The inmate advised that Basciano gave the inmate the List toward the end of the trial. In that same meeting, Basciano told the inmate that Basciano sought the murder of the listed individuals. Basciano did not raise the issue again, and the inmate took no action in response to Basciano's statement.[3]

As will be set forth below, we believe that the circumstances attendant to this list and the motives of the informant(s) who tendered it to the government are entirely inconsistent with this notion of an "abandoned" murder plot described by the government.


*Basciano Is Transferred To The S.H.U.*

5.        On Friday, July 28, 2006, without prior notice to him or counsel, Basciano was transferred to 9 South, a wing of the S.H.U.; he was provided with no documentation or formal charges or specifications.

6.        On Saturday, July 29, 2006, after being informed by his wife that Basciano had been moved, counsel immediately inquired at the M.C.C. as to the nature of the transfer, and attempted to

Law Office of James Kousouros

visit with Mr. Basciano. At this time, counsel was informed that Mr. Basciano was not permitted contact **with anyone, including his attorneys, investigators or family members**.  Defense attorneys were further informed by the staff at M.C.C. that all inquiries should be directed to Rufus Williams, who was not available until the following Monday morning.  Over the next several days, numerous calls were made to Williams by various members of the defense team, all without success or response. Attorneys next left messages for Les Owen of the legal department at the M.C.C. to discuss the placement.  These calls went unreturned as well.

7.        On July 31, 2006, counsel contacted the government concerning Mr. Basciano's new status. We were informed by Assistant United States Attorney Thomas Siegel that the government was aware of the situation, but would disclose no additional information. Siegel also confirmed that counsel of record were barred from visiting with Mr. Basciano, but assured the undersigned that this restriction was not based upon any allegation concerning counsel, and that visits would be reinstated expeditiously.

8.        On that same day, counsel filed a letter with this court, seeking an immediate hearing and release of Basciano from the S.H.U. (A copy of this letter is annexed hereto as **Exhibit A**).

9.        On August 2, 2006, the parties appeared before the court for the conference requested by defense counsel.  At this conference, the government offered no explanation for the placement of Mr. Basciano; it simply asserted that it was still investigating the matter (A copy of the transcript of this proceeding is annexed hereto as **Exhibit B**).  While the government was "not adverse" to the resumption of counsel visits with Mr. Basciano, they refused to permit Mr. Basciano's investigator to meet with him.  Counsel stressed that the conditions in the S.H.U. were intolerable, and that the restrictions imposed were sure to hamper any ability to prepare for trial. In addition, counsel stressed the urgency in preparing mitigation submissions concerning the pending death penalty

Law Office of James Kousouros

decision in Indictment 05-0060.    The court adjourned the conference until August 11, 2006, ordered the government to proceed expeditiously with its investigation, but declined the defense offer to receive the facts surrounding the confinement from the government *ex parte*.[4]

### *Basciano Commences Exhausting His Administrative Remedies.*

10.        On August 4, 2006, defense counsel contacted a representative of the Bureau of Prisons, and was informed that while Basciano's placement in the S.H.U. was not initiated by the facility, his only immediate remedy was to pursue the matter administratively. As a consequence, Mr. Basciano filed the "Informal Resolution Form - BP8" on which he stated that:

> [i]n court prosecutor Chan said I must go through my administrative remedies first.  I would like to know why I am in the S.H.U.  And I would ask to be put back in population.

(A copy of this form is annexed hereto as **Exhibit C**).

Shortly thereafter but prior to the conference conducted on August 11, 2006, Mr. Basciano spoke personally (*qua* "informally') with the warden and inquired as to when he would be restored to population.  The warden's response was "it was over [his] head".

11.        On August 7, 2006 the defense filed a letter/brief in advance of the conference scheduled for August 11, 2006 (a copy is annexed hereto as **Exhibit D**). The brief sought an order directing that Mr. Basciano be restored to population or, in the alternative, for a hearing to determine the propriety of the placement. Counsel also outlined the severe restrictions that already had been placed upon Mr. Basciano.  Except for the authorized visits with counsel, all contact with the outside world had been cut off.  His telephone privileges and already-restricted visits with family were terminated, and he did not have his legal papers. The defense's ability to prepare for the

upcoming trials and the death penalty litigation were being thwarted, and the effects upon Mr. Basciano both physically and emotionally were coming to bear.[5]

12.       On August 11, 2006, the parties again appeared before the court and the defense again asked that Mr. Basciano be restored to population, or that a hearing be immediately conducted to explore the propriety of the confinement.  The defense again outlined the hardships imposed upon the defendant, as well as counsel's growing inability to consult with Basciano on the twin issues of a trial defense and the mitigation submissions imminently due.

13.       At this time, the court indicated that the government had disclosed, *ex parte*, the nature and status of the investigation.  It related that the proffer contained allegations which were serious enough to warrant continued confinement in the S.H.U. pending the outcome of the investigation. The court therefore sustained all the restrictive conditions, including the prohibition against Mr. Basciano meeting with his investigators, (the absence of any allegation of wrongdoing by the investigators notwithstanding), as well as the denial of all non-legal visits and telephone privileges. Again, the defense was not provided with any details whatsoever as to the reason for the restrictive confinement. The court again advised the government to move with alacrity and scheduled another conference for August 28, 2006.

14.       On August 17, 2006, Basciano received a formal response to the "BP8" form he had timely filed. (A copy is annexed hereto as **Exhibit E**). In that required response, Unit Manager Joyce. Moore set forth that "[a]ccording to correctional services, it is because of security concerns [sic], you are housed in the Special Housing Unit."

15.       Basciano then took the next step required of him by the Bureau of Prisons' internal regulations. He filed a Request for Administrative Remedy - BP9 (a copy is annexed hereto as **Exhibit F**). On August 27, 2006, Basciano received a document entitled "Rejection Notice -

Law Office of James Kousouros

Administrative Remedy." (A copy is annexed hereto as **Exhibit G**). Although Basciano had indeed filed the "Informal Resolution Form" and had received a response from Unit Manager Moore, the Administrative Remedy Coordinator rejected Basciano's request because:

> you did not attempt informal resolution prior to submission of administrative remedy, or you did not provide the necessary evidence of your attempt at informal resolution.

Strangely, this rejection was endorsed as received by Joyce Moore, the same Unit Manager who had processed and responded to Basciano's initial BP8. In essence then, Moore endorsed a rejection on a grounds she knew to be false.

### The Government Discloses "The Plot"

16.        On August 28, 2006 the parties appeared for the follow-up conference before the court. (A copy of the transcript of this hearing is annexed hereto as **Exhibit H**). On this occasion, the government informed the court that the investigation was still continuing, but offered to disclose to the defense some pertinent information. This limited disclosure was premised on an agreement by all defense counsel and Mr. Basciano that the contents would not be disclosed to anyone. After the required assurances were given, defense counsel were provided with a letter dated August 28, 2006 (a copy is annexed hereto as **Exhibit I**) in which the government informed the parties:

> [w]e have received information that, during the trial of United States v. Basciano, et al., Cr. No. 03-929 (NGG), the defendant Vincent Basciano provided to another inmate at the Metropolitan Correctional Center a handwritten note, a copy of which is enclosed, and indicated to the inmate, in sum and substance, that he (Basciano) sought the murder of the listed individuals.

Attached to the letter was the "hit list," along with forensic handwriting reports concluding that Mr. Basciano had, in fact, authored the list.  After reviewing the letter, which was sealed, counsel

Law Office of James Kousouros

proffered, in a sealed proceeding, an explanation of the genesis of the list, and provided the government with details by which corroboration could be sought.

17.      As was adduced in a series of factual proffers to the government, the "list" was cultivated at the behest of a fellow inmate, who had advertised to Mr. Basciano that his mother was some sort of priestess who would be able to lift a spell which had been cast upon Mr. Basciano.  The "plot" list was preceded by a separate list which included well over a dozen names of many individuals associated with the case, including defense attorneys.

18.      In further support of these assertions, the defense made Angela Basciano available to the government to be interviewed. Ms. Basciano confirmed that she had spoken to her husband about the nature and genesis of the list, and that in fact she went to a location believed to be the apartment of the inmate's mother to meet with her. Ms. Basciano also related that before engaging in this conduct she spoke to her own Catholic priest to be sure that she was not engaging in any conduct condemned by her church. Ms. Basciano also provided the priest's name and parish during this interview. Parenthetically, it is incontrovertibly clear that the government, having surveilled countless conversations between Basciano and his wife over the past two years, is well aware that he has asked her to consult with fortune tellers and mystics concerning his future and the cases for which he is imprisoned.  The government's meeting with Ms. Basciano was conducted immediately **after** the sealed proceeding. This then, was **prior** to her awareness of the government's revelation of the list, its insidious interpretation, and the explanation tendered to the court by the defense.

