UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
**VINCENT BASCIANO,**

                      **Petitioner,**

                                                        Crim. Nos.   03 CR 929 (NGG)
    **- against -**                                                                      05-060 (NGG)

                                                           Civil No.     07-CV-0224 (NGG)
                                                                                    (RML)

**JERRY MARTINEZ, Warden,**
**of The Metropolitan Correction Center,**

                      **Respondent.**
------------------------------------------------------------------------X


## DEFENDANT/PETITIONER BASCIANO'S REPLY TO THE GOVERNMENT AND BOP MEMORANDUM IN OPPOSITION TO BASCIANO'S PETITION FOR A WRIT OF HABEAS CORPUS

      The petitioner herein, Vincent Basciano, by and through his counsel, hereby submit this memorandum in reply to the government's submission.

*THE PROCEDURAL FRAMEWORK*

      On January 5, 2007 Vincent Basciano filed a Writ of Habeus Corpus alleging that his continued confinement in the Special Housing Unit of the Metropolitan Correctional Center [hereinafter "M.C.C."], and the imposition of Special Administrative Measures [hereinafter "SAMs"] was unconstitutional. The titular respondent was the Warden of the M.C.C. The United States Attorney for the Eastern District of New York accepted service of the Writ for the M.C.C., and filed a memorandum in opposition on January 25, 2007.

Thereafter, on February 2, 2007 the Hon. Nina Gershon issued an Order directing the respondent to file a complete and entire answer to the writ within 45 days. On February 13, 2007 we spoke with Assistant United States Attorney John Buretta concerning Judge Gershon's order. We were informed that the government believes that its memorandum satisfied that order, and that no further submissions are contemplated by the respondent. Based thereon we submit this response to the government's memorandum in opposition to the writ.

At the outset, the government appears to be of the novel opinion that the court can resolve the issues asserted herein on the basis of its conclusory assertions. While the government debunks the idea of an evidentiary hearing, it also seems to believe that there is no need for *any* genuine fact-finding. No other explanation would appear to be apparent from the absence of any factual submission by the respondent itself or the administrative record generated by the facility. Despite lengthy and detailed investigations by the security section of the M.C.C. as to each of the "offenses" detailed by the government, it appears that the court is not to be the beneficiary of those findings, nor of the conclusions reached at each stage of internal administrative review.[1] Nor is the court to be the beneficiary of evidence upon which the government has relied in imposing the restrictive

---

[1] Of course, Basciano has received the perfunctory denial letters during his futile exhaustion of administrative remedies in which the BOP informed him that the investigation was continuing and that his confinement was justified by the conduct being investigated. These were annexed as exhibits to the writ and as is easily discerned from a review thereof, these reports provide no factual information elucidating the investigations conducted or the basis for the continued confinement.

confinement in issue.[2]

Mr. Basciano is scheduled to begin a re-trial of Indictment 03-929 (NGG) on April 23, 2007. In this matter, he is charged with Racketeering and murder and faces life imprisonment if convicted. In a separate indictment, Mr. Basciano is charged with a murder for which he could be sentenced to death. We have, for months, related to the court the deleterious effects upon Mr. Basciano of the confinement in the SHU and under the Special Administrative Measures, as well as the significant limitations on our ability to prepare for all pending litigation. The government's primary role in this restrictive confinement notwithstanding, petitioner has nevertheless been constrained to exhaust his administrative remedies. This process, which we have long maintained should have been waived given it's obvious futility, has been extremely time consuming and seemingly pointless. Moreover it has protracted what we submit is an unconstitutional punitive confinement since July 28, 2006 and an equally unwarranted imposition of SAMS since September 26, 2006.

