UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                          03 CR 929 (NGG)
                                        05 CR 060 (NGG)

VINCENT BASCIANO, also known as        07 CV 421 (NGG)
     "Vinny Gorgeous" and
     "Vinny from the Bronx,"

        Defendant.

- - - - - - - - - - - - - - - X

GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT VINCENT BASCIANO'S
MOTION FOR AN EVIDENTIARY HEARING AND OPPOSITION TO BASCIANO'S
REVISED SUPPLEMENTAL MEMORANDUM REGARDING HIS *HABEAS* PETITION FOR
<u>RELEASE FROM SPECIAL ADMINISTRATIVE MEASURES</u>

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

John Buretta
Amy Busa
Assistant United States Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT...........................................4

FACTUAL BACKGROUND..............................................4

I.   Overview Of The '03 Trial Evidence........................4

     A.   The Santoro Murder/ Murder Conspiracy ...............5

     B.   The Martino Murder Solicitation ....................10

     C.   The Vitale Murder Solicitation .....................11

     D.   Marijuana Distribution Conspiracy ..................13

     E.   Illegal Gambling ...................................13

     F.   The Defense Impeachment of Cicale ..................15

II.  The Government's Brady and Giglio Disclosures.............16

III. The False Murder Plot Allegation.........................17

IV.  Santomaggio..............................................18

V.   Basciano's Revised Supplemental Memorandum In Support Of His
     Habeas Petition..........................................20

     A.   Magistrate Judge Levy's Denial Of Basciano's
          Habeas Petition.....................................20

     B.   Basciano's Supplemental Memorandum..................21

ANALYSIS.......................................................24

I.   Basciano Has Failed To Establish A Brady/ Giglio Violation
     Sufficient To Overturn His July 2007 Conviction . . . . .24

     A. Knowledge Of The Cicale Allegation Cannot Be Imputed To The
        Prosecution . . . . . . . . . . . . . . . . . . . . . 24

     B. The Cicale Allegation Does Not Provide A
        Basis For A Retrial . . . . . . . . . . . . . . . . . 36

          1. There Is Overwhelming Evidence Establishing Basciano's
             Guilt In Addition To Cicale's Testimony . . . . . . 37

2. The Cicale Allegation, Even If True, Would Provide Only
Cumulative Impeachment And, As Such, Is Not A Ground For
Granting A New Trial . . . . . . . . . . . . . . 40

C. There Is No Brady/ Giglio Violation As To The '05 Trial
Because The Defense Learned Of The Cicale Allegation
Sufficiently In Advance Of Trial . . . . . . . . . . . . 42

II.  Basciano's Habeas Petition Should Be Denied . . . . . . . 43

A. The Use Of Ex Parte Submissions Regarding The Hit List Does
Not Violate The Confrontation Clause . . . . . . . . . . 44

B. Basciano's Challenge To The Other Evidence Of His
Dangerousness Lacks Merit . . . . . . . . . . . . . . .45

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

PRELIMINARY STATEMENT

The government respectfully submits this motion in opposition to defendant Vincent Basciano's motion for an evidentiary hearing regarding a purported <u>Brady</u> violation relating to an allegation made against cooperating witness Dominick Cicale. In addition, the government opposes Basciano's revised supplemental memorandum in support of his habeas petition, following Magistrate Judge Levy's Report and Recommendation upholding the imposition of the Special Administrative Measures.

As demonstrated below, Basciano's motions are without merit and should be denied.

FACTUAL BACKGROUND

I.   <u>Overview of '03 Trial Evidence</u>[1]

On July 31, 2007, a jury rendered a verdict convicting defendant Basciano of all counts in 03 CR 929 (S-8) (the "'03 case"), including racketeering – with predicate acts of murdering and conspiring to murder Frank Santoro, soliciting the murder of Salvatore Vitale, soliciting the murder of Dominick Martino, conspiring to distribute marijuana and two forms of illegal gambling (sports betting and an illegal lottery) – and

---

[1]    In 2008, Basciano is scheduled to be tried on additional racketeering murder charges in a separate indictment (the "'05 case").

substantive counts including marijuana distribution conspiracy and three forms of illegal gambling (sports betting, an illegal lottery and joker poker machines). Seven cooperating witnesses testified at trial, including two new cooperating witnesses: Nicholas Pisciotti and Mitchell Casper.[2]

As summarized below, numerous forms of evidence implicated Basciano in the charged crimes.

A.   The Santoro Murder/ Murder Conspiracy

The government proved this murder beyond a reasonable doubt through numerous forms of evidence, including the defendant's own admissions, which were recorded. In addition to the defendant's statements, the government called five cooperating witnesses who implicated Basciano in the Santoro murder: Salvatore Vitale, Nicholas Pisciotti, Richard Cantarella, James Tartaglione and Dominick Cicale.

For example, Bonanno family underboss Salvatore Vitale testified that Joseph Massino, the then-boss of the Bonanno family, told him about the Santoro murder and implicated Basciano in that murder. Specifically, in early 2001, Massino told Vitale that "Vinny Gorgeous" used a shotgun to kill a man (Santoro) who

---

[2]   Basciano's submission erroneously states that the only new cooperating witness at the '03 trial was Nicholas Pisciotti. See Evid. Hearing Br. at 12 ("The same cooperating witnesses who testified at the first '03 trial also testified in the '03 retrial case, with the sold addition of P.J. Pisciotti, a purported acting captain of the Bonanno family").

was looking to kidnap one of Basciano's sons while that man was walking his dog, and that Bruno (Indelicato) and a corrections officer or an ex-corrections officer was with Basciano when Basciano murdered Santoro. (Trial Tr. 307-09).

In addition to Vitale, Bonanno family acting captain Nicholas Pisciotti testified about the Santoro murder. Pisciotti stated that he learned about the murder from another member of the murder conspiracy, Anthony "Bruno" Indelicato. Pisciotti explained that Indelicato told him that Indelicato was charged with a murder of a junkie in the Bronx (Santoro) and that Basciano and Dominick Cicale were involved in that murder. Indelicato described to Pisciotti his own, Basciano's and Cicale's involvement in that murder, explaining that because Cicale shot at Santoro five times and missed, Basciano "had to get out and do it." (Trial Tr. 3429-32). Indelicato also referred to the murder as being a "test" for Cicale prior to Cicale being proposed for membership in the Bonanno family. (Trial Tr. 3429-32).

Bonanno family captain Richard Cantarella also testified that in 2001 he learned from Joseph Massino that Massino was angry with Basciano for committing an unsanctioned murder. (Trial Tr. 1974-75).

Further, the government offered consensual recordings of Basciano made by Bonanno family captain James Tartaglione.

Basciano admitted his involvement in the Santoro murder on the
first Tartaglione recording.

After explaining to Tartaglione that the two FBI-302
reports Tartaglione provided were really describing "two
different incidents" (the Santoro murder and the Martino murder
solicitation), Basciano stated:

> VB:  But that's good though.  It's good, you wanna
> know why?  Because let them think it's the same
> thing.  You wanna know why?  Because supposedly
> this was carried out, but he denied it . . . .
>
> VB:  They're gonna be tough to pinch me on this.
> They're gonna be tough to pinch me on this.  You
> wanna know why?  They got no forensics.  They have
> no guns.  They have no nothing.  Forget about the
> fact that I didn't do it anyway.  Okay?  I had
> nothing to do with it.  But if I did, there's no
> guns, there's no cars, there's no eyewitnesses,
> there's no rats.  How are they going to pinch me
> on that?

(GX 205a at 10).

Notably, the limited information regarding the murder
conveyed in the FBI-302 from Salvatore Vitale and the police
report regarding the Santoro murder did not describe the presence
of multiple guns, cars, eyewitnesses, or cooperators – these were
details that only a participant in the murder could know, as
Tartaglione himself explained. (See Trial Tr. 2259 ("That he
definitely had a lot to do with it.  I mean, how would you know
all these things and then he's saying, it's very, very difficult
to indict me on it only because of all these things that are

missing.  So he's telling me he did it even though he says in the beginning, even if I had nothing to do with it . . .").

