============================================================

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
03-CR-929 (S-8) (NGG)
05-CR–060 (S-8) (NGG)
_____

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**- versus –**

**VINCENT BASCIANO,**

**Defendant.**
_____

Before: **Honorable Nicholas G. Garaufis**, U.S.D.J.

-------------------------------------------------------------------------------------------------

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S
HABEAS PETITION**

-------------------------------------------------------------------------------------------------

**EPHHRAIM SAVITT, ESQ**
260 Madison Avenue
22nd Floor
New York, New York 10016
Tel:    212.679.4470
Fax:    212.679.6770
ephraim@savittesq.com

**RICHARD JASPER, ESQ**
276 Fifth Avenue
Suite 501
New York, New York 10001
Tel:    212.689.3858
Fax:    212.689.0669
ricjasp@aol.com

**YING STAFFORD, ESQ.**
276 Fifth Avenue
Suite 501
New York, New York 10001
Tel:    212.689.3858
Fax:    212.689.0669
ying@staffordesq.com

**JANE SIMKIN SMITH, ESQ.**

P.O. Box 1277
Millbrook, New York 12545
Tel:    845.724.3415
Fax:    845.724.3417
jssmith1@optonline.net

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND................................................................................................1

ANALYSIS ..........................................................................................................................6

CONCLUSION.....................................................................................................................21

PRELIMINARY STATEMENT

Defendant Basciano respectfully submits this reply memorandum in support of his habeas petition to release him from SHU and SAM restrictions, or in the alternative, to be granted an evidentiary hearing on the issues raised in the petition filings.

FACTUAL BACKGROUND

Basciano was arrested on November 19, 2004, after being superseded into indictment, 03 Cr. 929. On December 3, 2004, after two weeks of processing at the MDC, he was placed in general population. On December 29, 2004, Basciano was placed in the Secure Housing Unit ("SHU") of the Metropolitan Detention Center ("MDC").

On January 26, 2005, the government filed a separate indictment against Vincent Basciano and Dominick Cicale in docket number 05 CR 060. The indictment focused on Basciano's post-arrest participation in the affairs of the Bonanno family. The preamble to all counts of the indictment charged that following the arrest and incarceration of Basciano on the '03 indictment, Basciano proposed the murder of AUSA Greg Andres, the lead prosecutor responsible for investigating and prosecuting his case. Basciano was intercepted in consensually recorded conversations with Joseph Massino, the boss of the Bonanno family, which took place inside the SHU of the MDC, during which Massino repeatedly and unsuccessfully sought to snare Basciano into making incriminating statements regarding this supposed plot. The government had arranged to put Massino and Basciano together at the MDC to enable the recorded conversations.

On March 13, 2005, Basciano was transferred from the MDC to the SHU area of the Metropolitan Correctional Center ("MCC"). On May 5, 2005, per Your Honor's order, Basciano was

1

placed back into general population at the MCC. In restoring Basciano to general population, the Court found that the recordings did not establish that Basciano had hatched a plot to kill the prosecutor, as the government maintains, but merely that Massino and Basciano had previously discussed the topic.

> Taking the government's allegations concerning the Pizzolo murder first, my own review of the tape recordings reveals no indication by either party to the conversation, even drawing all inferences in favor of the government, that Basciano ordered Pizzolo's murder after he was detained on November 19, 2004. Nor does the government appear to have an answer to Basciano's assertion that he had no opportunity to pass any message to anyone outside MDC Brooklyn or to any other detainee from the time he was detained on November 19, 2004 until his release into general population on December 3, 2004, two days after the government alleges that Pizzolo was killed. Therefore, the facts currently before the court suggest that if Basciano ordered Pizzolo murdered, he did so before he entered MDC-Brooklyn. That allegation might well be sufficient to justify pre-trial detention. However, it is insufficient to justify detention under the harsh conditions present in the SHU. Second, the tape recordings, standing alone, do not sufficiently substantiate the government's allegation that Basciano conspired to kill a federal prosecutor while in detention or at any other time. According to my review of the tapes, the subject of whether to harm the prosecutor was raised by Massino several times during the two recorded conversations. Each time the subject was raised, Basciano disclaimed any interest in pursuing or discussing any such objective. A reasonable listener could certainly infer from the recorded dialogue that an earlier conversation took place concerning someone's desire to harm the prosecutor. However, the tapes alone do not reveal whether it was Basciano who harbored that desire, whether it was discussed seriously or in jest, whether Basciano agreed to go along with the plan, or disavowed it from the beginning, or any other detail of the conversation. The government may well possess other evidence concerning this purported, and as yet uncharged, conspiracy. If it does, however, it has not presented it to this court for consideration. And as with the government's first ground for holding Basciano in the SHU, I find that the government may not place Basciano in indefinite administrative detention for committing the crimes for which he is charged under this indictment without more substantial proof that he committed these crimes while in pre-trial detention. (M&O dated May 5, 2005 at 11-12)

Basciano remained in general population without incident at the MCC, while he prepared for his upcoming trial on charges related to his 03 Cr. 929 indictment ("'03 trial") until July 28, 2006.  Also,

in preparation for his '03 trial and his upcoming trial on charges related to his 05 Cr. 060 indictment ("'05 capital trial"), Basciano was permitted to attend co-defendant meetings at the MDC.

