JB:TM
F.#2005R00060

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -            05 CR 060 (S-9)(NGG)

VINCENT BASCIANO,

        Defendant.

- - - - - - - - - - - - - - - -X

THE GOVERNMENT'S MOTION <u>IN LIMINE</u> TO
ADMIT CERTAIN EVIDENCE AND TO PRECLUDE
<u>CERTAIN EVIDENCE AND ARGUMENTS AT TRIAL</u>

                                        LORETTA E. LYNCH
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

JOHN BURETTA
TARYN A. MERKL
NICOLE M. ARGENTIERI
Assistant United States Attorneys
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.  Procedural History . . . . . . . . . . . . . . . . 1

    II. The Court's Prior Fed. R. Evid. 404(b) Rulings . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.  Evidence of Basciano's Involvement in Uncharged Crimes
       Is Admissible at Trial . . . . . . . . . . . . . . 4

       A.  Section 1959 . . . . . . . . . . . . . . . . . 5

       B.  Legal Standard: Evidence That Is Directly Relevant
          to and Inextricably Intertwined with the Evidence
          of the Charged Crimes . . . . . . . . . . . . 9

       C.  Legal Standard: Rule 404(b) . . . . . . . . . 14

       D.  Evidence of Basciano's Uncharged Crimes Is
          Admissible as Direct Evidence of the Charged
          Crimes and Under Rule 404(b) . . . . . . . . . 18

          1.  Conspiracy to Murder and Murder of Frank
             Santoro . . . . . . . . . . . . . . . . 18

             a.  Testimony of Dominick Cicale . . . . 18

             b.  Testimony of Joseph Massino . . . . 18

             c.  Testimony of Nicholas Pisciotti . . 19

             d.  The Tartaglione Recordings . . . . . 19

             e.  Analysis . . . . . . . . . . . . . . 21

          2.  Soliciting the Murder of Bonanno Underboss
             Salvatore Vitale . . . . . . . . . . . . 21

             a.  The Tartaglione Recordings . . . . . 22

             b.  Cooperating Witness Testimony . . . 22

             c.  Analysis . . . . . . . . . . . . . . 23

i

3.  Soliciting the Murder of Assistant United
    States Attorney Greg Andres . . . . . . .  24

    a.  Testimony of Joseph Massino  . . . .  24

    b.  The Massino Recordings . . . . . . .  24

    c.  Basciano's Admissions to Generoso
        Barbieri . . . . . . . . . . . . . .  28

    d.  Analysis . . . . . . . . . . . . . .  29

4.  Conspiracy to Murder Joseph Bonelli . . .  30

    a.  Cooperating Witness Testimony  . . .  30

    b.  The Massino Recordings . . . . . . .  30

    c.  Analysis . . . . . . . . . . . . . .  31

5.  The Extortion of Vendors at the Feast of San
    Gennaro Festival  . . . . . . . . . . . .  32

6.  Illegal Gambling & Loansharking . . . . .  34

    a.  Illegal Gambling . . . . . . . . . .  34

    b.  Loansharking . . . . . . . . . . . .  35

    c.  Analysis . . . . . . . . . . . . . .  35

7.  Conspiracy to Murder and Attempted Murder of
    David Nunez . . . . . . . . . . . . . . .  36

8.  Assaults and Other Crimes Committed With
    Cooperating Witnesses . . . . . . . . . .  36

    D.  Rule 403 . . . . . . . . . . . . . . . . .  38

II.  References to Basciano's Prior Trials Should Be
     Precluded at Trial . . . . . . . . . . . . .  39

CONCLUSION   . . . . . . . . . . . . . . . . . . .  41

ii

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion in limine to admit at trial evidence of additional uncharged crimes.  The government also moves to preclude references to Basciano's prior trials during the guilt phase of the trial.  For the reasons set forth below, the Court should grant the government's motion.

BACKGROUND

I.  Procedural History[1]

The defendant is charged in superseding indictment nine (the "'05 S-9 Indictment")[2] with conspiring to murder Randolph Pizzolo in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count Three); murdering Pizzolo in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), a capital offense (Count Four); a related firearms charge, in violation of

_____

[1]  The factual and procedural history of this case is set forth in greater detail in the government's other filings, including the government's response to Basciano's supplemental pretrial motions, which was filed on August 13, 2010.  (05 CR 060, Docket Entry No. 923).  As the Court is aware, on November 19, 2004, Basciano was arrested and charged with racketeering conspiracy in violation of 18 U.S.C. § 1962(d), pursuant to an indictment captioned United States v. Massino, et al., 03 CR 929 (NGG) (S-2) (the "'03 S-2 Indictment").  The case filed against Basciano under docket number 03 CR 929 will be referred to herein as "Basciano I."

[2]  The government anticipates presenting a superseding indictment to the grand jury prior to trial in this case to remove the counts ordered dismissed by the Second Circuit and to remove references to co-defendants who have pled guilty.  No new charges will be presented to the grand jury.

1

18 U.S.C. § 924(c) (Count Five); and conspiring to murder Patrick

DeFilippo in aid of racketeering, in violation of 18 U.S.C.

§ 1959(a)(5) (Count Nine).

II.  The Court's Prior Fed. R. Evid. 404(b) Rulings

Prior to the defendant's original trial in Basciano I,

the Court granted the government's motion in limine to admit,

inter alia, evidence of the following uncharged crimes by

Basciano:

- the extortion of vendors at the Feast of San Gennaro Festival, various restaurants and the New York City heating oil industry;

- the murder of Anthony Colangelo;

- the murder of Randolph Pizzolo;

- the conspiracy to murder Joseph Bonelli;

- the conspiracy to murder Michael Mancuso;

- the conspiracy to murder Patrick DeFilippo;

- the solicitation to murder the girlfriend of Dominick Cicale; and

- the assault of an insubordinate Bonanno family member.[3]

---

[3]     In the midst of the first Basciano I trial, the Court
admitted evidence of the defendant's participation in the murder
of a John Doe in a Queens social club – an uncharged crime – in
order to rebut Basciano's assertion at trial that he would never
disobey Bonanno family rules, including the rule prohibiting
unsanctioned murders.  See United States v. Basciano, 2006 WL
544465, at *3 (E.D.N.Y. March 6, 2006) (Garaufis, J.).  Depending
upon arguments made by counsel, the government may elicit this
evidence during the instant case for the same purpose.

<u>See</u> Memorandum & Order, <u>United States v. Basciano</u>, 03 CR 929 (E.D.N.Y. June 19, 2007) at 1 (Docket Entry No. 842).  The Court admitted this evidence pursuant to Rule 404(b) of the Federal Rules of Evidence in order to "complete the story of the charged crimes, demonstrate relationships of trust and corroborate the testimony of cooperating witnesses." <u>United States v. Basciano</u>, 2006 WL 385325, at *10 (E.D.N.Y. Feb. 17, 2006) (Garaufis, J.).