19.      In the weeks that followed the August 28 hearing, the defense made every good-faith effort to dispel the criminal connotations ascribed to this document. The government was provided with an address for the inmate's mother as given to Ms. Basciano.  In addition, upon his return to the M.C.C. on August 28, 2006, Basciano himself insisted that C.O. Maddis accompany him to his

Law Office of James Kousouros

cell to recover the other primary list.  Officer Maddis refused to take physical custody of the list, but copied it word for word in his own hand.  This was, upon information and belief, subsequently provided to the government by the M.C.C.  This list, along with the many inscribed names,  begins with a spell like pre-amble.[6]  The government was also provided with the name of a case manager – Ms. Chancioso – who was also aware of the list and its meaning.  We understand that the F.B.I. interviewed both Maddis and Chancioso, and they have confirmed the explanation tendered by the defense.

20.        In addition, the officials from the Special Investigations Section [SIS] at the M.C.C. sent a Lieutenant Johnson to question Mr. Basciano about the "list," sometime before September 19, 2006.  Basciano communicated to the lieutenant that the inmate with whom he had discussed the lifting of the spell was Reginald White. Lieutenant  Johnson later informed Basciano that he had, in fact, interviewed Reginald White, and had confirmed Basciano's account of the nature and genesis of the list.  It appears that at the time of Johnson's interview of White, the government had not yet debriefed this inmate, despite having long been aware of his identity.   We believe that the government did speak with the lieutenant, who related the details of his investigation.

*The Imposition of the S.A.M.'s*

21.        In the weeks that followed the August 28 proceeding, the defense had been fully cooperating with the government in order to defuse this otherwise potentially explosive  situation. As we have stated, Basciano and defense counsel had been providing corroborative information to the government over the period of 3 weeks. Given the reports of the interviews and the review of

Law Office of James Kousouros

documents, we believed that the innocent (if bizarre) origin and purpose of the list had been conclusively established. We were also comforted by the sealing of the proceedings, given the dire prejudice inherent in the government's initial interpretation.   The defense believed that potential public (i.e. potential juror) knowledge of these allegations would be diffused by a significant evidentiary showing of the true nature of the list.   However, it now appears that the government turned a selectively deaf ear to these factual developments, and instead adhered to the notion of a hit list, apparently conceived and abandoned in the same instant.

22.        On September 19, 2006, the government, without notice to the defense, unsealed the letter of August 28, 2006 and the accompanying exhibits.[7] Then, although there had been no legal, administrative or forensic determination that Mr. Basciano actually intended harm to befall anyone, the government applied for and received authorization from the Attorney General to impose Special Administrative Measures upon Basciano.[8] At a conference on September 21, 2006 in which the defense sought to discuss the publication of the August 28, 2006 letter, the government informed counsel of the authorization for the S.A.M.'s and provided copies of the memorandum from the Attorney General (a copy is annexed hereto as **Exhibit J**). In addition, in what was a harbinger of the onerous incursions on Basciano's right to counsel, all defense attorneys were compelled to sign affirmations acknowledging and promising compliance with the restrictions.[9]


*The Effect of the S.A.M.'s*

23.        Immediately upon receipt of the authorization, the M.C.C. transferred Basciano to 10 South, the most restrictive unit in the facility. The room wherein Basciano is lodged is both illuminated and surveilled twenty-fours a day. Basciano is not permitted a radio, nor is he allowed magazines, newspapers or any other type of periodicals. For the first several weeks of this stage of

Law Office of James Kousouros

his confinement, he was not permitted to have any writing material of any kind, nor until recently to have, of all things, a dictionary.[10]

24.	Basciano is constrained to sleep on a steel bed covered only by a sheet but with no pillow. There are no windows in his cell, he has no recreation time nor any contact with other inmates; all activity is done in solitary. Despite provisions in the S.A.M.'s for visits by authorized persons, the M.C.C. has thus blocked any and all visits by non-lawyers. As a result since his extraction in September, Basciano has not been able to see any one or more of his family members.

25.	His legal visits are non-contact, in a cubicle on 10 south, separated by a screen. He and counsel cannot visually review documents, motions, reports, briefs or exchange materials.  Any review of documents must be conducted through the screen. Counsel cannot leave documents with Mr. Basciano for his review.  All documents must be left downstairs and the "inspection" process can take weeks.  While he is permitted to personally review legal documents, this is limited to one or two boxes at a time, with a turnaround time of 7-10 days between removing one box and bringing another into the cell.

26.	The effect on our ability to have significant exchanges has been monumental. Any genuine communication regarding issues such as recusal, trial defense strategy and death penalty mitigation has been impeded by the conditions attendant to the legal visits. The prohibition against jointly visually reviewing documents is fundamentally counter-intuitive to effective attorney-client communication.

27.	Any such logistical impediments are exacerbated by the emotional and psychological toll that this utter isolation has had on Basciano. At times he appears depressed and withdrawn; on other occasions hyperactive and agitated. His perspective of what is happening to him, and his sense of the

Law Office of James Kousouros

true context of the criminal cases against him, are becoming increasingly difficult to fathom or predict.

### The Recusal Motion

28.        The defense was convinced in August, 2006, and remains convinced today, of the innocent nature and origin of the "list." Nevertheless, the government's placement of Basciano in S.A.M. confinement was a disquieting alarum, which lent an aura of legitimacy to their view of the list. We considered that perhaps the government investigation had uncovered evidence of which we were unaware, some proof which impelled them to impose such harsh restrictions fully three months after the discovery of the "murder list."[11] Certainly, to have disregarded the panoply of proof that the list was as Basciano described, the government must have been in possession of substantial and credible evidence, probably of the on-going nature of the threat. And once it became clear that the court had been the recipient of ex parte disclosures, undoubtedly of this compelling evidence, our concerns for the seeming impartiality of the process began to swell.

29.        As a consequence, after considerable deliberation, in October 11, 2006 and October 31, 2006 respectively we brought motions to recuse the district court pursuant to **28 U.S.C.A. §455(a)** and to disqualify A.U.S.A. Greg Andres. While Basciano was consulted to the degree possible, the decision was made chiefly after extensive discussion among the attorneys. Nevertheless, in their response, the government accused the defense of bringing the motion as a "pretextual" maneuver, giving a formal voice to "Basciano's tactical desire to obtain a different judge . . .". (***See, Government Memorandum in Opposition, p. 1***).  This assertion was made notwithstanding the

Law Office of James Kousouros

absence of <u>any</u> evidence that the list was <u>ever</u> intended to be made public and the fact that immediately upon being informed of the list, the defense made every effort to convince the court and the government of the innocent nature of its origin.

30.        In their responsive submissions, the government provided, for the first time, the following details concerning the list beyond the August 28 disclosure. In one summary breath, they asserted:

> Moreover, the investigation to date of the List, **summarized below**, has revealed that the List apparently did not mature into a concrete murder plot, but was **limited to a single discussion with another inmate**, who took no action on the List.

Government Memorandum in Opposition, p.2 (emphasis added)

An attentive reader might then scan the submission for the referenced "investigation . . . of the List.," and would find the following:

> **On June 30, 2006**, the government learned from an inmate at the M.C.C. that Basciano gave the inmate a piece of paper on which Basciano had written the names of the presiding judge, the lead prosecutor and three cooperating witnesses who testified in Basciano's Spring 2006 trial. (See Ex. A). The inmate advised that Basciano gave the inmate the List toward the end of the trial. In that same meeting, Basciano told the inmate that Basciano sought the murder of the listed individuals. **Basciano did not raise the issue again, and the inmate took no action in response to Basciano's statement**.

Government Memorandum in Opposition, p.2 (emphasis added)

A clear reading of this carefully worded, if sparse, paragraph would suggest that the government learned all it needed or wanted to know on June 30, 2006 and that this information alone was, in the government's view, sufficient to justify the restrictive confinement imposed.  Certainly an otherwise uninformed reader might wonder whether there were other components to the investigation, particularly since the S.A.M.'s were not sought or granted until three months after the informant came forward. In the weeks and months after the initial revelation of June 30, we submit that at least

Law Office of James Kousouros

some of the evidence uncovered by the government pointed away from the account provided by the informant, and was far more consistent with the innocent and innocuous origin of the list presented by the defense.  The government's failure to even reference these aspects of the "investigation" at any time bespeak their use of what has become a clearly questionable predicate  by which to isolate Basciano.