Additionally, and of paramount significance, this placement and the government's basis therefore will certainly impact upon the Attorney General's decision making in whether to seek the death penalty. The imposition of SAMS was predicated upon the

---

[2] From the onset of Mr. Basciano's restrictive confinement in July, 2006 it has been strikingly clear that the placement was at the government's direction based upon it's own independent investigation and not the M.C.C.. We understand that the M.C.C. has conducted its own internal mandated investigations of the various claims set forth by the government and has interviewed several inmates concerning the various allegations made. As the Court is surely aware, both the government and the M.C.C. generate reports of investigation relevant to the allegations under investigation. As demonstrated, *infra*, these reports are routinely reviewed in these proceedings at hearings.

recovery of a list which the government maintains was an assassination menu. According to the government's skewed view, Basciano memorialized a list of names, including the trial judge and chief prosecutor as targets for murder. Having thus created such devastating evidence, he passed it on to an inmate, and then in the same instant seemingly changed his mind, pursuing it no further, and did nothing to recover the list. We have long challenged that theory, and have presented the government with ample evidence with which to confirm the innocuous meaning of the list. For months we requested a hearing to elucidate these issues and to factually resolve the allegations. No such hearing has been forthcoming, and we have brought this writ as a matter of final resort.[3]

We have requested a hearing for the above reasons since July, 2006 with no success. In our every submission we have been forthcoming with evidence we have uncovered to debunk the allegations made by the government. We have named the individuals from whom the information was obtained, and we have made numerous witnesses available to

---

[3]

We have been denied access to the government's submission to the Attorney General in its recommendation concerning the death penalty, and are thus unaware as to whether the "list" was made a part of the presentation. We *do* know that some submission concerning these events *was* made to the Attorney General who ordered the imposition of Special Administrative Measures. Moreover, simple logic mandates the conclusion that evidence that a defendant actually conspired to kill a federal judge and a prosecutor along with government witnesses is likely if not certain to tip the scales in favor of execution. It would be an unmitigated travesty of justice for such evidence to be utilized in error.

As a consequence, on November 21, 2006 we requested that the Capital Crimes Unit defer their decision on the death penalty until these allegations are resolved. Despite our entreaty, it appears that the process is moving forward (Annexed hereto is a copy of said letter to Margaret P. Griffey, Chief of the Capital Crimes Unit). On March 1, 2007 the defense will travel to Washington D.C. to meet with the Capital Crimes Unit to personally present arguments in opposition to the imposition of the death penalty upon Mr. Basciano. Stated simply, we submit that unless the issues presented in this writ are litigated and resolved prior to the decision on the death penalty, there remains a distinct possibility that Vincent Basciano will be authorized for execution and possibly executed based at least in large part, upon evidence which in truth would not support such a decision.

the government and to the M.C.C. investigating officers. Our willingness to proffer notwithstanding, every response from the government has been met with the same mocking retort; that the court should simply accept the government's word and that of its prison informants and that the defense is entitled to no more than that provided by the government. In addition, our efforts to seek redress for our client have been repeatedly countered by cynical imputations of impropriety. In their most recent submission, the government stated:

> his repeated requests for such a hearing appear to be *simply an attempt to identify (or confirm the identity) of cooperating witnesses so that Basciano may commit additional acts of obstruction*, or at least an attempt at a double opportunity to cross-examine witnesses the government may call to testify against Basciano at his upcoming trials.

Government Memorandum in Opposition, p.14, fn. 6

Simply stated, the government posits that Basciano's team of experienced and committed attorneys are nothing more than mindless pawns in our client's insidious plots. The government asserts that we are wilfully blind to the conclusory merits of their position, and have brought a frivolous writ for the purpose of aiding Basciano in the obstruction of justice.[4] Such assaults are unworthy of the an agency ostensibly committed to an impartial adjudication of the law. The notion that the instant challenge to the government's position

---

[4] The government was similarly disparaging of the defense's motion to recuse Judge Garaufis. Basciano had been accused of trying to murder the trial judge, and as a consequence had been removed to isolated confinement normally reserved for members of Al-Qaeda. The government reduced our long-considered motion for the recusal of Judge Garaufis as "a pretextual maneuver motivated by Basciano's tactical desire to obtain a different judge."

is an evil subterfuge is disconcerting and so clearly unwarranted.[5] This pattern of attacking the lawyers in lieu of a full and fair hearing of the issues sets a disheartening tone for those expecting objective and professional advocacy.