In addition, Basciano, not Tartaglione, explained that the police report regarding the Santoro homicide that Tartaglione had brought matched the statements on the FBI-302 about that murder.

> VB:  In other words basically, this over here corroborates the statement that he makes. . . . This is a police report for this.
>
> CW:  This is the police report.
>
> VB:  To report what actually happened.

(GX 205a at 7).

In addition to the testimony of the five cooperating witnesses and the recording of the defendant's own admissions, the government introduced a variety of other evidence that corroborated the witnesses' testimonies.  These included:

- The testimony of Kenneth Champlin, who corroborated Cicale that two different types of weapons were fired and that there were two cars speeding from the scene following the murder. (Trial Tr. 1628, 1629).

- The prison calls of Anthony "Bruno" Indelicato immediately following Indelicato's knowledge of Basciano's arrest.  Notably, Indelicato inquired whether "Jethro," a nickname for Cicale, was also arrested and expressed astonishment that Basciano was

the only person arrested for the murder. (See GX 650a at 3-4; GX 650d at 4).

- The telephone records of Anthony Donato and Dominick Cicale, confirming that Cicale attempted to reach Donato, another participant in the Santoro murder conspiracy, as soon as he learned Basciano was arrested.

- The testimony of Special Agent Michael Breslin who testified that after he advised Basciano that Basciano had been charged with the murder of Frank Santoro and that Donato had been arrested on the same day, Basciano asked whether Donato was charged with the same things. (Trial Tr. 4056).

- Testimony of Det. Luis Fontanez, a ballistics expert, who testified that the four shotgun shells recovered from the Santoro murder scene were fired from one shotgun. (Trial Tr. 846).

- Testimony of Dr. Gill, the medical examiner, that Santoro was shot from a distance of four to ten feet and was shot while he was lying on the ground (Trial Tr. 819-20, 820-22), which corroborated Cicale's account regarding Basciano's commission of the murder.

B.   <u>The Martino Murder Solicitation</u>

The government proved this murder solicitation beyond a reasonable doubt through numerous types of evidence, including the testimony of cooperating witnesses Richard Cantarella and Dominick Cicale, as well as the defendant's admissions on the first Tartaglione recording.

Richard Cantarella testified that he learned of Basciano's solicitation to murder a junkie (Martino) from both Bonanno family boss Joseph Massino and from Basciano himself. Cantarella explained that after Basciano was introduced to him as a captain, he had a conversation with Basciano in which Basciano agreed that Basciano had to learn to "change his ways and slow down." (Trial Tr. 1924).  Basciano explained that Massino "had just nixed" a plot Basciano had to kill someone, a plot Basciano had all arranged involving a shooter on the back of a motorcycle. (Trial Tr. 1924).  Prior to his conversation with Basciano, Cantarella had learned from Massino that Massino had denied Basciano permission to kill a drug addict because the drug addict's brother was a made member of the Genovese family out of respect for the brother's status in organized crime. (Trial Tr. 1925-26).

Dominick Cicale provided detailed testimony regarding the initial altercation between Martino and Anthony Donato that led Basciano to decide to kill Martino, Basciano's plan to kill

Martino using a shooter on a motorcycle, Basciano's asking
Massino for permission to kill Martino, and Massino's ultimate
denial of permission to kill Martino. (Trial Tr. 1135-43).

Further, Basciano admitted this crime on the first
Tartaglione recording, where Basciano explained not only the
background of his dispute with Martino but also that he had asked
Massino for permission to kill Martino:

> VB:  In other words, they're saying,
> supposedly, I shot a guy over here.  Okay,
> he's a junkie.  And over here, he's saying
> that Massino denied Basciano (UI) the
> junkie's brother was a friend. Oh! You know
> who that was?  I know who that was.  That was
> um, how the fuck did it get back to Sal?  You
> know who that is, it's Joe Martino.  He's a
> friend with the West Side.  His brother hit
> Anthony, a kid around me.  Okay, they had a
> fight in the club, and he hit Anthony.  And I
> wanted to clip him, I wanted to clip him, but
> he wouldn't let me clip him.  It was two
> different incidents.

(GX 205a at 9).  Moreover, by correctly identifying the source of
the two separate 302s regarding the Martino solicitation and the
Santoro murder as, respectively, Richard Cantarella and Salvatore
Vitale (GX 205a at 90), Basciano corroborated the testimony of
Cantarella, who testified that Basciano told him directly about
the Martino murder solicitation.

C.    The Vitale Murder Solicitation

The evidence that proved the defendant's guilt
regarding this predicate beyond a reasonable doubt included the
defendant's admission caught on tape and the testimony of

11

Dominick Cicale.  On the first Tartaglione recording, Basciano admitted that he spoke with then-Bonanno family boss Joseph Massino regarding Salvatore Vitale's purported cooperation with the government and explained that Massino could not act on Basciano's suggestion to kill him:

> VB:  He braved this one out.  He braved it out. He braved it out and you wanna know something, he thought with his heart and not with his head, with his head with this one.  And in this life over here, he'll tell ya himself.  You know what, unfortunately, we learn by our mistakes.  But some mistakes are too gruesome to learn from.  You gotta just act on 'em.
>
> AU:  A lot of people getting hurt here.
>
> VB:  You just gotta act on 'em.  Okay, here's one thing over here that he was thinking about his wife and everything and he probably in the back of his mind, he didn't wanna actually believe it. Okay, but he knows because I went to him and I went to him (UI) about three weeks before.  This is the way, this is the way the tone was going. And he says listen to me.  He says . . .
>
> AU:  He had a bad feeling about it then.
>
> VB:  They're by his house, they're by his house. He couldn't do it.

(GX 205a at 50).

Cicale also implicated Basciano in the Vitale murder solicitation.  Cicale testified that Basciano had asked Cicale to kill Vitale for the Bonanno family but that Massino had denied permission for Vitale's murder. (Trial Tr. 1160, 1162-63).

D.   <u>Marijuana Distribution Conspiracy</u>

As to the marijuana distribution conspiracy, Pisciotti,
Bottone and Cicale implicated Basciano.  Pisciotti explained that
he received 10-20 pounds of marijuana on several occasions from
members of the marijuana distribution conspiracy, including once
from Basciano directly at Kalb's house, in 2000 and 2001.  (Trial
Tr. 3303-16).  Bottone testified that in 1999 or 2000 Basciano
attempted to recruit him to transport marijuana packaged in
duffel bags to New York. (Trial Tr. 2890-92).

E.   <u>Illegal Gambling</u>

As to the illegal sports betting, Mitchell Casper,
Pisciotti, Vitale and Cicale implicated Basciano.  Casper, in
particular, extensively described the sports betting operation,
its high-level participants including Basciano, its office in
Costa Rica, the website used, and the total profits and losses
per season. (Trial Tr. 3655-60; 3563-64; 3569).  Casper's
testimony paralleled that of Cicale, among other things,
regarding the participants in the sports betting operation, the
business's operation, and its profits and losses per season.
(Trial Tr. 3593-94; 3635-41; 3649-69). As to the illegal joker
poker machines, Vitale, Cantarella, Thomas Lee, Pisciotti,
Bottone and Cicale implicated Basciano in running a long-standing
joker poker business that operated from the early 1980s up
through Basciano's arrest in November 2004.  The testimony of the

13

cooperating witnesses was corroborated by numerous other witnesses.  For example, Anthony Colangelo, Jr. testified about Basciano's running of the joker poker locations in the early 1980s. (Trial Tr. 3000).  Several police officers testified about arresting members of Basciano's joker poker operation, such as Joseph DiMarco, Clarence Hopkins and Giuseppe Mondelli, for possession of illegal electronic gambling devices.

As to the illegal lottery, Cicale implicated Basciano, explaining that Basciano, as acting boss, approved the Bonanno family lottery run by Louis DeCicco.  (Trial Tr. 1250-51). Additional testimony established that one of DeCicco's associates was Anthony DeFilippo, from whom the FBI recovered gambling records consistent with the illegal lottery Cicale described.