In January of 2006, on the eve of jury selection in Basciano's first '03 trial, Dominick Cicale signed a cooperation agreement with the government to testify against Basciano. At Basciano's first '03 trial Cicale testified for three days. In particular he testified that he sought permission from Basciano to kill Mancuso through Thomas Lee. Lee, who also became a cooperating witness, had been an attorney who had passed messages between Joseph Massino in jail and Basciano, when he was the alleged acting boss on the street and, after Basciano's arrest, Lee also allegedly passed messages from Basciano to Cicale and Mancuso who took over as "acting street boss." In contrast to Cicale's testimony that Basciano, in a message conveyed to Lee, had arranged Mancuso's murder, Lee testified that Basciano made it clear to Lee, in messages that he wanted Lee to convey, to both Cicale and Mancuso, that Basciano was directing Cicale to get along with Mancuso and to obey Mancuso's directions. Lee swore unequivocally that Basciano had never passed a message to have Cicale harm Mancuso.[1] After three months of trial testimony and exhibits, on May 9, 2006, the jury in Basciano's '03 trial, unable to reach a unanimous verdict on all counts, found Basciano guilty on Count One (racketeering conspiracy), not guilty on count Eleven (extortionate collection of credit conspiracy) and deadlocked on the remaining counts, including the predicate acts relating to the

---

1 Lee's testimony is even more direct on this point. In response to cross-examination by defense counsel Lee testified:

> Q: There was never a message by Mr. Basciano to Dominick Cicale to harm or hurt Michael Mancuso, correct?
> A: No, sir.
> Q: Actually, Mr. Basciano while he was incarcerated, he wanted everyone in the Bronx to get along, did he not, to your knowledge?
> A: It seemed that way, yes. (_United States v Vincent Basciano_, 03 Cr. 929 (S-6)(NGG) at 6908)

Santoro homicide.

On May 30, 2006, the government, by letter to the Court, sought to preclude Basciano from attending co-defendant meetings premised solely on the trial testimony provided by Cicale at Basciano's '03 trial and the alleged extortion of a criminal defense attorney charged in Racketeering Act 13 of Basciano's 05 Cr. 60 indictment. (*See* ECF Document 185).

On Friday, July 28, 2006, without prior notice to counsel, Basciano was transferred to 9 South, a wing of the SHU. He was provided with no documentation or formal charges or an explanation for the sudden move. At that time, counsel were informed that Basciano was not permitted contact with anyone, including his attorneys, investigators or family members. Defense attorneys were further informed by the staff at the MCC that all inquiries should be directed to Captain Rufus Williams of the Security Investigative Service ("SIS") at the institution.

On August 11, 2006, the parties appeared before the Court and the defense asked that Basciano be restored to general population, or that a hearing be immediately conducted to explore the propriety of the confinement. At that time, the Court indicated that the government had disclosed, *ex parte* and under seal, the nature and status of its investigation, including allegations that, according to the government, were serious enough to warrant Basciano's continued confinement in the SHU pending the outcome of the investigation. The Court again advised the government to "move with alacrity" and scheduled another conference for August 28, 2006.

On August 28, 2006, the government disclosed to Basciano's counsel the basis for his placement in the Secure Housing Unit ("SHU") of the MCC. Specifically, the government stated that in April 2006, during the final stages of his first trial, Basciano provided a list of five names to a fellow inmate as part of a murder solicitation plot to have those enumerated murdered. The list

together with samples of Basciano's outgoing letters, and a handwriting analysis concluding that Basciano authored the list, were provided to the defense. The list included the names of "Greg Andres", "Judge [sic] Nickolas Garafis", "Dominick Cicale", "Tommy Lee" and "Lou Tartaglione." The later three were principal cooperating witnesses who had already testified at the trial. According to the government's disclosure, the inmate to whom the list was provided had not disclosed its existence to any government representative for more than two months. The government further advised that, after Basciano gave the list to the inmate, Basciano no longer pursued the alleged murder plot.

Immediately after the August 28, 2006, court appearance, the defense made Angela Basciano available to the government to be interviewed about "The List,"[2] without advance notice to her of the subject matter about which she would be questioned. Mrs. Basciano confirmed that her husband had contacted her about a "Santeria list" that he had prepared at the suggestion of a fellow inmate, which counsel later learned was Reginald White.  She also stated that, at her husband's request, she had gone to a location in the Bronx to meet that inmate's mother, who reportedly was a Santeria. The government's interview of Ms. Basciano was conducted immediately after the August 28, 2006, sealed proceeding.