Prior to the re-trial on the <u>Basciano I</u> case pursuant to the '03 S-8 Indictment, the government sought to introduce evidence of numerous additional uncharged crimes by Basciano, in addition to those admitted at the first trial, including: (1) participation in an illegal gambling business involving policy, (2) loansharking, (3) narcotics distribution involving MDMA and heroin, (4) the attempted murder of David Nunez, (5) the attempted murder of Stephen Deluca and (6) the assault of Frank Porco.  Basciano did not object to the admission of evidence regarding the illegal policy gambling, loansharking, MDMA distribution and the attempted murder of David Nunez, <u>see</u> June 19, 2007 Mem. & Order at 1-2 (03 CR 929, Docket Entry No. 842), and the Court ordered that those four uncharged crimes would be admitted at trial.  The Court further held that evidence of the assault on Frank Porco was admissible, but that evidence regarding heroin trafficking would be excluded under Fed. R. Evid. 403.

3

ARGUMENT

I.   Evidence of Basciano's Involvement in
     Uncharged Crimes Is Admissible at Trial

          At trial, the government seeks to offer evidence of

Basciano's involvement in other uncharged crimes in order to

establish the existence of the enterprise, i.e., the Bonanno

family; the enterprise's involvement in racketeering activity;

Basciano's rank and position within the Bonanno family; the

Bonanno family's effect on interstate commerce; and the history

and relationships between Basciano and cooperating witnesses.

Just as in Basciano's prior trials, evidence of his involvement

in other crimes is admissible to "complete the story of the

charged crimes, demonstrate relationships of trust and

corroborate the testimony of cooperating witnesses."  United

States v. Basciano, 2006 WL 385325, at *10 (E.D.N.Y. Feb. 17,

2006) (Garaufis, J.).  In addition, uncharged act evidence,

namely, "threatening family members of witnesses or an associate

for fear he may become a cooperating witness" may be admissible

to show consciousness of guilt.  Id. at 5.

          Specifically, at trial, the government will seek to

introduce evidence of Basciano's involvement in (1) the

conspiracy to murder and murder of Frank Santoro; (2) soliciting

the murder of Bonanno underboss Salvatore Vitale; (3) soliciting

the murder of Assistant United States Attorney Greg Andres;

(4) conspiring to kill Joseph Bonelli; (5) the extortion of

4

vendors at the Feast of San Gennaro Festival; (6) illegal
gambling and loansharking; (7) the conspiracy to murder and
attempted murder of David Nunez; and (8) other crimes that
Basciano committed together with cooperating witnesses, including
assaults.  Evidence of each of these uncharged acts is admissible
to prove the existence of the Bonanno family, the Bonanno
family's involvement in racketeering activity and its impact on
commerce.  The evidence is likewise admissible to prove
Basciano's history in the enterprise and the development of
relationships of trust between him and his coconspirators,
including cooperating witnesses.  The evidence is also admissible
to corroborate cooperating witness testimony.

    A.    <u>Section 1959</u>

      As set forth above, Basciano is presently charged with
two conspiracies to murder in aid of racketeering, in violation
of 18 U.S.C. § 1959(a)(6), murder in aid of racketeering, in
violation of 18 U.S.C. § 1959(a)(1), and use of a firearm in
relation to a crime of violence, in violation of 18 U.S.C.
§ 924(c).  "To prove a § 1959(a) conspiracy, the government must
establish, <u>inter alia</u>, that the defendant (1) agreed with others
to commit a violent crime - either murder or kidnapping, <u>see</u>
§ 1959(a)(5), or maiming or specified assaults, <u>see</u> § 1959(a)(6)
- and (2) entered into that agreement 'for the purpose of gaining
entrance to or maintaining or increasing position in an

5

enterprise engaged in racketeering activity,' 18 U.S.C. § 1959(a)(5)."  United States v. Basciano, 599 F.3d 184, 198-99 (2d Cir. 2010) (quoting 18 U.S.C. § 1959(a)).

To prove a substantive violation of § 1959, the government must prove (1) the existence of an enterprise engaged in or affecting interstate commerce; (2) that the enterprise was engaged in racketeering activity;[4] (3) that the defendant had or was seeking a position in the enterprise; (4) that the defendant committed the alleged crime of violence; and (5) that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise.  See Modern Federal Jury Instructions, Instruction 52-36.

In turn, 18 U.S.C. § 1959(b)(2) defines "enterprise" as "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."  See United States v. Mejia, 545 F.3d 179, 203 (2d Cir. 2008) (defining "enterprise" in the context of violence in aid of racketeering statute as "'a group of persons associated together for a common purpose of engaging in a course of conduct'" (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).

---

[4]   "Racketeering activity" is defined in 18 U.S.C. § 1959(b)(1) by cross-reference to 18 U.S.C. § 1961, which includes, among other crimes, murder, gambling and extortion.

6

An "enterprise" "must have an existence separate from the series of criminal acts that constitute its racketeering activity."  Id. at 203.  Accordingly, the Second Circuit has expressly approved the admission of prior act evidence in the context of a § 1959 prosecution to prove the existence of the enterprise:

> Where, as here, the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible "to prove an essential element of the RICO crimes charged-the existence of a criminal enterprise in which the defendants participated." [United States v.] Matera, 489 F.3d [115,] 120 [(2d Cir. 2007)] (upholding admission of evidence of uncharged murders).  The evidence was also admissible to show the existence of the conspiracy with which both Appellants were charged.

Id. at 206 (citing United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)); see Matera, 489 F.3d at 120 (upholding the admission of uncharged murders to prove the existence of the Gambino family); Mejia, 545 F.3d at 206-07 (reiterating Matera and concluding that the admission of evidence of a prior uncharged shooting was proper as the shooting demonstrated the existence of the racketeering enterprise and the existence of the conspiracy with which the defendants were charged).

With respect to the "maintain and increase position" element of § 1959, the Second Circuit has explained that the motive requirement may be proved in various ways, as follows:

7

In order to establish that a crime of violence was committed "for the purpose of . . . maintaining or increasing position in" a RICO enterprise, the government is required to prove, <u>inter alia</u>, that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise. . . . Self-promotion need not have been the defendant's only, or even his primary, concern, if it was committed "as an integral aspect of membership" in the enterprise. <u>United States v. Concepcion</u>, 983 F.2d [369,] 381 [(2d Cir. 1992)]. The motive requirement is thus satisfied if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." <u>Id.</u>

In <u>Concepcion</u>, for example, the § 1959 defendant, a lieutenant in a narcotics enterprise, received a complaint from his workers that a competitor was trying to take over one of the defendant's retail spots, and the defendant led his associates into a gun battle against the organization's competitors. The jury in that case could properly have concluded that, as a leader of the enterprise, the defendant would have been expected to respond to reported threats to the organization's competitive position and that a failure to do so would have undermined the defendant's position and authority in his organization. <u>See also</u> <u>United States v. Rosa</u>, 11 F.3d [315,] 340-41 [(2d Cir. 1993)] (where § 1959 defendant joined narcotics organization as a lower-level worker, rose to become one of its leaders, and ruthlessly killed an associate in a dispute over defendant's narcotics distribution spot, jury could properly find that the motive of the murder was the maintenance of defendant's position in organization).