31.      In essence then, the government has asserted that the plot, in its inception, was genuine, but was almost immediately abandoned, and was not pursued past the initial encounter between Basciano and the inmate in April 2006. Yet the government asserted in it's submission of October 31, 2006 that "its [the plot's] viability has been even further diminished by discovery and exposure of the List and *imposition of Special Administrative Measures ("S.A.M.'s") on Basciano*." (*Government Opposition Memorandum, p.2 (emphasis added)*). Even crediting the government's dubious theory of this "plot," how can it be rationally asserted that the imposition of the S.A.M.'s in September has impacted on a plan hatched and abandoned in April? There is simply no evidence that any of the "animus" that Basciano felt towards the listed persons has been actuated in any fashion since the moment he allegedly handed that note to the informant.

32.      The court's decision on the recusal motion, (2006 U.S. Dist. LEXIS 86533), adopted the government's view of a pretext, however, the court ventured to a conclusion that even the government declined to espouse. Whereas the government's submission embraced the murder plot as genuine, however brief, the court instead concluded that "it appears that *one of Basciano's objectives in writing the May 2006 list* and filing this motion *is to 'engineer' this court's recusal*, much as he facilitated changes in his representation." **Id.** at *4 **(emphasis added).** As such, the court denied the motion for recusal.  It would appear then that attempting to "engineer" a recusal by the use of a fabricated "hit list" would not warrant the imposition of the S.A.M.'s

Law Office of James Kousouros

restrictions as implicit in the court's finding is the absence of any real danger to those enumerated on the list.

### The Defense Investigation

33.         Given the government's strangely tenacious adherence to their theory of the nature of the list, in the face of both logic and countervailing evidence, the defense embarked on its own investigative sojourn. It has led to a sensible but deeply troubling window, through which arise questions concerning the propriety of having imposed these most onerous and debilitating conditions of confinement.

34.         As set forth, **supra**, upon being informed on August 28, 2006 of the list and attendant information disclosed by the government, the defense was immediately forthcoming with its explanation of the list.  In the ensuing weeks, the defense made witnesses available and provided corroborating information as it became known.  Then, in the past month, in an entirely unforeseen development, the defense was made aware of at least two individuals who were personally privy to the circumstances surrounding the use of a list by an inmate informant(s) to ingratiate himself (or themselves) with the government.  In short, according to these individuals,  Basciano has been falsely and maliciously accused of creating this list to facilitate the murder of the enumerated individuals.  The following has been culled by the investigation conducted.

35.         After Basciano was placed on 11 South of the M.C.C., he met several individuals with whom he socialized and played cards. Several of these inmates believed in, practiced, or had relatives who practiced various forms of "magic" or fortune telling.  Basciano, who believed in such practices, was often observed speaking to any number of these inmates discussing fortune telling and "readings" and spells he was told had been placed upon him.  One of these inmates, as the defense

Law Office of James Kousouros

has proffered, was Reginald White, who offered to have his mother lift a spell placed upon Basciano.

36.        Basciano was also befriended by inmates Carlos Reyes, Danny Reyes and Anderson Pena. Carlos Reyes ran a poker game for select inmates; he was paid with commissary and other items from those who lost at his table.   One of these inmates who frequented the poker game advertised that he too had a relative who, if provided with a list of individuals involved in the case, could lift a spell from Basciano.

37.        Daniel Reyes has reported that Carlos Reyes and another inmate named Anderson Pena planned to set up Basciano and another inmate, Peter Lioumis. In an effort to curry favor with the government, they planned to falsely report that Basicano and Lioumis were paying them out of commissary monies to have those people referenced on the list murdered.[12]  Danny Reyes maintains that Carlos Reyes and Pena together invented the story and he refused to support them because the allegation was false.  Based upon this information, it is our belief that the June 30, 2006 government informant is either Carlos Reyes or Anderson Pena or both.

38.        On or about November 2, 2006, according to Danny Reyes, after the imposition of sentence on his own matter, he was brought to a room by the marshals, where he met with two prosecutors and two FBI agents. One of the prosecutors began to discuss the possibility of cooperating with the government in its case against Basciano and Lioumis in exchange for sentence consideration. According to Reyes, he refused to cooperate or disclose letters sent to him by Carlos Reyes and the meeting was terminated.

39.        If in fact Danny Reyes did meet with prosecutors and related the above information to them, we submit that the information provided to the government was at least as credible as the delayed disclosure by the June 30 informant, and certainly called into question the integrity of that

Law Office of James Kousouros

initial revelation. Yet no submission by the government has disclosed Mr. Reyes' identity or the information he possessed disputing the legitimacy of the "murder plot" or any non-incriminating information concerning this allegation for that matter.  Putting aside for the moment the technical requirements attendant to **Brady** material, there are fundamental issues of fairness which arise from the continued restrictive confinement of this defendant in the face of what may well be a fabricated predicate therefor.  We submit that due process mandates intensive fact finding, during which the propriety of this overly restrictive confinement is openly decided by the court; not unilaterally or behind a veil of secrecy by the government.

### *Basciano's Final Exhaustion Of His Administrative Remedies*

40.        As previously set forth, prior to his extraction from 9 South, Basciano had timely and properly filed his BP8 and BP9 forms. In October 2006, Basciano received a letter from the Warden of the M.C.C., Marvin D. Morrison, setting forth that Basciano was being detained in:

> . . . a non-punitive status for which restricted conditions of confinement are required to ensure the safety of inmates or others, the protection of property, or the security and orderly running of the institution. Specifically you are being held in S.H.U. pending the outside investigation of a possible criminal act.  Your housing status continues to be reviewed.

(A copy of this letter is annexed hereto as **Exhibit K**)

Thereafter Basciano filed his BP10, which was the Regional Administrative Remedy Appeal. (A copy is annexed hereto as **Exhibit L**). On or about November 7, 2006, the Regional Director denied the appeal, stating that ". . . you did not raise specific concerns regarding conditions of your S.H.U. placement (i.e., visiting, phone calls, recreation, attorney visits)" (A copy of this response is annexed hereto as **Exhibit M**).[13]

Law Office of James Kousouros

41.      In November 2006, Basciano filed his final appeal, via a BP11, to the General Counsel for the Bureau of Prisons in Washington. His appeal was denied.

42.      No other petition, writ or motion has been made or is pending in state or federal court seeking the relief requested herein.

WHEREFORE, Mr. Basciano prays that this Court:

A.      Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint;

B.      Grant him an evidentiary hearing at which the propriety of the restrictive confinement imposed can be litigated, and allow him a reasonable period of time subsequent to any hearing this court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing;

C.      Grant such other relief as law and justice require.

Yours, etc.

JAMES KOUSOUROS, ESQ.
YING STAFFORD
STEPHANIE CARVLIN
EFRAIM SAVITT
*Attorneys for Petitioner Vincent Basciano*
*80-02 Kew Gardens Road*
*Suite 1030*
*Kew Gardens, New York 11415*
*718-575-5450*

Law Office of James Kousouros

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

VINCENT BASCIANO,

                              Petitioner,


        - against -                                          03-929 (NGG)
                                                             05-0060 (NGG)


JERRY MARTINEZ, Warden,
Metropolitan Correction Center,

                              Defendant.
-------------------------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF VINCENT BASCIANO'S MOTION PURSUANT TO 28 U.S.C. §2241 AND THE BAIL REFORM ACT, 18 U.S.C. §3142 FOR AN ORDER DIRECTING THE GOVERNMENT AND THE BUREAU OF PRISONS TO RELEASE HIM FROM SPECIAL ADMINISTRATIVE MEASURES OF <u>CONFINEMENT</u>

Vincent Basciano, by and through his attorneys, respectfully submits this Memorandum of Law in Support of his Writ seeking an order, pursuant to **28 U.S.C. §2241** and the *Bail Reform Act*, **18 U.S.C. §3142** directing the government and the Bureau of Prisons to release him from the Special Administrative Measures of Confinement at the Metropolitan Correctional Center.

1.        **JURISDICTION  - 28 U.S.C. §2241**[14]

This application is cognizable as a habeas corpus petition under **28 U.S.C. §2241** because Mr. Basciano avers that the successive confinement in the S.H.U. and imposition of

Law Office of James Kousouros

S.A.M.'s "violat[es] ... the Constitution" (**28 U.S.C. §2241(c)(3)**).  This restrictive confinement has violated a protected liberty interest without the semblance of due process of law. In addition, he separately claims that such confinement violates the Fifth Amendment proscription against the imposition of  "punish[ment] prior to an adjudication of guilt" **Bell v. Wolfish**, 441 U.S. 520, 535-36, 99 S. Ct. 1861 (1979), *See also*, **Zadvvdas v. Davis**, 533 U.S. 678, 699 (2001).