Indeed our repeated requests for a factual hearing are not baseless as the government contends. While the breadth and scope of any such hearing are left to the Court's discretion, there is no question but that factual records are developed to a far greater extent than would content the government in this matter. The decisions in **United States v. Boudin,** 533 F. Supp. 786 (S.D.N.Y. 1982) and **United States v. Gotti,** 755 F. Supp 1159 (E.D.N.Y. 1991), are significant for the breadth and depth of the factual records upon which the courts relied in their determinations. In **Boudin**, the court conducted an evidentiary hearing and received detailed submissions from prison officials, including internal memoranda and detention review reports. In determining that there was no legitimate purpose for the nature of the detention imposed, the court considered the substantial evidence adduced by both sides.

In **Gotti**, the defendants sought to be released from restrictive confinement akin to that imposed upon Basciano. The court was presented with a detailed affidavit of the Warden of the M.C.C., as well as a submission by the facility's legal counsel, together with copies of the documentation evincing the requisite due process ostensibly afforded the

---

[5] That the government's unfortunate statements are without any basis is clear from the August 2, 2006 hearing, the first after the placement of Basciano in the SHU during which counsel made clear that an *in camera* presentation to the court was acceptable; "So I don't know how we resolve this here, but we want to know what's going on, we want to know why he's being denied in whatever forum you believe it's appropriate. If it needs to be in camera, we'll do that. We're not looking to jeopardize any investigation, we're just looking for legal and appropriate answers" (Transcript, August 2, 2006, page 4).

defendants. As here, the government asserted that no evidentiary hearing was warranted; the court agreed and *released* the defendants from the SHU on the basis of the lengthy administrative record before it.[6] In so opining the court made the following salient observations:

> The essence of the issue before me is whether it is enough to justify placing a pretrial detainee in *administrative detention for a stated reason without providing any basis for the reason*. The cases are legion which caution that courts must give due deference to the expertise of corrections officials in operating their institutions in a manageable fashion. *But surely due deference does not mean blind deference. If it were otherwise, then any statement of reason offered by correction official, whether well-founded or not, would justify the imposition of any condition or restriction of confinement* and leave the detainee completely vulnerable to arbitrary governmental action. "Prison authorities are not afforded unbridled discretion" because the detainee is either notorious or newsworthy or both. Boudin v. Thomas, 533 F. Supp. 786, 791 (S.D.N.Y. 1982).

755 F. Supp 1159, 1164 (emphasis added).

Thus, the determination of whether the due process rights of a detainee have been violated must be based on something more substantial than the conclusory "statement of reason" proffered by the government. Given that the B.O.P. conducted independent administrative investigations, the documentation of those findings is an integral part of the relevant record as is the government's separate investigation upon which the confinement is principally predicated. *See also* **United States v. Suleiman**, 1997 U.S. Dist. LEXIS 5793, *6 (S.D.N.Y); **United States v. McTier**, 2006 U.S. Dist. LEXIS 49956 (E.D.N.Y.); **United States v. McGriff**, 04 Cr 00966 (January 8, 2007) [Block, J] [court held a hearing on the issue of

---

[6] Judge Glasser's inverse agreement with the government was based on the sufficiency of the factual evidence before him, not on any notion that a summary resolution was the best procedural device.

whether McGriff's confinement was constitutional; BOP and government presented evidence to support their positions that the confinement was reasonably related to legitimate governmental objective]).

The government's (and the Bureau of Prison's) responsive pleading is entirely devoid of any investigative support for the detention sought to be justified. With respect to the list and the most recent allegations of obstruction, the government has engaged in an informational hide and seek. They have provided the list and a letter and their informants' accusations and nothing more. A hearing is clearly required during which the government must furnish the entirety of the prison file, as well as present the evidence from its own investigation to substantiate the allegations made therein. Only then can a fair determination as to the propriety of the this debilitating confinement be assessed. If the government instead chooses to adhere to the present paucity of evidence, we reaffirm that this petition should be granted in its entirety.