In his submission, Basciano attempts to characterize Cicale as central to the government's case.  (Mem. in Support of The Defendant's Motion For An Evidentiary Hearing ("Evid. Hearing Br.") at 12.)  Basciano had been indicted on the most serious charges in the case – the Santoro murder and the Martino solicitation - before Cicale cooperated.  Moreover, as to those charges, several other cooperating witnesses implicated Basciano. Likewise, as set forth above, as to the other lesser charges, cooperating witnesses other than Cicale and other evidence directly implicated Basciano.

14

F.    The Defense's Impeachment of Cicale

      During its direct examination of Cicale, both the government and the defense comprehensively elicited Cicale's past crimes and frauds, including his conviction for manslaughter for his role in the murder of George Kehoe, his commission of and guilty plea to the murders of Frank Santoro and Randolph Pizzolo, his involvement in drug dealing, assaults, shooting at people, armed robbery while on bail, arson, frequent violations of prison rules and supervised release, his attempts to cash fraudulent checks and accusations of domestic violence. (See, e.g., Trial Tr. 965, 968-69, 972, 974-76, 978-84, 991-92, 1007-09, 1010-11, 1276-77, 1298-99, 1331, 1332, 1354, 1376-77, 1380, 1383-85, 1387-89, 1392-93, 1425-26, 1512-15).  Cicale also testified about defrauding his grandmother. (Trial Tr. 1299-1300, 1326).  The government also elicited the fact that Cicale had lied about giving his cousin a bag of guns during his first proffer session. (Trial Tr. 1298).  The defense extensively impeached Cicale on his allegedly prior inconsistent statements that were made either during debriefings or at the first Basciano trial on a variety of topics, including Cicale's recollection of the Santoro murder, the facts surrounding Basciano's solicitation of the murder of Donnie Martino, and Basciano's and Cicale's involvement in illegal gambling. (See, e.g., Trial Tr. 1348, 1360, 1363-64,

1367-70, 1410-11, 1413-14, 1439-44, 1454, 1458, 1472-74, 1478-80, 1521-22, 1523-25, 1563-66, 1578-79, 1604).

II.   The Government's *Brady* and *Giglio* Disclosures

Prior to and during the '03 trial, the government made numerous Brady and Giglio disclosures to the defense.  Several of those disclosures pertained to cooperating witness Dominick Cicale.  Those disclosures included, among others, information from another federal cooperating witness that contradicted Cicale's discussion of the events leading to the Santoro murder. The other cooperating witness had advised that the witness sold Cicale the shotgun used in the Santoro murder, and that Cicale had told his father about the Santoro murder.  Because this cooperating witness was prosecuted by federal prosecuting office other than the United States Attorney's Office for the Eastern District of New York, the government requested that the Court order that entity to permit the disclosure.[3]

In addition, the government disclosed voluminous Giglio material for Cicale.  That material included, among other items, (1) Cicale's numerous prior violent acts, (2) Cicale's lack of truthfulness in certain regards in his initial proffer session with the government (Tr. 1298), and (3) Cicale's conviction of prison infractions after cooperating, stemming from Cicale's assault of another inmate (Tr. 1275-76).

---

[3]      This occurred during a sealed side bar.

III. <u>The False Murder Plot Allegation</u>

On August 17, 2007, several weeks after the <u>Basciano</u> verdict, a cooperating witness in another matter unrelated to organized crime ("CW-1") made an allegation to an Assistant United States Attorney that Cicale had propositioned CW-1 falsely to claim that Marco Santomaggio, a prison guard at the Metropolitan Correctional Center ("MCC"), asked CW-1 to kill Cicale on behalf of Basciano. That Assistant United States Attorney immediately informed the undersigned, who in turn promptly commenced an inquiry into the allegation.[4]

In its inquiry, the Office has determined that CW-1 did not inform any Assistant United States Attorney of this allegation prior to August 17, 2007. The Office has further determined that CW-1 did not inform anyone in the Federal Bureau of Investigation of this allegation prior to August 17, 2007. In this regard, a violent crimes squad of the FBI is the investigating agency for CW-1. A different FBI squad – the

---

[4] Basciano has misrepresented that the government has conceded the veracity of this allegation. (Evid. Hearing Br. at 6 ("the government acknowledged in its letter submitted under seal to the Court, that Dominick Cicale, while housed in Witsec at the MCC, had in fact, solicited another Witsec inmate, to falsely claim that a senior correctional officer at the MCC, asked the inmate to kill Cicale on behalf of Basciano.")). That is patently untrue: the government has never conceded the truth underlying the allegation. The most the government has acknowledged is that CW-1 has made an allegation against Cicale. As it has in past submissions, the government again assumes, for the purposes of this motion, the allegation by CW-1 is true.

Bonanno organized crime squad – is the investigating agency for the Basciano matter.  CW-1 told neither of these squads, nor anyone else in the FBI, about the allegation prior to August 17, 2007.

The Office has further determined that the only persons CW-1 informed about the allegation prior to August 17, 2007 were certain BOP employees in the Protective Custody Unit ("PCU") at the Metropolitan Correctional Center.  Those employees do not serve an investigative function, but rather are responsible for supervising the inmates in the PCU.  Those BOP employees did not inform the U.S. Attorney's Office or the FBI of the allegation. (See Ex. A, enclosing the affidavits of the MCC staff).[5]

The BOP PCU employees at some point notified an employee in the Special Investigative Services ("SIS") section of the MCC about the allegation.  The SIS employee, however, did not in turn inform anyone outside MCC prior to Basciano's conviction.  Likewise, the separate MCC employees responsible for supervising the implementation of Basciano's Special Administrative Measures ("SAMs") in Unit 10 South were not informed of the allegation.

---

[5]   Because the affidavits are compelled statements and may result in disciplinary action, the government is filing these affidavits under seal.  In addition, the government is currently submitting these affidavits ex parte because they are the subject of the government's pending motion for a protective order.  Once this Court decides the motion for the protective order, the government will provide the affidavits to the defense.

IV.  Santomaggio

On August 15, 2007, two days before the government learned of the allegation, Basciano's defense attorneys submitted an ex parte letter to Your Honor advising the Court that, on August 13, 2007, Santomaggio had sua sponte communicated with Basciano at the MCC and that Santomaggio later met with Basciano's defense attorneys to inform them of the allegation. The August 15 letter failed to identify any legal basis for communicating ex parte with the Court.

On September 4, 2007, the Court disclosed the August 15 letter to the government and issued an Order directing the government to respond in particular in regard to the defense's apparent discovery violation claim.

On September 10, 2007, Basciano's defense attorneys submitted an affidavit from Santomaggio under seal.  In the affidavit, Santomaggio states that he learned of the allegation on July 31, 2007.  (See Santomaggio Aff., ¶ 2).  Santomaggio does not assert (nor do Basciano's defense attorneys) that Santomaggio, or anyone else in the Bureau of Prisons, ever advised the United States Attorney's Office or anyone else outside the MCC of the allegation prior to Santomaggio's contact with Basciano's defense attorneys.  (See Santomaggio Aff., passim).  Likewise, Santomaggio notes that, according to CW-1's alleged statements to Santomaggio, CW-1 did not advise the United

States Attorney's Office or anyone outside the MCC of the allegation until after Basciano's conviction. (See Santomaggio Aff., ¶ 6). Santomaggio's affidavit further discloses the identity and location of a Witness Security inmate at the MCC, in violation of 18 U.S.C. § 3521(b)(3), which prohibits disclosure of that information without specific approval from the Attorney General of the United States.

V.    Basciano's Revised Supplemental Memorandum In Support
      Of His Habeas Petition

      A.   Magistrate Judge Levy's Denial Of Basciano's Habeas
           Petition

     In denying Basciano's habeas petition in all relevant parts,[6] Judge Levy ruled that "Basciano has not met his burden of showing that the imposition of the SAMs and his placement in Unit 10 South are unconstitutional conditions of confinement." (Report & Recommendation at 10). As Judge Levy found,

> the evidence of Basciano's dangerousness is
> substantial. Both parties have provided
> transcripts of petitioner's 2006 trial and of
> recorded conversations between Basciano and his
> associates. These transcripts, along with the
> government's in camera proffer regarding the
> alleged hit list, convincingly portray a troubling
> pattern of criminal activity conducted within the
> confines of federal detention facilities.