At a conference on September 21, 2006, the government informed counsel that the Attorney General Alberto Gonzalez had authorized the imposition of SAM restrictions on Basciano and insisted that counsel sign the authorization memorandum as a precondition to being permitted to

---

2 This list will be referred to as "List #2" as in our prior submission based on a chronological sequence of similar list "discoveries," List #1 was taken from inmate Reginald White's mail by MCC Officer Santamaggio which he turned over to SIS, which, in turn provided it to the FBI. "List #3" was copied by MCC Officer Maddis at Basciano's request from his papers in his cell,

communicate with Basciano. Immediately upon receipt of the authorization, the MCC transferred

Basciano to 10 South, the most restrictive unit in the facility.

On January 5, 2007, defense counsel filed a habeas petition with this Court to release

Basciano from the SAM and SHU restrictions. On January 31, 2007, Your Honor referred the habeas

petition to Magistrate Judge Levy for Report and Recommendation to the Court. On May 25, 2007,

Magistrate Levy issued a Report and Recommendation ("Levy R&R") that the Court grant

Basciano's petition only with respect to permitting contact visits with his attorneys.  The Levy R&R

concluded that List #2 was a "hit list," based in large measure on the government's *ex parte*

representation, thereby conflicting with the Court's conclusion, in denying the pretrial recusal motion

in the '03 case, that the List #2 was an artifice by which Basciano sought to "engineer" the Courts'

recusal. (*See* M&O, dated November 30, 2006).

## ANALYSIS

The government urges the Court to adopt Magistrate Levy's R&R, which is premised

principally on an *in camera* proffer that has not been disclosed to the defense and, for that reason, can

only be addressed based on a logical assumption that the source of the in camera information is also

an inmate, who has undoubtedly committed crimes and is therefore facing a long prison term and is

motivated to cooperate in order to diminish his punishment.  As Judge Levy put it:

> The statements described in the *in camera* proffer strongly indicate that the
> handwritten list of five names was intended to serve as a hit list.

(Levy R & R at 12-13).

The government has successfully thwarted the defense's efforts to learn about the

---

upon his return from the court proceedings in which the government revealed "List #2."

information in the _in camera_ proffer, or the identity of the source of that information.  Presumably, the _in camera_ proffer, as noted above, is based in the untested account of a cooperator - and formerly, a fellow inmate in the MCC while Basciano was housed there - - who claims that Basciano gave him the list while recruiting him to murder the presiding Judge, the chief prosecutor, and the three principal witnesses who already had testified against him, Thomas Lee, Lou Tartaglione and Dominick Cicale - - all during the pendency of the first '03 trial.  The government further maintains, undoubtedly based on the account of this undisclosed cooperator, that after one brief discussion with him, and the provision of the "hit list," Basciano never again spoke to him about this mystical plot to kill every major player in Basciano's trial, other than those who sat around the defense table, without anyone ever suspecting that Basciano was behind this magical massacre.

There are several disturbing aspects of the government's position that cross the line between implementation of measures to meet a demonstrated valid security interest under _Bell v. Wolfish_, 441 U.S. 520 (1979), on the one hand, and the imposition of "arbitrary" and "purposeless" pretrial punishment based on unsubstantiated and unidentified hearsay information, on the other.  (Id. at 538-39).  In creating a fictitious alarm, founded on undisclosed information to which the defense is not privy- - and therefore is bereft of the basic due process requirements of notice and an opportunity to be heard - - the SAM measures to which the government doggedly adheres imposes severe punishment on a defendant facing the death penalty in derogation of his Fifth and Sixth Amendment due process and confrontation rights and his Eighth Amendment protection against cruel and unusual punishment in a proceeding where his unnecessary, prolonged and severe confinement conditions under the SAM regime have reduced his ability to assist in his own defense against capital charges and punishment and, if not removed, will ultimately eviscerate that ability.

In its memorandum in opposition to the habeas petition (hereinafter "GOM"), the government offers lame justifications for the continued SAM restrictions that, on an increasing scale, are making it more difficult every day for us, as Basciano's defense lawyers, to do our jobs properly and to focus Basciano on defending his capital case, rather than on the conditions of his confinement and his inability to have the same contact with his loved ones as other inmates enjoy.   These proffered excuses do not even begin to justify such a fundamental flaw in the death penalty case proceedings.