8

<u>United States v. Thai</u>, 29 F.3d 785, 817-18 (2d Cir. 1994)
(citations omitted); <u>see</u> <u>United States v. Payne</u>, 591 F.3d 46 (2d
Cir. 2010) ("'[T]he motive requirement is satisfied if the jury
could properly infer that the defendant committed his violent
crime because he knew it was expected of him by reason of his
membership in the enterprise or that he committed it in
furtherance of that membership.'" (quoting <u>United States v.</u>
<u>Pimentel</u>, 346 F.3d 285, 295-96 (2d Cir. 2003)); <u>United States v.</u>
<u>Desena</u>, 260 F.3d 150, 155 (2d Cir. 2001); <u>United States v. Diaz</u>,
176 F.3d 52, 95 (2d Cir. 1999); <u>Concepcion</u>, 983 F.2d at 381.

Under <u>Thai</u> and its progeny, the nature of the charged
enterprise, the rules and structure of that enterprise, and the
expectations of membership are all relevant to proving whether a
defendant agreed to commit, or committed, a violent crime with
the purpose of "maintaining or increasing position" within the
enterprise.  <u>See also</u> <u>United States v. Castro</u>, 659 F. Supp. 2d
415, 421 (E.D.N.Y. 2009) (concluding in § 1959 prosecution that
evidence of an uncharged shooting was admissible to prove the
motive for a charged shooting where the motive behind both
shootings was to "harm members of rival gangs").

    B.    **Legal Standard: Evidence That Is Directly Relevant to
and Inextricably Intertwined with the Evidence of the
Charged Crimes**

As discussed below, evidence of Basciano's involvement
in additional uncharged crimes is admissible as direct evidence

of the charged offenses, and as evidence that is inextricably intertwined with evidence of the charged offenses.  The Second Circuit has explained that "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).  Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of the crime."  Id.; see also Fed. R. Evid. 401, 402.  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case."  Old Chief v. United States, 519 U.S. 172, 183 (1997).

It is well settled that "'evidence of uncharged criminal activity is not considered other crimes evidence under Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)") if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'"  United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting Gonzalez, 110

F.3d at 942)[5]; see also Thai, 29 F.3d at 813; United States v.
Towne, 870 F.2d 880, 886 (2d Cir. 1989) (same).

Accordingly, the Second Circuit has repeatedly held
that evidence of "other" or "uncharged" crimes is admissible to
establish the existence of the charged conspiracy in prosecutions
for racketeering offenses.  In United States v. Baez, 349 F.3d
90, 93 (2d Cir. 2003), the Second Circuit held: "It is well
settled that in prosecutions for racketeering offenses, the
government may introduce evidence of uncharged offenses to
establish the existence of the criminal enterprise."  Id.

_____

[5]      In Gonzalez, 110 F.3d at 941-42, where the defendants
were charged with being felons in possession of a firearm, the
Second Circuit upheld admission of evidence regarding a burglary
because it was relevant both to motive for the defendants'
possession of firearms and to provide "crucial background
evidence that gave coherence to the basic sequence of events that
occurred on the night" of the defendants' arrest.  In rejecting
defendants' argument to preclude this evidence pursuant to Rule
404(b), the court held:

> It is well established that "evidence of
> uncharged criminal activity is not considered
> 'other crimes' evidence under Fed. R. Evid.
> 404(b) if it 'arose out of the same
> transaction or series of transactions as the
> charged offense, if it [is] inextricably
> intertwined with the evidence regarding the
> charged offense, or if it is necessary to
> complete the story of the crime [on] trial.'"

Id. at 942 (quoting United States v. Towne, 870 F.2d 880, 886
(2d. Cir. 1989) (emphasis added) (alterations in original).  The
evidence of the burglary was thus admitted pursuant to Rule 401,
after the requisite inquiry under Rule 403 determined that the
probative value of the evidence was not substantially outweighed
by the danger of unfair prejudice.

(upholding district court's admission of sixteen uncharged robberies).

A criminal act committed in furtherance of the alleged conspiracy is "not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992); see United States v. Quinones, 511 F.3d 289, 309 (2d Cir. 2007) (quoting Towne and Concepcion). Thus, crimes committed in furtherance of the racketeering enterprise do not fall within the ambit of Rule 404(b). See United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of uncharged murders admissible to prove relationship and continuity of RICO enterprise's illegal activities).

In United States v. Wong, 40 F.3d 1347 (2d Cir. 1994), the Second Circuit held that the district court properly permitted testimony of an uncharged shootout between rival gangs. In affirming the court's ruling, the Second Circuit noted that:

> the evidence [of uncharged acts] was admissible to prove the existence and nature of the Green Dragons "enterprise" and the participation of defendants-appellants in that enterprise, rather than as evidence of other crimes under Rule 404(b). The court determined that although other evidence had been admitted regarding the defendants' violent conduct, the challenged evidence was not cumulative because "there is no piece of evidence that the government has proffered that I do not expect will be subject to challenge, if not here during the evidentiary

12

> phase of trial, [then] during summations of
> counsel."

Id. at 1378 (second alteration in the original).  The Second
Circuit added: "this evidence was probative of the existence,
organization, and nature of the RICO enterprise, a central
allegation in the indictment.  Accordingly, 'the fact that it may
also have been probative of a separate uncharged crime is
irrelevant.'"  Id. at 1378 (quoting United States v. Coiro, 922
F.2d 1008, 1016 (2d Cir. 1991)).[6]

Similarly, in United States v. Diaz, 176 F.3d 52, 79
(2d Cir. 1999), the Second Circuit affirmed the admission of
various uncharged criminal acts admitted as "enterprise evidence"
to establish the existence of the charged enterprise, including
evidence of drug trafficking, possession of weapons, assaults in
aid of racketeering, robbery and related acts of violence.  The
Second Circuit specifically held that this evidence was not
subject to Rule 404(b).  See id.  In United States v. Miller, 116
F.3d 641, 682 (2d Cir. 1997), the Second Circuit upheld the
district court's ruling admitting evidence of uncharged murders
as proof of a RICO enterprise and conspiracy without regard to
Rule 404(b).  Id. ("The district court concluded that the proof
of these murders was relevant to show the existence and nature of

---

[6]    The Second Circuit further held that the district court
acted well within its discretion in concluding the evidence was
admissible under Rules 401 and 403.

the enterprise and the conspiracy and that the probative value of

the evidence was not substantially outweighed by its potential

for unfair prejudice . . . we see no abuse of discretion here.").