The remedies implicit in habeas corpus lie when a pre-trial detainee is put under additional and unconstitutional restraints during his lawful custody. Thus, a **§2241** petition is the appropriate remedy for a prisoner seeking transfer from administrative detention to general population. **Preiser v. Rodriguez**, 411 U.S. 475, 499, 93 S. Ct. 1827, 1841 (1973); **Boudin v. Thomas**, 732 F.2d 1107 (2d Cir. 1983); **United States v. Basciano**. 369 F. Supp. 2d 344 (E.D.N.Y 2005);  **United States v. Felipe**, 1996 WL 409181 (S.D.N.Y.); **Giano v. Sullivan**, 709 F. Supp. 1209 1212 (S.D.N.Y. 1989); **Epps v. Cuomo**, 1988 WL 151703 at 2 (W.D.N.Y. 1988).


A.      THE EXISTENCE OF A PROTECTED LIBERTY INTEREST

While generally, restrictive confinement imposed for administrative [*qua* non-punitive] reasons does not implicate a liberty interest, the government, by enacting certain statutory or regulatory measures, may create such an interest  in remaining in the general prison population. **Hewitt v. Helms**, 459 U.S. 460, 468-72, 103 S. Ct. 864 (1983); **Russell v. Coughlin**, 910 F.2d 75, 77 (2d Cir. 1990); **Sher v. Coughlin**, 739 F.2d 77, 81 (2d Cir. 1984). It was the unquestioned law of the Second Circuit that where a statutory scheme detailed a substantive predicate for the imposition of some restrictive confinement, it engenders a liberty interest to which constitutional due process attaches. As the court observed in **Russell v. Coughlin**:

> To create a constitutionally protected liberty interest, a state regulation
> must employ "language of an unmistakably mandatory character, requiring

Law Office of James Kousouros

> that certain procedures 'shall,' 'will,' or 'must' be employed . . . and that [restrictive confinement] will not occur absent specified substantive predicates. . . ." *[citations omitted]*

910 F.2d at 77.

There has been some question as to the continued vitality of this analysis in the wake of the Court's decision in **Sandin v. Conner**, 515 U.S. 472, 115 S. Ct. 2293 (1995).

Therein, the Court held that a prisoner's liberty interests:

> will be generally limited to freedom from restraint which, while not exceeding the ***sentence*** in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, see, *e. g., Vitek, 445 U.S. at 493* (transfer to mental hospital), and *Washington, 494 U.S. at 221-22* (involuntary administration of psychotropic drugs), ***nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.***

515 U.S. at 481 (emphasis added)[15]

As a consequence of **Sandin**, the Second Circuit hybridized its own previous standard with the Court's new substantive definition. As such, a prisoner will have a protected liberty interest "only if the deprivation . . . is atypical and significant and the [government] has created the liberty interest by statute or regulation." **Tellier v. Fields**, 280 F.3d 69, 80 (2d Cir. 2000); **Sealey v. Giltner**, 116 F.3d 47, 51 (2d Cir. 1997).

### 1)   *28 C.F.R. §541.22 - Administrative Detention*

It was through this newly-bifurcated lens that the Second Circuit scrutinized the provisions and application of **28 C.F.R. §541.22**, the "administrative detention" statute.[17] In **Miller v. Selsky**, 111 F.3d 7 (1997), the court embraced the notion that, as a general proposition, administrative detention could well deprive an inmate of a liberty interest. 111 F.3d at 8. Moreover, the court acknowledged the need for individualized and "extensive fact-finding" to assess the

Law Office of James Kousouros

degree to which administrative detention imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." **Id.**

In **Tellier v. Fields**, *supra*, the court considered a §1983 claim by a federal prisoner who had been detained under the auspices of **28 C.F.R. §541.22**, the same regulation by which Basciano was removed from the general prison population. The court expressly rejected the argument that **Sandin** precluded the evocation of a protected liberty interest in the removal of an inmate to administrative detention. Indeed, after applying the **Hewitt-Sandin** analysis, the court unequivocally concluded that the provisions of §541.22 created a cognizable liberty interest. The rationale espoused is particularly instructive:

> Under **Hewitt**, courts considering the existence of an alleged liberty interest must ascertain whether "statutes or regulations require, in 'language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates." [citations omitted] We find that Section 541.22 *contains such mandatory language* and therefore creates a protectable liberty interest in not being confined.

> In reviewing the text of **Section 541.22**, we find its text replete with words such as "shall," "unless," and "only." Although the mere use of these words is neither dispositive nor talismanic, it supports plaintiff's argument that the Bureau of Prisons *intended to guide the decision making power of prison officials* by requiring that *certain prerequisites be met and certain procedures be followed whenever a prisoner was subject to segregated housing*.

280 F.3d at 80 (emphasis added)

Thus, it is clear that the removal and retention of Mr. Basciano to the S.H.U. potentially impacts on a recognized liberty interest, sufficient to warrant exercise of the court's subject-matter jurisdiction. In addition, the clear import of the law in the Second Circuit is that the court must conduct a fact-finding hearing to determine the duration, nature and conditions of Basciano's present confinement. **Palmer v. Richards**, 364 F.3d 60, 64 (2d Cr. 2004).

Law Office of James Kousouros

### *2)  28 §C.F.R. 501.3 - The Imposition of Special Administrative Measures*

If the Second Circuit's scrutiny of the impact and language of §541.22 yielded an accession of a protectable interest, it is axiomatic that the provisions of §501.3[18] warrant the same status. The extensive incursion on a detainee's rights is predicated upon some showing that "there is a substantial risk that . . .  communications or contacts . . .  could result in death or serious bodily injury to persons . . . "   In its genesis and utility as a device for detaining potential terrorists,[19] as well as its allowance for isolation, denial of privileges and interception of attorney-client conversations, it surely meets the "atypical and significant" prong of the **Tellier** standard.[20]   In addition, the language of the statute is replete with the mandatory and directive terms the court found so compelling in §541.22 (see endnote 15, infra). To the extent that a liberty interest is marked by statutory language mandating that "***certain prerequisites be met and certain procedures be followed,"*** the provisions of §501.3 clearly exceed any such articulable threshold.


The degree to which Basciano's isolated status is "atypical" inheres in the unnatural setting of segregated confinement. In **McClary v. Kelly**, 4 F. Supp. 2d 195 (W.D.N.Y. 1998), the district court reviewed the claims of an inmate held in the Attica S.H.U., wherein conditions were more restrictive than those imposed on Basciano.

The court conducted an evidentiary hearing, where it considered expert testimony of the "toxic" effects of prolonged confinement in restrictive environments. There was evidence adduced that "symptoms include anxiety disorders, paranoia, perceptual disorders, difficulties in thinking, concentration and memory." **Id.** at 206. One of the experts testified that:

Law Office of James Kousouros

> the primary toxic affect of S.H.U. confinement is "the inability to maintain an adequate state of alertness because of an ***inadequate amount*** of ***external environmental stimulation***" [citation omitted]
>
> ". . . as a person loses their capacity to maintain a normal state of alertness and they head towards that stupor, delirium kind of state, they become ***unable to have a normal attentional process***. This results in either obsessional thinking or the kind of fugue, fog, cloud, disassociative sort of state, and both things can happen." [citations omitted]

**Id.** (Emphasis added)

While contrary psychological evidence was adduced at the hearing, the court observed that the differences in the opinions were "really tangential to the liberty interest issue before this court." The court noted that even when the smoke of disputed testimony cleared, it was certain that:

> (1) psychological stressors typically present in a maximum security prison are "more intense" in S.H.U., [citation omitted]; (2) the more restrictions and isolation you impose on an inmate the more psychologically stressful his environment becomes [citation omitted] and (3) the longer an inmate spends in S.H.U., the more likely it is that the inmate will have "difficulty dealing with it".{citation omitted]

**Id.**

The court concluded by observing that for legal analytical purposes, an "atypical hardship is established if the risk of psychological harm is increased by placing an inmate in S.H.U. for prolonged periods." **Id**.

In **Madrid v. Gomez**, 889 F. Supp. 1146 (N.D. Ca. 1995); the court drew similar conclusions regarding the impact of segregated confinement:

> Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances. These include perceptual distortions, hallucinations, hyperresponsivity to external stimuli, aggressive fantasies, overt paranoia, inability to concentrate, and problems with impulse control.