*THE GRAVAMEN OF THE GOVERNMENT'S ALLEGATIONS*

The foundation for the government's position is readily divided into three components; the prior allegations which precipitated his initial placement in restrictive confinement in 2005,[7] the "list" which was the original impetus for the present restrictive confinement, and the most recent allegations of a conspiracy to harm a cooperating witness. The prior allegations were previously rejected and cannot now be used to justify an equally unconstitutional detention. The "new" claims, we respectfully submit are

---

[7] As will be set forth, *supra*, and conceded by the government, these claims were rejected by Judge Garafuis in May, 2005 and Basciano was returned to population.

simply false; the government has either been misinformed by opportunistic prison informants or has turned a blind eye to the information heretofore provided. Once again we will respond to these claims both with information that is a matter of record, and with details disclosed to the defense during its own investigation of these claims. We do so in good faith and yet we fully expect that the vitriolic invective which to date has marked every government response will spring forth again. We urge the court to act as the arbiter of the facts, to parse through the hyperbole, and to fairly determine the propriety of Mr. Basciano's continued confinement.

### *Michael Mancuso*

The government asserts in their response that Basciano authorized the murder of Michael Mancuso after he was incarcerated. In support of this proposition, it cites the testimony of cooperating witness Dominick Cicale. Cicale testified that he sought permission from Basciano to kill Mancuso through attorney Tom Lee, an attorney who was passing messages to and from Joseph Massino and Basciano, and who has since pled guilty and cooperated with the government. Cicale claims he told Basciano that he felt "like a sitting duck" and that Basciano said "[d]on't be a duck, do it. If you feel threatened, do what you have to do". Initially, there was never a claim that Basciano was sending an order to murder Mancuso. Cicale claims to have asked permission and the testimony even in this regard is cryptic at best. What is most disconcerting about this claim is the government's failure to also cite testimony from Tom Lee at the very same trial during which Lee stated that Basciano had selected the very same person as his "number two" (TT; page 6797) and

that Basciano had made clear to Lee that he wanted Cicale to get along with Mancuso. He unequivocally swore that Basciano never passed a message through him to have Cicale harm Mancuso:

> Q: Isn't' it true that the message that you told the FBI that Mr. Basciano sent back to Dominick Cicale was–[s]top the fighting and why can't you all get along, wasn't that the message that was sent from Mr. Basciano?
>
> A: That was part of the message.

(TT: 6907).

After reading a 302 relating the proffer session during which Lee related this information to the FBI, Lee testified:

> Q: Yes. It also says, does it not, Mr. Basciano instructed you to tell them they should all get along?
> MR. ANDRES: Objection.
> Q: Correct?
> THE COURT: You may answer.
> A: They should learn to get along, yes.
> *Q: There was never a message by Mr. Basciano to Dominick Cicale to harm or hurt Michael Mancuso, correct?*
> *A: No, sir.*
> *Q: Actually, Mr. Basciano, while he was incarcerated, he wanted everyone in the Bronx to get along, did he not, to your knowledge?*
> *A: It seemed that way, yes.*

(TT:6908, emphasis added).

We submit that this record speaks volumes and is but one example of one cooperator waxing loquatic for the government, only to be flatly contradicted by yet another cooperator. Lee's testimony is clear; Basciano *never* gave him a message for Cicale to kill Mancuso. Perhaps Cicale, a convicted murderer, did want to kill Mancuso but that is evidence only of the need for *his* restrictive confinement, not Basciano's.