Report & Recommendation at 11). Regarding the alleged "hit list," Judge Levy concluded

---

[6]    Judge Levy recommended Basciano's petition be granted in one respect, by permitting Basciano to have contact visits with his

I agree with the government that
revealing the details of the in camera
proffer and affidavit would unduly expose the
government's cooperating witness to danger.
The instant record, including the recorded
conversations and Basciano's 2006 conviction
on racketeering charges, shows that Basciano
has extensive contacts in organized crime,
such that revealing the identity of a
cooperator could expose the witness or his
family to grave danger.  The same record
lends credence to the government's contention
that the alleged hit list was part of a
genuinely violent endeavor that Basciano had
the capacity to accomplish.

The statements described in the in
camera proffer strongly indicate that the
handwritten list of five names was intended
to serve as a hit list.  The government has
presented convincing evidence that it has
conducted an extensive investigation of the
reliability of this witness and his
statements.  I therefore agree that the
government has demonstrated that Basciano
would present a significant security risk if
returned to the general population.  This is
a valid security interest under Bell v.
Wolfish; therefore, the imposition of SAMs
was not arbitrary.  Further, given the
credibility of the evidence of the evidence
regarding petitioner's dangerousness, I find
that the imposition of SAMs and Basciano's
placement in Unit 10 South is not an
exaggerated response to the government's
security concerns.

Report & Recommendation at 12-13.

B.   Basciano's Supplemental Memorandum

In his revised supplemental memorandum in support of

his habeas petition to be released from the Special

---

attorneys. (Report & Recommendation at 21-22).

Administrative Measures ("SAMs"), Basciano makes several arguments.

First, Basciano argues that there is no foundation for the government's assertion that the list of five names is a hit list. Rather, Basciano contends, that list, like the two others that were turned over by Basciano to guards at MCC, were "Santeria" lists.[7]  In addition, Basciano asserts that at an evidentiary hearing, several inmates (Peter Lionous, Danny Reyes, Reginald White) that had been housed with Basciano and MCC staff (Lt. Johnson, Officer Chancioso) would testify that the lists were provided for a Santeria ritual.

Second, Basciano challenges, as a violation of <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), the government's <u>ex parte</u> submission to Magistrate Judge Robert Levy supporting the government's contention that the list of 5 names was a hit list.

Third, Basciano then challenges the other bases for finding that Basciano presents a danger in general population, including the pending charge that Basciano attempted to extort a criminal defense attorney in prison and Basciano's alleged solicitation to murder Michael Mancuso, citing purportedly inconsistent testimony by Dominick Cicale, on the one hand, and Nicholas Pisciotti and Thomas Lee, on the other.  Fourth,

---

[7]    Notably, during the pendency of the habeas litigation, Basciano has taken, and failed, a polygraph examination provided by his own polygraph examiner regarding the alleged hit list.

Basciano also notes the existence of another inmate at MCC, Paul Villanueva, who would purportedly testify that there was no plot to kill a suspected cooperating witness, Joseph Borelli, on behalf of Basciano.  Here Basciano acknowledges that Magistrate Judge Levy declined to use this allegation as a basis to uphold the SAMs.

Finally, Basciano submits that the restriction upon his communicating with his paramour, Debra Kalb, impinges on his ability to develop a mitigation case by practically preventing him in having contact with his youngest son, Anthony Kalb.  The government is now working with the Attorney General's Office to amend the SAMs to permit Kalb to have monitored contact with Basciano consistent with that provided to Basciano's other family members (with the exception of Vincent Basciano, Jr.).

<u>ANALYSIS</u>

I.   <u>Basciano Has Failed To Establish A Brady/ Giglio Violation</u>
     <u>Sufficient To Overturn His July 2007 Conviction</u>

     A.   <u>Knowledge Of The Cicale Allegation Cannot Be Imputed To</u>
          <u>The Prosecution</u>

          Basciano claims that even though the prosecution team

was not aware of the allegation, knowledge of the allegation

should nonetheless be imputed to it because the BOP was aware of

the allegation. Basciano's claim is without merit.

          In <u>United States v. Avellino</u>, 136 F.3d 249, 255 (2d

Cir. 1998), the Second Circuit described the circumstances in

which knowledge can be imputed to the prosecution:

> The <u>Brady</u> obligation extends only to material
> evidence  . . . that is known to the
> prosecutor.  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S.
> at 437, 115 S.Ct. St 1567.  An individual
> prosecutor is presumed, however, to have
> knowledge of all information gathered in
> connection with his office's investigation of
> the case and indeed 'has a duty to learn of
> any favorable evidence known to the others
> acting on the government's behalf in the
> case, including the police.'  <u>Id.</u>; <u>see</u> <u>United</u>
> <u>States v. Payne</u>, 63 F.3d 1200, 1208 (2d Cir.
> 1995).  Nonetheless, knowledge on the part of
> persons employed by a different office of the
> government does not in all instances warrant
> the imputation of knowledge to the
> prosecutor, for the imposition of an
> unlimited duty on a prosecutor to inquire of
> other offices not working with the
> prosecutor's office on the case in question
> would inappropriately require us to adopt a
> 'monolithic view of government' that would
> 'condemn the prosecution of criminal cases to
> a state of paralysis.'  <u>United States v.</u>
> <u>Gambino</u>, 835 F. Supp. 74, 95 (E.D.N.Y. 1993),
> <u>aff'd</u>, 59 F.3d 353 (2d Cir. 1995), <u>cert.</u>

> denied, 517 U.S. 1187, 116 S.Ct. 1671, 134
> L.Ed.2d 776 (1996).  Thus, in United States
> v. Locascio, 6 F.3d 924 (2d Cir. 1993)
> ("Locascio"), cert. denied, 511 U.S. 1070,
> 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994), we
> refused to impute to the AUSAs prosecuting
> that action knowledge of reports prepared by
> FBI agents who were 'uninvolved in the
> investigation or trial of the defendants-
> appellants.'  In United States v. Quinn, 445
> F.2d 940 (2d Cir.), cert. denied, 404 U.S.
> 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971), we
> refused to impute the knowledge of a Florida
> prosecutor to an AUSA in New York, rejected
> as 'completely untenable [the] position that
> 'knowledge of any part of the government
> is equivalent to knowledge on the part of this
> prosecutor.'  Id. at 944."

Following its admonishment to avoid creating a
"monolithic view" of the government, the Second Circuit has
repeatedly concluded that the prosecution team lacks
constructive knowledge of evidence possessed by other
government agencies that are not involved in the
investigation of the defendant.  See, e.g., Avellino, 136
F.3d at 256 (refusing to impute information gathered in
state investigation to federal prosecutor); Locascio, 6 F.3d
924, 949 (2d Cir. 1993)(concluding that prosecution lacked
constructive knowledge of information obtained by FBI agents
uninvolved in investigation); Pina v. Henderson, 752 F.2d
47, 49-50 (2d Cir. 1985) (concluding prosecution did not
have constructive knowledge of information relayed to parole
officer); United States v. Stofsky, 527 F.2d 237 (2d Cir.
1975) (no imputation of witness's tax information held by

the IRS); <u>United States v. Canniff</u>, 521 F.2d 565 (2d Cir.
1975) (no imputation of information in witness's Pre-
Sentence Report); <u>United States v. Ferguson</u>, 478 F. Supp. 2d
220, 239-40 (D. Conn. 2007) ("Although the Court recognizes
that the government did coordinate pieces of its
investigation with the NYAG during two months in 2005, the
Court concludes that this collaboration was not so extensive
as to be 'joint' to impute knowledge of the NYAG's
investigation to the government"); <u>United States v. Shakur</u>,
32 F. Supp. 2d 651, 664-65 (S.D.N.Y. 1999) (concluding that
vague allegation by undercover NYPD officer that supervisors
requested he prepare unsigned notes "for the Federal
Government" "is not the stuff of which imputed knowledge is
made"); <u>United States v. Chalmers</u>, 410 F. Supp. 2d 278, 289-
90 (S.D.N.Y. 2006) (refusing to impute evidence in custody
of federal agencies that did independent investigation of
United Nations Oil-For-Food program to prosecution team).