To justify not revealing the _ex parte_ information on which Judge Levy made his recommendation, the government seeks refuge in the argument that _Crawford v. Washington_, 541 U.S. 36 (2004), which we cited in our argument, limits the scope of confrontation clause protection to the context of a trial, and does not extend that protection to a "civil litigation of a petitioner's conditions of confinement." (GOM at 44-45).   The government completely misses the point in making this artificial argument.   Under _Bell v. Wolfish_, the government has the burden of demonstrating that the SAM measures are a proper application of necessary security measures of confinement, based on demonstrated misconduct, rather than the premature imposition of unnecessary punishment that prevents a defendant from assisting in his own defense, especially in a death penalty case. (441 U.S. 590 (1979)). This is not merely a "civil proceeding' where the confrontation clause has a reduced role; it is, in every sense, a proceeding that is aimed at protecting Basciano's trial rights in this capital case.  Hiding behind inapposite talismanic language, as the government is doing, does not change the importance to Basciano, as a death-eligible defendant, of transparency in these proceedings with the need for a meaningful opportunity to confront his accuser.  If _Crawford_ has any meaning, it protects not only against the introduction of non-testimonial, and therefore, inherently unreliable hearsay statements during a trial; the _Crawford_ principal  also guards against undisclosed, non-testimonial

8

hearsay from a secret source as the foundation for pre-trial punishment in the form of the SAM restrictions and as a means for the government to establish self-propagating aggravating factors, based on those restrictions, at a potential penalty phase in order to persuade the trier of fact to impose the death penalty.  Quite apart from _Crawford_, the "heightened reliability" of information that either is introduced at a capital trial or penalty phase or that impacts on a capital defendant's ability to defend himself against the capital charges and the ultimate punishment sought by the government in this case should compel disclosure of the pivotal, confidential hearsay information on which the SAM's were imposed.

As the Supreme Court stated in a seminal death penalty case _Woodson v. North Carolina,_ 428 U.S. 280 (1976),

> ... the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.  (*See* _Woodson v. North Carolina,_ 428 U.S. at 305 (1976)).

Again in _Lockett,_ the Supreme Court reiterated its insistence upon the heightened reliability of information that impacts whether a defendant receives the ultimate punishment of death,

> We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed. (_Lockett v. Ohio_, 438 U.S. 586, 604 (1978)).

Moreover, the Supreme Court has repeatedly stated as it did in _Ford v. Wainwright,_ 477 U.S. 399 (1986), that a defendant facing the death penalty should not be limited from developing or presenting relevant evidence in mitigation of the sentence,

> In all other proceedings leading to the execution of an accused, we have said that the

fact finder must "have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas,* 428 U.S. 262, 276 (1976). And we have forbidden States to limit the capital defendant's submission of relevant evidence in mitigation of the sentence. *Skipper v. South Carolina,* 476 U.S. 1, 8 [p414] (1986); *Lockett v. Ohio,* 438 U.S. 586, 604 (1978). It would be odd were we now to abandon our insistence upon unfettered presentation of relevant information, before the final fact antecedent to execution has been found. (*See* <u>*Ford v Wainwright*</u>, 477 U.S. at 413-14 (1986)).

The Second Circuit in <u>*Fell*</u> stated conclusively,

> "heightened reliability" is essential to the process of imposing a death sentence.  As the Supreme Court has repeatedly emphasized, "the Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death.  The finality of the death penalty requires a 'greater degree of reliability' when it is imposed."

>      *       *       *       *

> What the district court failed to acknowledge, however, is that the Supreme Court has also made clear that in order to achieve such "heightened reliability," *more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors… (<u>*United States v. Fell*</u>, 360 F.3d 135, 143 (2004)).

Lastly, Judge Weinstein opined in <u>*United States v. Taveras*</u>, 424 F.Supp.2d 446 (2006),

> The proposition that "death is different" is central to the Court's death penalty jurisprudence.  *See, e.g.,* <u>*Caldwell v. Mississippi,*</u> <u>472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)</u> (vacating sentence because prosecutor's remarks were inconsistent with the "heightened 'need for reliability' " in capital cases (citing <u>*Woodson*</u> )); <u>*Harmelin v. Michigan,*</u> <u>501 U.S. 957, 994, 111 S.Ct. 2680, 2701, 115 L.Ed.2d 836 (1991)</u> (refusing to require proportionality review of life imprisonment for narcotics offense;  "[p]roportionality review is one of several respects in which we have held that 'death is different,' and have imposed protections that the Constitution nowhere else provides."). (*See* <u>*United States v. Taveras*</u>, 424 F.Supp.2d at 457 (2006)).

A particularly pernicious by-product of the SAM restrictions is the interference, as a result of the confinement conditions, with Basciano's right to counsel guarantees under the Fifth and Sixth Amendments.  Although the SAMs contains provisions allowing counsel of record to visit Basciano,

the provisions specifically exclude his court-appointed investigator, as well as any other expert professional, including mitigation investigators, from conferring with Basciano unless counsel is present.  Given conflicts in schedule, this restriction prevents professionals from doing their jobs properly and expeditiously in assisting counsel to prepare for Basciano's defense in a death-penalty case.