    C.   <u>Legal Standard: Rule 404(b)</u>

      The evidence regarding Basciano's involvement in

uncharged crimes is also admissible under Federal Rule of

Evidence 404(b).[7]  Evidence of a defendant's other acts is

admissible under Rule 404(b) if relevant to an issue at trial

other than the defendant's character and if its probative value

is not substantially outweighed by the risk of unfair prejudice.

<u>United States v. Williams</u>, 205 F.3d 23, 33 (2d Cir. 2000).

      The Second Circuit follows an "inclusionary approach"

to 404(b) evidence.  <u>Mejia</u>, 545 F.3d at 206; <u>United States v.</u>

<u>Pascarella</u>, 84 F.3d 61, 69 (2d Cir. 1996).  Accordingly, "prior

act evidence is admissible if offered 'for any purpose other than

to show a defendant's criminal propensity.'"  <u>Mejia</u>, 545 F.3d at

206 (quoting <u>United States v. Garcia</u>, 291 F.3d 127, 136 (2d Cir.

---

    [7]    Federal Rule of Evidence 404(b) provides, in pertinent
part, as follows:

    Evidence of other crimes, wrongs, or acts is not
    admissible to prove the character of a person in order
    to show action in conformity therewith.  It may,
    however, be admissible for other purposes, such as
    proof of motive, opportunity, intent, preparation,
    plan, knowledge, identity, or absence of mistake or
    accident . . . .

2002)); see also Huddleston v. United States, 485 U.S. 681
(1988); Pascarella, 84 F.3d at 69.  In line with this clear
precedent, a court in this district recently held that evidence
of an uncharged shooting was admissible to prove a charged
shooting because the defendant's motive for both shootings was
the same.  Castro, 659 F. Supp. 2d at 421.

In addition, the Second Circuit has repeatedly and
consistently held that evidence pertaining to how members of a
conspiracy met, committed crimes together and grew to trust each
other over time is relevant and admissible to explain the
relationship between a defendant and his co-conspirators in the
charged conspiracy.  See Williams, 205 F.3d at 33-34; Pascarella,
84 F.3d at 72-73; United States v. Pipola, 83 F.3d 556, 565 (2d
Cir. 1996); United States v. Araujo, 79 F.3d 7, 8 (2d Cir. 1996);
United States v. Alli-Baloqun, 72 F.3d 9, 11-12 (2d Cir. 1995);
United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); United
States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992); United
States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990).

Evidence of other crimes is admissible when offered for
a proper purpose so long as the evidence "'[does] not involve
conduct any more sensational or disturbing than the crime[] with
which [the defendant has been] charged.'"  United States v.
Pitre, 960 F.2d at 1120 (quoting Roldan-Zapata, 916 F.2d at 804).
Where the uncharged crimes are similar in nature to the charged

15

crimes, Rule 404(b) evidence is generally admissible under the Rule 403 balancing test.  See United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (upholding admissibility of evidence that the defendant, a police officer charged with engaging in excessive use of force with an arrestee, choked another arrestee, on the basis that "the evidence did not involve conduct more inflammatory than the charged crime, and the district court gave a careful limiting instruction"); see also United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (prior cocaine convictions admissible as proof that the defendant was aware that substance in his closet was cocaine; observing that evidence admissible pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice where the evidence does not "involve conduct more inflammatory than the charged crime[s]").

In interpreting Rule 404(b) of the Federal Rules of Evidence, the Second Circuit routinely has sanctioned the government's use of such evidence as a means of providing the jury with background information as to the charged crimes and an explanation of the development of criminal relationships.  See Williams, 205 F.3d at 33-34; Pipola, 83 F.3d at 566; Rosa, 11 F.3d at 333-34.

For example, in Williams, the Second Circuit affirmed the district court's admission of uncharged criminal conduct involving the defendant and his coconspirators – including

16

marijuana distribution, credit card fraud and filing false charges of assault – because such conduct "was relevant to inform the jury of the background of the [cocaine distribution] conspiracy charged, to complete the story of the crime charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed."  205 F.3d at 33-34.

Moreover, to the extent that evidence of uncharged crimes includes inculpatory admissions by cooperating witnesses who participated in the uncharged crimes jointly with the defendant, such evidence also is admissible to corroborate those witnesses' testimony.  See United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987); United States v. Mejia-Valez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994).

Even were there a danger of undue prejudice, any such risk could be mitigated effectively by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered.  See, e.g., United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991); United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984).

17

D.   Evidence of Basciano's Uncharged Crimes Is
     Admissible as Direct Evidence of the Charged
     Crimes and Under Rule 404(b)[8]

1.   Conspiracy to Murder and Murder of Frank Santoro

During the evening of February 15, 2001, Frank Santoro was shotgunned to death by Vincent Basciano while walking his dog on the Throgs Neck Expressway Extension in the Bronx.  The participants in the Santoro murder included Basciano, Dominick Cicale, Anthony "Bruno" Indelicato, Anthony Donato and John Tancredi.

a.   Testimony of Dominick Cicale

Bonanno family captain Dominick Cicale has previously testified in detail about the circumstances of the Santoro murder, including describing Basciano's personal shotgunning of Santoro to death and Basciano's involvement of Cicale in the murder at a formative point in their organized crime relationship.

b.   Testimony of Joseph Massino

Massino is expected to testify in regard to the Santoro murder that, among other things, Basciano directly informed Massino about the murder, explaining that Basciano and Cicale had been the shooters, and that Donato and Indelicato had also participated.

_____

[8]   The evidence summarized herein provides an overview of some of the evidence and testimony through which the government will seek to prove Basciano's crimes.

18

c.   <u>Testimony of Nicholas Pisciotti</u>

Bonanno family acting captain Nicholas Pisciotti has previously testified about the Santoro murder.  Pisciotti stated that he learned about the murder from another member of the murder conspiracy, Anthony "Bruno" Indelicato.  Pisciotti explained that Indelicato told him that Indelicato was charged with the murder of a junkie in the Bronx (Santoro) and that Basciano and Dominick Cicale participated with Indelicato in that murder.  Indelicato described to Pisciotti his own, Basciano's and Cicale's involvement in that murder, explaining that because Cicale shot at Santoro five times and missed, Basciano "had to get out and do it."  Indelicato also referred to the murder as being a "test" for Cicale prior to Cicale being proposed for membership in the Bonanno family.

d.   <u>The Tartaglione Recordings</u>

Basciano admitted his involvement in the Santoro murder during consensual recordings made by Bonanno family captain James Tartaglione.  After explaining to Tartaglione that the two FBI-302 reports Tartaglione provided were really describing "two different incidents" (the Santoro murder and the Martino murder solicitation[9]), Basciano stated:

---

[9]      Because the discussion in the Tartaglione recording evidences both the Santoro murder and a murder solicitation as to Dominick Martino, at trial, the government anticipates introducing evidence regarding the Martino murder solicitation to put the Tartaglione recording into context and to corroborate

BASCIANO:   But that's good though.  It's good, you wanna know
            why?  Because let them think it's the same thing.
            You wanna know why?  Because supposedly this was
            carried out, but he denied it . . . .