889 F. Supp at 1230.

Law Office of James Kousouros

The conditions under which Basciano is constrained to exist, communicate with counsel and consider the nuances of his legal defense, are far more onerous than those in **McClary** and **Madrid**. Therefore, we urge this court to the same considered conclusion as reached in **McClary**,; to wit, . " . . . that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science." **Id**. at 208.  ***Accord generally***,  **Davenport v. DeRobertis**, 844 F.2d 1310, 1316 (7th Cir. 1988),  **United States v. Ayala-Lopez**, 327 F. Supp. 2d 138, 144 (D. P.R., 2004); **Koch v. Lewis**, 216 F. Supp. 2d 994 , 1001 (D. Ariz. 2001) **Giano v. Kelly**, 2000 U.S. Dist. LEXIS 9138 *21-22 (W.D.N.Y. 2000); **Morris v. Travisono**, 549 F. Supp. 291, 295 (D. R.I. 1982) aff'd, 707 F.2d 28 (1st Cir. 1983): **Ruiz v. Estelle**, 503 F. Supp. 1265, 1360 (S.D. Tex. 1980); **Kelly v. Brewer**, 378 F. Supp. 447, 451 (S.D. Iowa 1974): **Landman v. Royster**, 354 F. Supp. 1302, 1307 (E.D. Va. 1973). Clearly, Basciano's placement in S.A.M.'s implicates a protected liberty interest and continued confinement without due process cannot pass constitutional muster.

### B.        THE VIOLATION OF DUE PROCESS

The constitutional due process attendant to a protected liberty interest provides inmates with two types of safeguards.[21] The first category consists of procedural protections. Generally, an inmate designated for placement in segregated confinement must receive adequate notice, an opportunity to be heard, and periodic review. ***See*** **Wolff v. McDonnell**, 418 U.S. 539, 563-70, 94 S. Ct. 2963 (1974). These protections have been statutorily embodied in the provisions of **28 C.F.R. §541.22(c)**.

We readily acknowledge that the initial decision to place a detainee in administrative detention is wholly discretionary, and there is no constitutional predicate for that decision.

Law Office of James Kousouros

However, that unfettered discretion is neither boundless nor continuing. **Tellier**, 280 F.3d at 82. The due process provisions of **§541.22(c)** which require personal interviews, written reports, and psychiatric or psychological assessments, are designed to ensure that a prisoner is kept in the S.H.U. for no longer than is necessary. Thus, prisoners may not be removed from general population and placed in administrative detention indefinitely for the purposes of "monitoring" pending the outcome of an SIS Investigation of indeterminate duration or some other unspecified review. **Tellier**, 280 F.3d at 81. *See also* **Russell v. Coughlin**, 910 F.2d 75, 79 (2d Cir. 1990); **Wright v. Smith**, 21 F.3d 496, 500 (2d Cir. 1994).  In this regard **§ 541.22(c)** specifically provides:

> Except as otherwise provided in paragraphs (c)(2) and (c)(3) of this section, the Segregation Review Official will review the status of inmates housed in administrative detention. The SRO shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a ***hearing*** and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and ***shall hold a hearing and review these cases formally at least every 30 days***. ***The inmate appears before the SRO at the hearing unless the inmate waives the right to appear.***

(Emphasis added)

Suffice it to say, Basciano has never been afforded a "hearing" of ***any***  type since his extraction from general population and continued placement in the S.H.U.  Nor has there been any type of "hearing" relative to the September 21 imposition of the S.A.M.'s restrictions, although the Bureau of Prisons administrative procedures are included by reference in **§501.3(e)**.[22]

The second category of due process safeguards consists of evidentiary protections. Prison officials cannot deprive an inmate of a constitutionally-protected liberty interest absent a sufficient evidentiary basis. The Supreme Court has held that, at the very least, there must be "some evidence in the record" supporting the decision to segregate an inmate. **Superintendent v. Hill**, 472 U.S. 445, 454, 105 S. Ct. 2768 (1985). In addition, the evidence relied upon must have

Law Office of James Kousouros

"some indicia of reliability." **Williams v. Fountain**, 77 F.3d 372, 375 (11th Cir. 1996); **Hensley v. Wilson**, 850 F.2d 269, 276 (6th Cir. 1988) **Brown v. Smith**, 828 F.2d 1493, 1495 (10th Cir. 1987); **Cato v. Rushen**, 824 F.2d 703, 705 (9th Cir. 1987); **Padilla v. Rumsfeld**, 243 F. Supp.2d 42, 56 (S.D.N.Y. 2003).  These evidentiary protections operate "to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens." **Hill**, 472 U.S. at 455.  Aside from the sparse statements offered by the government since July, 2006, there has been no evidence adduced on the record to support the restrictive confinement in issue.  Indeed, as set forth, *supra*, there has been ample evidence in contradiction to the statements tendered by the government to rebut the basis offered for the confinement. It appears then the Basciano is indeed in restrictive confinement while this indefinite investigation continues clearly in violation of his rights to Due Process of Law.


## C.       THE PROHIBITION AGAINST PUNITIVE CONFINEMENT

As we have previously noted, it is well-settled that so long as pretrial detention is administrative rather than punitive, or does not impact on a protected liberty interest, it is constitutional. **United States v. Salerno**, 481 U.S. 739, 746-51, 107 S. Ct. 2095 (1987); **Bell v. Wolfish**, 441 U.S. 520, 535-40, 99 S. Ct. 1861 (1979). Whether a particular instance of detention is punitive rather than regulatory generally revolves around "whether an alternative purpose to which [the detention] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose." **Wolfish**, 441 U.S. at 538.

In **Turner v. Safley**, 482 U.S. 78, 87, 107 S. Ct. 2254 (1987), the Court delineated the standard of review that governs detainee's constitutional claims. In determining whether a prison regulation "burdens fundamental rights," the court must ask whether the regulation is "'reasonably

Law Office of James Kousouros

related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns." **Id.** The Court promulgated a four-prong test for evaluating whether a prison regulation that allegedly violates a constitutional right is reasonably related to a valid correctional objective. In the first instance, the court must consider  whether there is a "valid, rational connection" between the regulation and the legitimate governmental interest used to justify it. In addition, the court must determine whether there are alternative means for the prisoner to exercise the rights at issue, and the nature of the impact that any accommodation will have on guards, other inmates, and prison resources. Finally, the court must assess the absence of "ready alternatives" to the challenged conditions of confinement. **Id**. at 89-91; **United States v. El-Hage**, 213 F.3d 74, 80 (2d Cir. 2000; **United States v. Felipe**, 148 F.3d 101, 110 (2d Cir. 1998).

　　　　　With regard to the first criterion, a court must decide whether the disability is imposed for the purpose of punishment or whether it is incidental to some other legitimate governmental purpose. In the absence of a showing of an express intent to punish on the part of the government, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." **Bell v. Wolfish**, 421 U.S. at 538. Therefore, if a particular set of conditions or restrictions of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."  **Id**. Conversely, if the confinement is not rationally related to a legitimate goal -- if it is arbitrary or purposeless -- an inference may be drawn that the purpose of the governmental action is the type of punishment that may not constitutionally be inflicted upon detainees. **Id**.  "[Judges] must be mindful that these requirements spring from constitutional requirements and that judicial answers to them must reflect that fact". **Id**.  Moreover, where, as here, the regulation at issue imposes

Law Office of James Kousouros

pretrial restrictions on liberty, the "legitimate penological interests" served must go beyond the traditional objectives of rehabilitation or punishment. **United States v. El-Hage**, 213 F.3d at 81; *See also* **McGinnis v. Royster**, 410 U.S. 263, 273, 93 S. Ct. 1055 (1973)

Although it has never been expressly confirmed, it is clear that the only cognizable rationale for Basciano's present confinement is the "murder plot" allegation. His removal from the general population, and the imposition of the S.A.M.'s, loosely coincide with the timing of the revelations of the "hit list."  As such, there must be "a valid rational connection" between the present conditions of confinement, and the government theory of his involvement in this ostensible plot.  We submit that the validity of the connection between the imposition of S.H.U./S.A.M.'s and the alleged wrongdoing can only be predicated upon a finding that the evidence is credible and reliable. As we have previously set forth,  the proof of the nefarious aspect of "the list" has been seriously called into question, and cannot withstand reasoned judicial scrutiny.  At an absolute minimum, however, judicial scrutiny must be conducted in this matter.

In addition, even assuming that the government is correct in its view of events, they have not alleged that the "plot" was more than a passing thought, was ever re-visited or pursued past that solitary exchange. Basciano remained in the general population for months after his supposed meeting with the informant, without any intimation that he presented a continuing risk of harm or violence to anyone. There is no evidence that the government informed the court of this alleged threat prior to the late July, 2006 *ex parte* disclosure or that the government instituted any protective measures upon receiving the information from the informant on June 30, 2006. Indeed Basciano was not extricated from general population until July 28, 2006. The nexus between that isolated and unfulfilled "threat," and the restrictive confinement imposed five months later is thus neither rational nor purposeful.[23]  At an absolute minimum, the time has

Law Office of James Kousouros

certainly come for the government to be required, at an evidentiary hearing, to produce sufficient credible evidence in support of the restrictive confinement summarily imposed in this matter.