*Solicitation to Murder Greg Andres*

The government next cites allegations concerning a solicitation to murder Assistant United States Attorney Greg Andres. While this is indeed a most serious allegation, this claim was raised by the government in it's previous attempt to place Basciano in *less* restrictive confinement and was specifically rejected by Judge Garafuis in his written decision dated may 5, 2005. This allegation was intertwined with the charge concerning the murder of Randolph Pizzolo, which is conspicuously absent from this government submission given the government's initial assertion that this murder was also ordered by Basciano from jail. As the court succinctly observed:

> Reasoning that Basciano's words have the power to kill even from within a detention facility, and did in fact cause Pizzolo's death, the government asserts that in order to protect the community from Basciano, and thus fulfill the purposes of his pretrial detention, it must prevent Basciano's words from escaping the MCC by isolating Basciano from all potential messengers. And the only way to accomplish this end, the government contends, is to place Basciano indefinitely in administrative detention.

Despite these weighty allegations, the court rejected the government's evidence as insufficient to warrant continued segregated detention. The court's assessment of the government's view as to both the Pizzolo and Andres "plots" is worth excerpting in its entirety, as its internal logic and insight still serve to undercut the government's present posture. With regard to the Pizzolo murder, the court noted:

> . . . my own review of the tape recordings reveals no indication by either party to the conversation, even drawing all inferences in favor of the government, that Basciano ordered Pizzolo's murder after he was detained on November 19, 2004. ***Nor does the government appear to have an answer to Basciano's assertion that he had no opportunity to pass any message to anyone outside MDC-Brooklyn or to any other detainee from the time he***

> *was detained on November 19, 2004 until his release into general population on December 3, 2004, two days after the government alleges that Pizzolo was killed.* Therefore, the facts currently before the court suggest that if Basciano ordered Pizzolo murdered, he did so before he entered MDC-Brooklyn. That allegation might well be sufficient to justify pre-trial detention... . *However, it is insufficient to justify detention under the harsh conditions present in the SHU.*

369 F. Supp2d 344, 351-2 (emphasis added)

With equal precision, the court dissected the government's proffer as to the "Andres plot":

> Second, the tape recordings, standing alone, do not sufficiently substantiate the government's allegation that Basciano conspired to kill a federal prosecutor while in detention or at any other time. *According to my review of the tapes, the subject of whether to harm the prosecutor was raised by Massino several times during the two recorded conversations. Each time the subject was raised, Basciano disclaimed any interest in pursuing or discussing any such objective.* A reasonable listener could certainly infer from the recorded dialogue that an earlier conversation took place concerning someone's desire to harm the prosecutor. *However, the tapes alone do not reveal whether it was Basciano who harbored that desire, whether it was discussed seriously or in jest, whether Basciano agreed to go along with the plan, or disavowed it from the beginning, or any other detail of the conversation*. The government may well possess other evidence concerning this purported, and as yet uncharged, conspiracy. If it does, however, it has not presented it to this court for consideration. *And as with the government's first ground for holding Basciano in the SHU, I find that the government may not place Basciano in indefinite administrative detention for committing the crimes for which he is charged under this indictment without more substantial proof that he committed these crimes while in pre-trial detention.*

Id. at 352 (emphasis added).

The government should not be permitted to simply re-assert previously rejected grounds to support the restrictive confinement in this case and we submit that it is doing so in order to deflect attention from the paucity of proof concerning the new allegations.

*The List*

The government now claims that the insufficient proof previously presented to Judge Garaufis has been strengthened by the uncovering of "the list," whose mysterious purpose, seemingly quickly abandoned, was to document the targets of Basciano's continuing murderous intent. However, as we have set forth at some length, both the creation of the list and its passage into government hands have explanations which cut against the grain of the prosecution's theory. We submit that compelling the MCC to furnish their internal investigative reports and memoranda and the government to disclose its evidence will convincingly demonstrate the frail nature of the government's claim.