Prison officials who are uninvolved with the
investigation of the defendant cannot be deemed as part of
the "prosecution team" for purposes of determining whether
the government has met its <u>Brady</u> and <u>Giglio</u> obligations.
Particularly instructive is <u>Pina v. Henderson</u>, 752 F.2d 47
(2d Cir. 1985) in which the Second Circuit rejected a habeas
challenge alleging that an exculpatory statement made to a

parole officer uninvolved in the investigation was imputable
to the prosecution under Brady.  The Circuit distinguished
the parole officer from an agent who had kept a confidential
file on a key government witness

> [b]ecause that agent had supervised the
> informant, had participated actively in the
> investigation and sat at the prosecutor's
> side during all or most of the trial, we
> deemed it fair to treat him as an 'arm of the
> prosecutor.'  That descriptive cannot be
> applied to Parole Officer Kaplan, who did not
> work in conjunction with either the police or
> the prosecutor.

Pina, 752 F.2d at 49-50.  Similarly, the Third Circuit noted
that "the BOP was not part of the prosecutorial arm of the
federal government as it was not at all involved in either
the investigation or the prosecution of the defendants" when
rejecting the defendants' claim that the government violated
Brady by failing to disclose the recorded prison calls of
three cooperating witnesses.  United States v. Merlino, 349
F.3d 144, 155 (3d Cir. 2003).  In Bell v. Pool, No. 00 CV
5214 (ARR), 2003 WL 21244625, at *17 (E.D.N.Y. Apr. 10,
2003), Judge Ross concluded that the New York State
Department of Correction was not acting on behalf of the
police or the prosecution and thus, a photograph in that
agency's possession was not constructively possessed by the
prosecution despite the fact that the DOC regularly provided

the District Attorney's Office with phone and visitation
records:

> The court is not persuaded by petitioner's
> argument that because the District Attorney's
> Office regularly obtained DOC phone and
> visitation records, the DOC effectively acted
> as an arm of the prosecution.  Merely
> complying with requests for information did
> not transform the corrections department –
> whose function was the "care, custody, and
> control" of inmates – into an investigatory
> agency working at the behest of the
> prosecution.

Bell, 2003 WL 21244625, at *17.

While two courts have concluded that knowledge by
police officers or marshals involved in the protection of a
cooperating witness should be imputed to the prosecution, in
those cases, unlike here, there was evidence that the officers
involved in protection had assisted meaningfully in the
investigation.  In United States v. Bin Laden, 397 F. Supp. 2d
465, 485 (S.D.N.Y. 2005), the court noted that the witness
security marshals acted beyond the scope of merely providing
protection when they installed videoconferencing in a location
near a cooperating witness to assist in ongoing terrorism
investigations, affirmatively volunteered to review with the
witness a consensually recorded phone call the witness had made,
and spontaneously relayed substantive information to prosecutors
relating to the investigation.  Ultimately, the court denied the
defendant's request for a new trial since none of the undisclosed

28

information was "powerful enough to displace the Government's other evidence of El-Hague's guilt." Bin Laden, 397 F. Supp. 2d at 518.  In Mastracchio v. Vose, 274 F.3d 590, (1st Cir. 2001), the First Circuit imputed knowledge by police officers providing a cooperating witness with protective custody to the prosecution where those officers had supervised debriefings of the witness and had advised the investigative team when the witness provided information relevant to the investigation of the defendant. Mastracchio, 274 F.3d at 599 n.2.  Ultimately, the court affirmed denial of Mastracchio's habeas petition because the undisclosed Giglio information would not have undermined the verdict due to the corroborating evidence of the cooperator's testimony regarding the charged murder and the fact that the cooperating witness was extensively impeached by similar evidence. 274 F.3d at 603.  In this case, however, there is no evidence that MCC staff had any involvement in the investigation of Basciano or in performing any task other than guarding inmates at MCC or ministerially implementing the provisions of the SAMs.

The affidavits of the MCC staff who became aware of the allegation made against Cicale conclusively establish that at no time prior to Basciano's conviction on July 31, 2007, did any of them inform the FBI or the United States Attorney's Office of that allegation.  Nor would the MCC necessarily be required under its own procedures to notify the FBI or the U.S. Attorney's

29

Office of an inmate's allegation against another inmate prior to
undertaking its own investigation.  As Special Investigative
Agent Mary Wade-Jones explained, when an inmate makes an
allegation of criminal activity or inappropriate conduct by
another inmate (which is what allegedly occurred here), the SIS
Department first conducts an internal investigation and if it is
determined, following that investigation, that criminal activity
occurred, SIS refers the matter to the appropriate law
enforcement agency.  (Wade-Jones Decl. ¶ 6).  If there is no
indication of criminal activity or if the criminal activity does
not warrant a referral for prosecution, law enforcement is not
notified and the matter is dealt with internally. (Wade-Jones
Decl. ¶ 6).  It appears clear from the affidavits that MCC staff
did not follow MCC's own guidelines about fully reporting the
allegation internally to either superiors or the SIS department.
Nor does the affidavit of Santomaggio, submitted by the defense,
establish that the prosecution team was aware of the allegation
prior to Basciano's conviction. (See Santomaggio Aff. ¶ 6
("According to CW-1, he informed his prosecutors of Cicale's plan
soon after Basciano's conviction.  I also learned that CW-1 was
interviewed shortly thereafter by a prosecutor with whom he is
cooperating").  All Santomaggio claims is that Officer Eldridge
"told me this matter was brought to her attention by CW-1 and she
in turn 'took it to the people who needed to know about it,'

including the MCC's Security Investigative Services" (Santomaggio

Aff. ¶ 2) – a vague assertion directly refuted by Officer

Eldridge who denies that she "ever told Santomaggio about any

allegations made against him by any inmate.  I never told him

about the information provided by [CW-1], or any other inmate.  I

never advised Santomaggio that there was any kind of ongoing

investigation regarding a murder plot involving him and inmates

Cicale and Basciano.  I did not have any such a conversation with

Santomaggio on July 31, 2007, or any other day.  I never advised

Santomaggio that I had referred the matter to the SIS, or 'took

it to the people that need to know about it.'" (Eldridge Aff. ¶

21).[8]  Eldridge, in fact, confirms the opposite: that she did not

tell anyone outside of the MCC regarding CW-1's allegation prior

to Basciano's conviction.  (Eldridge Aff. ¶¶ 9-10 (stating that

she did not inform her supervisor, the inmate monitoring section,

the FBI, the U.S. Attorney's Office, the Office of the Inspector

General's Office or the Office of Enforcement Operations)).  In

---

[8]     Notably, at the time Santomaggio swore to his affidavit,
he was under internal investigation for improperly investigating
CW-1.  Santomaggio's self-serving statement regarding what Eldridge
allegedly directed him to do lacks credibility in light of his need
to defend against that administrative charge.

light of these statements, there can be no plausible argument that the MCC staff's knowledge can be imputed to the prosecution.

Confronted with Santomaggio's allegation that CW-1 did not inform his prosecutors until after Basciano's conviction and the statements by MCC staff that they did not inform the prosecution team about the allegation, the defendant speculatively surmises that there "must" have been joint investigation of the Cicale allegation.  But such surmise is woefully insufficient to establish a factual dispute requiring an evidentiary hearing, much less to establish a Giglio violation requiring a new trial.  See, e.g., Avellino, 136 F.3d at 261 (concluding it "was well within the discretion of the court to conclude that no evidentiary hearing was necessary" where defense counsel only "rain[ed] rhetoric" on the court); United States v. Spadoni, 2006 WL 2592274, at *7 (D. Conn. Sept. 7, 2006) ("if the moving papers themselves disclose the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing," denying an evidentiary hearing is appropriate); see also United States v. DiPaolo, 835 F.2d 46, 50 (2d Cir. 1987) (no error in denial of evidentiary hearing regarding witness's recantation where judge observed the witness at trial); United States v. Ferguson, 478 F. Supp. 2d 220, 240 (D. Conn. 2007) (concluding evidentiary hearing was unnecessary based on supporting documents submitted with each

32

side's briefs); <u>United States v. Shakur</u>, 32 F. Supp. 2d 651, 664-
65 (S.D.N.Y. 1999) (concluding that vague allegation by
undercover NYPD officer that supervisors requested he prepare
unsigned notes "for the Federal Government" "is not the stuff of
which imputed knowledge is made").