Moreover, as we pointed out in our earlier submissions, Basciano's increasing isolation under the SAM regime, which has persisted for the past 17 months, creates psychological obstacles to his ability to assist counsel in preparing for his defense to both the capital trial charges as well as in a potential penalty proceeding.  As Dr. Cunningham reported, the SAM restrictions are actually more oppressive than those in place at the "Supermax" facility in Florence, Colorado where <u>sentenced</u> inmates who are the "worst of the worst" are housed.  The SAM conditions create an ever-deteriorating psychological mindset which is gradually, but surely, eviscerating Basciano's ability to focus on anything other than his strict conditions of confinement.  As the Court noted, in its decision granting Basciano's motion for an order directing his removal from administrative detention at the MCC to general population:

> The foremost factor informing my conclusion is the reality that Basciano is a death-eligible defendant whose attorneys are now preparing to make a mitigation submission to the Attorney General.  It is therefore of the utmost importance that Basciano be capable of working with his attorneys as they attempt to dissuade the Attorney General from seeking the death penalty against him.  Yet Basciano's detention in the SHU presents both practical and psychological obstacles to this result.  As a practical matter, the security restrictions in place in the SHU make it much more difficult for Basciano to have productive meetings with his counsel, as Basciano's attorneys have credibly argued.  More importantly, it is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee.  <u>See, e.g.</u> Craig Haney & Mona Lynch, <i>Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement,</i> 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997) ("Direct studies of the effects of prison isolation have documented a

wide range of harmful psychological effects, including increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdown, self-mutilation, and suicidal impulses. ... There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects.") Taken together, the urgency of Basciano's need to marshal his legal defense in the hopes of avoiding a death-penalty trial and the likely effect of continued solitary confinement on Basciano's mental state require that the government reserve the "nuclear option" of indefinite solitary confinement until it is clear that less restrictive options have failed to constrain Basciano. (M&O dated May 5, 2005 at 12-13).

Apart from the undemonstrated basis for implementation of those conditions in the first place, the SAM restrictions represent a tangible interference with counsel's ability to engage Basciano's assistance to our efforts in defending him against conviction and possibly punishment in a death penalty case. No other factor is as powerful an interference with Basciano's basic Constitutional right to counsel as the SAM restrictions that the government strenuously defends on a paper-thin record.

In assessing Levy's R&R, we urge the Court to consider that Judge Levy was not presented with the detailed information we put forth in our supplemental submission that is attributed to three inmates, Peter Liounous, Danny Reyes and Reginald White, who had been housed at the MCC and whose combined accounts put the lie to the *in camera* informational source who claims that List #2 was a "hit list," rather than part of a Santeria ritual. We also stress the importance of the fact that Judge Levy was also not made aware that the accounts of these three inmates are further supported by information learned from two MCC officials, Lt. Johnson, who investigated the nature of the list and learned from Reginald White that it, indeed, was a Santeria list, and of Officer Chancioso, who had independent knowledge of Santeria rituals and the significance of the creation of such lists as part of such rituals. As such, Judge Levy had nothing of substance to refute the government's *ex parte*

information on which he concluded that:

> [T]he government presented convincing evidence that it has
> conducted an extensive investigation of the reliability of the witness
> and his statements.

(Levy R & R at page 13).

Not only was Judge Levy unaware of the detailed information by these 5 sources, 2 of whom are MCC officials, that contradict the government's *ex parte* source, but he was certainly unaware that, in its response, the government would "not dispute that their testimony would be consistent with Basciano's post-hoc defense of the hit list allegation...." (GOM at 57). Although the government apparently persists in its position that the other 2 lists written by Basciano were Santeria-related, but that List #2, which is just a shorter version of the other two lists, has somehow been morphed into a "hit list," it is quite revealing that the government, apparently as a result of its own investigation, concedes that the reported accounts, in Basciano's supplemental habeas memorandum, of Peter Liounous, Danny Reyes, Reginald White, Lt. Johnson and Officer Chancioso are accurate.

The government's contention that an evidentiary hearing on the habeas issues is unnecessary because "[t]he proffered testimony by these witnesses does not call into question the substance of the government's *ex parte* submission to Judge Levy" (id.), is flawed for two reasons. The first is that the *ex parte* information which the government suggests is unimpeachable is still being suppressed from the defense, and that, in and of itself, is a due process violation. Moreover, why does the government believe that undisclosed information from an unidentified source who is not subject to cross-examination - - undoubtedly an inmate who has committed serious offenses and now seeks to benefit from his cooperation against a "mob boss" - - somehow outweighs the consistent accounts of 3 other inmates, all of whom have been identified by the defense, and who have nothing to gain by making

13

their reports which exonerate Basciano from the quintuple murder plot allegations, as well as the corroborative information of two MCC officials, who certainly are not trying to curry favor for a reduced sentence, as the government's source is undoubtedly doing? The government's bald assertion that "the substance" of its undisclosed source's information is not "called into question" by the contrary factual presentation based on the defense's 5 identified sources is therefore astounding.