BASCIANO:   They're gonna be tough to pinch me on this.
            They're gonna be tough to pinch me on this.  You
            wanna know why?  They got no forensics.  They have
            no guns.  They have no nothing.  Forget about the
            fact that I didn't do it anyway.  Okay?  I had
            nothing to do with it.  But if I did, there's no
            guns, there's no cars, there's no eyewitnesses,
            there's no rats.  How are they going to pinch me
            on that?

Dec. 21, 2003 Tartaglione Tr. at 10 (enclosed as Exhibit A).[10]

Notably, the limited information regarding the murder
conveyed in the FBI-302 from Salvatore Vitale and the police
report regarding the Santoro murder did not describe the presence
of multiple guns or cars, or the lack of eyewitnesses or
cooperators.  Basciano's discussion with Tartaglione thus
included specific details that only a participant in the murder
could have known, as Tartaglione can testify, and has previously
testified.

_____

testimony of cooperating witnesses.  At the second Basciano I
trial, in convicting Basciano of racketeering, the jury
unanimously found "proved" the predicate act alleging the Martino
murder solicitation.

[10]    Enclosed as Exhibit B is the second consensual
recording made by Tartaglione involving Basciano, on January 18,
2004.  The government anticipates offering into evidence at trial
both of the Tartaglione consensual recordings involving Basciano.

e.   <u>Analysis</u>

This evidence is admissible as background evidence to establish the existence of the Bonanno family, the enterprise's involvement in racketeering activity and to demonstrate the defendant's history within the Bonanno family.  In committing the Santoro murder, Basciano demonstrated his capability for violence, a necessary prerequisite to rise to power within the Bonanno family, a violent criminal enterprise.  In addition, as has been established at prior trials, Cicale participated in the murder with Basciano as Cicale was proving himself as an associate worthy of membership in the Bonanno family.  The Santoro murder thus demonstrates the evolution of the relationship of trust between Basciano and Cicale, which ultimately led to Basciano's delegating the Pizzolo homicide to Cicale, a trusted Bonanno family member.  Finally, evidence of the Santoro murder will corroborate cooperating witness testimony.  Accordingly, evidence of the Santoro murder should be admitted at trial as proof of the murder in aid of racketeering charges and to complete the story of the crimes charged.

2.   Soliciting the Murder of Bonanno Underboss
<u>Salvatore Vitale</u>

Shortly before Massino's arrest on January 9, 2003, Basciano asked Massino for permission to murder Bonanno underboss Salvatore Vitale, because Basciano feared that Vitale would become a cooperating witness.

21

a.   The Tartaglione Recordings

During the December 21, 2003, consensually recorded conversation made by cooperating witness James Tartaglione, Basciano admitted, among other things, that Basciano had asked Massino for permission to murder Salvatore Vitale.  The following is a pertinent excerpt from that recording:

BASCIANO:   He [Massino] braved this one out.  He braved it out.  He braved it out and you wanna know something, he thought with his heart and not with his head, with his head with this one.  And in this life over here, he'll tell ya himself.  You know what, unfortunately, we learn by our mistakes.  But some mistakes are too gruesome to learn from.  You gotta just act on 'em.

URSO:   A lot of people getting hurt here.

BASCIANO:   You just gotta act on 'em.  Okay, here's one thing over here that he was thinking about his wife and everything and he probably in the back of his mind, he didn't wanna actually believe it.  Okay, but he knows because I went to him and I went to him (UI) about three weeks before.  This is the way, this is the way the tone was going.  And he says listen to me.  He says . . .

URSO:   He had a bad feeling about it then.

BASCIANO:   They're by his house, they're by his house.  He couldn't do it.

Dec. 21, 2003 Tartaglione Tr. at 50 (enclosed as Exhibit A).

b.   Cooperating Witness Testimony

In addition, two cooperating witnesses, Joseph Massino and Dominick Cicale, are expected to testify that Basciano solicited Massino for permission to murder Vitale.  Massino would testify that Basciano personally solicited Massino, and Cicale

22

has previously testified that, inter alia, Basciano admitted to
Cicale soliciting Massino, as well as asking Cicale to prepare to
participate in murdering Vitale.

   c. <u>Analysis</u>

   This evidence is admissible as background evidence to
establish the existence of the Bonanno family, as well as the
Bonanno family's prohibition on cooperating with law enforcement.
In addition, the evidence is highly probative and relevant to the
murder in aid of racketeering charges against Basciano in that
the evidence shows that Basciano took allegations of cooperation
seriously and sought to protect the Bonanno family in an effort
to maintain and increase his position within the charged
enterprise.  Notably, during one of the Massino Tapes, Basciano
stated that Michael Mancuso told Basciano that Pizzolo was a
"rat" – which explanation was provided to Massino as part of the
reason that Basciano ordered Pizzolo's murder.  <u>See</u> Jan. 3, 2005
Massino Tr. at 25 (enclosed as Exhibit C).  <u>See, e.g.</u>, <u>Castro</u>,
659 F. Supp. 2d at 421 (concluding in § 1959 prosecution that
evidence of an uncharged shooting was admissible to prove the
motive for a charged shooting where the motive behind both
shootings was to "harm members of rival gangs").  Accordingly,
the evidence of Basciano's solicitation of Vitale's murder is
admissible as direct evidence of the charged crimes or, in the
alternative, as proof of motive and intent under Rule 404(b).

23

3.   Soliciting the Murder of Assistant United States
     Attorney Greg Andres

        a.   Testimony of Joseph Massino

In late 2004, while Massino and the defendant were both in a "bullpen" at the Eastern District courthouse, Basciano asked Massino for permission to murder Assistant United States Attorney ("AUSA") Greg Andres.  At the time, AUSA Andres was the lead prosecutor in the then-pending federal cases against both Massino and Basciano, and had been the lead prosecutor in the government's indictment and conviction of dozens of other Bonanno members and associates in the immediately preceding years.

        b.   The Massino Recordings

As set forth above, evidence of Basciano's solicitation to kill AUSA Andres was also captured on the Massino Tapes. Specifically, during the recordings, the defendant made detailed statements admitting to ordering the murder of Randolph Pizzolo, and admitting to soliciting the murder of other individuals, including Bonanno captain Patrick DeFilippo, and AUSA Greg Andres.  In regard to AUSA Andres, on January 3, 2005, Massino and the defendant discussed on the recording the defendant's prior bullpen request for permission to murder AUSA Andres:

    MASSINO:   . . . As far as the last time when I spoke with
               you at the bullpen, remember?  We spoke in the
               bullpen?

    BASCIANO:  Yeah.

24

MASSINO:    And you want to take the prosecutor out.  What are
            we gonna gain by?  What are you gonna gain if we
            take the prosecutor out?

BASCIANO:  Nothing.

MASSINO:   What are you going to gain?

BASCIANO:  Forget about it.