## II.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

It is, of course, a long-standing general principle that a claimant must exhaust his available administrative remedies before seeking redress from the courts.  Yet this is hardly a rigid and inflexible rule, but is instead grounded in principles of comity and equity. While exhaustion is a common-sensical notion, "federal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them. **Colorado River Water Conservation Dist. v. United States**, 424 U.S. 800, 817-18, 96 S. Ct. 1236 (1976).

Although exhaustion of administrative remedies is absolutely required if explicitly mandated by Congress, courts have more latitude in dealing with exhaustion questions where, as here, Congress has remained silent, and exhaustion is judicially crafted. **Darby v. Cisneros**, 509 U.S. 137, 153-54, 113 S. Ct. 2539 (1993); **McCarthy v. Madigan**, 503 U.S. 140, 144, 112 S. Ct. 1081 (1992).   In such purlieus, the court of first instance possesses discretion to relax the exhaustion requirement. **Salus v. GTE Directories Serv. Corp.**, 104 F.3d 131, 138 (7th Cir. 1997).

The seminal decision articulating these principles in a prison conditions setting is **McCarthy v. Madigan**, 503 U.S. 140, 112 S. Ct. 1081 (1991). The Court explained that:

> [i]n determining whether exhaustion is required, federal courts must balance the ***interest of the individual in retaining prompt access*** to a federal judicial forum against countervailing institutional interests favoring exhaustion. "Administrative remedies ***need not be pursued*** if the litigant's interests in immediate judicial review ***outweigh the government's interests*** in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." [citations omitted]

Law Office of James Kousouros

503 U.S. at 145 (emphasis added)

The decision recognized a trio of circumstances which would justify bypassing exhaustion of administrative remedies.[24] Failure to exhaust would be excusable where "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action," **Id.** at 146-47, such as where there is "an unreasonable or indefinite time frame for administrative action," or where "A [party] may suffer irreparable harm if unable to secure immediate judicial consideration of his claim." **Id.**  Additionally, the court may excuse exhaustion if it appears that an administrative appeal would be futile, or because the appeals process is shown to be inadequate to prevent irreparable harm to the defendant.  **Howell v. Immigration and Naturalization Serv**., 72 F.3d 288, 291 (2d Cir. 1995); **Lyons v. United States Marshals**, 840 F.2d 202, 204 (3d Cir. 1988); **United States v. Basciano**, 369 F. Supp. 2d 344, 348 (S.D.N.Y 2005). ***See also* United States v. Nosair**, 1994 WL 469364 (S.D.N.Y.1994);  **United States v. Zampardi**, 1996 WL 409181 (S.D.N.Y.).

In addition, an exception may arise where there is doubt as to whether the agency is empowered to grant effective relief, because of "institutional incompetence to resolve the particular type of issue presented . . .," 503 U.S., at 147-48, or the agency "lack[s] authority to grant the type of relief requested." **Id.** Finally, a showing that the "the administrative body is . . . biased or has otherwise predetermined the issue," **Id.** will also relieve a claimant from the exhaustion requirement.

We submit that Basciano has fully exhausted his administrative remedies by submitting each and all of the forms required by **C.F.R. §540**. However, while we readily acknowledge that **§501.3(e)** incorporates the mandatory Administrative Remedy Program, we

Law Office of James Kousouros

submit that's its statutory inclusion is irrational, crafted for the express purpose of thwarting a S.A.M.'s detainee's right to judicial review.

The decision to impose S.A.M.'s rests solely and exclusively within the province of the Attorney General. ***See***, **C.F.R. §501.3(a)** and **U.S.A.M. §9-24.100** (". . . only the Attorney General is authorized to direct the BOP to implement the special administrative measures with respect to an inmate"). It is equally clear that the Bureau of Prisons is without discretion to *refuse* to impose any such measures directed by the Attorney General. The inexorable corollary is that S.A.M.'s restrictions may not be lifted or withdrawn unless at the direction of the same official.

In addition, the statue makes it abundantly clear that all logistical decisions pertaining to the S.A.M.'s are the non-delegable responsibility of the Director of the Bureau of Prisons. ***See***, **C.F.R. §501.3 (a)** and **(c)**.

Within this context, the administrative requirement to petition individuals who are without authority to take any remedial action is the ultimate exercise in futility. For example, the notion of a requisite attempt at informal resolution with an M.C.C. Unit Manager of S.A.M.'s imposed by John Ashcroft or Alberto Gonzalez is beyond comprehension. As such, efforts at exhaustion as prescribed for S.A.M.'s fall well within the parameters of exclusions because of "institutional incompetence to resolve the particular type of issue presented . . .,"or because the Bureau of Prisons "lack[s] authority to grant the type of relief requested." **McCarthy**, 503 U.S., at 147-48.  Moreover and of utmost significance, as amply demonstrated herein, Basciano has and will continue to suffer irreparable harm if he is unable to secure judicial consideration of his claim at this time after close to six months in the S.H.U. and close to four months under S.A.M.'s.

Based upon the foregoing, this Court should assume jurisdiction and entertain the within writ and grant the relief requested herein.

Law Office of James Kousouros

## **CONCLUSION**

Based upon the foregoing, we submit that Vincent Basciano has been confined to the S.H.U. and under the restrictions of S.A.M.'s. in violation of the United States Constitution and that this confinement must be immediately terminated.  It is respectfully requested that the court grant the relief sought in this writ in its entirety, and for such other and further relief as the court may deem equitably necessary and proper.

Respectfully Submitted,

JAMES KOUSOUROS

## **END NOTES**

[1]
Given the weighty requirements of ***stare decisis*** and its ultimate call for detailed fact-finding, we are setting forth as many salient details as possible. In our view, any fact which pertains to the origin and nature of the list which precipitated Basciano's challenged confinement,  or which reflects an effort by Basciano to exhaust his administrative remedies, is germane to the disposition of this writ.

[2]
The court did excerpt a compelling psychological study in support of its conclusions:

> Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effects, including increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilation, and suicidal impulses. ... There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects.

[3]
The only information that the government has been willing to divulge regarding this plot has been in their responsive submissions to our recusal litigation. ***See generally***, Government's Memorandum of Law in Opposition to the Motions to Recuse by Defendants Basciano, Mancuso and Indelicato, pp. 6-7, 13; Government's Memorandum of Law in Opposition to The Defendant Basciano's Motion

Law Office of James Kousouros

to Disqualify Assistant United States Attorney Greg Andres.

4

Although the details of its disclosure remain sealed and secret, it appears that the government had informed the court of the list, its contents and its suspected purpose in July, 2006.  *See*, **United States v. Basciano**, 2006 U.S. 86533 at \*2.  (" The alleged threat was disclosed to this court in July of 2006 and to defense counsel on August 28, 2006").

5

It was during these weeks that the temperature in the northeast was oppressively hot with temperatures over a hundred degrees on a daily basis with stifling humidity.  While other sections of the M.C.C. including the visiting section were amply air conditioned and at least tolerable, the S.H.U. has no such luxuries for inmates confined there.  Events which have unfolded over the past two months leave little doubt that the conditions in the S.H.U. are purposefully designed to test the limits of inhumane and punitive treatment of those inmates designated to this unit.  Moreover, in the thirteen days which had passed since being extracted from the general population, Mr. Basciano had lost eight pounds, and the effects of his confinement were clearly affecting the productivity normally attendant to our counsel visits.

6

The government has since issued a subpoena to the defense to provide this list; Mr. Basciano has been unable to locate it.  As will be discussed, *infra*, he was again moved pursuant to his placement in Special Administrative Measures confinement and has not had all of his legal documents available to him.  Those papers to which he did have access, however, do not contain this list.  It is unquestionable, however, that it was Basciano and the defense team that alerted the government to this list and urged C.O. Maddis to copy it verbatim.

7

Aside from the forensic fingerprint evaluations, the attachments included known writing samples of the defendant.  Despite having literally hundreds of such samples, many innocent and innocuous, the government chose to attach and publicly release a letter written to Mr. Basciano's girlfriend (with whom he has a child).  This letter included personal intimate passages; the choice of this letter simply could not have been for any purpose other than an attempt to humiliate Mr. Basciano's wife and upset his familial relationships.

8

As we discuss below, the S.A.M.'s are generally reserved for the highest security risks, rarely for detainees, and most often for persons charged with terrorist activities. The imposition of the S.A.M.'s requires a showing that there is a *substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons*, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.

9

Counsel initially refused to sign the affirmations as we had not been given an opportunity to discuss the contents thereof with our client. It is difficult to fathom any other development in a criminal matter where an attorney is presented with such a weighty document to consider, but is unilaterally

Law Office of James Kousouros

foreclosed from discussing the matter with his client. The endorsement of these forms was the singular condition precedent for further contact with Basciano. In a frightening example of the new power of the executive, the court asserted that it was without authority to permit a criminal defendant, still shrouded in the presumption of innocence, from consulting with his attorneys. It was in this charged context that counsel signed the affirmations.