When the "list" was first disclosed, the defense immediately provided the government with any and all information it had. We disclosed that the list was given to Reginald White, an MCC inmate who claimed that his mother was a priestess who would assist Mr. Basciano with a spiritual ritual. We made Angela Basciano available to the government and she confirmed this and the fact that she actually went to meet White's mother, and that prior to this she consulted with her own priest, whose name and parish were also disclosed to the government. None of this could have surprised the government as they had been listening to Basciano discuss fortune tellers and readers on the telephone since 2004. The government however was obviously unimpressed.

After the government made the "list" public in September, 2006 and imposed SAMS on Basciano, we were constrained to file a recusal motion given the public knowledge of the government's view of the list as well as the resultant appearance of bias created

thereby. In their response, the government, for the first time, disclosed that the list was conceived and abandoned in the same moment. The court went even further and in denying the motion, held that Basciano authored the list to "engineer" the court's recusal thus further debunking the government's murderous interpretation of the list.

Given the painfully slow but clear dilution of the only initial predicate for the restrictive confinement in this matter, it was no surprise to the defense to learn from Danny Reyes that two inmates, Carlos Reyes and Anderson Pena solicited him to join in their framing of Basciano relative to the list. The government has responded with more of the same dismissiveness by asserting that the individuals named by the defense were not the recipients of the list. The government describes Basciano's "shifting explanations" as without any credence , thereby seeking to undermine Basciano's claim that the list was intended for a spiritual ritual (*See, Government Memorandum, page 8*). Basciano has *never* shifted his explanation of this list. He has *always* maintained that the list was for a spiritual ritual and that it was given to White. Neither Basciano nor the defense team invented Peter Lioumis or Danny Reyes; *they* came to *us*. And while the government mocks this information, serious and salient questions logically arise from the information imparted by them. Did the government speak with Reyes as he claims? Did the government ask him to cooperate concerning the list and a murder plot as Reyes swears and if so how does this relate to the government's claim that an entirely separate inmate was involved? Did the government ask him about letters written by Carlos Reyes and/or Anderson Pena concerning Basciano and their plan? Regardless of whether these individuals had the list,

was the government made aware that they intended to frame Basciano?  Did the government subpoena Peter Lioumis' mother and accuse her at a meeting of sending money to Reginald White in connection with a murder plot? Did the government offer Lioumis a deal if he testified against Basciano? Again we did not create these people or seek them out.  They came to the defense because of the injustice they claimed to have witnesses.  If they are lying, at long last let the government come forward and demonstrate this to be the case.  If there is truly a separate inmate who says he received the list with a request to kill those enumerated, after seven months of terrorist confinement let the government produce this person and subject his evidence to proper scrutiny.[8]  If indeed the list is as the government maintains, the instant writ will be denied based upon a full and fair review of a complete record and the litigation pending will move forward.

The shroud of mocking secrecy behind which the government rests does nothing to further the interest of justice. For seven months our efforts to protect our client have been met with nothing but dissonance and cryptic half disclosures.  We have two trials to prepare for and an execution to prevent. The government must be directed to put its evidence forth at a hearing once and for all.

*Prison Conversations*

Seemingly to bolster the tenuous and illogical theory of this list, the government

---

[8] There can be no logical claim that this is a subterfuge to learn who this inmate is.  If the government's view is to be entertained, Basciano gave the inmate the list and thus would know who he is unless the government contends that Basciano closed his eyes and simply asked a crowd of strangers if anyone among them had time to kill several people for him.  If an extra cross examination is really what concerns the government, we submit that the constitutional magnitude of the issues extant and the impending decision on the death penalty take precedence over any such concerns.

has referred to a series of telephone conversations in which Basciano speaks poorly of AUSA Andres. This, they, assert, is the proof in the murderous pudding. While as stated, we consider the allegations concerning Andres to be most serious, the government's reliance upon statements by a defendant concerning the prosecutor assigned to his case as evidence of murderous intentions is simply untenable. After all, what high-profile defendant, accused of crimes for which the prosecution contemplates executing him, segregated from all but prison guards for 24 hours a day, whose personal romantic relationships have been exposed publicly by the government, would speak in any but loving terms about his chief antagonist? The absurdity of invoking such conversations bespeaks a prosecutorial myopia uninfluenced by the pragmatics of criminal cases. Does the government truly expect Basciano to refer to Andres in any but the harshest terms? In the thousands of prison conversations listened to by the government every year, is the government prepared to say they have not heard such rants on a daily basis? If such descriptive deprecation of a prosecutor were a sound predicate for segregated detention, there would be no set of facilities large enough to hold all the detainees.