           In support of his argument, Basciano cites the fact
that the SIS file submitted to Judge Levy "does not contain any
report of an investigation of either the alleged hit lists"
(Evid. Hearing Br. at 17).  Far from supporting Basciano's
argument, this contention proves that MCC did <u>not</u> work in
conjunction with the investigative team.  If MCC staff were
investigating the list along with the FBI and U.S. Attorney's
Office, its files would contain references to the 'hit list'
investigation.  The mere fact that MCC may have supplied the
actual investigative team with documents or information does not
convert MCC into a member of the prosecution.[9]  <u>See</u> <u>Bell</u>, 2003 WL
21244625, at *17 ("Merely complying with requests for information
did not transform the corrections department – whose function was
the 'care, custody, and control' of inmates – into an
investigatory agency working at the behest of the prosecution.").
If the provision of documents sufficed to convert entities into
members of the investigation, then in each grand jury

_____

[9]    Notably, the MCC did not provide the government with
the alleged 'hit list' and it was only after Basciano
himself informed prison staff of the two additional Santeria

33

investigation in which telephone companies or banks provide records, those companies would then become a member of the prosecution – a notion that is nonsensical.

Basciano also conclusorily asserts that MCC was involved in the FBI's investigation of the hit list from the fact that cited within the affidavit of MCC Unit Manager Kenneth Haas is information from Basciano's trial, the charges pending in the '05 case, and a recitation of the existence of the 'hit list,' which Haas claimed he learned in part from the government. Notably, Haas does <u>not</u> claim he was involved in investigating the hit list, but rather, he explains that MCC used the information learned from the government in making its own security assessment.  Haas's mere receipt of information from the government for purposes of submitting an affidavit during Basciano's habeas litigation and his ministerial implementation of the SAMs by coordinating the family visits the FBI is required to monitor under the SAMs with the FBI do not magically transform all staff members within the MCC into part of the prosecution.

Basciano's request for the identities of the AUSAs and agents working with CW-1 is inappropriate because, even accepting Santomaggio's affidavit on its face, Basciano raises no fact to suggest that those people learned of the Cicale allegation prior to Basciano's conviction.  In fact, Santomaggio claims the

lists that MCC staff recovered one of those lists.

opposite: that CW-1 told Santomaggio that he did not inform his prosecutors of the Cicale allegation until after Basciano's conviction. (Santomaggio Aff. ¶ 6). Santomaggio's additional accusation that Cicale committed acts of "murder sabotage" (Santomaggio Aff. ¶ 4) is clearly baseless, as his cited examples of throwing water in the cable box and pouring coffee on the kitchen floor cannot plausibly be believed to be 'murderous' acts. The most Santomaggio claims about these incidents is that CW-1 told his prosecutors that Cicale had "acted out" in this fashion, a vague allegation that in no way suggests CW-1 raised the Cicale false murder plot allegation to his prosecutors prior to Basciano's conviction especially in light of Santomaggio's clear statement to the contrary. Even presuming both that CW-1 informed prosecutors that Cicale was acting out by damaging a cable box or pouring coffee on the kitchen floor and that these allegations were true, they in no way rise to the level of a Brady or Giglio violation since they are not material to any crime for which Basciano has been convicted and are, at best, impeachment on a collateral matter, which is properly excludable by the Court. See, e.g., United States v. Purdy, 144 F.3d 241, 245-26 (2d Cir. 1998) (affirming exclusion of allegedly impeaching testimony of "material" Defense Contract Audit Agent, who had assisted the government in preparing its case, who would have testified that only some of the purchase orders of the

fruits of the government contract-kickback conspiracy related to prime contracts with the government); United States v. Mulinelli-Navas, 111 F.3d 983, 988 (1st Cir. 1987) (excluding as collateral testimony from an attorney that would have contradicted what the witness stated occurred prior to an interview; "In light of the collateral issue rule, in order to be admissible, [the attorney's] offered testimony must not only contradict a statement of [the witness], but must also be material to [the defendant's] guilt or innocence.  [The defendant] fails, however, to indicate any independent and material ground for admitting [the attorney's] testimony as to what he told [the witness] at the time of the interview.").

     In sum, there is no evidence that the investigation/ prosecution team was aware of the Cicale allegation prior to Basciano's conviction and simply no evidence by which to conclude the knowledge of those who guarded CW-1 could legally be imputed to the prosecution team.

          B.   The Cicale Allegation Does Not Provide A
               Basis For A Retrial

     When seeking a retrial on the basis of newly discovered impeachment evidence, defendants bear a heavy burden:

          In general, evidence whose function is
          impeachment may be considered to be material
          where the witness in question supplied the
          only evidence linking the defendant to the
          crime.  Similarly, impeaching matter may be
          found material where the witness supplied the
          only evidence of an essential element of the

offense.  This is especially true where the
undisclosed matter would have provided the
only significant basis for impeachment.
Undisclosed impeachment evidence is not
material in the Brady sense when, although
possibly useful to the defense, it is not
likely to have changed the verdict.  For
example, where the undisclosed evidence
merely furnishes an additional basis on which
to challenge a witness whose credibility has
already been shown to be questionable or who
is subject to extensive attack by reason of
other evidence, the undisclosed evidence may
be cumulative, and hence not material.

Avellino, 136 F.3d at 256-57.  As explained below, because Cicale

did not provide the only evidence of an essential element of any

of the crimes for which Basciano was convicted and because Cicale

was already the subject of extensive impeachment, Basciano cannot

establish that he is entitled to a new trial.

     1.    There Is Overwhelming Evidence Establishing
           Basciano's Guilt In Addition To Cicale's
           Testimony

The evidence of Basciano's guilt as to all charges, but

especially as to the Santoro murder, Martino murder solicitation,

the sports betting operation, the marijuana distribution

conspiracy and joker poker operation, was overwhelming and from

numerous sources other than Cicale.  Even as to those charges -

the Vitale murder solicitation and the illegal lottery charge -

for which Cicale was the only cooperating witness to testify, the

government corroborated Cicale's testimony through other

evidence, including Basciano's own statements on the Tartaglione

recording and the recovery of the Bonanno family lottery records

from Bonanno family associate Anthony DeFilippo which were consistent with Cicale's testimony.

For example, regarding the Santoro murder, Vitale testified that he learned from Bonanno family boss Joseph Massino that Basciano, Indelicato and a former corrections officer shotgunned a man who threatened to kidnap Basciano's son while that man was walking his dog in the Bronx and left his body in the street – details which match the murder of Frank Santoro. Pisciotti testified he learned from Bruno Indelicato, a participant in the Santoro murder conspiracy, that Indelicato was involved in a murder of a junkie with Basciano and Cicale and that during the murder, Cicale shot at the victim five times and missed and that Basciano "had to get out and do it."   Contrary to Basciano's rhetorical assertions, his "denials" of the Santoro murder on the Tartaglione recording were anything but: Basciano explained to Tartaglione that the government lacked key evidence that only a participant in the murder would know existed.   In addition, Tartaglione explained his understanding, based upon, among other things, his past conversations with Basciano regarding criminal activity and his extensive experience in organized crime of having members of the Bonanno family reporting and discussing criminal activity, that he understood Basciano to mean that "he definitely had a lot to do with it. I mean, how would you know all these things and then he's saying, it's very,

very difficult to indict me on it only because of all these things that are missing.  So he's telling me he did it even though he says in the beginning, even if I had nothing to do with it." (Trial Tr. 2259).