The other flaw in the government's argument against an evidentiary hearing is the fact that 5 sources identified by us in our submissions, who, as the government concedes, would testify in accordance with our factual descriptions of their accounts, and obviously contradict its _ex parte_ source as to the nature of List #2. That contradiction, as identified by the government, in and of itself provides a _prima facie_ compelling reason for an evidentiary hearing to resolve the disputed factual issues underlying the SAM restrictions.

The government's gratuitously comments that "[t]ellingly, Basciano had the opportunity to submit affidavits from these witnesses to Judge Levy, but did not do so" (Id.) First of all, the government does not contest the accuracy of the information attributed to each of these potential witnesses. Second, the original petition papers were filed by predecessor trial counsel whose strategic approach to the habeas issues have been modified, especially in light of the government's articulated position that its source trumps the consistent accounts of 5 other sources, without explaining why its source is more compelling. More importantly, the government is well aware, as is evident from the recent declination by the MCC warden to allow requested interviews of staff members by the defense, that its statement that the defense had "ample opportunity" to obtain affidavits from the defense sources is simply untrue. As to the "ample opportunity" to obtain affidavits from inmates, that is subject to the invariably onerous procedural requirements of each individual institution where

14

different inmates are housed.  In fact, the BOP requires that we first get written permission from the inmate and his attorney for a personal interview required to obtain an affidavit.  The procedure not only is time consuming and expensive, particularly if the inmate is now incarcerated far away from the area, but, as a practical matter, it is difficult, if not impossible, to secure the required dual consent in most cases.

The more expeditious, inexpensive and efficient manner of promoting meaningful fact-finding by the Court on the habeas issues requires the attendance of all the described sources of information, those disclosed by the defense and the one as-yet undisclosed source on whom the government principally relies, to appear as witnesses at a hearing and to be subject to cross-examination by opposing counsel.  That procedure, and not the suppression and sophistry advocated by the government, is the sure-fire way of getting to the truth of whether the SAMs are necessary security measures or, as we believe the Court will find, constitute impermissible pretrial punishment premised on flawed and impeachable information in derogation of Basciano's constitutional rights and the "heightened reliability" standard in a capital case.[3]

---

[3] The government correctly notes that Basciano failed "a polygraph examination provided by his own polygraph examiner regarding the alleged hit list." (GOM at 22, footnote 7).  Four points are in order.  The first is that unless Basciano actually believed that List #2 was not a "hit list," he would not have insisted, as he did, to take the polygraph test.  The second is that the result of the test is a prime example of why polygraph results are inadmissible in court proceedings because polygraphs are notoriously unreliable and are not generally used as an investigative tool by the government.

Thirdly, it is axiomatic that polygraph results are often skewed by the ability or inability of the polygraph examiner to formulate the correct questions for the examination.  In this case, the examiner regrettably failed to consult adequately with predecessor counsel in learning the underlying facts needed to form the appropriate test questions.

Finally, if the government actually believed that the polygraph test was determinative of

15

The government's other arguments in support of its habeas position further underscore why the SAMs must be removed and how a full hearing will demonstrate that necessity. Tellingly, it does not respond to our factual presentation, based on the undersigned's detailed conversation with Jeffrey Lichtman, the defense lawyer who, according to the government, had been the victim of an attempted extortion by Basciano during a co-defendant meeting at the MDC, that he, in fact, was neither the threatened nor felt threatened by Basciano at any time. Despite that disclaimer, the government charged this purported extortion attempt as a racketeering predicate.

Moreover, it is apparent, in closely reviewing the government's proffered excuses for maintaining the SAMs regime, that those excuses are specious and signify subtle, yet important, shifts of its position in addressing the habeas issues. Faced with the factual presentations of 5 potential witnesses that List #2 was anything <u>but</u> a "hit list," the government has reformulated its position by suggesting that there are several additional bases for the imposition of the SAMs. As reflected in Levy's R&R, List #2 was characterized as a "hit list" based exclusively on the government's *ex parte* presentation, and that, in turn, was the reason for his recommendation against granting the habeas relief.

Although Judge Levy alluded to the "trial evidence" as "lending credence to the government's contention that the alleged hit list was part of genuinely violent behavior that Basicano has the capacity to accomplish," he stated plainly that the government's "*in camera* proffer strongly indicate[d] that the handwritten list of five names was intended to serve as a hit list." For that reason, and that reason alone, Judge Levy concluded that, "I therefore agree that the government has

the habeas petition, it would not have relegated the point to a footnote, as it did and as this response is relegated.