MASSINO:   No, that's no good.  That's off limits.

BASCIANO:  Forget about it.  Forget about that.

Jan. 3, 2005 Massino Tr. at 13 (enclosed as Exhibit C).

        This topic was raised again later in the conversation:

MASSINO:   And I thought about what you said with the with
           the prosecutor, right?  What are we going to gain?

BASCIANO:  No.  Forget about it.  Forget about it.  Let's not
           even discuss it again.

MASSINO:   No, you understand what I'm saying?

BASCIANO:  Yeah, forget about it.  Forget about it.

MASSINO:   What are you going to gain?  You make no sense.

BASCIANO:  Forget about it.

MASSINO:   I thought about it like I said let me think about
           it.  I don't want to talk.  Downstairs.

BASCIANO:  Right.  Right.

MASSINO:   In - the in that room there.

BASCIANO:  Okay.

MASSINO:   But I said to myself what are we going to gain by
           hurtin' him?

BASCIANO:  No.

MASSINO:   That don't make any sense.  And the more people
           that get hurt the more heat is gonna come down.

                            25

    BASCIANO: Yeah, I know that.

Jan. 3, 2005 Massino Tr. at 19 (enclosed as Exhibit C).

       Later in the conversation, Basciano again acknowledged that he had raised the prospect of murdering AUSA Andres with Massino:

    MASSINO:  Did I see you in the bullpen?

    BASCIANO: Yeah.

    MASSINO:  <u>You talked about the prosecutor</u>.

    BASCIANO: <u>Right</u>.

    MASSINO:  <u>And I said give me time, I want to think about it</u>. And I got nothing but time up here.  Think, think, think.

    BASCIANO: <u>Right.  Right</u>.

    MASSINO:  We ain't going to benefit nothin'.

    BASCIANO: No.  No.  No.  Forget it.

Jan. 3, 2005 Massino Tr. at 77-78 (enclosed as Exhibit C) (emphasis added).

       In a second consensually recorded conversation between Massino and Basciano on January 7, 2005, the subject of Basciano's solicitation to murder AUSA Andres was again discussed, in conjunction with a discussion of Basciano's ordering of Pizzolo's murder:

    MASSINO:  So, I mean, they can't throw, I don't see them throwin' me, the only thing I figure, it was Randy or the, or, or the prosecutor.

    BASCIANO: No, no, no, no, no.

26

MASSINO:    Alright.

BASCIANO: No.

MASSINO:    You tell me that, okay.

BASCIANO: No, absolutely not.

MASSINO:    I don't want me and you.

BASCIANO: No, Bo.  Yeah, but let them do what the fuck,
          <u>listen, this prosecutor, I can't underestimate him</u>
          <u>because he's a dirty, rotten, cocksucker, okay</u>?
          But as far as Randy, nobody fuckin' knows.

MASSINO:    No, I know that, I know that, but I don't, but you
            gotta remember one thing, Vin.  I know you told,
            listen to me, I know you told me in the bullpen, I
            said let me think about it.  But I don't know who
            you told.

BASCIANO: Nobody, Bo.

MASSINO:    But I don't know that . . .

BASCIANO: No!

MASSINO:    . . . until just now.

BASCIANO: Joe, you're my guy.

MASSINO:    I understand.

BASCIANO: Come on, I'm the guts (UI).

MASSINO:    But how, do I know, maybe you said somethin' to
            Dominick.

BASCIANO: No, nobody!

MASSINO:    Do I gotta ask ya?

BASCIANO: Yeah.

MASSINO:    Okay.

BASCIANO: Never.

MASSINO:    I gotta ask ya.

BASCIANO:   Come on, I gotta be a fuckin' dope.  I mean, you
            know, everything else here that I did, I'll take
            the blame for or I take the credit for.  That's
            it.  There was guys out there that I think
            deserved it, we were in a wartime situation, this
            family was falling apart and guess what?  I had
            them all.

MASSINO:    We was okay until I got pinched.

BASCIANO:   Yeah, no.

MASSINO:    We was on top of the world.

BASCIANO:   We were terrific, terrific, and we're gettin', got
            news for you, those subsequent months over there?
            We fell apart.  We fell apart, and I took the bull
            by the horns, Bo.

Jan. 7, 2005 Massino Tr. at 52-54 (enclosed as Exhibit D)

(emphasis added).

> c.   Basciano's Admissions to Generoso Barbieri

Generoso Barbieri, a former Bonanno family acting

captain, is also a cooperating witness.  While incarcerated at

the MDC with Basciano, Basciano admitted to Barbieri that

Basciano had ordered Pizzolo's murder.  In addition, Basciano

told Barbieri, in substance, that Basciano knew where to find

AUSA Andres and that Basciano had a crew of capable enforcers.

In context, and in light of Barbieri's decades of experience in

organized crime and his familiarity with Basciano's manner of

speaking, Barbieri understood Basciano's statement to mean that

Basciano was planning to kill AUSA Andres.  Barbieri is also

expected to testify that one of his principal motivations for

28

agreeing to cooperate with the government was to prevent Basciano from carrying out the murder.

>        d.   <u>Analysis</u>

The evidence of Basciano's involvement in a solicitation to kill AUSA Andres is admissible for several reasons.  First, as demonstrated by the above excerpts of the Massino Tapes, the evidence regarding the charged crimes relating the Pizzolo murder is inextricably intertwined on the Massino Tapes with evidence regarding Basciano's solicitation to kill AUSA Andres.  <u>Carboni</u>, 204 F.3d at 44 ("'[E]vidence of uncharged criminal activity is not considered other crimes evidence under Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)") if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'") (quoting <u>Gonzalez</u>, 110 F.3d at 942).

Second, the evidence demonstrates the existence of the Bonanno family and Basciano's concern that the successive prosecutions brought against members and associates of the Bonanno family, which AUSA Andres was leading at the time, were damaging the enterprise.  Evidence of Basciano's seeking to protect the family, in his capacity as acting boss, is thus highly relevant in establishing Basciano's role in the Bonanno

family enterprise, as well as to demonstrate Basciano's
motivation to maintain and increase his position within the
family.  Accordingly, the evidence of Basciano's solicitation of
AUSA Andres's murder is admissible as direct evidence of the
charged crimes or, in the alternative, as proof of motive and
intent under Rule 404(b).

### 4.   Conspiracy to Murder Joseph Bonelli

During the fall of 2004, Basciano ordered the murder of
Joseph Bonelli, a Genovese family associate who had been
disrespectful to a member of the Bonanno family.  Basciano first
gave the order to kill to Joseph Cammarano, Jr., and then to
Dominick Cicale, who was also tasked by Basciano to kill Pizzolo
in the same time period.

### a.   Cooperating Witness Testimony

Cicale is expected to testify that the plan for the
Bonelli murder was to have Randolph Pizzolo do the murder, after
which Pizzolo would himself be killed.  Another cooperating
witness is also expected to testify that the original plan
proposed for the Pizzolo murder involved Pizzolo's killing an
individual, after which Pizzolo was to be killed.