10

Although this certainly does not comprise the gravamen of the prejudice that has inured to Basciano, one is truly left to wonder how a compendium of definitions, used only for personal enlightenment, poses a security risk.

11

The timing of the S.A.M.'s does appear skewed. The information came into government hands in June, 2006, presumably via the debriefed account tendered by an inmate informant. Every indication is that the additional investigation conducted by the F.B.I. and the S.I.S. (of the M.C.C.) uncovered only evidence which was consistent with Basciano's account or as set forth herein, evidence which clearly called into question the government's initial view of the list. So what then, we were compelled to wonder, was the factor which prompted the September 19, 2006 application to the Attorney General for the imposition of the S.A.M.'s?

12

Peter Lioumus has forthrightly debunked any notion that commissary deposits were used for any nefarious purpose by either he or Basciano. For years, inmates sent money to fellow inmates that they befriended for gratuitous purposes, to pay off gambling debts, or for additional food, stamps, and other items available from commissary. This is what was done in this matter and we believe that an SIS investigation has borne this out. Indeed, SIS was reportedly aware of video footage in the jail showing certain inmates returning from commissary holding several bags of food and other items and bringing them to inmates for whom the items had been purchased. At no time did Basciano provide commissary funds to any inmate in payment for harm to befall anyone.

13

Even a cursory review of Basciano's BP-10 belies the assertions of the Regional Director's response. His references to "no radio," "lights are on 24/7 ," "no access to fresh air" and the diminished productivity of his meetings with his lawyers were certainly specific enough to alert the director to the nature of is grievances.

14

The court also has the authority to entertain this application as a motion for release from administrative detention under the provisos of the Bail Reform Act. *See*, e.g., **United States v. Ciccone**, 2002 WL 31015623 (E.D.N.Y.), **United States v. Nosair**, 1994 WL 469364 (S.D.N.Y.) In considering these motions, the courts have implicitly relied on the Bail Reform Act. *See* **United States v. Gotti**, 755 F. Supp. at 1163 (discussing BRA in directing defendants' transfer and stressing that "administrative detention" defied the"purpose" of the remand order). This reasoning finds compelling support in **Fed. R. Crim P.§§46(g)** and **(h) (1)** which states that district courts "must supervise the detention within the district of any defendants awaiting trial ..." so as to "eliminate unnecessary detention."

Law Office of James Kousouros

[15]

The fact that **Sandin**'s principles revolved around a claim by a *sentenced* prisoner raise some questions as to its applicability in cases of pre-trial detainees. In the decision itself, the Court drew a clear distinction between the two classes of prisoners, emphasizing the demarcation between the "impermissible punishment" and "permissible regulation" of pretrial detainees as distinct from the confinement of sentenced inmates. 515 U.S. at 484.

[17]**28 C.F.R. §541.22** sets forth as follows:

> Administrative detention is the status of confinement of an inmate in a special housing unit in a cell either by self or with other inmates which serves to remove the inmate from the general population.
>
> (a) Placement in administrative detention. The Warden may delegate authority to place an inmate in administrative detention to Lieutenants. Prior to the inmate's placement in administrative detention, the Lieutenant is to review the available information and determine whether the inmate's placement in administrative detention is warranted. The Warden may place an inmate in administrative detention when the inmate is in holdover status (i.e., en route to a designated institution) during transfer, or is a new commitment pending classification. The Warden may also place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate:
>
> (1) Is pending a hearing for a violation of Bureau regulations;
>
> (2) Is pending an investigation of a violation of Bureau regulations;
>
> (3) Is pending investigation or trial for a criminal act;
>
> (4) Is pending transfer;
>
> (5) Requests admission to administrative detention for the inmate's own protection, or staff determines that admission to or continuation in administrative detention is necessary for the inmate's own protection (see **§541.23**); or
>
> (6) Is terminating confinement in disciplinary segregation and placement in general population is not prudent. The Segregation Review Official is to advise the inmate of this determination and the reasons for such action.
>
> (I) Except for pretrial inmates or inmates in a control unit program, staff ordinarily within 90 days of an inmate's placement in post-disciplinary detention shall either return the inmate to the general inmate population or request regional level assistance to effect a transfer to a more suitable institution.
>
> (ii) The Assistant Director, Correctional Programs Division, shall review for purpose of making a disposition, the case of an inmate not transferred from post-disciplinary detention within the time frame specified in paragraph (a)(6)(I) of this section.
>
> (iii) Staff in a control unit will attempt to adhere to the 90-day limit for an inmate's placement in post-disciplinary detention. Because security needs required for an inmate in a control unit program may not be available outside of post-discipline detention, the Warden may approve an extension of this placement upon determining in writing that it is not practicable to release the inmate to the general inmate

Law Office of James Kousouros

population or to effect a transfer to a more suitable institution.

(iv) The appropriate Regional Director and the Assistant Director, Correctional Programs Division, shall review (for purpose of making a disposition) the case of an inmate in a control unit program not transferred from post-disciplinary detention within the 90-day time frame specified in paragraph (a)(6)(iii) of this section. A similar, subsequent review shall be conducted every 60-90 days if post-disciplinary detention continues for this extended period.

(b) Administrative detention order detailing reasons for placement. The Warden shall prepare an administrative detention order detailing the reasons for placing an inmate in administrative detention, with a copy given to the inmate provided institutional security is not compromised thereby. Staff shall deliver this order to the inmate within 24 hours of the inmate's placement in administrative detention, unless this delivery is precluded by exceptional circumstances. An order is not necessary for an inmate placed in administrative detention when this placement is a direct result of the inmate's holdover status.

(c) Review of inmates housed in administrative detention. (1) Except as otherwise provided in paragraphs (c)(2) and (c)(3) of this section, the Segregation Review Official will review the status of inmates housed in administrative detention. The SRO shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and shall hold a hearing and review these cases formally at least every 30 days. The inmate appears before the SRO at the hearing unless the inmate waives the right to appear. A waiver may be in writing, signed by the inmate, or if the inmate refuses to sign a waiver, it shall be shown by a memorandum signed by staff and witnessed by a second staff member indicating the inmate's refusal to appear at the hearing. Staff shall conduct a psychiatric or psychological assessment, including a personal interview, when administrative detention continues beyond 30 days. The assessment, submitted to the SRO in a written report, shall address the inmate's adjustment to surroundings and the threat the inmate poses to self, staff and other inmates. Staff shall conduct a similar psychiatric or psychological assessment and report at subsequent one-month intervals should detention continue for this extended period. Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection (see **§541.23**), or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns. An inmate may be kept in administrative detention for longer term protection only if the need for such protection is documented by the SRO. Provided institutional security is not compromised, the inmate shall receive at each formal review a written copy of the SRO's decision and the basis for this finding. The SRO shall release an inmate from administrative detention when reasons for placement cease to exist.

(2) The Warden shall designate appropriate staff to meet weekly with an inmate in administrative detention when this placement is a direct result of the inmate's holdover status. Staff shall also review this type of case on the record each week.

Law Office of James Kousouros

(3) When an inmate is placed in administrative detention for protection, but not at that inmate's request, the Warden or designee is to review the inmate's status within two work days of this placement to determine if continued protective custody is necessary. A formal hearing is to be held within seven days of the inmate's placement (see **§541.23**, Protection Cases).

(d) Conditions of administrative detention. The basic level of conditions as described in **§541.21(c)** for disciplinary segregation also apply to administrative detention. If consistent with available resources and the security needs of the unit, the Warden shall give an inmate housed in administrative detention the same general privileges given to inmates in the general population. This includes, but is not limited to, providing an inmate with the opportunity for participation in an education program, library services, social services, counseling, religious guidance and recreation. Unless there are compelling reasons to the contrary, institutions shall provide commissary privileges and reasonable amounts of personal property. An inmate in administrative detention shall be permitted to have a radio, provided that the radio is equipped with ear plugs. Exercise periods, at a minimum, will meet the level established for disciplinary segregation and will exceed this level where resources are available. The Warden shall give an inmate in administrative detention visiting, telephone, and correspondence privileges in accordance with part 540 of this chapter. The Warden may restrict for reasons of security, fire safety, or housekeeping the amount of personal property that an inmate may retain while in administrative detention.

18

The entire text of the statute is, of course, relevant for its inclusion of mandatory and directive language, as well as for its detailing of procedures and procedural predicates.