### *The New Plot*

The government now asserts that in the fall of 2006, well after Basciano's placement in the SHU (July 28, 2006) and around the time of the imposition of the SAM's, CW-2 was threatened via a letter reportedly sent by an MCC inmate. Here again, the government has made a most serious allegation but without any specific support. Once again we will respond with what we have been able to glean from interviews and the government's

submission on it's face.

Initially, the government does not even lay this plot at Basciano's door and as such they should not be permitted to assert this plot, without more, as a basis for the confinement challenged herein. The government asserts that in the fall of 2006, "an MCC inmate approached an individual and advised that "word came from upstairs from some friends of 'Vinny Gorgeous' from the Basciano Family that they will pay $5000 to have [cw#2] stabbed and fucked up". This was in retaliation for "ratting out 'Vinny Gorgeous' on a murder charge" and that additional instructions would be provided during church services where inmates from all tiers are permitted to congregate.[9] As such, there is no evidence that Basciano **is** the instigator of this "threat," or that he is even aware of the antagonist. It appears to be someone who **claims** to be his friend. Basciano has not been housed with any of his co-defendants for over a year - there are no "friends of 'Vinny Gorgeous'" from the "Basciano Family"- housed with Basciano who could have relayed any such message. We believe that in the fall of 2006, *all* of Basciano's co-defendants were housed at the Metropolitan Detention Center, where they presently remain.[10]

We also have received information that an inmate at the M.C.C. was overheard on a prison call discussing a conspiracy to kill a witness in *his* case and we believe that this was what precipitated this allegation. It appears that the government is of the opinion that this inmate was actually discussing CW #2 and not a witness in his own case. The inmate

---

[9]Basciano has never been to the church at the M.C.C. due to separation order.

[10] The note apparently implies that the friend is related to organized crime and is from the "family".

reportedly told the government that this was not true, that he never met Basciano and that he never had anything to do with him.

We believe that this matter too was fully investigated by officials of the M.C.C. and that the inmates involved were interviewed. We submit that both inmates denied knowing Basciano or having anything to do with any obstruction conspiracy involving him. We further submit that these inmates have told this to the government repeatedly and would so testify if called.[11]

The government is also hard-pressed to explain how Basciano, who has been segregated since the summer, managed to arrange this autumnal plot from the confines of his locked-down cell. Until September 26, 2006 Basciano was in the Special Housing Unit on the 9th Floor of the MCC. He was confined to his cell and permitted attorney visits only. On September 26, 2006 the government imposed the SAMs, which made it unquestionably impossible for the communication alleged to have occurred.

Again we have set forth information gleaned by the defense during its investigation of the claims set forth by the government and we have done so in good faith. Only with the production of the information and hearing requested however can the validity of these allegations and the confinement in issue be resolved.

---

[11] The failure to have the Warden respond and produce the reports and results of "the list" and the "CW-2" investigations is astonishing. If these events are as the government describes, what could be the possible prejudice in producing these materials for the court to review? If, however, as we suspect, these investigations concluded that the allegations were baseless, the court must consider them apart of the factual landscape in reaching its determination.

*Conclusion*

We have patiently waited for some objective assessment of the cold record of these matters, while Basciano suffers under punitive and unwarranted conditions of confinement. We now ask this court to pierce through the veil of obfuscatory rhetoric and examine a full and informative record. We have every confidence that if production of that record is compelled, this court will determine that there are no legitimate reasons for Basciano to remain as presently confined.

Respectfully Submitted,

JAMES KOUSOUROS