As to the Martino murder solicitation, in addition to Cicale's testimony, Richard Cantarella testified that Basciano admitted the solicitation to him, a solicitation that was also confirmed by Bonanno family boss Joseph Massino.  Basciano himself confessed to the crime on the Tartaglione recording, explaining,

> VB:  In other words, they're saying, supposedly, I shot a guy over here. Okay, he's a junkie.  And over here, he's saying that Massino denied Basciano (UI) the junkie's brother was a friend. Oh! You know who that was?  I know who that was.  That was um, how the fuck did it get back to Sal?  You know who that is, it's Joe Martino.  He's a friend with the West Side.  His brother hit Anthony, a kid around me.  Okay, they had a fight in the club, and he hit Anthony.  And I wanted to clip him, I wanted to clip him, but he wouldn't let me clip him.  It was two different incidents. (GX 205a at 9).

There is no claim, nor could there credibly be, that CW-1's allegation in any way tended to exonerate or exculpate Basciano from the numerous crimes of which he stands convicted. See Locasciao, 6 F.3d at 949 (quoting District Court decision in United States v. Locascio)); United States v. Sposato, 446 F.2d 779, 781 (2d Cir. 1971) (new evidence "which merely discredits a

39

government witness and does not directly contradict the
government's case ordinarily does not justify a new trial").[10]

>   2.  The Cicale Allegation, Even If True, Would
>       Provide Only Cumulative Impeachment And, As
>       Such, Is Not A Ground For Granting A New Trial

As the Second Circuit has concluded, the non-disclosure
of additional grounds for impeachment of a cooperating witness
does not warrant a new trial where that witness was extensively
impeached:

>   Thus, the Gravano cases teach that where
>   there has been disclosure of an
>   abundance of evidence of a witness's
>   long history of brutality, rapacity, and
>   mendacity, the belatedly disclosed
>   evidence suggesting that the witness
>   perjured himself by concealing

---

[10]    Basciano's citation of the fact that the jury from his
first trial hung 11 to 1 in favor of conviction on the
Santoro murder predicate is a non-starter as it was clear
from the jury's notes to the Court that the one hold-out
juror categorically refused to believe the testimony of any
cooperating witness.  Nor does the contact from the
'purported juror' from Basciano's second trial change the
analysis.  There is simply no proof that the person who
contacted former counsel James Kousouros was an actual
juror.  Indeed, all the jurors were polled by the Court
immediately following the verdict and all jurors indicated
their agreement with the verdict.

> additional crimes may be immaterial,
> whether that perjury occurred in the
> trial at issue on appeal, as in
> <u>Locascio</u>, or in other trials, as
> hypothesized in <u>Gambino</u>.

<u>Avellino</u>, 136 F.3d at 258 (concluding that state wiretap evidence suggesting cooperating witness was involved in continued narcotics trafficking, which he had denied, was not material in light of the government's disclosure of the witness's "atrocious criminal record" and the fact that there "was a wealth of disclosed evidence with which D'Arco could have been impeached"); <u>Locascio</u>, 6 F.3d at 949 (affirming denial of a new trial on Brady claim; "as the district court found, these reports [of statements by a separate cooperating witness of undisclosed murders by witness Salvatore Gravano] would have had no effect on Gravano's credibility, not only because they were untrustworthy, but also because they would merely have been cumulative.  Gravano had already confessed to numerous crimes, including murders, and was subject to withering cross examination for those actions.  The addition of a few more allegations would not have materially affected the defense's cross examination of him."); <u>United States v. Schlesinger</u>, 438 F. Supp. 2d 76, 103 (E.D.N.Y. 2006) ("Impeachment evidence that bears only on credibility is generally not a sufficient basis for obtaining a new trial"). Here, the addition of another allegation – even presuming its truth – that Cicale was a lying criminal would not have

materially altered the jury's assessment of his credibility. Adverse facts about Cicale, elicited by both the government and the defense, established Cicale was a violent, lifelong criminal. Indeed, defense counsel spent approximately nine hours cross-examining Cicale about his prior bad acts, alleged prior inconsistent statements and motivations to lie and falsely implicate Basciano. The defense emphasized in its summation why Cicale's testimony was unworthy of belief and why Cicale had a motive to falsely implicate Basciano.

      C.    There Is No <u>Brady/ Giglio</u> Violation As To The '05 Trial Because The Defendant Learned Of The Cicale Allegation Sufficiently In Advance of Trial

It is well established that no <u>Brady</u> violation is found when the defendant knows of the information allegedly not disclosed sufficiently in advance of trial. <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976) (information is suppressed within the meaning of <u>Brady</u> only where it is "known to the prosecution but unknown to the defense"); <u>Leka v. Portuondo</u>, 257 F.3d 89, 100 (2d Cir. 2001) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."); (quoting <u>United States v. LeRoy</u>, 687 F.2d 610, 618 (2d Cir. 1982)); <u>United States v. Diaz</u>, 922 F.2d 998, 1007 (2d Cir. 1990). Here, the defense knew of the Cicale allegation almost one year before the '05 trial is scheduled to begin, a length of time more

than sufficient for the defense to act upon the information. See
United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007)
("Brady information must be disclosed, furthermore, in a manner
that gives the defendant a reasonable opportunity either to use
the evidence in the trial or to use the information to obtain
evidence for use in the trial. Thus, the Government must make
disclosures in sufficient time that the defendant will have a
reasonable opportunity to act upon the information
efficaciously."); Leka, 257 F.3d at 100 ("It is not feasible or
desirable to specify the extent or timing of disclosure Brady and
its progeny require, except in terms of the sufficiency, under
the circumstances, of the defense's opportunity to use the
evidence when disclosure is made.  Thus disclosure prior to trial
is not mandated.").


II.  BASCIANO'S HABEAS PETITION SHOULD BE DENIED

          The government incorporates by reference its responses
to all of Basciano's prior habeas submissions as well as Judge
Levy's detailed factual findings.  In his supplemental memorandum
in support of his habeas petition, Basciano again fails to raise
a sufficient showing that the imposition of the SAMs and his
placement in the Special Housing Unit are unconstitutional
conditions of confinement. Similarly, Basciano's arguments in

this supplemental memorandum lack consequence and can be dealt
with in short order.

A.   The Use Of _Ex Parte_ Submissions Regarding The Hit List
     Does Not Violate The Confrontation Clause

Basciano's Confrontation Clause argument regarding
Judge Levy's receipt of, and reliance on, an _ex parte_ submission
lacks merit.  The Sixth Amendment simply has no bearing on
Basciano's habeas petition because the Sixth Amendment "right to
confrontation is a _trial_ right." _Pennsylvania v. Ritchie_, 480
U.S. 39, 52 (1987) (emphasis in original); _accord_ _California v.
Green_, 399 U.S. 149, 157 (1970) ("it is this literal right to
confront the witness _at the time of trial_ that forms the core of
the values furthered by the Confrontation Clause") (emphasis
added).  Accordingly, the extensive protections attendant to
trial, such as the full panoply of Fifth Amendment Due Process
rights and Sixth Amendment Confrontation Clause rights, do not
apply to non-trial proceedings, such as pre-trial detention
hearings, _United States v. El-Hage_, 213 F.3d 74, 82 (2d Cir.
2000), and sentencing hearings, _United States v. Martinez_, 413
F.3d 239, 242 (2d Cir. 2005).

The Supreme Court itself in _Crawford_ explained that
its holding extended only to _trials_.  _See Crawford_, 541 U.S. at
53-54 ("the Framers would not have allowed admission of
testimonial statements of a witness who did not appear at a
trial"); _id._ at 59 ("Our cases have thus remained faithful to the

Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine"); id. at 59 n.9 ("Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.").  Nothing in Crawford, or its Second Circuit progeny, suggests an intent to expand the Confrontation Clause to apply to non-trial matters, such as a civil litigation of a petitioner's conditions of confinement.