16

demonstrated that Basciano would present a significant security risk if returned to the general population." (Levy R & R at 12-13). The government's recently reformulated position emphasizes Cicale's information, particularly the messages sent by Basciano as part of alleged plot to kill Michael Mancuso and the allegations regarding Basciano's supposed plot to kill a prosecutor, as equally compelling reasons for continuation of the SAMs. However, the government's shift in position deviates not only from Judge Levy's recommended determination, but from its original presentation to him that led to that determination.

In that regard, the government maintains that Basciano "does not challenge Judge Levy's findings that Basciano passed messages out of prison regarding running the Bonanno family[4] or that he discussed the murder of a prosecutor with Massino in prison...." (GOM at 46-47). If that is a two-fold suggestion that Cicale's testimony is another basis for the SAM restrictions and that his version about "messages" from prison and the alleged plot to kill a prosecutor is unchallengeable, the record of the '03 trial and the habeas submissions by the defense refute the government's position.

Indeed, the recent disclosures about Cicale's misconduct as a cooperator during the '03 retrial, by hatching a fake murder plot with himself as the victim in order to implicate Basciano and Senior Corrections Officer Santamaggio, and his attempted enlistment of fellow Witsec inmates to carry out this plan, could not possibly have been considered by Judge Levy in his report and recommendation findings, which predated that misconduct. Not only does this subject of Cicale's misconduct raise

---

[4] The passing of messages, standing alone, certainly does not justify the SAM restrictions. As the Court observed, although "pre-trial detention in general population might prove to be an insufficient safeguard against Basciano's demonstrated determination to run the Bonanno family despite his present detention, in the absence of any proof that these violations of prison regulations caused or were intended to cause criminal activity, I am not persuaded that Basciano's indefinite detention in the SHU is warranted at this time". (M&O dated May 5, 2005 at 12).

serious _Brady/Giglio_ issues as to the upcoming '05 case, it spawns considerable doubt as to the integrity of the government's proof that led to the conviction in the '03 case.  The government's reformulation, in throwing in Basciano's alleged murder plots as to Mancuso and a federal prosecutor as supplemental reasons for the SAMs is based exclusively on the uncorroborated reports of Cicale, the government's star witness against Basciano, whose cooperation agreement should have been ripped to shreds as soon as the government learned about his own criminal misconduct as a cooperator.

First of all, all of the allegations of Basciano's direction of criminal activity in jail are based principally on Cicale's version of events, and predated the imposition of the SAM restrictions.  The only factual element that "changed the landscape" was the so-called "hit list," which is the real reason, notwithstanding the government's reformulated argument, that Basciano was placed under the SAM restrictions in the first place.[5]  As such, it is pure sophistry to attempt, as the government does, to shore up its flawed reliance on List #2 as a "hit list" with citations to other allegations of Basciano's misconduct in prison that did not result in the SAM restrictions.

Perhaps the government overlooks the fact that we pointed out, in the related _Brady/Giglio_ motion submissions, that Cicale's testimony about his receipt of "messages" from Basciano in prison, principally through Thomas Lee, conflicted with the testimony of government cooperator Lee himself, as well as government cooperator Pisciotti.  In particular, Cicale's uncorroborated allegation that Basciano, in a message conveyed through Lee, plotted to kill Michael Mancuso, is  refuted by Lee's

---

[5] It is interesting to note that in light of Judge Levy's rejection of the alleged plot against Borelli as attributable to Basciano, the government now trivializes that allegation.  (GOM at 47 footnote 12).  Yet, it strenuously advocated that as a reason for continuation of the SAM restrictions in the proceedings before Judge Levy.

testimony that Basciano had passed a message through him to both Cicale and Mancuso, not to kill anyone, but instead that they should try "to all get along."  In a strained effort to ameliorate this plain inconsistency between the testimonies of its principal cooperators, the government suggests that Basciano's alleged message that Cicale and Mancuso should "get along" may be "coded language" for an entirely different message. (GOM. at 49 footnote 13).  If that insupportable contention had any merit, the government would have cracked the so-called "code" at trial or, failing that, at least it should have given an explanation of how an unambiguous message to two antagonists that they should try to "get along" is actually a coded call for murder.  Nothing in the recorded discussions in the Massino-Basciano tapes that the government quotes at pages 47-49 of its memorandum, in which the two discuss the growing animosity between Cicale and Mancuso, supports the government's farfetched "coded language" argument.[6]

As to Cicale's testimony regarding Basciano's alleged plot to kill a prosecutor, derived exclusively from the Massino-Basciano in-jail recorded conversations in January 2005, that topic has been covered exhaustively in our prior submissions.  Not only does Basciano repeatedly tell Massino to "fah-get-about-it" in response to the numerous attempts by Massino to inveigle Basciano into making even one self-incriminating statement about that subject, this was a matter addressed by the Court, in its decision 2 1/2 years ago, to restore Basciano, upon the defense's application and over the government's opposition, from the SHU to general population at the MCC. As Your Honor noted, the taped exchanges "standing alone, do not sufficiently substantiate the government's allegation that Basciano conspired to kill a federal prosecutor while in detention or at any other time." (M&O dated

---

[6] Instead, the substance of the recorded conversations suggests that Cicale may have sought authorization to murder Mancuso because of their growing animosity, which he never received.