### b.   The Massino Recordings

Evidence of the Bonelli murder conspiracy was also
captured on the January 3, 2005 Massino Tape as follows:

BASCIANO: Oh let me tell you about Joe's kid so (UI)
          There's a place called Villa Sonoma (ph).  Villa

Sonoma is a place on Whitestone it's a café.
There's a kid named Joe Bonelli (ph) around the
Westside that was creating fucking havoc.  Shot up
the Whitestone Villa, ah, shot up the restaurant.
Went to the owner's house.  The owner's around
Paulie.  Shot up the house and Joe . . .

MASSINO:  Who Paulie?

BASCIANO:  . . . Who, our friend Paulie.  He's a friend.

MASSINO:  Fat Paulie?

BASCIANO: Yeah, Fat Paulie.  He shot up the owner's house
and then he made somebody call up the house and
they says and fuck Nicky, meaning Nicky Santora.
Now, I go see Joey C., says Joey, go take care of
it.  Any help that you need you do what you got to
do.  We can't have them guys shootin' up people's
houses and sayin' fuck Nicky.  I ain't fucking
tolerating that.  Do what you gotta do.  He comes
back a week and a half later now he tests me.  He
says listen to me Randy went into Villa Sonoma he
went with a gun he got drunk and he says he's the
only one capable of killing anybody in this
family.  He says he was an ex-seal and he was this
and he was that, you know, talkin' like a fuckin'
jerkoff.

Jan. 3, 2005 Massino Tr. at 76-77 (enclosed as Exhibit C).

        c.   <u>Analysis</u>

        The evidence demonstrating the existence of the

conspiracy to kill Bonelli is inextricably intertwined with the

evidence of the Pizzolo murder.  Indeed, the cooperating witness

testimony regarding the Pizzolo murder would be incomplete,

confusing and inaccurate without reference to the Bonelli murder

plot.  Similarly, the evidence of the Bonelli plot is intertwined

with the conversation between Basciano and Massino about the

Pizzolo murder.  The evidence regarding Bonelli is thus

                              31

admissible to complete the story of the charged crimes and to corroborate the testimony of the cooperating witnesses.

> 5. The Extortion of Vendors at the Feast of
>     San Gennaro Festival

From approximately 2003 until the time of his arrest, Basciano collected the Bonanno family's share of the illegal profits from the extortion of lighting and garbage vendors at the annual Feast of San Gennaro Festival held in the Little Italy section of Manhattan.  The Bonanno family, in partnership with the Genovese family, has long controlled the San Gennaro Feast. During his tenure as the acting boss of the Bonanno family (and before), Basciano was charged with collecting the Bonanno family's illegal profits from the San Gennaro Feast, which he later divided with Bonanno family boss Joseph Massino.  Bonanno family soldier Perry Criscitelli was also involved in the Feast extortion as was Massino.[11]

---

[11]   During a recorded conversation with Tartaglione in December 2003, Basciano made a specific reference to the Feast, the involvement of the Genovese family (the "Westside") in the Feast and inquired about Tartaglione's influence at the Petrocelli lighting company.  The following exchanged took place:

BASCIANO:      I got it from . . . No let me ask you a
               question.  Petrocelli lighting, they're
               around you?

TARTAGLIONE:   No, he's with the West Side.

BASCIANO:      He's with the West Side?  Too bad.

TARTAGLIONE:   Listen to me.

Evidence regarding Basciano's involvement in the extortion of the Feast is relevant to establishing the Bonanno family enterprise, the fact that the Bonanno family was engaged in racketeering activity, and the enterprise's effect on commerce.  In addition, the evidence is admissible to prove Basciano's role as the Bonanno family boss as of 2004.  Such evidence is highly probative and relevant to the murder in aid of racketeering charges against Basciano in that the government must prove Basciano's position in the Bonanno family enterprise in connection with proving how Basciano's ordering Pizzolo's murder was for the purpose of maintaining and increasing Basciano's position in the Bonanno family.  The evidence also completes the

---

| | |
|---|---|
| BASCIANO: | Cause I maybe could use them to do the lights for the Feast. |
| TARTAGLIONE: | Who does the lights for the Feast? |
| BASCIANO: | We have a guy who's with the West Side. |
| TARTAGLIONE: | Wasn't that Angelo Prisco (ph)? |
| BASCIANO: | Yes, we just straightened it out.  It is Angelo Prisco. |
| TARTAGLIONE: | Yeah, I remember Angelo Prisco. |
| BASCIANO: | That (UI) fellow, that who (UI). |

Dec. 21, 2003 Tartaglione Tr. at 14 (enclosed as Exhibit A).

Later, during that conversation, Basciano specifically mentioned Criscitelli, who at one time controlled the Feast, and the fact that Criscitelli was on record with Basciano.  Basciano told Tartaglione: "I got Perry now."  Id. at 28.

33

story of the crimes charged, which involve Basciano's ascending
to the heights of power in the Bonanno family and his murder of
Pizzolo to establish his authority and to send a message to the
rest of the Bonanno family and other members and associates of
organized crime.

      6.   <u>Illegal Gambling & Loansharking</u>

      a.   <u>Illegal Gambling</u>

From approximately the late 1970s until the time of his
arrest, Basciano operated an illegal gambling business involving
policy.[12]  That business employed many members and associates of
the Bonanno family, including but not limited to Dominick Cicale,
Bonanno family soldier Anthony Donato, Bonanno family associates
Richard Basciano, Thomas Basciano, Vincent Basciano, Jr., Alan
Handler, Larry Weinstein, Anthony Congello, Giuseppe Mondelli,
Gennaro Tocco and John Tancredi, and former attorney and current
cooperating witness Thomas Lee.  In addition, cooperating
witnesses will testify that Basciano was involved in running an
illegal sports betting operation and a joker-poker operation,

---

[12]    At the first <u>Basciano I</u> trial, in convicting Basciano
of racketeering conspiracy, the jury unanimously found "proved"
the predicate act relating to Basciano's illegal policy
operation.  At the second <u>Basciano I</u> trial, in convicting
Basciano of substantive racketeering, the jury unanimously found
"proved" the predicate act that alleged illegal gambling
involving sports betting, in addition to convicting Basciano on
the substantive counts charging illegal gambling involving sports
betting and joker-poker.

together with, among others, Cicale, Aiello, Donato and Sylvester "Sally Daz" Zottola.

### b.   Loansharking

Former Bonanno family underboss and current cooperating witness Salvatore Vitale is expected to testify that, at various times throughout the 1990s, he loaned money to Basciano, who in turn used the money to make loansharking loans.  In addition, Generoso Barbieri is expected to testify that he borrowed money from Basciano, as did John Palazzolo and others.  Cicale is also expected to testify regarding Basciano's involvement in loansharking activity.