**§501.3** Prevention of acts of violence and terrorism.

(a) Upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to ***implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury***. These procedures may be implemented upon written notification to the Director, Bureau of Prisons, by the Attorney General or, at the Attorney General's direction, by the head of a federal law enforcement agency, or the head of a member head of a member agency of the United States intelligence community, that there ***is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons***. These special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, ***as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.*** The authority of the Director under this paragraph may not be delegated below the level of Acting Director.

Law Office of James Kousouros

(b) Designated staff *shall* provide to the affected inmate, as soon as practicable, *written notification of the restrictions imposed and the basis for these restrictions*. The notice's statement as to the basis may be limited in the interest of prison security or safety or to protect against acts of violence or terrorism. The inmate *shall sign for and receive a copy of the notification.*

(c) Initial placement of an inmate in administrative detention and/or any limitation of the inmate's privileges in accordance with paragraph (a) of this section *may be imposed for up to 120 days or, with the approval of the Attorney General, a longer period of time not to exceed one year.* Special restrictions imposed in accordance with paragraph (a) of this section may be extended thereafter by the Director, Bureau of Prisons, in increments not to exceed one year, upon receipt by the Director of an additional written notification from the Attorney General, or, at the Attorney General's direction, from the head of a federal law enforcement agency or the head of a member agency of the United States intelligence community, that there continues to be a substantial risk that the inmate's communications or contacts with other persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. *The authority of the Director under this paragraph may not be delegated below the level of Acting Director.*

(d) In any case where the Attorney General specifically so orders, based on information from the head of a federal law enforcement or intelligence agency that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism, the Director, Bureau of Prisons, *shall*, in addition to the special administrative measures imposed under paragraph (a) of this section, provide appropriate procedures for the monitoring or review of communications between that inmate and attorneys or attorneys' agents who are traditionally covered by the attorney-client privilege, for the purpose of deterring future acts that could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.

(1) The certification by the Attorney General under this paragraph (d) *shall be* in addition to any findings or determinations relating to the need for the imposition of other special administrative measures as provided in paragraph

(a) of this section, but may be incorporated into the same document.

(2) *Except* in the case of prior court authorization, the Director, Bureau of Prisons, *shall* provide written notice to the inmate and to the attorneys involved, prior to the initiation of any monitoring or review under this paragraph (d).

The notice *shall* explain:

(i) That, notwithstanding the provisions of part 540 of this chapter or other rules, all communications between the inmate and attorneys may be monitored, to the extent determined to be reasonably necessary for the purpose of deterring future acts of violence or terrorism;

(ii) That communications between the inmate and attorneys or their agents are not protected by the attorney-client privilege if they would facilitate criminal acts or a

Law Office of James Kousouros

conspiracy to commit criminal acts, or if those communications are not related to the seeking or providing of legal advice.

(3) The Director, Bureau of Prisons, with the approval of the Assistant Attorney General for the Criminal Division, *shall* employ appropriate procedures to ensure that all attorney-client communications are reviewed for privilege claims and that any properly privileged materials (including, but not limited to, recordings of privileged communications) are not retained during the course of the monitoring. To protect the attorney-client privilege and to ensure that the investigation is not compromised by exposure to privileged material relating to the investigation or to defense strategy, a privilege team *shall* be designated, consisting of individuals not involved in the underlying investigation. The monitoring *shall* be conducted pursuant to procedures designed to minimize the intrusion into privileged material or conversations. Except in cases where the person in charge of the privilege team determines that acts of violence or terrorism are imminent, the privilege team s*hall not disclose any information unless and until* such disclosure has been approved by a federal judge.

(e) *The affected inmate may seek review of any special restrictions imposed in accordance with paragraph (a) of this section through the Administrative Remedy Program, 28 CFR part 542.*

(f) Other appropriate officials of the Department of Justice having custody of persons for whom special administrative measures are required may exercise the same authorities under this section as the Director of the Bureau of Prisons and the Warden.

[19]

Most of the recently reported cases involving consideration of the S.A.M.'s provisions revolved around charges and allegations of terrorist activities, **United States v. Abu-Ali**, 396 F. Supp.2d 703 (E.D.Va. 2005)  **Yousef v. Reno**, 254 F.3d 1214 (10th Cir. 2001) **Al-Owhali v. Ashcroft**, 279 F. Supp. 2d 13 (D.D.C. 2003); **United States v. El-Hage**, 213 F.3d 74 (2d Cir. 2000); **United States v. Reid**, 214 F. Supp. 2d 84 (D.Mass  2002); **United States v. Sattar**, 2006 U.S. Dist. LEXIS 79328 (S.D.N.Y.).

[20]The mandate of the Second Circuit in this regard is as follows:

> Where the [detainee] was confined for an intermediate duration--between 101 and 305 days--"development of a detailed record" of the conditions of the confinement relative to ordinary prison conditions is required.[citations omitted]  In those situations, a district court must "make a fact-intensive inquiry," [citation omitted], examining "the actual circumstances of S.H.U. confinement" in the case before it without relying on its familiarity with S.H.U. conditions in previous cases,

**Palmer v. Richards**, 364 F.3d 60, 65 (2004); *See also* **Colon v. Howard**, 215 F.3d 227, 232 (2d Cir. 2000); **Sims v. Artuz**, 230 F.3d 14, 23 (2d Cir. 2000)

Law Office of James Kousouros

As of the date of this filing, Basciano will have been confined to the S.H.U. for approximately 165 days and subject to the S.A.M.'s restrictions for 100 days. At the juncture where issue is joined by a government response, of course, these periods will be longer.

[21]

Prior to the Court's decision in **Sandin v. Conner**, 515 U.S. 472, 115 S. Ct. 2293 (1995), courts distinguished between disciplinary and administrative segregation, holding that stringent procedures were required prior to disciplinary confinement, while more relaxed procedures were sufficient in the context of administrative segregation. **Sandin** marked a departure from rigid, categorical divides, espousing instead  a more fluid approach premised on the nature of the deprivation. There would now appear to be no real substantive support for differentiating between disciplinary and administrative segregation when determining what level of process is owed to an inmate.  As the court astutely noted in **Koch v. Lewis**, 96 F. Supp. 2d 949, 964-65 (D. Ariz. 2000):

> . . .       after **Sandin**, distinguishing between disciplinary and administrative actions for the purposes of defining the level of process owed a prisoner is problematic, if not inappropriate. If the issue is the relative severity of the deprivation . . .it would seem *that greater procedural safeguards are owed an inmate before he is assigned indefinitely, and absent misconduct, to administrative segregation . . . than before a short-term and less onerous "disciplinary" sanction is imposed for actual misconduct*. **Sandin** was an attempt to return to basic due process principles which stress proportionality and a balancing of the interests involved . . . *More process is due where the deprivation is greatest*.

(Emphasis added)

*See* **Arce v. Walker**, 139 F.3d 329, 334-35 (2

d Cir.1998)

[22]U.S.A.M. §9-24.400, Effect of BOP Policy:

> Conditions of confinement for all persons in BOP custody are set in accordance with various BOP policies. Any additional restrictions imposed pursuant to **28 C.F.R. § 501.3** *will not affect the implementation of BOP policies unless specifically set forth in the memorandum from the Attorney General directing the implementation of special administrative measures.* The Bureau of Prisons will continue to have authority to take any other measures with respect to an inmate subject to special administrative measures deemed necessary to maintain the order, safety, security, and discipline of any BOP institution.

(Emphasis added)

Law Office of James Kousouros

Absent some express directive suspending the procedural safeguards, such as they are, in **§ 541.22**, Basciano was entitled to a hearing regarding the imposition of the S.A.M.'s.

23

Indeed, given the government's seeming disregard of the corroborative evidence supporting Basciano's account the list, as well as the information reportedly tendered by Danny Reyes, there is ample evidence to support "an inference . . .   that the purpose of the governmental action is the type of punishment that may not constitutionally be inflicted upon detainees *qua* detainees. **Bell v. Wolfish**, 421 U.S. at 538.

24

There have been a number of cases where courts have rigidly enforced the exhaustion requirement in dismissing actions for relief from S.A.M.'s detention. **Yousef v. Reno**, 254 F.3d 1214 (10th Cir. 2001); **United States v. Abu-Ali**, 396 F. Supp.2d 703 (E.D.Va. 2005); **Al-Owhali v. Ashcroft**, 279 F. Supp. 2d 13 (D.D.C. 2003).

In each of these cases the court invoked the mandatory exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C.A. §1997e (a), in which Congress expressly provided:

> ". . . no action shall be brought with respect to prison conditions under *Section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The Second Circuit has unequivocally rejected the applicability of these statutory provisions to **§2254** habeas corpus petitions. **Carmona v. United States Bureau of Prisons**, 243 F.3d 629, 634 (2001).

Law Office of James Kousouros