> B.   Basciano's Challenge To The Other Evidence Of His Dangerousness Lacks Merit

In addition to the evidence submitted regarding the hit list and the findings made by Judge Levy, there is additional evidence establishing that Basciano would present a danger if released from the SAMs and SHU restrictions.[11]  As Judge Levy

---

[11]   Basciano has argued that Judge Levy's conclusion that the list of five people was a hit list conflicts with this Court's conclusion that the list was designed to engineer the Court's recusal in denying Basciano's motion to recuse the Court from the '03 trial. (Revised Supp. Mem. In Support Of Habeas Pet. at 9-10).  But Judge Levy's conclusive findings that the list of five people was a hit list is not inconsistent with this Court's finding that Basciano desired to use the list as a manipulation to require the Court to recuse itself.  In its decision denying the recusal motion,

noted, multiple witnesses testified that Basciano used a defense
attorney, his son and a private investigator to pass messages out
of prison. (Report & Recommendation at 11-12).  Indeed, on the
Massino recordings, Basciano acknowledged using his son, Tommy
Lee, a defense attorney, and Vic Juliano, a private investigator,
to pass messages both to Massino before Basciano was incarcerated
and out of prison after Basciano was incarcerated, about the
affairs of the Bonanno family. (See, e.g., Jan. 3, 2005 recording
at 29, 32, 33, 37-38, 58, 64, 65, 72, 77, 84, 96; Jan. 7, 2005
recording at 34).  Judge Levy also noted that the Massino
recordings included references to the merits of their previous
conversations about whether to murder a federal prosecutor.
(Report & Recommendation at 12).

       In his revised supplemental memorandum, which
procedurally, is in support of his objection to Judge Levy's
Report and Recommendation upholding the institution of the
Special Administrative Measures, Basciano does not challenge
Judge Levy's findings that Basciano passed messages out of prison
regarding running the Bonanno family or that he discussed the

---

this Court noted that "it appears that one of Basciano's
objectives in writing the May 2006 list and filing this
motion is to 'engineer' this court's recusal." (United
States v. Basciano, 03 CR 929 (NGG), Mem. & Order at 4 (Nov.
30, 2006) (emphasis added).  As this Court found, Basciano
is a "sophisticated party" (id. at 3), and at the time he
authored the list, would have been well aware of possible
ramifications in his court cases if the list were ever
discovered.

murder of a prosecutor with Massino in prison, but instead raises

several contentions to the government's proof of his

dangerousness within prison, only some of which were addressed by

Judge Levy in his ruling.[12]

        While the defense notes the allegedly inconsistent

testimony between Cicale, on the one hand, and Lee and Pisciotti,

on the other, regarding Basciano's giving permission to Cicale to

kill Mancuso if Cicale felt threatened, Basciano himself backs

Cicale's account on the Massino recordings:

> Basciano: He says – But what I understand
> Alfred told Dominick.  It doesn't make sense.
> Louie is a little edgy with Michael, and
> Alfred was a little edgy with Michael, and
> Dominick was a little edgy with Michael, and
> Dominick had words with Michael because
> Dominick told – Dominick wanted to know . . .

(Jan. 3, 2005 recording at 36).

> Basciano: Yeah, listen, Dominick ain't taken
> no fucking shit.
>
> Massino:  Alright. Alright. Alright. But now
> how is Dominick gettin' along with Mike?
>
> Basciano: What happened over here is that I .
> . .
>
> Massino:  There's somethin' going on.

---

[12]    Because Judge Levy did not rely on the allegation about
the plot against Borelli or the attempted extortion charge,
the government does not address Basciano's arguments on
those topics.  Similarly, the government does not address
Basciano's rhetorical argument regarding Cicale's testimony
that another inmate tried to kill him – something Cicale
himself testified had nothing to do with Basciano – as this
allegation was not before Judge Levy.

Basciano: . . .  I'm gonna tell you what happened . . . .  I sent our word for him. Joe Gambina thumbs up, and to bump up Louie Electric was to – I sent it out.  He went back to Michael.  Michael says where did the message come from?  Dominick says I'm not at liberty to tell you where it comes from but the other guy knows about it.  He asked but he's . . .

Massino:  But he is at liberty to tell him. He's on the panel.

(Jan. 3, 2005 recording at 53).

Massino:  Does Michael have a problem with Dominick?

Basciano: Michael went to Dominick and wanted to know where the things that I have in the street.  Dominick caught a delusion.

Massino:  Why would Michael want to know what you have in the street? It's not his business.

(Jan. 3, 2005 recording at 76).

Basciano: I tell you one thing Dominick had a big hair up his nose with Michael. I says calm the fuck down.  He says Vinnie I'm not going to let Michael abuse me.  I said, I said tell Dominick.  Listen to me Dominick was (UI) says Vinnie it's getting out of hand everybody is doing what they want to do.

Massino:  So, may be this is what the message that I'm getting.

Basciano: He told me, Dominick says he wants to get all the captains together.

Massino:  Dominick?

Basciano: Dominick says Vinnie it's getting out of hand everybody is doing what they want to do. I says check with them first.  Check with them.  He says everybody is going in

48

their own direction and doin' what they want
to do.

(Jan. 3, 2005 at 83-84).[13]

Notably, Basciano does not challenge Judge Levy's
reliance on the charged solicitation to murder a federal law
enforcement official – a solicitation which occurred while
Basciano was incarcerated.  Basciano discussed this plot on
the Massino recordings. (See Jan. 3, 2005 recording at 11-
12, 17; Jan. 7, 2005 recording at 6, 46-47).

---

[13]   Magistrate Judge Levy noted that Lee testified that
Basciano had also stated that Cicale and Mancuso should try
"to all get along," but both Cicale and Lee testified that
Lee transmitted coded language that he did not always
understand.  (See, e.g., United States v. Basciano, 03 CR
929, Trial Tr. at 5834-35 (Mar. 24, 2006) (testimony of
Dominick Cicale) ("I told him, I said, to Tommy Lee, one of
the messages I was giving him, let Vinny know that Michael
had me take care of the footings on that job."  Q.  Is that
a coded message?  A.  Yes."); United States v. Basciano, 03
CR 929, Trial Tr. at 1256 (Jun. 27, 2007)(testimony of
Dominick Cicale) ("Vinny Basciano informed Tommy Lee to ask
Joe, Joe Massino, if he could jocco Patty"); United States
v. Basciano, Trial Tr. at 3083 (Jul. 16, 2007) (testimony of
Thomas Lee) ("Q  The messages that you passed to Mr. Massino
and Mr. Basciano, did you understand the meaning of each and
every one of those messages?  A  No, sir.  Q  Why not?  A
They were often given in code.").  In addition, Lee was not
the only person used by Basciano to pass messages.  As to
the discrepancy between Cicale's testimony and Pisciotti's,
Pisciotti testified that by the time Cicale was involved
with a dispute with Mancuso, Pisciotti no longer trusted
Cicale and had stopped listening to him. (Trial Tr. 3335-36,
3367 ("By the time that all that stuff was happening I
really wasn't paying attention to what Dominick said.  He
was complaining all the time.  He was complaining.  He was
just meeting up with the captains, find out what side of the
fence they were on.  That's all I remember him saying.")).

As to Basciano's remaining contentions, there is no need for an evidentiary hearing with testimony from Peter Lionous, Danny Reyes, Reginald White, Lt. Johnson and Officer Chancioso as the government for purposes of this motion does not dispute that their testimony would be consistent with Basciano's post-hoc defense of the hit list allegation of claiming the other lists Basciano turned over were intended to be used in a Santeria ritual.  The proffered testimony by these witnesses does not call into question the substance of the government's <u>ex parte</u> submission to Judge Levy.  Tellingly, Basciano had the opportunity to submit affidavits from these witnesses to Judge Levy, but did not do so.

Finally, Basciano's claims regarding Debra Kalb are now moot as the government is working with the Attorney General to modify the SAMs to permit Kalb to have monitored contact with Basciano, consistent with that provided to Basciano's other family members (with the exception of Vincent Basciano, Jr., who is barred both by the SAMs and order of this Court, from contact with the defendant).

CONCLUSION

For the reasons set forth above, defendant

Basciano's motion for an evidentiary hearing and his habeas

petition should be denied in all respects, as without merit.


Dated:      Brooklyn, New York
            November 21, 2007

                              Respectfully submitted,

                              BENTON J. CAMPBELL
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

John Buretta
Amy Busa
Assistant United States Attorneys
     (Of Counsel)

cc: Ephraim Savitt, Esq., counsel for defendant Vincent
    Basciano (by ECF and by facsimile, without exhibit)