May 5, 2005 at 11).  As Your Honor further noted, "each time the subject of killing the prosecutor was raised [by Massino], Basciano disclaimed any interest in pursuing or discussing any such objective" (Id. at 11-12).

Although, as Your Honor further observed, "[a] reasonable listener could certainly infer from the recorded dialogue that an earlier conversation took place concerning someone's desire to harm the prosecutor,... the tapes alone do not reveal whether it was Basciano who harbored that desire, whether it was discussed seriously or in jest, whether Basciano agreed to go along with the plan, or disavowed it from the beginning, or any other detail of the conversation." (Id. at 12).  Apart from Cicale's expected, uncorroborated testimony, there will be no evidence at the '05 trial on which the government can premise the murder plot allegation, unless the government decides to call Massino as a witness and he backs the government's version.  Cicale's credibility as a cooperator is suspect, to say the least, given the revelations of his recent misconduct in the MCC Witsec unit, as discussed thoroughly in our contemporaneous _Brady/Giglio_ submissions seeking a new trial in the '03 case and an evidentiary hearing in the '05 case.[7]

---

[7] The government apparently is not pushing its previously-discredited notion that the Pizzolo death-eligible homicide was ordered by Basciano after his incarceration, which created the specter of "future dangerousness" in prison on that basis.  It is evident from the Massino-Basciano recordings, as this Court found, "even drawing all inferences in favor of the government, that Basciano ordered Pizzolo's murder after he was detained on November 14, 2004." (Id. at 11). Moreover, even accepting Cicale's testimony as accurate, he maintained that he would not have proceeded with the Pizzolo murder had he not been given the authorization for that crime by then-"street boss" Michael Mancuso after Basciano was incarcerated, as the following exchange in Cicale's cross-examination demonstrates:

> Q: Randy Pizzolo was alive, correct?
> A: Yes, sir, that's correct.
> Q: Mr. Bonelli was also alive, correct?
> A: Yes, sir, that's correct.

Finally, the government exercises a strained version of Talmudic reasoning in an effort to harmonize its position, adopted by Judge Levy, that List #2 was a "hit list" with the Court's determination, in its opinion denying Basciano's recusal motion prior to the first '03 trial, that List #2 evidenced Basciano's attempt to manipulate the Court's recusal. (G.O.M. at 45, footnote 11).  The government seizes on the Court's usage of the words "it appears that one of Basciano's objectives in writing the May 2006 list and filing this motion is to "engineer" this Court's recusal" (M&O dated November 30, 2006 at 4), as reflective of the Court's _sub silencio_ determination that it was also a "hit list."  The fallacy in the government's interpretation that the Court suggested that List #2 was both a hit list and a judge-disqualification subterfuge is very simple - - that is not what the Court actually said in its order.  And the reason that the Court did not allude to List #2 as a "hit list" does not appear to be accidental.  A "hit list," by its very nature, is not intended to be discovered by anyone outside the conspiratorial circle, particularly by the government and the Court.  A "recusal list," on the other hand, has no value unless it is discovered, especially by the government and the Court.  List #2 cannot be both, irrespective of the government's after-the-fact tortured interpretation.

If the List #2 was a subterfuge for recusal, Basciano should not have been placed under SAMs

---

Q: And, you testified on direct that as far as you were concerned. I believe your words were "the hit was off," correct?
A: Pertaining to Randy Pizzolo?
Q: Yes, sir.
A: Yes, sir. After Vincent Basciano was arrested, I called it off. That's correct, sir.
Q: And, you didn't want to do it and at that point you weren't going to do it, correct?
A: That is correct, sir.
Q: And, except for the intervention of the new acting boss, you wouldn't have done it, correct?
A: Yes, sir, that is correct.   (_United States v. Vincent Basciano_, (S-8)(NGG) at 1611-12)

and the habeas petition must be granted.  On the other hand, if it really was a "hit list," Basciano's recusal motion was meritorious, given the putative victims identified in that list.  The government simply cannot have it both ways.

<u>CONCLUSION</u>

For the reasons set forth above, the habeas petition to release Basciano from the SHU and SAM restrictions and restore him to general population should be granted in all respects. An evidentiary hearing is requested on all disputed facts as well as the disclosure of the *ex parte* affidavit on which Magistrate Judge Levy relied, and of the identity of the informant who provided List No. 2.

Respectfully submitted,
By: _____

EPHRAIM SAVITT, ESQ
YING STAFFORD, ESQ.
JANE SIMKIN SMITH, ESQ
RICHARD JASPER, ESQ
*Attorneys for Basciano*

Dated: New York, New York
        November 28, 2007