### c.   Analysis

Evidence of Basciano's involvement in gambling and loansharking is admissible as evidence of the murder in aid of racketeering charge, in that it demonstrates the existence of the Bonanno family enterprise, the enterprise's involvement in racketeering activity, and that the enterprise had an effect on interstate commerce.  The gambling and loansharking evidence is also admissible because it demonstrates the development of the criminal relationship between Basciano and other Bonanno family members and associates and corroborates the testimony of cooperating witnesses who participated in these crimes with Basciano, including Vitale, Cicale, Barbieri and Lee.

35

7.   Conspiracy to Murder and Attempted Murder
     of David Nunez

On November 14, 1985, Basciano – together with Donato

and Bonanno family captain Patrick DeFilippo – attempted to

murder David Nunez as a result of a dispute relating to

Basciano's policy operation.  Following the attempted murder,

Basciano and others tampered with witnesses, including Nunez.[13]

Evidence of Basciano's participation in this uncharged attempted

murder and subsequent witness tampering is admissible to complete

the story of the crime on trial and to corroborate Cicale, who is

expected to testify that Basciano confided the details of the

attempted murder to Cicale as a lesson in the importance of

proper planning when engaging in murder.

8.   Assaults and Other Crimes Committed With
     Cooperating Witnesses

Notwithstanding this motion's enumeration of certain

uncharged crimes evidence, the government may also elicit at

trial testimony from cooperating witnesses concerning other of

Basciano's uncharged crimes to establish the history and

relationships of trust between Basciano and the cooperating

witnesses.  This evidence - much of which was admitted at prior

Basciano trials - is admissible to show the development of the

_____

[13]   At the prior trial, in convicting Basciano of
racketeering conspiracy, the jury unanimously found "proved" the
predicate act relating to the conspiracy to murder and attempted
murder of David Nunez.

criminal relationships between Basciano and the cooperating witnesses, including Cicale and another cooperating witness, and to corroborate the cooperating witness testimony regarding the charged offense.

For example, Cicale is expected to testify that, in 2003 or 2004, Basciano directed Cicale and other Bonanno family members and associates to assault Frank Porco in connection with a dispute that had arisen between Porco and Sylvester "Sally Daz" Zottola, a Luchese family associate who maintained Basciano's joker-poker machines. Cicale is expected to testify that Basciano instructed him to use a particular member of his crew (who is now a cooperating witness) and another individual for the assault to see how they would handle themselves. The cooperating witness who was involved in the assault is expected to testify that he was told by Cicale to assault an individual named "Frank," and that Cicale had instructed him that Basciano wanted the cooperating witness to pass a particular message to "Frank" during the assault.

This evidence is important background as to the charged homicide. Specifically, cooperating witness testimony and the Massino Tapes will show that Cicale had asked a member of his crew who was involved in the assault on Frank to participate in the Pizzolo murder, but that the individual ultimately declined to participate. This cooperating witness's history of committing

37

crimes ordered by Basciano through Cicale is thus important evidence to illustrate how the cooperating witness was in a position to be entrusted with participation in the Pizzolo murder plot, and as corroboration for the cooperating witnesses' testimony.  In addition, the evidence is admissible to show that the Bonanno family enterprise is engaged in racketeering activity.

> D.   Rule 403

With respect to all of the above uncharged crimes, the significant probative value of the evidence is not substantially outweighed by the minimal prejudicial effect.  The Second Circuit has reiterated that evidence admissible for a proper purpose under Rule 404(b) ordinarily will not be precluded by Rule 403 so long as the evidence "[does] not involve conduct any more sensational or disturbing than the crimes with which [the defendant has been] charged."  Roldan-Zapata, 916 F.2d at 804; see also Livoti, 196 F.3d at 326 (affirming admissibility of evidence that defendant police officer charged with excessive force previously had choked another suspect, as "the evidence did not involve conduct more inflammatory than the charged crime").

As Basciano already is charged with serious crimes of violence, including a murder in aid of racketeering and a second conspiracy to murder in aid of racketeering, the additional evidence of uncharged crimes sought to be admitted by the

38

government plainly is no more serious – and in some cases, is much less serious – than the evidence to which the jury already will be exposed.

In any event, any minimal prejudice that might result can be effectively mitigated by a cautionary instruction that limits the jury's consideration of uncharged crimes evidence to the specific purposes for which it is admitted.  See United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991).

## II. References to Basciano's Prior Trials Should Be Precluded at Trial

The government requests that defense counsel be precluded from referencing Basciano's prior trials and other cases at trial, including (1) his acquittal on heroin distribution conspiracy charges in the Southern District of New York, a case known as the "Blue Thunder" case; and (2) the results of his two trials in Basciano I.  It is well settled that such matters are irrelevant under Rule 401 and that the admission of results of other trials risks jury confusion.  In addition, proof of an acquittal constitutes inadmissible hearsay.  See, e.g., United States v. Viserto, 596 F.2d 531, 537 (2d Cir. 1979) ("A judgment of acquittal is relevant only to the legal question of whether the prosecution is barred by the constitutional doctrine of double jeopardy and collateral estoppel."); accord United States v. Kerley, 643 F.2d 299, 300 (5th Cir. 1981) ("We agree with the Government's position that evidence of a prior

39

acquittal is not relevant because it does not prove innocence but rather merely indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime."). The prior acquittal also merits exclusion because it is hearsay, and because of "the danger it would present for confusion of the issues and misleading the jury." United States v. Gambino, 818 F. Supp. 536, 539 (E.D.N.Y. 1993) (Glasser, J.). This Court has already so found in this case. See United States v. Basciano, 2006 WL 2270760, at *1 (E.D.N.Y. Apr. 8, 2006) (Garaufis, J.); see also United States v. Amato, 2006 WL 1495497, at *3 (E.D.N.Y. May 26, 2006) (Garaufis, J.) (barring defendant Locurto from eliciting evidence of prior state court murder acquittal, even though murder charged in pending indictment as racketeering act, because such evidence lacked probative value, risked confusing the jury and constituted inadmissible hearsay).

        With respect to the Basciano I case, the existence of that proceeding and its outcome – a guilty verdict on the racketeering conspiracy charge with acquittals or a hung jury on certain predicates and substantive counts in the first Basciano I trial, and a guilty verdict on the substantive racketeering charge with all predicate acts found proved in the second Basciano I trial – is irrelevant and risks jury confusion. For the same reasons, defense counsel should be precluded on cross-

examination from referencing that any of the government's witnesses have testified in a proceeding where Basciano was a defendant.

To the extent defense counsel can properly seek to impeach any witness using testimony at the Basciano I trials, defense counsel should be required to refer to that trial only as a "proceeding," without identifying who was a defendant in the matter or the outcome.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should grant the government's motion <u>in limine</u> to admit evidence of additional uncharged crimes and to preclude references to Basciano's prior trials and cases at trial.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

John D. Buretta
Taryn A. Merkl
Nicole M. Argentieri
Assistant United States Attorneys
      (Of Counsel)

41