UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**

**05-CR-060 (NGG)**

-against-

VINCENT BASCIANO,

Defendant.
--------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Vincent Basciano ("Basciano") is charged in a superseding indictment with various crimes stemming from his alleged participation in the activities of the Bonanno organized crime family. (See S-9 Superseding Indictment ("S-9 Indictment") (Docket Entry # 464).)[1] The Government seeks the death penalty. On June 26, 2009, the court heard five-and-a-half-hours of oral argument on the dozens of pretrial motions made by the Defendant. (See ("Arg. Tr.") Docket Entry # 723.) The motions fall into three broad categories: general pretrial motions, discovery motions, and penalty-phase specific motions.[2] As set forth below, Basciano's motions are granted in part and denied in part.

---

[1] The Government has previously represented that it will present a superseding indictment to the grand jury reflecting changes in light of United States v. Basciano, 599 F.3d 184 (2d Cir. 2010). Because the S-9 Indictment is the operative indictment until a superseding indictment is returned, the court cites to the S-9 Indictment here.

[2] While the following is not an exhaustive list of the papers filed in support of and in opposition to Basciano's motions addressed herein, all filings cited to in this memo are listed below in chronological order.

# I.     BACKGROUND

For the purpose of these motions, the current criminal action against Basciano is referred to as "Basciano II." United States v. Basciano, 05-CR-060 (NGG) (E.D.N.Y.). Basciano was also a defendant in an earlier criminal action before this court, which is referred to throughout this opinion as "Basciano I." United States v. Basciano, No. 03-CR-929 (NGG) (E.D.N.Y.). The fact that Basciano was previously tried and convicted in Basciano I is relevant to a number of the Basciano II motions addressed herein.

---

The court cites to the following submissions by Basciano: Def.'s Mem. in Support of Basciano's Motions to Dismiss the Aggravating Factors Noticed by the Gov't and to Preclude the Gov't from Seeking the Death Penalty ("Def. Death Penalty Mem.") (Docket Entry # 311); Def.'s Mem. in Support of Motion to Suppress the "Massino" Tapes and to Dismiss the Indictment ("Def.'s Massino Suppression Motion") (Docket Entry # 502); Def.'s Reply Mem. in Support of Motions to Suppress ("Def.'s Massino Suppression Reply") (Docket Entry # 527); Def.'s Mem. in Support of Motion to Supplement Motion to Suppress ("Def. Suppression Supp. Motion Mem.") (Docket Entry # 576); Def.'s Motion for Material Witness Orders and Warrants of Jan. 11, 2009 (Docket Entry # 601); Affirmation of Lawrence Mark Stern of Jan. 11, 2009 ("Stern Aff.") (Docket Entry # 601); Def.'s Mem. in Support of Def.'s Motion for Material Witness Orders and Warrants of Jan. 11, 2009 ("Def. Witness Mem.") (Docket Entry # 601); Def.'s Letter of Jan. 30, 2009 ("Def.'s Massino Reply Letter") (Docket Entry # 622); Def.'s Mem. in Support of Pretrial Motions ("Def. Pretrial Mem.") (Docket Entry # 631); Def.'s Letter of May, 19, 2009 (Docket Entry # 689); Def.'s Reply Mem. in Support of Pretrial Motions ("Def. Pretrial Reply") (Docket Entry # 694); Def.'s Letter of May 31, 2009 (Docket Entry # 702); Transcript of Oral Argument on June 26, 2009 ("Arg. Tr."); Def.'s Letter of July 13, 2009 (Docket Entry # 726); Attorney's Supporting Declaration of Aug. 19, 2009 ("Goltzer Reyes Decl.") (Docket Entry # 770); Def.'s Mem. in Support of His Motion to Compel Immunity for D. Reyes ("Def. Reyes Immunity Motion") (Docket Entry # 770); Def.'s Letter of Sept. 16, 2009 (Docket Entry # 785); Def.'s Supplemental Mem. in Support of Pretrial Motions ("Def. Supp. Pretrial Mem.") (Docket Entry # 907-2); Reply Mem. in Support of Pretrial Motions ("Def. Supp. Pretrial Reply") (Docket Entry # 934.); Def.'s Letter in Opp. to the Gov't's Letter Regarding Def.'s Request to be Transferred to the MDC (Docket Entry # 971); Def.'s Letter Motion that Vincent Basciano be Immediately Returned to MDC (Docket Entry # 973); Def.'s Letter Addendum to Motion for Transfer (Docket Entry # 975); Def.'s Letter in Further Support of an Order Directing the Def. be Transferred Back to the MDC ("Def. Nov. 29, 2010 Letter") (Docket Entry # 976); Def.'s Motion to Compel Vacatur of SAM, Hearing, and Bill of Particulars ("Def. Vacatur Motion") (Docket Entry # 979); Def.'s Letter of December 28, 2010 (Docket Entry # 1009); Def.'s Reply to Motion to Compel (Docket Entry # 1015); Def's Letter of Jan. 10, 2011 (not yet filed on ECF).

The court cites to the following submissions by the Government: Gov't Mem. in Opp. to Def.'s Motion to Suppress the "Massino Tapes" and Dismiss the Indictment ("Gov. Massino Suppression Opp.") (Docket Entry # 516); (Gov't's Letter of Sept. 22, 2008 ("Voluntary Disclosure") (Docket Entry # 528); Gov't's Letter of Jan. 23, 2009 ("Massino Opp. Letter") (Docket Entry # 611); Gov't's Letter of Feb. 19, 2009 ("Particulars Production") (Docket Entry # 639); Gov't's Mem. in Opp. to Def.'s Pretrial Motions ("Gov. Pretrial Opp.") (Docket Entry # 668)); Gov't's Letter of June 29, 2009 (Docket Entry # 715); Gov't's Mem. in Opp. to Supplemental Pretrial Motions ("Gov. Supp. Pretrial Opp.") (Docket Entry # 923); Gov't's Motion *In Limine* to Admit Certain Evidence and to Preclude Certain Evidence and Arguments at Trial ("Gov. *In Limine*") (Docket Entry # 945); Gov't's Letter in Response to the Def.'s Letter Application Directing Basciano's Transfer to MDC (Docket Entry # 967); Gov't's Letter Regarding the MCC's Legal Visiting Conditions (Docket Entry # 978); Gov't's Response to Motion to Compel (Docket Entry # 1012); Gov't's Letter of Jan. 5, 2011 (Docket Entry # 1013).

In the current operative indictment, the S-9 Indictment, Basciano is charged with numerous criminal acts arising from his actions as the "acting boss" of the Bonanno organized crime family. (See S-9 Indictment.) The charges in the S-9 Indictment relate to Basciano's continued involvement in the Bonanno crime family during his incarceration, following his arrest in Basciano I on November 19, 2004. (See Memorandum & Order of Oct. 14, 2008 ("Double Jeopardy Order") (Docket Entry # 540) at 6.)

In Basciano I, Basciano was twice tried and convicted by jury. The charges in that case stemmed from his participation in the Bonanno organized crime family from 1979 through 2004. (See Double Jeopardy Order at 2-3.) On May 9, 2006, a jury found Basciano guilty of a racketeering conspiracy in violation of 18 U.S.C. § 1962(d), including predicate acts of illegal gambling and the attempted murder of David Nunez. (See Jury Verdict, Basciano I (Docket Entry # 749).) Under a superseding indictment, Basciano was re-tried on charges for which no verdict had been reached in the first trial. A second jury found him guilty of substantive racketeering, including predicate acts of illegal gambling, conspiracy to distribute marijuana, solicitation to murder Salvatore Vitale and Dominick Martino, and conspiring to murder and murdering of Frank Santoro. (See Basciano I, Jury Verdict (Docket Entry # 981).) The jury also found Basciano guilty of three counts of illegal gambling and one count of conspiracy to distribute marijuana. (Id.) The various charges in the indictments in Basciano I related to Basciano's "expansive involvement in the livelihood of the Bonanno organization." (See Double Jeopardy Order at 11; see also id. at 2-3.) On April 7, 2008, the court entered judgment against Basciano, sentencing him to a term of life imprisonment. (See Basciano I, Docket Entry # 1073.) Basciano is designated by the Bureau of Prisons to serve his life sentence in the Administrative Maximum Facility of the Florence Federal Correctional Complex ("Florence Supermax").

(Docket Entry # 889.)  The Second Circuit has thus far upheld Basciano's conviction.  See
United States v. Basciano, 384 F. App'x. 28 (2d Cir. 2010); (Basciano I, Docket Entry # 1075,
1164).

Here, in Basciano II, the indictment was first filed on January 26, 2005.  (Indictment
(Docket Entry #1).)  Over the course of this case, the indictment has been superseded several
times.  The current operative indictment, the S-9 Indictment, charges Basciano with four separate
crimes.  Counts Three and Four of the S-9 Indictment charge Basciano with allegedly conspiring
to murder and murdering Randolph Pizzolo in aid of racketeering in violation of 18 U.S.C. §
1959(a).  (Id. ¶¶ 52-56.)  Pizzolo was killed on or about November 30, 2004.  (Id. ¶ 56.)  The
Government has filed a Notice of Intent to Seek the Death Penalty ("Notice of Intent") against
Basciano, should he be convicted of murdering Pizzolo in aid of racketeering under Count Four.[3]
(See Docket Entries ## 284, 294, 938; S-9 Indictment ¶¶ 73-74.)  The Eighth Superseding
Indictment ("S-8 Indictment"), which was filed on November 15, 2007, was the first indictment
to include the Notice of Special Findings, which sets forth the Statutory Aggravators and
Gateway Factors that must be found by the jury at the penalty phase of the capital trial.  (Docket
Entry # 358.)  Count Five charges Basciano with knowingly and intentionally possessing a
firearm in relation to the crimes of violence charged in Counts Three and Four, in violation of 18
U.S.C. § 924(c).  (See S-9 Indictment ¶ 57.)  Finally, Count Nine charges Basciano with
conspiring to murder Patrick DeFilippo in aid of racketeering in violation of 18 U.S.C. §
1959(a)(5).  (See id. ¶¶ 63-64.)[4]

---

[3]     Under the Federal Death Penalty Act, if the Government seeks the imposition of the death penalty on a
defendant, it must provide notice before trial "stating that the government believes that the circumstances of the
offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the government will
seek the sentence of death," and set "forth the aggravating factor or factors that the government, if the defendant is
convicted, proposes to prove as justifying a sentence of death."  18 U.S.C. § 3593(a).

[4]     The remaining counts in the S-9 Indictment relate only to Basciano's co-defendants.

Basciano previously moved to dismiss several of the charges against him in this case on double jeopardy grounds, claiming that they "constitute a second prosecution for offenses already tried by the Government" in <u>Basciano I</u>. (<u>See</u> Double Jeopardy Order at 1.) On October 14, 2008, the court denied Basciano's motion, concluding that "double jeopardy does not raise a bar" to the charges in this case. (<u>Id.</u>) The court later denied Basciano's motion to reconsider its decision (<u>see</u> Docket Entry # 607), and Basciano took an interlocutory appeal to the Second Circuit. (<u>See</u> Docket Entry ## 612, 613; <u>United States v. Basciano</u>, No. 09-0281-cr (2d Cir.).) Basciano subsequently cited this appeal as a basis for postponing his trial date in this matter, which was scheduled to begin in September 2009. (<u>See</u> Order of Apr. 24, 2009 (Docket Entry # 671) at 1, 3.) To avoid "dual jurisdiction" between this court and the Court of Appeals, the court granted Basciano's continuance request and postponed the trial until "no sooner than 30 days after a decision by the Second Circuit in the pending appeal." (Order of June 4, 2009 ("June 4 Order") (Docket Entry # 708) at 1, 3.)[5] The Court of Appeals affirmed this court's denial of Basciano's motion to dismiss Counts Three and Nine of the S-9 Indictment (conspiracy to commit murder in aid of racketeering) but reversed this court's denial of dismissal of Count One of the S-9 Indictment (charging substantive racketeering), finding it to be barred on double jeopardy grounds. <u>See</u> <u>United States v. Basciano</u>, 599 F.3d 184 (2d Cir. 2010).

## II.    GENERAL PRETRIAL MOTIONS

The motions addressed in this section cover five challenges made by Basciano: (1) the disqualification of the United States Attorney's Office for the Eastern District of New York, and various other issues relating to alleged prosecutorial misconduct; (2) issues relating to the inclusion of the "AUSA Andres solicitation" in the S-9 Indictment; (3) Basciano's request to

---

[5]    Basciano's request also cited the preparedness of counsel for a September trial date as grounds for a continuance, but the court was not persuaded by this argument, particularly because of the thousands of hours and millions of dollars already expended on Basciano's defense. (<u>See</u> June 4 Order at 1-3.)

admit evidence relating to a list of names he wrote (the "List"); (4) a request to suppress conversations and tapes of conversations between Basciano and former Bonanno family crime boss Joseph Massino; and (5) renewed requests relating to the conditions of Basciano's confinement. The court addresses each issue in turn.

### A. Alleged Prosecutorial Misconduct

Several of the issues raised by Basciano are based on what the court previously referred to as "free-wheeling theories of sinister prosecutorial motives." (See Double Jeopardy Order at 13-14 n.4.) The following facts are essential to understanding Basciano's prosecutorial misconduct arguments.

In Basciano I, Assistant United States Attorney Greg Andres ("AUSA Andres") served as the lead prosecutor. The court takes judicial notice that over the course of Basciano I and much of the history of Basciano II, AUSA Andres served in senior positions in the United States Attorney's Office for the Eastern District of New York (the "Office"), including Chief of the Criminal Division. The reason that AUSA Andres is relevant to these motions is that prior to Count One of Basciano II being stricken from the Indictment on double jeopardy grounds, Basciano was charged with a racketeering predicate act of solicitation to murder AUSA Andres. (S-9 Indictment ¶ 32.) The alleged solicitation to murder AUSA Andres occurred on or about November 23, 2004, following Defendant's November 19, 2004 arrest in Basciano I. (Id. ¶¶ 20, 22, 32.) Then, in May 2006, the Government alleges, though it did not charge Basciano in any version of the Basciano II indictment, that Basciano authored the List in prison which contained my name, the name of AUSA Andres, and the names of three cooperating witnesses. The Government asserts that the List was a hit list, and that Basciano had solicited the murder of those named on the list. Basciano claims that it was a "Santeria" list. Basciano's prosecutorial

misconduct arguments rely upon these facts to challenge the impartiality of the Office and the role AUSA Andres played in the Basciano II prosecution.

## 1.    Request to the Disqualify U.S. Attorney's Office

Basciano moves for the court to disqualify the Office from prosecuting this case. (See Def.'s Mem. in Support of Pretrial Motions ("Def. Pretrial Mem.") (Docket Entry # 631) at 14-18.) Defendant argues that the entire Office is not disinterested and has "an axe to grind" with him because of the "untested allegation of Joseph Massino that Basciano solicited" the murder of AUSA Greg Andres, one of "their own." (Def. Pretrial Mem. at 14-15.) Basciano argues that every Assistant United States Attorney ("AUSA") in the Office "is subordinate to Andres and under his influence." (Def. Pretrial Mem. at 14.) Further, Basciano attempts to show the "untoward interest" of the Office's prosecutors, "their overly zealous pursuit of the death penalty against" him, by alleging various improprieties. (Def. Pretrial Mem. at 15-18.) Basciano contends that the "appearance of partiality and lack of disinterestedness on the part of [the Office] require their removal." (Def. Pretrial Mem. at 18.) The Government opposes this motion and rebuts Basciano's various claims of misconduct on the part of the Office. (See Gov't's Mem. in Opp. to Def.'s Pretrial Motions ("Gov. Pretrial Opp.") (Docket Entry # 668) at 20-33.)

The primary asserted basis for disqualifying the Office is that Basciano was, until the Second Circuit's double jeopardy decision, charged in this case with a substantive racketeering predicate of soliciting the murder of a member of the Office, AUSA Andres. Basciano's argument for recusal of the Office is similar to his multiple arguments for my recusal which have

been repeatedly rejected by both this court and the Court of Appeals.[6] See United States v. Basciano, 08-1699-cr, 2010 WL 2802566, at *3-4 (2d Cir. July 16, 2010); In re Basciano, 542 F.3d 950, 956-58 (2d Cir. 2008).

The Office has repeatedly represented that AUSA Andres has not participated in Basciano II. The disqualification of the entire U.S. Attorney's Office because AUSA Andres was the target of a crime would compromise the efficient administration of justice. See Grand Jury Subpoena of Ford v. United States, 756 F.2d 249, 254 (2d Cir. 1985) ("[I]f the disqualification of one government attorney could serve as the predicate for the disqualification of the entire United States Attorney's Office, the administration of justice would be irreparably damaged."). In fact, the overwhelming weight of authority counsels against disqualification of an entire U.S. Attorney's Office.[7] "[E]very circuit court that has considered the disqualification of an entire United States Attorney's office has reversed the disqualification." United States v. Bolden, 353 F.3d 870, 879 (10th Cir. 2003) (internal citations and quotation omitted); see also United States v. Hasarafally, 529 F.3d 125, 128 (2d Cir. 2008) ("While a private attorney's

---

[6]    The court notes that it has considered Basciano's recusal request in the context of Defendant's extensive history of attempting to change the players involved in his criminal proceedings. As the parties are aware, Basciano has sought to recuse this court from the case on five separate occasions. (See Memorandum & Order of June 30, 2009 (Docket Entry # 721) (describing recusal motions); Memorandum & Order of November 1, 2010 (Docket Entry # 964).)

    Basciano previously sought to disqualify AUSA Andres from the prosecution team in Basciano I. In response to that request, the court noted that "there is nothing in the record to suggest that [AUSA] Andres bears any actual bias toward Basciano[,]" and that, prior to Basciano's construction of the List, Basciano had "remarked in several recorded conversations that he felt [AUSA] Andres was performing better than Basciano's defense counsel." (See Memorandum & Order of Dec. 1, 2006 (Docket Entry # 249) ("Andres Disqualification Order"), at 4, 2.) The court concluded that his request appeared to be "yet another attempt by him to manipulate the judicial process which this court will not sanction." (Id. at 4.)

[7]    One reason that disqualifying an entire prosecutor's office is strongly disfavored is that it implicates separation of powers concerns. Article II of the Constitution "vests the Executive with substantial discretion in choosing when and how to prosecute cases." Bolden, 353 F.3d at 877. "[D]isqualifying government attorneys implicates separation of powers issues," and "the generally accepted remedy" for an asserted conflict is "to disqualify a specific Assistant United States Attorney, not all the attorneys in the office." Id. at 879. This counsels against ordering recusal of the entire office.

conflict of interest may require disqualification of that attorney's law firm in certain cases, such an approach is not favored when it comes to the office of a United States Attorney, or, *a fortiori*, to the Department of Justice as a whole.") (internal citations omitted); <u>Cope v. United States</u>, 272 F. App'x 445, 449 (6th Cir. 2008) (rejecting ineffective assistance of counsel claim for failure to move to recuse prosecutor's office after murder threat against prosecutor, explaining that "[d]isqualifying an entire United States Attorney's office is almost always reversible error, regardless of the underlying merits of the case") (quoting <u>Bolden</u>, 353 F.3d at 876)). This strongly counsels against disqualification in this case.

An entire U.S. Attorney's Office should only be disqualified, if ever, when special circumstances demonstrate that the interest of justice could only be advanced by this drastic remedy. Basciano argues that special circumstances exist here, listing instances of purported Government misconduct and suggesting that these instances were motivated by the Office's belief that Basciano attempted to murder AUSA Andres. (<u>See</u> Def. Pretrial Mem. at 15-18; Transcript of Oral Argument on June 26, 2009 ("Arg. Tr.") at 24-37.) The court does not set out Basciano's various challenges to the Government's conduct here, but having reviewed them carefully, the court finds that none of them assert any particular act of bad faith or unethical conduct. They fail to rise to the level of creating the special circumstances required for recusal. Basciano has not shown that the Office possesses anything more than "the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." <u>Wright v. United States</u>, 732 F.2d 1048, 1056 (2d Cir. 1984). In this case,

the drastic remedy of disqualifying an entire prosecutor's office is not justified.[8]  Accordingly,

Basciano's motion is DENIED.

2.      <u>Motion to Dismiss Indictment or to Compel Production of Grand Jury Minutes</u>

Basciano argues that the grand jury proceedings were tainted by Government misconduct.

(Def. Pretrial Mem. at 19-20.)  Basciano asserts that because of this alleged Government

misconduct it is appropriate for the court to review the minutes of the grand jury proceedings or

to dismiss the S-9 Indictment.  (Def. Pretrial Mem. at 19-20.)

Basciano alleges three different acts of Government misconduct before the grand jury.

First, Basciano contends that because AUSA Andres had an interest in the prosecution, it is *likely*

that he must have been involved in pursuing the indictment and presenting it to the grand jury.

(<u>Id.</u> at 31-33.)  Second, Basciano alleges that the grand jury to which AUSA Andres presented

<u>Basciano I</u> was the same grand jury that indicted Basciano on charges in <u>Basciano II</u>.  (Def.'s

Mem. in Support of Motion to Suppress the "Massino" Tapes and to Dismiss the Indictment

("Def.'s Massino Suppression Motion") (Docket Entry # 502) at 33-36.)  Because this indictment

included the charge of soliciting the murder of AUSA Andres, Basciano argues that the grand

jury, who may have developed a working relationship with AUSA Andres, may have been

impermissibly prejudiced against Basciano.  (<u>Id.</u>)  Third, Basciano asserts that the Government

Government *may* have "impermissibly" presented evidence of the List to the grand jury, in

---

[8]      Defendant's reliance on <u>United States v. Wright</u>, 603 F. Supp. 2d 506 (E.D.N.Y. 2009) is misplaced.  (<u>See</u> Def.'s Reply Mem. in Support of Pretrial Motions ("Def. Pretrial Reply") (Docket Entry # 694) at 12.) In <u>Wright</u>, the U.S. Attorney's Office decided to recuse itself in a case involving an assault on an AUSA in the courtroom.  In subsequent proceedings, Judge Vitaliano found transfer of venue to the Southern District to be appropriate.  Judge Vitaliano noted that there had been "no evidentiary support, of any . . . bias or inappropriate behavior" on the part of personnel in the U.S. Attorney's Office.  <u>Id.</u> at 508.  With no objection from the Government, he ruled that transfer was appropriate based on the possible appearance of partiality.  <u>Id.</u> 508-09.  Here, by contrast, the U.S. Attorney's Office has decided not to recuse itself, and the cited case law protects this determination.  Absent extreme and unusual circumstances, which are not present here, the court will not intrude upon the prosecutor's discretion to decide whether an alleged conflict requires recusal of an entire U.S. Attorney's Office.

obtaining at least some of the Superseding Indictments in this case. (Def. Pretrial Mem. at 19-20.) Basciano contends that if the Government presented the List and argued that Basciano intended to have a federal judge and AUSA Andres killed, this would inflame the grand jury and cause prejudice. (Id.)

In response, the Government contends that Basciano's motion is based entirely on speculation about what may have occurred before the grand jury. (Gov't's Mem. in Opp. to Def.'s Motion to Suppress the "Massino Tapes" and Dismiss the Indictment ("Gov. Massino Suppression Opp.") (Docket Entry # 516) at 15-19.) It also asserts that it erected a conflict wall between the prosecution teams in Basciano I and Basciano II. (Id. at 4-5, 16.) Further, the Government argues that it had no obligation to impanel a new grand jury to hear the Basciano II indictments, and that no basis has been provided to disclose the minutes of those grand jury proceedings. (Id. at 17-19.) Finally, the Government argues that Basciano offers nothing more than speculation that the List was actually shown to the grand jury, or that doing so would have been improper. (Gov. Pretrial Opp. at 33-35.)

The record does not make clear whether, in fact, the same grand jury heard both cases. Even if the Government presented both cases to the same grand jury, this in no way resolves the issue of whether the grand jury minutes should be produced or the indictment should be dismissed.

 "It is axiomatic that 'grand jury proceedings are accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." United States v. Tranquillo, 606 F. Supp. 2d 370, 381 (S.D.N.Y. 2009) (quoting United States v. Mechanik, 475 U.S. 66, 75 (1986). "Also clear is the principle that 'an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on

the basis of inadequate or incompetent evidence.'" Id. (quoting United States v. Calandra, 414 U.S. 338, 345 (1974)).  There is "a tradition in the United States," codified by Federal Rule of Criminal Procedure 6, "that proceedings before a grand jury shall generally remain secret."  In re Petition of Craig, 131 F.3d 99, 101 (2d Cir. 1997).  Under that rule, a court may order disclosure of grand jury materials to a criminal defendant "who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  To make this showing, the defendant "must demonstrate a 'particularized need' for the materials."  United States v. Ordaz-Gallardo, 520 F. Supp. 2d 516, 519 (S.D.N.Y. 2007) (citing United States v. Moten, 582 F.2d 654, 662 (2d Cir. 1978)).  This is a heavy burden, since the "review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."  United States v. Torres, 901 F.2d 205, 232 (2d Cir. 1990). Furthermore, "as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."  Id. at 233 (quoting Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988)).  "[D]ismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations."  Bank of Nova Scotia, 487 U.S. at 256 (internal quotation marks omitted).

Basciano's allegations of "government misconduct" before the grand jury are insufficient to require dismissal of the S-9 Indictment or disclosure of the grand jury minutes because they are based entirely on speculation rather than fact.  As a purported example of government misconduct, Basciano speculates that AUSA Andres *might* also have been involved in supervising the presentation of the Government's case to the grand jury in Basciano II.  In lieu of

factual support for this allegation, Basciano makes a number of unfounded assumptions and provides a series of conjectural statements about Andres's possible role in <u>Basciano II</u>. (Def.'s Massino Suppression Motion at 30-31.) This conjecture about AUSA Andres's role in the presentation of <u>Basciano II</u> is based almost entirely upon speculation about what it is "natural to assume" given Defendant's characterization of the workings of the U.S. Attorney's Office and AUSA Andres's interest in this prosecution. (<u>Id.</u> at 32.)

Basciano's argument is entirely speculative and thus is insufficient to satisfy the particularized showing required to overcome grand jury secrecy, let alone to require the dismissal of the indictment. <u>See</u> <u>Ordaz-Gallardo</u>, 520 F. Supp. 2d at 519-20 ("Defendants offer little more than speculation that some impropriety may have occurred before the grand jury that would require this case to be dismissed. Such speculation falls well short of the 'particularized need' Defendants must show to obtain disclosure of grand jury materials."). The Government has repeatedly stated that AUSA Andres has not participated in <u>Basciano II</u> (<u>see, e.g.</u>, Gov. Massino Suppression Opp. at 15-17, 15 n.2; Arg. Tr. at 38), and the Defendant has failed to make any showing sufficient for the court to reject the Government's representation. Accordingly, there are insufficient grounds to dismiss the charges or grant access to grand jury materials.

Basciano also argues that the indictment must be dismissed because the grand jury would have been biased by the introduction of evidence of the solicitation to murder Andres in <u>Basciano II</u>, because Andres had presented <u>Basciano I</u> to that same grand jury. (Def.'s Massino Suppression Motion at 33-34.) Without citing any authority for the proposition, Basciano argues that the indictment should be dismissed because the "Eastern District prosecutors failed in this obligation when, instead of impaneling a separate grand jury to consider the charges ultimately

brought in the '05 case, they presented the evidence relating to the Andres matter . . . to the same grand jury that had returned the indictment in the '03 case." (Def.'s Massino Suppression Motion at 33-36.) The court finds no support for the proposition that dismissal of the indictment is required under the circumstances.

Here the Andres murder solicitation was only one predicate act included in one count of S-9 indictment, which alleges numerous serious crimes. Defendant has failed to establish a reasonable basis from which this court could conclude that, in light of the vast evidence of the Defendant's criminal activity that must have been considered by the grand jury, that presentation of the evidence of the Andres murder solicitation "substantially influenced the grand jury's decision to indict, or [that] there is grave doubt that the decision to indict was free from the substantial influence of such violations." Bank of Nova Scotia, 487 U.S. at 256 (internal quotation marks omitted). Moreover, in light of the fact that the substantive racketeering charge containing the solicitation to murder Andres has been dropped from the indictment, see Basciano, 599 F.3d 184, the concerns that prejudice infected the S-9 Indictment is further minimized.

Finally, Basciano's argument that the possible presentation of the List to the grand jury requires the court to dismiss the S-9 Indictment or inspect the grand jury minutes is similarly unavailing. Basciano speculates that the Government presented evidence of the List to the grand jury, thereby impermissibly prejudicing him. (Def. Pretrial Mem. at 19-20.) For support, Defendant points to the fact that the Government relied upon evidence of the List in seeking a Special Administrative Measures detention order against Basciano, and that the Government "presumably" relied upon it in deciding to seek the death penalty. (Id. at 19.) But Basciano does not explain how these other uses of the List lead to his conclusion that "it is reasonable to assume

that the prosecutors deemed it important enough to present it to the grand jury that was being asked to return not only the latest superseding indictments . . . but also the special findings necessary for a death verdict." (Id. at 19-20.) Just because the Government may have deemed the List relevant in determining the appropriate conditions of confinement for Basciano, or as a factor supporting the decision to pursue the death penalty, it does not necessarily follow that the Government also must have presented the List to the grand jury.[9]

Basciano concedes that the List was discovered after the grand jury had already charged him with every count and every predicate he is currently facing under the S-9 Indictment. (Def. Pretrial Reply at 15.) The List, therefore, could not have affected the grand jury's determination on the substantive charges. The only part of the S-9 indictment that Basciano claims is affected by the possible introduction of the List is the "Notice of Special Findings" included in the S-8 and S-9 Indictments. (Id.)[10] These Findings relate exclusively to the Pizzolo murder, charged in Count Four, and Basciano's past conviction of crimes "involving the use or attempted or

---

[9]     In support of his request, Basciano relies upon the Second Circuit's decision in United States v. Hogan, 712 F.2d 757 (2d Cir. 1983). (See Def. Pretrial Mem. at 19-20; Arg. Tr. 53.) In Hogan, the Second Circuit "dismissed an indictment for narcotics violations because the prosecutor [during grand jury proceedings] prejudiced the defendant by characterizing him as a 'hoodlum' who should be indicted as a 'matter of equity' and a 'suspect' in two murders and a bribery scheme, when he in fact had never been charged with those offenses." United States v. Ruggiero, 934 F.2d 440, 447 (2d Cir. 1991). Dismissing based upon cumulative instances of "flagrant and unconscionable" conduct was meant to "prevent prosecutorial impairment of the grand jury's independent role." Hogan, 712 F.2d at 762, 761.

Hogan is not on point. Nor does it alter the general rule that "extreme acts of prosecutorial misconduct must be demonstrated before an indictment will be dismissed." Rosario-Dominguez v. United States, 353 F. Supp. 2d 500, 514 (S.D.N.Y. 2005); see also United States v. Giovanelli, 747 F. Supp. 875, 883 (S.D.N.Y. 1990) ("[R]equests for inspection of grand jury minutes should be granted sparingly in extreme cases only when the defendant advances facts . . . which clearly reflect a prejudicial irregularity in the grand jury proceedings.") (internal quotation marks omitted). No such demonstration has been made here. Even had the List been presented to the grand jury, as Basciano contends, proof of that presentation alone would not necessarily rise to the level of the "extreme acts of prosecutorial misconduct committed in Hogan . . . that materially impaired the grand jury's independence." United States v. Rodriguez, No. 95-CR-0754 (HB), 1996 WL 479441, at *2 (S.D.N.Y. Aug. 22, 1996).

[10]     The Notice of Special Findings "tracks the language of the statutory proportionality factors which must be proven to make a defendant eligible for capital punishment under the Federal Death Penalty Act, as well as two of the statutory aggravating factors for homicide required to be considered by the jury in the penalty phase." (Memorandum & Order of Dec. 31, 2008 ("Particulars Order"), (Docket Entry # 593) at 2 (citing 18 U.S.C. §§ 3591(a), 3592(c)).)

threatened use of a firearm against another person. (S-9 Indictment ¶¶ 73-74.) Basciano, therefore, offers wholly insufficient support for his assertion that the Government must have presented the List. The court declines to examine the grand jury minutes based upon speculative theories of government overreaching. Ordering the extraordinary remedy of inspecting the minutes of the grand jury proceedings, or the more extreme remedy of dismissing the S-9 Indictment, on the basis of mere speculation about the use of the List is not warranted in this case. Further, even if the List were presented to the grand jury, Defendant could not establish that it "substantially influenced the grand jury's decision to indict." Bank of Nova Scotia, 487 U.S. at 256 (internal quotation marks omitted).

For the foregoing reasons, Basciano's motion is DENIED.

### 3. Motion to Strike Charges and Death Penalty Notice

Basciano argues that the S-9 Indictment should be dismissed because the Government improperly manipulated the charges against him in Basciano I and Basciano II. Specifically, he claims that the Government brought a separate indictment in Basciano I charging him with murdering Santoro, even though the Government could have included that charge in Basciano II, which was already pending at the time. (Def. Pretrial Mem. at 12.) This charging decision, according to Basciano, enabled the Government to use the conviction for Santoro's murder in Basciano I as a death penalty aggravator in Basciano II. (Id.) Basciano refers to this as a "stepladder prosecution." (Id.) Basciano argues that, as part of this manipulation, the Government delayed trial in Basciano II until after obtaining a conviction for the Santoro murder in Basciano I. (Id.)

Basciano has previously offered – and the court has rejected – similarly broad-brushed theories of prosecutorial manipulation. (See Double Jeopardy Order at 13-14 n.4.) As a factual

matter, Basciano's theory of manipulation is not plausible because the timeline of events contradicts it. The Government charged Basciano with Santoro's murder in <u>Basciano I</u> on November 18, 2004; Pizzolo was not killed until November 30, 2004. (<u>See</u> Gov. Pretrial Opp. 2-4; <u>see also</u> <u>Basciano I</u>, S-2 Superseding Indictment of Nov. 18, 2004 ("<u>Basciano I</u> S-2 Indictment") (Docket Entry # 165) ¶¶ 43-45 (including murder of Santoro); S-9 Indictment ¶ 56 (charging Pizzolo murder as occurring on or about November 30, 2004).) Therefore, when the Government charged Basciano with the Santoro murder, it could not have made a decision to delay the prosecution of the death-eligible Pizzolo murder, because Pizzolo was still alive. Accordingly, Basciano is asking the court to conclude that "the government charged the Santoro murder to create an aggravator for a death-eligible murder that had not yet occurred." (Gov. Pretrial Opp. at 3.) The court rejects Basciano's illogical argument.

Basciano also argues that once the Government had sufficient evidence on which to charge the Pizzolo murder, it should have prosecuted that murder as part of its case for <u>Basciano I</u>, rather than as a separate case under <u>Basciano II</u>. Alternatively, he argues that the Government should have included the Santoro murder as part of <u>Basciano II</u>. These arguments are essentially identical to the argument in his double jeopardy challenge – that the two cases are actually one case, and that the Government impermissibly split the charges into two indictments. This court previously rejected that argument, the Court of Appeals has ruled on the double jeopardy challenges to the indictment, and the court will not disturb those rulings here. <u>See</u> <u>Basciano</u>, 599 F.3d 184. The court will not invade the Government's prosecutorial discretion by interfering with its decisions to separately charge conduct that is distinct. The Government was within the bounds of its discretion to try the Santoro murder as part of <u>Basciano I</u>.

Furthermore, as a legal matter, Basciano fails to cite any authority – and this court can find none – for the proposition that a "stepladder" prosecution strategy, even if proven, would provide a basis for dismissal of claims.  Defendant attempts to distinguish this case from United States v. Scarpa, 913 F.2d 993, 1013-14 (2d Cir. 1990), where the Court of Appeals for the Second Circuit rejected a challenge to this form of prosecutorial conduct.  The Scarpa court rejected the defendants' arguments under two separate frameworks: double jeopardy and prejudicial preindictment delay.  Any possible double jeopardy concerns in the present case have been fully resolved by the Court of Appeals in Basciano, 599 F.3d 184, so they need not be addressed here.

In regard to preindictment delay, the court in Scarpa held that to "[t]o establish denial of due process based on excessive pre-indictment delay [a defendant] bears the heavy burden . . . of showing not only that he was prejudiced by the delay but that it was so unfair as to violate fundamental concepts of fair play and decency, such as would occur if the prosecutor deliberately used the delay to achieve a substantial tactical advantage."  913 F.2d at 1014.  Prejudice in this context requires a showing of the "sort of deprivation that impairs a defendant's right to a fair trial.  This kind of prejudice is commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness."  United States v. Cornielle, 171 F.3d 748, 752 (2d Cir. 1999).  For the tactical advantage to be impermissible it must be "a course intentionally pursued by the government for an improper purpose."  Id.  Basciano fails to provide any support for his claim that the Government has proceeded with a deliberate strategy of delay, let alone one pursued for an improper purpose.  (Def. Pretrial Mem. at 13-14.)  Indeed, this court has presided over this case for several years and observes that there has not been any delay on the part of the Government that could give rise to an inference of strategic manipulation.  Basciano has been

responsible for a significant portion of the delay in bringing this case to trial. Furthermore, Basciano has failed to establish that his right to a fair trial has been prejudiced by the Government's delay. Even if the Government did intentionally separate the charges for a tactical advantage, the conspiracy to murder and murder of Frank Santoro was found beyond a reasonable doubt by a jury in <u>Basciano I</u>. (<u>Basciano I</u>, Jury Verdict (Docket Entry # 981).) It is unclear how use of this prior conviction at the present trial is impermissible or would prejudice Basciano's right to a fair trial.

Consequently, Basciano's motion to dismiss the case or, alternatively, to strike the Notice of Intent to Seek the Death Penalty is DENIED.

**B.     Issues Relating to the Indictment**

**1.     Motion to Strike Surplus from the Indictment**

Basciano argues that the court should strike the allegations against his co-defendants, as well as the introductory language relating to the solicitation to murder AUSA Andres, from the S-9 Indictment. (Def. Pretrial Mem. at 6-8.) Basciano argues that this material is "surplusage" that the court may strike pursuant to Federal Rule of Criminal Procedure 7(d). <u>See</u> Fed. R. Crim. P. 7(d) ("Upon the defendant's motion, the court may strike surplusage from the indictment or information."). The Government does not oppose Basciano's request and has stated that it will "return a superseding indictment eliminating the objected to introductory language and the reference to other defendants who have pleaded guilty" or redact the S-9 indictment with Basciano's consent. (Gov. Pretrial Opp. at 14 n.2; Arg. Tr. at 60.)

The motion is GRANTED as unopposed.

### 2. Request to Sever Count One for Separate Trial

Basciano asks the court to sever Count One from the S-9 Indictment and to try that charge separately from the other counts pending in the Indictment. (See Def. Pretrial Mem. at 1-5.) As discussed above, the Court of Appeals ordered Count One, the substantive racketeering charge, dismissed based on double jeopardy grounds. Basciano, 599 F.3d 184. Consequently, this motion is DENIED as moot.

### C. Evidence of the List

As discussed above, in or around May 2006 Basciano authored a list including the names of five individuals: me, AUSA Andres, and three cooperating witnesses who had testified against Basciano in his 2006 trial. See, e.g., Basciano v. Lindsay, 530 F. Supp. 2d 435, 439 (E.D.N.Y. 2008) ("Basciano Habeas"). According to the Government, Basciano provided the List to another inmate because he wanted the five individuals murdered. See, e.g., Id.[11] Basciano contends that the List was actually a Santeria list (see, e.g., Arg. Tr. at 97), meaning that Basciano wrote the names down as part of ritual stemming from the religious tradition of Santeria. (See, e.g., Andres Disqualification Order at 3) ("Basciano claimed that he was told to write the May 2006 list, place it in his right shoe and stamp five times every day during the trial.") (internal quotation marks omitted).) Basciano seeks to introduce evidence concerning the List in the guilt phase of the proceedings.

---

[11] The List was part of the evidence that the Government relied upon in establishing the basis for the placing Defendant under Special Administrative Measures ("SAMS") at the Metropolitan Detention Center. See Basciano Habeas, 530 F. Supp. 2d at 439. SAMS are imposed pursuant to 28 C.F.R. § 501.3(a), which authorizes measures that are "reasonably necessary to protect persons against the risk of death or serious bodily injury." This court denied Basciano's petition for a writ of habeas corpus regarding the circumstances of his confinement, and the Second Circuit subsequently affirmed this decision. See Basciano v. Martinez, No. 08-1227-pr, 316 F. Appx. 50, 50-51 (2d Cir. Mar. 20, 2009) ("In light of the extensive evidence that Petitioner violated prison communications restrictions, engaged in criminal activity from jail, and tried to interfere with his own trial, we hold that his conditions of confinement were not intended to punish, but rather were rationally connected to the penological purpose of protecting the public from a detainee facing trial.").

1.      Request to Admit the List at the Guilt Phase

Basciano seeks "an *in limine* ruling to allow [him] to introduce evidence relating to the [List] and the government's investigation of it in the guilt phase." (Def. Pretrial Mem. at 60.) Basciano argues that the List should be admitted to show his state of mind (see, e.g., Def. Response at 57) and to show that the Government's investigation of him was tainted by the Government's willingness to accept the story of an allegedly unreliable witness, Joseph Massino. (See Def. Pretrial Mem. at 59-65.) Basciano argues that "[t]he list and surrounding events are relevant as part of the defense to the alleged solicitation to murder Andres, and an attack on the thoroughness and good faith of the government's investigation . . . an investigation that relied on unreliable informants whose unreliability the government either failed to recognize, ignored or consciously avoided." (See Def. Pretrial Mem. at 60.) Defendant argues that discrediting the quality of the Government's investigation is a valid defense tactic. (See Def. Pretrial Mem. at 61-65.) In response, the Government argues that the List is hearsay, that it is not relevant to the charged crimes, and that, even if it were relevant, it would cause jury confusion and would unduly prejudice Basciano. (See Gov. Pretrial Opp. at 35-37.) The Government does not plan to introduce the List at the guilt phase. (See id.)

The court finds that admission of the List at the guilt phase is inappropriate. Basciano asserts that the List is relevant to the formerly charged solicitation to murder AUSA Andres in November 2004, which Government seeks to introduce as an uncharged crime admissible under Federal Rule of Evidence 404(b) and as direct evidence of the charged crimes. (See Def. Pretrial Mem. at 60; see also S-9 Indictment ¶ 32.; Gov't's Motion *In Limine* to Admit Certain Evidence and to Preclude Certain Evidence and Arguments at Trial ("Gov. *In Limine*") (Docket Entry # 945).) Yet, the List was authored by Basciano in approximately May 2006 – nearly eighteen

months after the alleged solicitation to murder AUSA Andres.  (See, e.g., Andres Disqualification Order at 3.)  The government has not charged Basciano with any crime relating to the creation of the List, nor does the government intend to introduce the List at the guilt phase of the trial.  (See Gov. *In Limine*.)  Its creation, therefore, is conduct that is not charged and is not at issue in this case.

Basciano, nonetheless, argues that the List is relevant to his "state of mind" in soliciting the murder of AUSA Andres eighteen months earlier, because it shows that his intent was actually to perform a religious ritual.  (See, e.g., Attorney's Supporting Declaration of Aug. 19, 2009 ("Goltzer Reyes Decl.") (Docket Entry # 770) ¶ 16.)  This argument is without merit. Whether Basciano intended to practice a Santeria ritual involving five individuals, including Andres, in the middle of 2006 does not tend to prove or disprove anything about his state of mind when he allegedly solicited the murder of AUSA Andres in 2004, in a conversation with another inmate.  Nor does evidence of the Government's investigation techniques in 2006 tend to prove or disprove whether the Government was using proper investigative techniques in 2004. Consequently, the List evidence is not relevant to the crimes at issue in this case.  See Fed. R. Evid. 401.

In any event, any relevance this evidence has to the alleged AUSA Andres solicitation – whether for state of mind or otherwise – is far outweighed by the significant probability that it could cause confusion of the issues at trial, mislead the jury, and cause undue delay by creating a protracted side trial.  See United States v. Aboumoussallem, 726 F.2d 906, 912 (2d Cir. 1984) ("[R]elevant evidence may be excluded under Rule 403 if its probative value is substantially outweighed by 'the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay.'") (quoting Fed. R. Evid. 403).  Evidence relating to the List

could improperly confuse the jury's consideration of the serious charges of murder, solicitation, and attempt that are actually at issue in this case. Moreover, should Basciano attempt to prove that the List is not a "hit list" but, rather, a Santeria list and that the Government did not investigate the List in good faith, the proceedings would almost certainly turn into a trial within a trial about the circumstances surrounding the List's creation and whether Basciano intended to solicit the killing of the individuals on the list or perform a religious ceremony. Accordingly, the court declines to allow the diversion Basciano's introduction of the List would create.

Basciano's motion to admit evidence of the List at the guilt phase is DENIED.

### 2. Request to Grant Immunity to Danny Reyes

Following oral argument, Basciano requested that the court compel the Government to grant immunity to Danny Reyes ("Reyes") so that he might "provide critical defense testimony to contradict the notion that the [List] was a 'hit list' as alleged by the government." (Goltzer Reyes Decl. ¶ 14; see also Def.'s Letter of Sept. 16, 2009 (Docket Entry # 785).) He asserts that Reyes would provide testimony showing that the List was actually a Santeria list. (See, e.g., Goltzer Reyes Decl. ¶ 15.) Basciano argues that if Reyes does not testify, Basciano "will be unable to fairly demonstrate that an alleged 'hit' list was nothing more than an innocent piece of paper to be utilized in a Santeria ritual." (Def.'s Mem. in Support of His Motion to Compel Immunity for D. Reyes ("Def. Reyes Immunity Motion") (Docket Entry # 770) at 2.)

On May 5, 2009, the court granted Basciano's request to depose Reyes. (See Order (Docket Entry # 682).) On May 18, 2009, the parties were present for the deposition, but Reyes invoked his Fifth Amendment right against self-incrimination in response to defense counsel's questioning. (See Minute Entry of May 18, 2009 (Docket Entry # 699).) Defense counsel objected to this invocation of the privilege, challenging it as an invalid assertion of the Fifth

Amendment.  (See, e.g., id.; Def.'s Letter of May, 19, 2009 (Docket Entry # 689).)  On May 21, 2009, the court held a conference with the parties to discuss the issue of Reyes's invocation of the Fifth Amendment privilege.  (See Minute Entry of May 21, 2009 (Docket Entry # 700).) Reyes's counsel was present.  (See id.)

The court conducted an *in camera*, *ex parte* hearing with Reyes and his counsel, on May 21, 2009, to determine whether his invocation of the privilege had been valid.  The *in camera* hearing was sealed and assigned a miscellaneous docket number.  See In re Reyes, No. 09-Misc-0280 (NGG) (E.D.N.Y.).  The court announced in open court its conclusion that Reyes's invocation of the Fifth Amendment had been valid, and subsequently filed an Order memorializing its decision.  (See Order of May 26, 2009 (Docket Entry # 697).)  A supplemental memorandum was filed in the sealed case that further elaborated the court's reasons for its conclusion.  (See id. at 3.)  Basciano's motion to compel the Government to grant immunity to Reyes followed.

"[T]he fifth amendment does not require that defense witness immunity must be ordered whenever it seems fair to grant it."  United States v. Bahadar, 954 F.2d 821, 825 (2d Cir. 1992) (internal citation and quotation marks omitted).  "The government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized."  United States v. Ebbers, 458 F.3d 110, 118 (2d Cir. 2006).  Moreover, decisions regarding immunity have long been considered "preeminently a function of the Executive Branch."  Bahadar, 954 F.2d at 825 (internal citation and quotation marks omitted).  Accordingly, a trial court should order a prosecutor to grant a defense witness immunity "only in extraordinary circumstances."  Blissett v. Lefevre, 924 F.2d 434, 441 (2d Cir. 1991).

The Second Circuit has ruled that such extraordinary circumstances exist only when a defendant can show that: "(1) the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment"; and "(2) the witness' testimony will be material, exculpatory and not cumulative and is not obtainable from any other source." Ebbers, 458 F.3d at 118 (quoting United States v. Burns, 684 F.2d 1066, 1077 (2d Cir. 1982). The Second Circuit, however, has never found a case in which such extraordinary circumstances existed so as to require a court to compel the Government to grant immunity. See Gordon Mehler, John Gleeson & David C. James, Federal Criminal Practice: Second Circuit Handbook, 414 (2010).

As set forth above, the evidence of the List will not be permitted at the guilt phase. Because the List and related evidence is being excluded in the guilt phase, Reyes's testimony about the List's creation is not material to any question at issue in the guilt phase. Accordingly, Basciano fails to make the showing required under Ebbers to compel the Government to grant immunity.

To the extent Reyes's testimony could be used at the penalty phase or for another purpose such as showing that "during the time period that Basciano is speaking over a recorded prison phone call with Ms. Kalb regarding his animus towards AUSA Andres, he is engaging in Santeria practice to ward off negativity; not solicitation to murder," (Def.'s Letter of Sept. 16, 2009 (Docket Entry # 785) at 3), his request must also be denied. Even assuming Reyes's testimony would be relevant, Basciano has not met his burden under the Second Circuit's test for compelled immunity. He has made no showing that the Government engaged in the "discriminatory use of immunity to gain a tactical advantage" or that the Government has improperly "forced [Reyes] to invoke the Fifth Amendment." Ebbers, 458 F.3d at 118. Instead,

it appears simply that Basciano would like Reyes to testify about the List, but that, on advice of counsel, Reyes has declined to do so in fear of self-incrimination.  No discriminatory or manipulative actions by the Government are presented, let alone manipulative actions that approach the standard set forth by the Second Circuit.  These circumstances do not justify the extraordinary measure of forcing the Government to grant him immunity.

Basciano's motion to compel the immunity of Danny Reyes at any stage of the trial is DENIED.

### D.    Massino

"While in prison awaiting trial in [Basciano I] and after being found guilty in a prior case before this court, Joseph Massino, the then-head of the Bonanno crime family, agreed to become a government informant and taped conversations in prison that he had with Basciano." (Basciano I, Memorandum & Order of Dec. 12, 2005 ("Basciano I December Order") (Docket Entry # 389) at 4 (internal citation omitted).)  Basciano spoke with Massino on multiple occasions between the November 23, 2004 and January 6, 2005.  The first two conversations that Massino had with Basciano in prison were not recorded (the "Massino Conversations").  The Massino Conversations "have been identified by Basciano as taking place in the bullpen of the U.S. Marshal detention facility at the Brooklyn federal courthouse on November 23, 2004, and during a co-defendant meeting on December 3, 2004."  (Basciano I, Memorandum & Order of Jan. 3, 2006 (Docket Entry # 420) ("Basciano I January 2006 Order"), at 5 n. 5; see also Def.'s Mem. in Support of Motion to Supplement Motion to Suppress ("Def. Suppression Supp. Motion Mem.") (Docket Entry # 576) at 1.)  Later, Basciano and Massino had conversations which were recorded by Massino (the "Massino Tapes").  "Joseph Massino recorded two January 2005 conversations he had with Basciano in the Metropolitan Detention Center, where they both were

held awaiting trial in [Basciano I]."  Basciano I January Order 4 n.2.  These recorded

conversations occurred on January 3, 2005 and January 7, 2005.  (S-9 Indictment) at 21.)

In this case, Basciano moves to suppress the Massino Conversations and the Massino

Tapes.  He argues that Massino was acting as a government agent and that these statements were

obtained in violation of his Fifth and Sixth Amendment rights.  (See Def. Pretrial Mem. at 8-11.)

Basciano presents his arguments in a variety of briefs, and, indeed, some of these arguments

were previously made and ruled upon in Basciano I.[12]

### 1.    The Massino Conversations

Under Massiah v. United States, 377 U.S. 201 (1964), "the Sixth Amendment right to

counsel is violated when a private individual, acting as a government agent, 'deliberately elicits'

incriminating statements from an accused in the absence of his counsel."  United States v.

Miller, 116 F.3d 641, 665 (2d Cir. 1997) (quoting Massiah, 377 U.S. at 206).  "The primary

concern of the government informant rule is to avoid secret interrogation by investigatory

techniques that are the equivalent of direct police interrogation."  United States v. Birbal, 113

F.3d 342, 346 (2d Cir. 1997) (internal citation and quotation marks omitted).  In Basciano I,

Basciano requested a Massiah hearing "to determine whether Joseph Massino's testimony about

unrecorded jailhouse conversations [was] admissible at trial, or whether the admission of such

testimony [would] violate[] Basciano's Sixth Amendment right to counsel."  (Basciano I January

3006 Order at 7-8.)

---

[12]    See Def.'s Massino Suppression Motion; Gov. Massino Suppression Opp.; Def.'s Reply Mem. in Support
of Motions to Suppress ("Def.'s Massino Suppression Reply")  (Docket Entry # 527); Def. Suppression Supp.
Motion Mem.; Gov't's Letter of Jan. 23, 2009 ("Massino Opp. Letter") (Docket Entry # 611); Def.'s Letter of Jan.
30, 2009 ("Def.'s Massino Reply Letter") (Docket Entry # 622); Def.'s Supplemental Mem. in Support of Pretrial
Motions ("Def. Supp. Pretrial Mem.") (Docket Entry # 907-2); Gov't's Mem. in Opp. to Supplemental Pretrial
Motions ("Gov. Supp. Pretrial Opp.")  (Docket Entry # 923); Reply Mem. in Support of Pretrial Motions ("Def.
Supp. Pretrial Reply") (Docket Entry # 934).

The court found that a <u>Massiah</u> hearing was warranted to determine "whether Joseph Massino was a government agent at the time of his unrecorded jailhouse conversations with Basciano." <u>Id.</u> at 10. The conversations "took place less than a month before the Government claims that Massino agreed to record conversations with Basciano, and more than three months after Massino began to talk with the Government." (<u>Basciano I</u> January 2006 Order at 10.) The court held the <u>Massiah</u> hearing in <u>Basciano I</u> on January 17-18, 2006. (<u>See</u> Gov't's Letter of June 29, 2009 (Docket Entry # 715) (attaching hearing transcript ("<u>Massiah</u> Tr.")).) Following the hearing, the court announced its decision in open court:

> As I ruled in my memorandum and order on January 3, 2006, Mr. Basciano met the burden to be afforded a M[a]ssiah hearing on the issue of whether Mr. Massino's testimony at trial about two unrecorded conversations between Massino and Basciano would violate Mr. Basciano's Sixth Amendment right to counsel.
>
> At that time I had before me the evidence that Joseph Massino had worn a government wire, [and had] recorded a conversation with Basciano a month after the conversations at issue. This was sufficient to raise a suggestion that Massino may have been a government agent at the time of the unrecorded conversations. I also had Mr. Basciano's affidavit that Mr. Massino had asked him questions and not merely listened during those conversations which were not recorded. There was a suggestion that Basciano and Massino would not have been placed together but for the interference of the government.
>
> Yesterday and today, the court heard the government's presentation of its position that it had not made any efforts to place Massino and Basciano together; that Massino was not acting as a government agent at the time of the conversations, and that Massino had been instructed not to ask questions.
>
> The government presented the testimony of FBI Special Agent Kimberly McCaffrey; of Massino's shadow counsel, Edward McDonald; of staff attorney of the Metropolitan Detention Center, Rina Desai; and Deputy U.S. Marshal John Drago.
>
> These witnesses, along with a number of government exhibits, established neutral reasons for the two times that Massino and Basciano were able to talk with one another. They also establish that before the conversations in question, Massino had been told, on or about November 12, 2004, that there was no chance of a cooperation agreement. The only subject still open to negotiation was whether he

28

was willing to plead guilty to the charge or murdering George Sciasca in his death penalty case in which the Attorney General had previously certified the prosecution for a possible sentence of death.

Yesterday, the government sufficiently established that Joseph Massino fit more into the model of an entrepreneurial inmate whose questions do not violate M[a]ssiah, as explained by the Second Circuit in United States v. Birbal, 113 F.3d 342, at 346.

I have been very clear from the beginning that affidavits were not sufficient for this hearing and that I wanted live testimony. The government thus has been on notice that it may need to present Joseph Massino at the hearing to testify. Nonetheless, within the Birbal analysis, it is not important what the entrepreneurial inmate said to the defendant to get a confession. Massino's testimony therefore was not vital to the court.

Basciano did not offer compelling evidence to dispute the government's case. In fact, Basciano did not offer any witnesses. Once the government had met its burden, Basciano needed to demonstrate specifically how the government was involved in the conversations, either by showing evidence that Massino was an agent of the government or by showing actions by the government to put two talkative inmates together. Basciano, instead, sought to show that the government did not do enough to prevent Massino from [asking] Basciano about crimes for which Basciano was already indicted and that Massino did in fact ask probing questions about subjects relating to Basciano's existing indictment.

This alone is not sufficient to establish a violation of Basciano's Sixth Amendment right to counsel under M[a]ssiah v. United States. Because the government has shown a lack of government agency in the conversations in question and because Mr. Basciano has failed to prove any government agency, the court will admit Mr. Massino's testimony about the conversations at trial, if such testimony is offered by the government.

Massiah Tr. 272-74.

In this case, Basciano moves to suppress the statements that the court deemed admissible in Basciano I. (See Def. Suppression Supp. Motion Mem. at 1-19.) He argues that the court's determination in Basciano I was erroneous because Massino himself did not testify at the Massiah hearing. (See id. at 2-3, 15, 17.) He also argues that additional factors support suppression. In particular, he argues that the Government "must have known" in late 2004 that Massino would seek incriminating statements from Basciano; that it "must have known" that he

and Massino would be together in prison; and that the Government exploited this situation, thereby rendering Massino a government agent.  (See id. at 5-6, 16.)  Basciano argues, moreover, that the Government's decision to seek the death penalty for Massino, coupled with its cooperation negotiations with him, intentionally put pressure on Massino to seek incriminating information from Basciano.  (See id. at 4-5, 11-13.)  For these reasons Basciano seeks another Massiah hearing to readdress the same issues upon which that the court permitted two days of oral argument and fact finding in January 2006.  (See id. at 17.)

In response, the Government notes that, in Basciano I, the court made a ruling on precisely the issues presented in this motion and argues that there is no basis for reconsideration of its decision.  (See Massino Opp. at 1-5.)  The Government contends that its decision not to seek the death penalty for Massino is not relevant to whether Massino was acting as an agent of the Government, and that the Government did not exploit, nor is there evidence that they did exploit, plea negotiations with Massino in order to maximize his incentive to obtain incriminating statements from Basciano.  (See id. at 3-5.)  Finally, the Government argues that holding another hearing at which Massino would testify would only allow defense counsel to preview Massino's testimony, which would "run afoul of the Jencks Act."  (See id. at 5-6.)

"The Sixth Amendment right to counsel requires that a defendant have counsel present at interrogations by the Government after the defendant is indicted."  (Basciano I December Order 15 (citing Massiah v. United States, 377 U.S. 201 (1964)).)  "Once the right attaches, 'the Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel.'"  United States v. Rommy, 506 F.3d 108, 135 (2d Cir. 2007) (quoting Michigan v. Harvey, 494 U.S. 344, 348 (1990)).  "[D]eliberate elicitation under the Sixth Amendment 'covers only those statements

obtained as a result of an *intentional* effort' on the part of government officials to secure incriminating statements from the accused." United States v. Rommy, 506 F.3d 108, 135 (2d Cir. 2007) (quoting United States v. Stevens, 83 F.3d 60, 64 (2d Cir. 1996)).

In considering whether there has been deliberate elicitation, the intentional actions of a government agent are attributable to the government for the purposes of the Sixth Amendment. United States v. Pannell, 510 F. Supp. 2d 185, 189 (E.D.N.Y. 2007). An informant becomes a government agent, however, "only when the informant has been instructed by the police to get information about the particular defendant." Id. (quoting Birbal, 113 F.3d at 346). "The Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant." Birbal, 113 F.3d at 346. "[T]o treat every inmate who hopes to cut some future deal as a 'government informant' is to extend the idea behind Massiah far beyond its natural reach, and that we are not willing to do." Stevens, 83 F.3d at 64.

In Basciano I, this court ruled that "the government [had] shown a lack of government agency in the conversations in question." (Massiah Tr. at 274.) Following a hearing, at which the court took live testimony over the course of two days and considered arguments from Basciano and the Government, the court found, under Birbal, that "Joseph Massino fit more into the model of an entrepreneurial inmate whose questions do not violate Massiah." Id. at 273. The precise issue that was before the court during that hearing is before the court in the instant application. Basciano has offered neither new evidence nor new argument that would compel a different result. All the arguments that Basciano presents in his motion either were made to the court before its ruling in Basciano I or were available to Basciano at that time.

Basciano also argues that the Government paid Massino's shadow counsel, Edward McDonald, and that Massino and Mr. McDonald were, therefore, government agents. (See Def. Suppression Supp. Motion Mem. at 7, 9-10, 12, 14-15, 17, 18-19.) The Government states that Massino's counsel was retained by Massino, and, in any case, that defense counsel had the opportunity to explore the circumstances of his representation at the Massiah hearing. (See Massino Opp. at 3-4.) At the Massiah hearing in Basciano I, defense counsel contended that McDonald was working "in conjunction with the government," but I explained that "I appointed him to represent Massino, not to represent the government." (Massiah Tr. at 233-34.) The court appointed Mr. McDonald from a list of names provided by the Government. (See id. at 149-50; Arg. Tr. at 41-42.) Mr. McDonald's testimony at the Massiah hearing does not support a conclusion that he was acting as a Government agent – rather than simply as Massino's attorney – nor has Basciano presented any other evidence suggesting that he was. (See id. at 141-62, 207-42 (Mr. McDonald's testimony); see also id. at 269-71.)

Further, Basciano argues that the Government took intentional steps to encourage Massino to elicit information from Basciano. Yet, the Government's responsibility for Massino's activities when he elicited statements from Basciano in November 2004 was precisely the issue before the court in Basciano I. The court held a two-day hearing with testimony from several witnesses, and Basciano had a full opportunity to develop the factual record. The court found that, based on the evidence, the Government had not taken intentional steps to elicit information from Basciano. Having reviewed the transcript and the parties' arguments, the court rejects Basciano's arguments for the reasons set forth in its decision in Basciano I. Furthermore, even if Massino were acting as a government agent, which the court finds he is not, his testimony

for the purposes of <u>Basciano II</u> would not be barred by <u>Massiah</u> for the reasons set forth below relating to the Massino Tapes.

Basciano's motion to suppress the Massino Conversations is DENIED.

2.    <u>The Massino Tapes</u>

Basciano has also moved to suppress the Massino Tapes.  The Massino tapes were recorded on January 3, 2005 and January 7, 2005.  (S-9 Indictment at 21.)  At this time, Basciano was under indictment and had been arrested in <u>Basciano I</u>, and the <u>Basciano I</u> S-2 Indictment was the operative indictment.  Basciano had not yet been indicted in <u>Basciano II</u>.  The <u>Basciano II</u> indictment was filed on January 26, 2005.  (Indictment (Docket Entry #1).)

Basciano argues that his taped statements were made about events concerning <u>Basciano I</u> and, thus, violate his Sixth Amendment right to counsel in this case.  He argues that the rule articulated by the Supreme Court in <u>Texas v. Cobb</u>, 532 U.S. 162 (2001) – that the right to counsel does not attach for offenses that are separate from charged offenses – does not apply to the present case where "the right to counsel had attached to the subject matter of the Massino interrogation by virtue of the nature of the grand jury's conspiracy charge leveled against Basciano before the interrogation."  (Def. Supp. Pretrial Mem. at 7.)  He argues, for example, that the Massino Tapes address matters that pertain equally to both <u>Basciano I</u> and <u>Basciano II</u>, and because the offenses in <u>Basciano I</u> and <u>Basciano II</u> are so intertwined, the court should not separate them for the purposes of Sixth Amendment attachment.  (Def.'s Massino Suppression Motion at 5-10.)  He further argues that the Massino Tapes should be suppressed pursuant to Disciplinary Rule 7-104(A)(1) of the New York Code of Professional Responsibility, which prohibits communications with persons known to be represented.  (<u>See</u> <u>id.</u> at 15-19.)

In response, the Government argues that Basciano ignores <u>Cobb</u>'s holding that the Sixth Amendment does not attach when offenses are separate. (Gov. Massino Suppression Opp. 7-12.) It further argues that Disciplinary Rule 7-104 was not violated because, as the rule contemplates, "a prosecutor is 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." (<u>Id.</u> at 13 (quoting <u>Hammad</u>, 858 F.2d at 839).)

The Sixth Amendment is "'offense specific' which means that it cannot be invoked once for all future prosecutions." <u>United States v. Mills</u>, 412 F.3d 325, 328 (2d Cir. 2005). It "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of indictment or information." <u>Id.</u>; <u>see also</u> <u>Rothgery v. Gillespie County</u>, 554 U.S. 191, 198 (2008). Accordingly, "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges," while "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are . . . admissible at a trial of those offenses." <u>Maine v. Moulton</u>, 474 U.S. 159, 180 n.16 and accompanying text (1985). This rule recognizes that "to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." <u>Id.</u> at 180.

In <u>Texas v. Cobb</u>, the Supreme Court "held that the Sixth Amendment right to counsel does not extend to uncharged crimes unless they are the 'same offense' as the charged crime." <u>United States v. Mills</u>, 412 F.3d 325, 329 (2d Cir. 2005). There is "no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to

counsel.  Accordingly . . . when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the <u>Blockburger</u> test."  <u>Cobb</u>, 532 U.S. at 173, 121.  Accordingly, the Sixth Amendment does not apply to incriminating statements obtained by the Government from a defendant relating to charges for which no criminal prosecution has commenced, nor does it apply to statements obtained when charges have been brought, so long as those charges are not for the "same offense."  <u>See, e.g.</u> <u>United States v. Mir</u>, 525 F.3d 351, 355-56 (4th Cir. 2008) ("[T]he conversations whose admission [the defendant] so vigorously challenges here were part of the government's investigation of a completely different offense for which no charges had yet been filed – and therefore for which no Sixth Amendment right had attached.").  Furthermore, "[t]he Supreme Court in <u>Cobb</u> made clear that there is no exception to the offense-specific nature of the Sixth Amendment for uncharged offenses that are 'factually related' or 'inextricably intertwined with' a charged offense."  <u>Mir</u>, 525 F.3d at 356.

It is not relevant to the analysis that the conduct charged in <u>Basciano I</u>, for which Basciano was under indictment at the time of the recordings, relates in some way to the charges in <u>Basciano II</u>.  Furthermore, to accept Basciano's argument that <u>Cobb</u> does not apply to the specific facts of this case because here "the right to counsel had attached to the subject matter of the Massino interrogation by virtue of the nature of the grand jury's conspiracy charge leveled against Basciano before the interrogation," (Def. Supp. Pretrial Mem. at 7), would require this court to ignore the unambiguous holding of <u>Cobb</u> that the Sixth Amendment right attaches only to conduct that is the "same offense" as the charged conduct, as that term is defined under Double Jeopardy case law.  <u>Mills</u>, 412 F.3d at 329.

The Cobb rule is clear, and it does not permit for the case-specific exception that Basciano seeks here. "The deciding factor as to whether the right to counsel applies is whether an offense has yet been charged, not whether a later offense is somehow related to an earlier charge." United States v. Awan, 06-CR-0154 (CPS), 2006 WL 3207858, at *6 (E.D.N.Y. Nov. 6, 2006). The Court of Appeals' double jeopardy ruling struck the substantive racketeering count but affirmed this court's ruling that Counts Three and Nine of the S-9 indictment do not violate double jeopardy. See Basciano, 599 F.3d 184. Thus, it has been definitively resolved that none of the charges still pending in Basciano II are the "same offense" for which Basciano's Sixth Amendment rights had attached in Basciano I at the time the Massino Tapes were made. See, Basciano, 599 F.3d 184. Therefore, Basciano's Sixth Amendment rights, as they apply to the introduction of statements in Basciano II, had not attached in Basciano II at the time of the Massino Conversations. Accordingly, Massiah and its progeny do not require exclusion of *any* of the contents of the Massino Tapes or the Massino Conversations from Basciano II.

Basciano's arguments that the statements are barred by Disciplinary Rule 7-104(A)(1), are similarly unavailing. Disciplinary Rule 7-104(A)(1) provides that a lawyer representing a client shall not "communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so." While Disciplinary Rule 7-104(A)(1) has now been replaced by Rule 4.2 of the New York Rules of Professional Conduct, since the two rules are identically worded, and much of the case law refers to Disciplinary Rule 7-104(A)(1), the court will refer to the old rule, Disciplinary Rule 7-104(A)(1), here.

Disciplinary Rule 7-104(A)(1) "does apply to criminal prosecutions." U.S. v. DeVillio, 983 F.2d 1185, 1192 (2d Cir. 1993). However, "[u]nder DR 7-104(A)(1), a prosecutor is 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." Id. (quoting Hammad, 858 F.2d at 839). "The Hammad court based its finding of an ethical violation principally on the use of the bogus subpoena and cautioned 'restraint in applying the rule to criminal investigations to avoid handcuffing law enforcement officers in their efforts to develop evidence,' with district courts assumed to exercise their discretion 'cautiously and with clear cognizance that suppression imposes a barrier between the finder of fact and the discovery of truth.'" United States v. Rahman, 93-CR-181 (MBM), 1994 WL 388918, at *6 (S.D.N.Y. July 22, 1994) (quoting Hammad, 858 F.2d at 838, 834). Here, Defendant has failed to establish that the Government's use of recordings were not "legitimate investigative techniques" that were "authorized by law" under Disciplinary Rule 7-104(A)(1). As in United States v. Devillio, 983 F.2d 1185, 1192 (2d Cir. 1993), there is "no evidence of any violation rising to the level of the one [] considered in Hammad" and, thus, the extreme remedy of suppression is not appropriate.

Basciano's motion to suppress the Massino Tapes is DENIED.

3. Compelled Confession

Finally, Basciano argues that his statements made to Massino in prison – both the Massino Conversations and the Massino Tapes – were compelled by the Government and that their introduction would therefore violate his right to remain silent under the Fifth Amendment. (See Def. Pretrial Mem. at 8-11.) He asserts that the Government strategically took advantage of the fact that Massino was the "ruthless boss of the Bonanno crime family" since the Government

knew that Basciano would feel compelled to answer Massino's questions.  (See id. at 11.)

Because his statements were "compelled" by Massino, Basciano argues that they cannot be

admitted in this case.  In response, the Government points to Illinois v. Perkins, 496 U.S. 292

(1990), in which the Supreme Court rejected the defense theory of "strategic deception" by a

government agent.  (Gov. Pretrial Opp. at 15-20.)

> Under Perkins,
>
> [t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are
> not present when an incarcerated person speaks freely to someone whom he
> believes to be a fellow inmate. . . .  Questioning by captors, who appear to control
> the suspect's fate, may create mutually reinforcing pressures that the Court has
> assumed will weaken the suspect's will, but where a suspect does not know that
> he is conversing with a government agent, these pressures do not exist.

496 U.S. at 296-97.  The coercive atmosphere required for a prisoner's statements to be

considered compelled is absent "when an inmate speaks to someone he considers to be a fellow

inmate."  Birbal, 113 F.3d at 346.  Basciano's reliance on Justice Brennan's concurrence in

Perkins in which Brennan found the deceptive investigative practices may violate the Due

Process, see Perkins, 496 U.S. at 300-03 (Brennan, J. concurring), is unavailing because

Basciano  can point to no case that supports a finding that due process prohibits the form of

investigative practices used in this case.

Furthermore, despite Basciano's argument that his confession was coerced because

Massino was a ruthless person and the former leader of the Bonanno organized crime family, the

facts do not indicate that Basciano, who was found in Basciano I to also have held a senior

position in the Bannano crime family and to have similarly acted ruthlessly, spoke to Massino

under conditions which were sufficient to "overbear [his] will to resist and bring about

confessions not freely self-determined."  Rogers v. Richmond, 365 U.S. 534, 544 (1961).

Accordingly, the case law forecloses Basciano's argument that there was the necessary compulsion here.[13]

Basciano's motion to suppress the Massino Tapes and the Massino Conversations on compulsion grounds is DENIED.

### E.     Pretrial Detention Conditions

Basciano has bombarded[14] the court with arguments as to why the court should order Basciano moved from the Metropolitan Correctional Center ("MCC") to the Metropolitan Detention Center ("MDC") and lift the Special Administrative Measures ("SAMS") order. Defendant's pretrial detention has already been exhaustively litigated.  See <u>Basciano Habeas</u> 530 F. Supp. 2d 435; <u>Basciano v. Martinez</u>, 316 F. App'x 50, (2d Cir. 2009).  The Court of Appeals for the Second Circuit found that,

> "In light of the extensive evidence that Petitioner violated prison communications restrictions, engaged in criminal activity from jail, and tried to interfere with his own trial, we hold that his conditions of confinement were not intended to punish, but rather were rationally connected to the penological purpose of protecting the public from a detainee facing trial.  They continue to be connected to valid penological purposes, now that he has been convicted."

<u>Basciano v. Martinez</u>, 316 F. App'x at 50-51.  The court further stated that "[b]ecause Petitioner has now been convicted of a series of crimes and sentenced to life in prison, his conditions of confinement should be reviewed under the standard applied to prisoners serving a sentence."  <u>Id.</u>

---

[13]     As discussed above, at the time of the Massino Conversations, Massino was not acting as a government agent, and thus the Fifth Amendment does not apply to those conversations.  See <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).

[14]     Def.'s Letter Motion that Vincent Basciano be Immediately Returned to MDC (Docket Entry # 973); Gov't's Letter in Response to the Def.'s Letter Application Directing Basciano's Transfer to MDC (Docket Entry # 967); Def.'s Letter in Opp. to the Gov't's Letter Regarding Def.'s Request to be Transferred to the MDC (Docket Entry # 971); Def.'s Letter Addendum to Motion for Transfer (Docket Entry # 975); Def.'s Letter in Further Support of an Order Directing the Def. be Transferred Back to the MDC ("Def. Nov. 29, 2010 Letter") (Docket Entry # 976); Gov't's Letter Regarding the MCC's Legal Visiting Conditions (Docket Entry # 978);  Def.'s Motion to Compel Vacatur of SAM, Hearing, and Bill of Particulars ("Def. Vacatur Motion") (Docket Entry # 979); Gov't's Response to Motion to Compel (Docket Entry # 1012); Def.'s Reply to Motion to Compel (Docket Entry # 1015); Def's Letter of Jan. 10, 2011 (not yet filed on ECF).

at 50.  As this court has previously noted, in addition to being sentenced to life in prison, the Bureau of Prisons has designated Basciano to serve his life sentence in the Florence Supermax. (Docket Entry # 889.)  In light of this exhaustive litigation of the issue and of Defendant's life sentence in the earlier case, this court believes that Basciano's recent claims, coming months before trial, are frivolous and this court refuses to entertain relitigation of this issue.

The court has reviewed all of Defendant's theories and, for the reasons set out above, the court only needs to address Defendant's argument that being denied contact meetings with his attorneys in the MCC violates his Sixth Amendment right to counsel.  (See Def. Nov. 29, 2010 Letter.)  The Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.  In our view, such a standard is necessary if prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations."  Turner v. Safley, 482 U.S. 78, 89 (1987).

Judge Keenan's opinion in United States v. Kassir, 04-CR-356 (JFK), 2008 WL 2695307 (S.D.N.Y. July 8, 2008) is directly on point and this court finds it persuasive here.  Kassir, like Basciano, was housed in the Tenth floor, South Wing, of the MCC ("10 South") under SAMS. Kassir, 2008 WL 2695307, at *1.  Kassir, like Basciano, argued that his Sixth Amendment rights were violated by being "permitted only non-contact meetings" with his lawyers which "prevent counsel and Mr. Kassir from reviewing particular documents together."  Id. at *3.  The non-contact rule in the MCC was motivated by the security concerns arising from, at least in part, an incident in 2000 in which "a pretrial MCC detainee against whom a charge of providing material support to al-Qaeda was still pending, stabbed an MCC officer in the eye as part of a conspiracy to take hostages, including defense lawyers visiting clients in the prison."  Id.  The Kassir court

found that "[n]one of this burdens the defendant's Sixth Amendment rights – and to the extent the requirement of 'non-contact meetings' imposes any burden on document-sharing between the defendant and his counsel, this requirement is 'reasonably related' to the MCC's legitimate objective of protecting institutional security." Id. (citing Turner, 482 U.S. at 87, 96-97).

Basciano's argues that Kassir is "quite distinguishable from Mr. Basciano's situation" because Kassir, unlike Basciano, was accused of being a terrorist, and the "MCC terrorist wing was reconfigured because of the Salim incident," which was an incident involving an alleged terrorist. (Def. Vacatur Motion at 4.) Despite the fact that the no-contact-visit rule was created in response to an incident involving an alleged terrorist, the legitimate security concerns presented by Basciano's detention, which have been exhaustively litigated, justify the determination to house Basciano under SAMS and in 10 South, regardless of the no-contact rule. In light of the MCC's security concerns, this court finds the non-contact rule is valid, as applied to Basciano, even if it does make Defendant's access to counsel more cumbersome, because "it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. Furthermore, Defendant has three court-appointed attorneys who have billed millions of dollars in legal expenses in preparing this case over its five-year history. The court cannot conclude that Defendant's legal representation has been materially impaired by the non-contact visit policy.

Consequently, Defendant's motions relating to the conditions of his detention are DENIED.

## III.     DISCOVERY ISSUES

Basciano's discovery requests are voluminous and poorly organized, making it difficult for the court to determine which issues are actually presented for review. For example, in his pretrial motions Basciano incorporates at least *twenty-five* separate documents previously filed

containing discovery-related requests which span the entire life of this five-year-old case. (Def. Pretrial Mem. at 65.) Defendant also claims to have made "more particularized requests" which include "[m]isconduct and investigative reports, visiting records, and recordings of telephone calls of government witnesses while in custody, including specifically, but not limited to" and then listing the names of ten individuals. (Def. Pretrial Mem. at 66.) This request, like many others, is far from specific, and in fact, requests evidence which goes well beyond that which a criminal defendant is entitled to under Federal Rule of Criminal Procedure 16, 18 U.S.C. § 3500 ("§ 3500"), and required by due process. See Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972). The Government does not oppose many of the requests, but responds that it will disclose evidentiary materials at the appropriate time under applicable rules and case law.

A.     Evidence Relating to Dominick Cicale

In September 2007, defense counsel "brought to the court's attention allegations that cooperating witness [] Dominick Cicale ("Cicale") tried to frame Defendant Vincent Basciano in a 'bogus' prison murder plot." (Memorandum & Order of Dec. 19, 2007 ("Cicale Order") (Docket Entry # 379) at 1.) Specifically, Marco Santomaggio ("Santomaggio"), a Metropolitan Correctional Center prison guard, had informed Basciano's attorneys that Cicale solicited a prison inmate ("CW-1") to falsely claim that Basciano had asked Santomaggio to ask CW-1 to kill Cicale on Basciano's behalf. (See Basciano I, Memorandum & Order of Mar. 24, 2008 (Docket Entry # 1065) ("Basciano I March Order"), at 3.) The parties subsequently indicated

that three cooperating witnesses in unrelated matters, including CW-1, might have information

pertaining to that incident. (See Cicale Order 1.)[15]

The court notes that, while the Government has not provided Basciano with every piece

of information it seeks with regard to the alleged Cicale plot, it appears that the Government has

made great efforts to provide Basciano with a substantial amount of information, including the

identity of CW-1, that should provide Basciano with ample evidence with which to impeach

Cicale. Furthermore, as the court has noted previously, and as the Second Circuit recognized in

the appeal from Basciano I, "knowledge of the bogus murder plot would not have substantially

aided the jury in assessing Cicale's credibility, given the already plentiful impeachment evidence

offered against him." United States v. Basciano, 08-1699-cr, 2010 WL 2802566, at *2 (2d Cir.

July 16, 2010). Now, unlike in Basciano I, Basciano has substantial information about the bogus

murder plot to use for impeachment. The court, therefore, will not compel the Government to

comply with Defendant's inexhaustible efforts to obtain yet more evidence about one particular

incident pertaining to one potential Government witness. The circumstances of this case do not

justify the court supervising every one of Basciano's seemingly limitless discovery requests on

issues only collaterally related to his defense.

1.     Request to Disclose Documentary Evidence

Basciano has requested various documents relating to Cicale's bogus murder plot,

including a seven-page statement made by CW-1. (See Def. Pretrial Mem. at 66-67, 70-74.)

The Government responds that it has already provided much of the material requested by

Basciano, and that additional material will be provided as part of its discovery obligations. (Gov.

Pretrial Opp. at 90-93.) Since the June 26, 2009 oral argument, it appears that these materials

---

[15]     The Government informed defense counsel of the name of CW-1, and the court granted a protective order
prohibiting dissemination of that person's identity; the court also granted the Government's request to redact the
names of two other cooperating witnesses. (See id. at 8-9.)

have been turned over. On July 7, 2009, the Government submitted, *ex parte* and under seal, in

both redacted and unredacted form, several internal Bureau of Prisons documents relating to

Cicale. (See Docket Entry # 722.) After reviewing them, the court ordered the Government to

transmit the redacted versions of the documents to defense counsel and reserved decision on the

undisclosed portions. (See Order of August 21, 2009 (Docket Entry # 767).) After that order,

the Government determined that the previously undisclosed materials could be turned over to

defense counsel, with only certain inmate identification and location information removed. (See

Docket Entry # 783.) All of these documents have now been turned over, and the discovery

dispute surrounding them is moot. (See Docket Entries ## 771, 784.)

2. Request for Material Witness Warrants

Basciano has requested that the court issue material witness warrants authorizing the

arrest and continued detention pending trial of CW-1, as well as two other potential witnesses,

"CW-2" and "CW-3."[16] Basciano contends, as discussed above, that CW-1 is an individual in

the Witness Protection Program who Cicale solicited to claim that Santomaggio approached

CW-1, at Basciano's request, about killing Cicale. (See "Stern Aff." ¶ 4.) Basciano asserts that,

although he does not know their identities, CW-2 and CW-3 have knowledge about the alleged

fake murder plot. (Id. ¶ 19.) Basciano intends to call CW-1, CW-2, and CW-3 at trial because

he deems their testimony material to undermining Cicale's credibility – *i.e.*, to show that Cicale

is a liar who would fabricate evidence against Basciano. (Def. Witness Mem. at 3.) Basciano

also argues that this testimony will impeach Cicale by showing his bias against Basciano. (See

Def.'s Letter of May 31, 2009.)

---

[16] See Def.'s Motion for Material Witness Orders and Warrants of Jan. 11, 2009 (Docket Entry # 601);
Affirmation of Lawrence Mark Stern of Jan. 11, 2009 ("Stern Aff.") (Docket Entry # 601); Def.'s Mem. in Support
of Def.'s Motion for Material Witness Orders and Warrants of Jan. 11, 2009 ("Def. Witness Mem.") (Docket Entry
# 601).

According to Basciano, CW-1 is a foreign national within the Government's custody. (Stern Aff. ¶ 19.) Defense counsel is concerned that, if he is released, there is a risk that the defense will be unable to find him for trial. (Id.) Basciano asserts that the same problems securing CW-1's attendance might also apply to securing the attendance of CW-2 and CW-3. (Id.) Accordingly, Basciano asserts that the court should order their detention pending trial. (Stern Aff. ¶ 19.)

In response, the Government states that it will accept the service of a trial subpoena with respect to CW-1 while he is in the Witness Security Program, and that there is no plan to release CW-1 from custody. (See Gov't's Letter of Mar. 6, 2009 ("Gov. Witness Opp.") (Docket Entry # 651) at 1.) With respect to CW-2 and CW-3, the Government argues that Santomaggio, who apparently knows their identities, has chosen on the advice of counsel not to identify them, even though the Government has authorized him to do so. (See id. at 2.) It states, therefore, that a determination of how to secure their presence at trial is not ripe because their identities are not certain. (See id.) The Government also argues that the issue of Cicale's statements to another inmate about a murder plot is not "material," as would be required for a material witness warrant, because it is collateral to the issues at trial and is cumulative of other impeachment evidence. (See id. at 2 n.1.)

Under 18 U.S.C. § 3144, the court may order the detention of a material witness if (1) "it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding," and (2) "it is shown that it may become impracticable to secure the presence of the person by subpoena." United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003). Under the Warrants Clause of the Fourth Amendment, the warrant applicant must establish probable cause for each requirement. See id.

With respect to CW-1, Basciano has, at a minimum, not made an adequate showing under the second prong of the <u>Awadallah</u> test. He speculates that CW-1 may become unavailable in the event that CW-1 is released from government custody. However, the Government has represented that it has no plans to release CW-1 and that a trial subpoena will be adequate to secure his presence at trial. (Gov. Witness Opp. at 1.) Based upon these representations, the court finds that Basciano has not shown probable cause that it would be impracticable to secure CW-1's presence at trial by subpoena. <u>See</u> <u>United States v. Ionia Management S.A.</u>, 07-CR-134 (JBA), 2007 WL 2325199, at *3 (D. Conn. Aug. 9, 2007) (declining to find presence by subpoena "impracticable" based on counsel's representation of witnesses' availability). Should the Government's plans change with respect to CW-1, however, the Government should notify the court immediately so that this issue can be reevaluated if necessary.

With respect to CW-2 and CW-3, defense counsel points out that there is confusion surrounding their respective identities. (<u>See</u> Arg. Tr. at 133.) The Government's explanation at oral argument somewhat clarifies why this is the case: "Mr. Santomaggio identified by number certain individuals he said had personal knowledge about [the] allegation [relating to the Cicale bogus murder plot]. He hasn't talked to us about that, and in fact we've asked his counsel several times whether he would speak to us and he refuses to." (<u>Id.</u>; <u>see also</u> Order of Feb. 15, 2008 (Docket Entry # 423).) The Government further explained that it has been unable to determine whether anyone besides CW-1 was privy to Cicale's statements, but that it has "surmised" that a person named "Frank S." might be CW-2. (Arg. Tr. at 128, 133.) This information has been disclosed to defense counsel, and defense counsel has indicated an intention to interview Frank S. about the bogus murder plot. (<u>Id.</u> at 128, 131-33.)

The court concludes that Basciano has not shown probable cause that the testimony of CW-2 and CW-3 will be material and that their presence by subpoena is impracticable. The identities of these potential witnesses is in considerable doubt. As a practical matter, without knowing their identities, it is impossible for the court to order a cooperating witness warrant to secure their presence at trial. Further, with the minimal amount of speculative information provided to the court about CW-2 and CW-3, the court cannot assess whether obtaining their presence by subpoena is practicable. Furthermore, even if their identities were known, there has been no showing that their testimony would be material to the case, rather than merely cumulative of CW-1's or Santimaggio's testimony or other impeachment evidence. Quite simply, too little is known about CW-2 and CW-3, by no apparent fault of any party, for the court to grant the requested relief. The court does not deem it appropriate at this time to issue a warrant securing their presence at trial.[17] For the foregoing reasons, Basciano's motion for material witness warrants is DENIED.

---

[17]     In his reply on this issue, Basciano asks for an order compelling Santomaggio to disclose the identities of CW-2 and CW-3, as well as an order granting Santomaggio immunity. In contrast to his opening brief of five double-spaced pages, his reply brief is a fourteen-page, single-spaced letter that includes these new requests along with pages of speculation about prosecutorial misconduct. (See Def.'s Letter of May 31, 2009 (Docket Entry # 702).) The court has previously warned Basciano that "'arguments may not be made for the first time in a reply brief,' particularly because doing so deprives the Government of an opportunity to respond." (Particulars Order at 22 (quoting Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993)).) In the interest of completeness, however, the court has reviewed and considered these applications. They are without merit. With respect to compelling Santomaggio to provide the identity of the potential witnesses, the Defendant asks the court to "fashion some other method to compel Santomaggio to reveal the names of these inmates" without providing any explanation for what such a remedy would look like or providing any case law supporting issuance of such an order. (Def.'s Letter of May 31, 2009 at 6.) Santomaggio, on advice of counsel, has decided not to divulge their names. (Gov. Pretrial Opp. at 91.) Defense counsel can subpoena Santomaggio to testify at trial and the court will then decide whether Santomaggio's refusal to reveal information is driven by a legitimate assertion of his Fifth Amendment right against self-incrimination. This application is DENIED. With respect to immunity, defense counsel reiterated the application to immunize Santomaggio at oral argument (see Arg. Tr. at 136-37), but has provided no basis to conclude that forced immunity under the Second Circuit's standard in Ebbers, as discussed above, is appropriate. The application for immunity is also DENIED.

**B.     Other Evidentiary Requests**

Basciano makes numerous discovery requests based upon a variety of theories in a series of disorganized paragraphs in his pretrial briefing.  For example, he seeks discovery relating to Cicale's conduct in prison (see, e.g., Def. Pretrial Mem. at 67, 69, 70-71, 74, 80), Massino's cooperation (see, e.g., id. at 66, 70, 76, 77), and the investigation of the List (see, e.g., id. at 69, 79-80, 82).  He seeks the early disclosure of all evidence under Giglio, Brady, and 18 U.S.C. § 3500, as well as early disclosure of evidence under Federal Rules of Evidence 404(b) and 807. (See id. at 91-95, 96-97.)  In addition to these requests, Basciano has included a laundry list of nearly seventy areas about which he deems disclosure to be appropriate.  (See id. at 75-80, 84-91.)  It does not appear that he has even attempted to request these documents from the Government before bringing them to the court's attention.  (See Gov. Pretrial Opp. at 88.) Needless to say, these scattershot discovery requests are unduly burdensome to the court and do not provide sufficiently clear or focused requests for the court to effectively address any valid outstanding issues that may exist.

Since the time of briefing, the Government has made evidentiary disclosures to defense counsel (see, e.g., Arg. Tr. at 5, 21, 32), and has stated its intention to make other disclosures (see, e.g., id. at 127, 140.)  The parties have reached agreement on other evidentiary requests presented in Basciano's briefing.  (See, e.g., id. at 122, 132, 133-35.)[18]  In light of these developments, coupled with Basciano's disorganized and voluminous briefing on discovery issues, it is not entirely clear which disputes, if any, are pending before the court.   The Government's representations that it is aware of and will meet its discovery obligations, along

---

[18]     Basciano also sought all § 3500 materials produced in Basciano I.  (Def. Pretrial Mem. at 21-22.)  At oral argument, the court ordered that defense counsel be permitted to access that material, which has been warehoused in the anteroom of the courtroom.  (See Arg. Tr. at 134-35.)  Basciano has also sought an order requiring the preservation of interview notes of law enforcement.  (Def. Pretrial Mem. at 96.)  The Government has indicated that it is already its practice to preserve such notes, so this request is DENIED as moot.  (Gov. Pretrial Opp. at 99.)

with the fact that the Government has appeared to fully comply with its discovery obligations in good faith over the course of this case, are sufficient to deny Basciano's motions at this time. See United States v. Perez, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) ("Courts in this Circuit have repeatedly denied pretrial requests for discovery orders pursuant to Brady where the government . . . has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under Brady.").

Furthermore, Basciano recently moved for an order compelling discovery of the Transcript of Magistrate Levy's *ex parte*, *in camera* hearing relating to Basciano's habeas motion. (Def.'s Letter of Dec. 28, 2010 (Docket Entry # 1009). To the extent that materials provided to Judge Levy are independently subject to discovery under Federal Rule of Criminal Procedure 16, and required by Brady and Giglio, the Government should provide them to Defendant at the appropriate time. However, to the extent that they are not otherwise discoverable, the court will not compel the disclosure of documents and affidavits which were prepared and provided to Magistrate Levy for sole purpose of determining whether Basciano's conditions of confinement and SAMS order were justified by legitimate security concerns. It was previously found by Magistrate Levy that revealing the details of the ex parte, under seal materials to Basciano was not appropriate in light of legitimate security concerns. (See Gov't's Letter of Jan. 5, 2011 (Docket Entry # 1013) at 3).) Nothing has changed to justify reconsideration of that determination.

Accordingly, Basciano's motions to compel disclosure of discovery are DENIED.

## IV.    PENALTY-PHASE ISSUES

"Under the [Federal Death Penalty Act ("FDPA"), once a defendant is found guilty of a capital offense, the jury must determine whether the defendant is eligible for the death penalty."

United States v. Wilson, 493 F. Supp. 2d 364, 385 (E.D.N.Y. 2006).  "In this eligibility phase, the government must prove the existence of one of the four culpable mental states enumerated in 18 U.S.C. § 3591(a)(2)(A)-(D), and the existence of at least one statutory aggravating factor set forth in section 3592(c)."  Id.  "In the eligibility phase, these factors must be proven beyond a reasonable doubt."  Id. (citing 18 U.S.C. §§ 3591(a)(2), 3593(c)).  "Once the defendant is found eligible to receive a sentence of death, the jury must decide whether the death penalty is justified in the particular case by making findings as to the presence of any aggravating or mitigating factors and then weighing those factors against one another."  Id. (citing 18 U.S.C. §§ 3592, 3593(c)-(d)).[19]

On May 7, 2007, the Government filed a Notice of Intent to Seek the Death Penalty against Basciano.  (See Notice of Intent to Seek the Death Penalty ("Notice of Intent") (Docket Entry # 294).)  This Notice of Intent includes two statutory "Gateway Factors" required for death penalty eligibility under 18 U.S.C. § 3591(a)(2).  These are:

- Gateway Factor 1:  "Intentionally Participating in an Act, Contemplating that a Life Would Be Taken" under § 3591(a)(1)(C);[20] and
- Gateway Factor 2:  "Intentionally [and Specifically] Engaging in an Act of Violence that Created a Grave Risk of Death" under § 3591(a)(1)(D).[21]

---

[19]       "Statutory and non-statutory aggravating factors must be found beyond a reasonable doubt and unanimously by the jury."  Wilson, 493 F. Supp. 2d at 385 (citing 18 U.S.C. § 3593(c)-(d)).  "For mitigating factors, the defendant has the burden of establishing their existence by a preponderance of the information and any single juror who finds the existence of a mitigating factor established may consider that factor regardless of the number of jurors who concur that the factor has been established."  Wilson, 493 F. Supp. 2d at 385  (internal quotation marks omitted).

[20]       This factor states:  "The defendant intentionally participated in an act, contemplating that the life of Randolph Pizzolo would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Randolph Pizzolo died as a direct result of the act."  (Notice of Intent at 1-2.)

[21]       This factor states:  "The defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than a participant in the offense, such that participation in the act constituted a reckless disregard for human life and Randolph Pizzolo died as a direct result of the act."  (Notice of Intent at 2.)

(Id. at 1-2.)  The Notice of Intent also includes two "Statutory Aggravating Factors" under 18 U.S.C. § 3592(c).  These are:

- Statutory Aggravating Factor 1:  "Previous Conviction of Violent Felony Involving Firearm" under § 3592(c)(2);[22] and
- Statutory Aggravating Factor 2:  "Substantial Planning and Premeditation" under § 3592(c)(9).[23]

(Id. at 2-3.)  The Gateway Factors and Statutory Aggravating Factors are also charged as "Notice of Special Findings" in the S-9 Indictment.  (See S-9 Indictment ¶¶ 73-74.)

As mentioned, in deciding whether to impose the death penalty, the jury must "consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death."  18 U.S.C. § 3593(e). In this regard, the statute allows for the jury to "consider whether any other aggravating factors for which notice has been given exists."  18 U.S.C. § 3592(c); see also 18 U.S.C. § 3593(a).  In accordance with § 3593(a)(2), the Government has noticed six "Non-Statutory Aggravators." These are:

- Non-Statutory Aggravating Factor 1:  "Future Dangerousness of the Defendant," as evidenced by, at least, one or more of the following:  "Membership in an Organized Criminal Enterprise," "Continuing Pattern of Violence," "Low Rehabilitative Potential," "Lack of Remorse," and "Specific Threats of Violence While in Prison;"[24]
- Non-Statutory Aggravating Factor 2:  "Murder to Increase Standing within an Organized Criminal Enterprise;"[25]

---

[22]    This factor states: "The defendant previously has been convicted of an offense punishable by a term of imprisonment of more than one year, involving the use or attempted or threatened use of a firearm against another person."  (Notice of Intent at 2.)

[23]    This factor states: "The defendant committed the [death-eligible] offense after substantial planning and premeditation to cause the death of Randolph Pizzolo."  (Notice of Intent at 3.)

[24]    This factor states:  "The defendant is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others," and sets forth the particulars relating to each of the listed examples.  (Notice of Intent at 3-4.)

[25]    This factor states:  "The defendant sought Randolph Pizzolo's death in order to increase his standing in and leadership of the Bonanno organized crime family of La Cosa Nostra, a criminal enterprise . . . ."  (Notice of Intent at 4.)

- • <u>Non-Statutory Aggravating Factor 3</u>:  "Obstruction of Justice;"[26]
- • <u>Non-Statutory Aggravating Factor 4</u>:  "Contemporaneous Convictions;"[27]
- • <u>Non-Statutory Aggravating Factor 5</u>:  "Participation in Additional Uncharged Homicides, Attempted Homicides or Other Serious Crimes of Violence;"[28]
- • <u>Non-Statutory Aggravating Factor 6</u>:  "Victim Impact Evidence."[29]

(<u>Id.</u> at 3-6.)

Basciano's death-penalty motions fall broadly into four categories:  (1) a motion to preclude the death penalty on grounds of unconstitutionality; (2) a motion to bifurcate the penalty phase; (3) motions to strike various factors, including the "depraved indifference" Gateway Factor, two Statutory Aggravating Factors, and all the Non-Statutory Aggravating Factors; and (4) motions to require particulars from the Government regarding certain aggravating factors and for detailed victim impact evidence from the Government.

### A.      Constitutionality of the Death Penalty

Basciano argues on various grounds that the death penalty is unconstitutional and that it cannot be applied in this case.  First, Basciano argues that the rareness of the imposition of the death penalty makes its imposition arbitrary and capricious and, therefore, unconstitutional under the Eighth Amendment.  (<u>See</u> Def.'s Mem. in Support of Basciano's Motions to Dismiss the Aggravating Factors Noticed by the Gov't and to Preclude the Gov't from Seeking the Death Penalty ("Def. Death Penalty Mem.") (Docket Entry # 311) at 30-35.)  Second,  he argues that

---

[26]      This factor states:  "To attempt to obstruct justice, the defendant has engaged in conduct involving violence and threats of violence, including but not limited to murder conspiracy and murder solicitation."  (Notice of Intent at 5.)

[27]      This factor states:  "The defendant faces contemporaneous convictions for other serious acts of violence."  (Notice of Intent at 5.)

[28]      This factor states:  "The defendant has participated in uncharged murders, attempted murders, murder conspiracies, murder solicitation and murder authorizations, and other serious crimes of violence."  (Notice of Intent at 5.)

[29]      This factor states:  "As reflected by the victim's personal characteristic as a human being and the impact of the offense on the victim and the victim's family, the defendant caused loss, injury, and harm to the victim and the victim's family."  (Notice of Intent at 5.)

there is no difference between cases imposing the death penalty and those imposing life in prison, showing that the death penalty is arbitrary and, therefore, unconstitutional under the Eighth Amendment and Fifth Amendment. (See id. at 36-43.) Third, he argues that the racial and regional disparities make the federal death penalty unconstitutional and that the Government is impermissibly "balancing out" racial disparities by bringing this death penalty prosecution against a white defendant. (See id. at 44-72.) Fourth, he argues that the death penalty statute is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002), because aggravating factors are not included in an indictment and proven beyond a reasonable doubt. (See id. at 73-105.) Finally, Basciano argues that the death penalty is per se cruel and unusual punishment and that too many innocent people are executed to allow the death penalty to stand as punishment. (See id. at 133-42.)

Although Basciano's arguments are thoroughly and aptly presented, the court finds them to be without merit. The law is well settled that the death penalty is constitutional; thus, this court will not address Defendant's arguments at length here. See United States v. Wilson, 493 F. Supp. 2d 364, 383-84 (E.D.N.Y. 2006) ("[B]ecause the Second Circuit has squarely rejected the arguments put forth by the Defendant, I am compelled to uphold the constitutionality of the FDPA without further discussion."). Addressing the constitutionality of the FDPA, courts have repeatedly rejected the arguments presented by Basciano. See, e.g., United States v. Mitchell, 502 F.3d 931, 982 (9th Cir. 2007) (rejecting claim that FDPA is unconstitutional on various grounds relied upon by Basciano); United States v. Barnes, 532 F. Supp. 2d 625, 631 (S.D.N.Y. 2008) (rejecting essentially the same arguments advanced by Basciano); United States v. Williams, No. 00-CR-1008 (NRB), 2004 WL 2980027, at *5-*15 (S.D.N.Y. Dec. 22,

2004).[30]  In light of the precedent rejecting Basciano's arguments that the FDPA and the death penalty generally are unconstitutional, his motion to preclude the death penalty on these grounds is DENIED.

**B.      Bifurcation of the Penalty Phase**

Basciano requests that the court bifurcate the penalty proceedings into an "eligibility" phase and a "selection" phase.  (See Def. Pretrial Mem. at 53-58.)  In his view, the jury's penalty phase deliberations should proceed in two steps:  first, a determination of eligibility for the death penalty based upon consideration of whether there is one Gateway Factor and at least one Statutory Aggravating Factor, and, second, a decision to "select" the death penalty in light of all the aggravating and mitigating information.  (See id. at 55-56.)  Basciano argues that bifurcation will prevent any prejudice to the eligibility determination that might result from including information relating to, for example, the Non-Statutory Aggravating Factors when making the eligibility determination.  (See id. at 54-55.)[31]

In United States v. Fell, 531 F.3d 197, 239 (2d Cir. 2008), the Second Circuit endorsed the bifurcation approach as protective of the integrity of the jury's "death eligibility" determination.  The Court of Appeals in that case explained:

> While the FDPA speaks of "a separate sentencing hearing" after which the jury makes both the eligibility decision and the selection decision, see 18 U.S.C. § 3593(b)-(e), the central point of that phrase is that the sentencing decision should be separated from the guilt phase – not that the sentencing phase must necessarily take place during one uninterrupted hearing.  See generally Blake v. Carbone, 489 F.3d 88, 100 (2d Cir.2007) (noting our duty to "interpret statutes to avoid constitutional infirmities").  Although we would not go so far as to require trifurcation, we encourage district courts ruling on motions to trifurcate to

---

[30]       See also United States v. Quinones, 313 F.3d 49 (2d Cir. 2002) (upholding the FDPA over Fifth and Eighth Amendment challenges).

[31]       Because bifurcating the penalty results in a guilt phase and a two-part penalty phase, ordering this structure for capital proceedings can also be referred to as trifurcation.  See United States v. Fell, 531 F.3d 197, 239 (2d Cir. 2008) ("For instance, a number of district courts have 'trifurcated' capital proceedings by splitting the sentencing phase into two separate hearings: one for the eligibility phase and one for the selection phase.").

consider carefully the ramifications of presenting victim impact evidence, or any evidence that would otherwise be inadmissible in the guilt phase of a criminal trial, to a jury that has not yet made findings concerning death eligibility.

Id. at 240 n.28.

At oral argument, after hearing from the parties, the court ordered that the penalty phase be bifurcated into two parts. (See Arg. Tr. at 61-65.) The court now memorializes that decision. In light of the Second Circuit's guidance in Fell, the court has considered penalty-phase bifurcation and deems it appropriate. Part one of the penalty phase shall consider Basciano's eligibility for the death penalty, "including a determination of the existence of" one of the requisite Gateway Factors and at least one Statutory Aggravating Factor; part two "shall address whether the death penalty should be imposed, including the weighing of aggravating and mitigating factors." United States v. Natson, 444 F. Supp. 2d 1296, 1309 (M.D. Ga. 2006); see also United States v. Johnson, 362 F. Supp. 2d 1043, 1110-11 (N.D. Iowa 2005).

Basciano's motion on this issue is GRANTED.

### C.    Strike Requests

Basciano moves to strike the factors that the Government intends to rely upon during the penalty phase. These motions fall into three categories: (1) request to strike the "depraved indifference" Gateway Factor; (2) request to strike the two Statutory Aggravating Factors; and (3) request to strike the Non-Statutory Aggravating Factors.

#### 1.    Request to Strike Gateway Factor

In its Notice of Special Findings, the Government has stated its intention to prove that Basciano (1) participated in an act, contemplating that the life of Randolph Pizzolo would be taken or (2) intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to Pizzolo, "such that participation in the act constituted a reckless

disregard for human life and Randolph Pizzolo died as a direct result." (S-9 Indictment ¶ 74(b),

(c) (citing 18 U.S.C. § 3591(a)(2)(C)-(D)).) In order for Basciano to be eligible for the

imposition of the death penalty, the jury must find that one of these two Gateway Factors has

been established. Basciano has moved to strike the second of these Factors.

Basciano points out that the death eligible count in this case relies on the intentional

murder of Pizzolo, under New York law, in aid of racketeering under 18 U.S.C. § 1959. (See

Def. Pretrial Mem. at 34; see also S-9 Indictment ¶ 56 (citing New York Penal Law § 125.25(1),

20).)[32] He argues that, under New York law, depraved indifference murder and intentional

murder are inconsistent crimes. (See Def. Pretrial Mem. at 34.) He further argues that: "[i]f Mr.

Basciano is found guilty of [the murder of Pizzolo] and there is a penalty phase, the jury will

have necessarily found an intentional mental state. It should not be permitted to turn around and

find, inconsistently, that Basciano's state of mind was reckless." (Id.) He also appears to argue

that the inclusion of duplicative Gateway Factors is unconstitutional. (Id. at 34-35.)

In response, the Government argues that New York murder law has no relevance to the

charging of multiple mental states as Gateway Factors under the FDPA. (See Gov. Pretrial Opp.

at 61-65.) It also contends that the Gateway Factors under § 3591(a)(2) are not aggravating

factors that are weighed by a jury, but, rather, are part of a gateway determination of death

penalty eligibility. (Id.) For this eligibility determination, the Government argues, it is

permissible to present multiple mental states to the jury. (Id.)

As an initial matter, the Government is correct that, as courts have held, there is no

constitutional violation, or violation of the FDPA, by virtue of the Government's presentation of

---

[32] The capital crime with which Basciano is charged "targets a person who, 'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders or threatens to commit a crime of violence against any individual in violation of the laws of any State or attempts or conspires to do so.'" United States v. Jones, 291 F. Supp. 2d 78, 86 (D. Conn. 2003) (quoting 18 U.S.C. § 1959(a)) (internal alterations omitted).

multiple Gateway Factors to the jury during the death-penalty eligibility determination.  See, e.g., United States v. Kee, No. 98-CR-778 (DLC), 2000 WL 863119, at *11 (S.D.N.Y. June 27, 2000) ("[T]he four enumerated mental states are not four separate aggravating factors, and are not in any sense unfairly duplicative of one another.").  Rather, the four enumerated mental states "simply assure that no one is sentenced to death without the Government having proved a sufficient level of mens rea in connection with the capital offense."  Id.  As evidenced by the many cases in which multiple Gateway Factors have been found, multiple mental states may be found by the jury and these mental states need not match the mental state found at the guilt phase.  See, e.g., United States v. Wilson, 04-CR-01016 (NGG), Special Jury Verdict Form (Docket Entry # 360) (E.D.N.Y. Jan. 30, 2007) (finding all four mental states to have been proven beyond a reasonable doubt).  In this regard, there is no defect with the Government's Notice of Special Findings.

Of course, while the Government may be permitted to charge intentional murder together with the mental state required under § 3591(a)(2)(D), this does not necessarily resolve the challenge here.  In this case, the death-eligible count charges Basciano with "knowingly and intentionally murder[ing] Randolph Pizzolo."  (S-9 Indictment ¶ 56.)  It is alleged, that this particular murder was carried out while Basciano was incarcerated, at his behest.  Although the court does not have before it the evidence the Government will present on this charge, it is clear that the charged murder took place outside of prison at a time when Basciano was in prison. This conduct appears to fit the third Gateway Factor:

> intentionally participat[ing] in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act.

18 U.S.C. § 3591(a)(2)(C).  But this does not resolve the issue of whether this conduct could also fit the Fourth Gateway Factor:

> intentionally and specifically engag[ing] in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

18 U.S.C. § 3591(a)(2)(D).

This issue is directly addressed in United States v. Baskerville, 491 F. Supp. 2d 516, 522 (D.N.J. 2007).  In that case, the defendant was tried and convicted on death-eligible charges resulting from a murder that he ordered from prison.  Id. at 517-18.  For the purposes of death-penalty eligibility – just as in this case – the Government charged the defendant as having "intentionally participated in an act contemplating that the life of a person would be taken" under § 3591(a)(2)(C), and with having "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person" under § 3591(a)(2)(D).

Following trial, the defendant moved to strike the Gateway Factor under § 3591(a)(2)(D), arguing that "there was no evidence that Defendant himself 'specifically engaged in an act of violence,'" as required by that provision.  Id. at 519.  The district court agreed.  In deciding the motion, Judge Pisano began by observing that the Supreme Court's death penalty jurisprudence requires the court to focus on the actions of the defendant, rather than his co-conspirators, in assessing the propriety of a death sentence.  Id.  The court concluded that this conduct was not sufficient to meet the statutory language in § 3591(a)(2)(D).  The court framed the issue as whether "the meaning of the phrase 'intentionally and specifically engaged in an act of violence' in subsection (D) . . . encompasses the act of 'ordering a hit.'"  Id. at 521.  Based on a reading of the statutory text, and interpreting the meaning of "act of violence" from various sources, including the dictionary, the court concluded that § 3591(a)(2)(D) required a

defendant to engage in an act involving the use of physical force which was not satisfied by ordering a killing.  Id. at 522.  The court further concluded that "specifically engaged" required a level of personal involvement in the killing which was not satisfied by ordering a killing.  Id.

Despite the Baskerville court's thorough analysis, this court declines to follow that case here.  As the legislative history of the FDPA makes clear,[33] the purpose of these Gateway Factors was to permit the death penalty when the mental state rises to the level of culpability found in Tison v. Arizona, 481 U.S. 137 (1987), where a defendant did not intentionally or even knowingly participate in the actual killing of the victim, but substantially participated in a felony that resulted in death and possessed the mental state of reckless indifference to human life.  The focus of Tison and the FDPA is on the mental state of the defendant, as demonstrated by a substantial participation in actions that resulted in the death, rather than on whether the defendant personally committed the act of violence or was in close physical proximity to the act.

Accordingly, it would be inconsistent with this purpose to hold that a defendant who ordered another to commit acts of violence posing a grave risk of death, which caused the death of another, could not possess the requisite mental state for the death penalty to be permissible.  In the case of a defendant who orders another to commit an act of violence, therefore, the words "specifically engage" ensure that the defendant personally was aware of and responsible for the type of conduct committed.  Further, it ensures the defendant played a sufficient role in bringing

---

[33]     "The intentional participation and 'reckless disregard for human life' standards stem from the Supreme Court's holdings in the cases of Enmund v. Florida, 458 U.S. 782 (1982) and Tison v. Arizona, 481 U.S. 137 (1987). The Committee understands these cases to hold that under certain particularly heinous circumstances, the Constitution permits the application of the death penalty where the defendant acted with a state of mind short of an intent to kill or in circumstances where an intent to kill can be imputed to the defendant.  These circumstances can include situations in which the defendant intentionally and substantially participated in actions that resulted in a death and where the defendant's participation in an act of violence constituted extreme reckless indifference for human life. The Committee believes that the reckless indifference standard is appropriate, on both policy and constitutional grounds, when a defendant may not necessarily have had an actual intent to kill, but engaged in an act of violence that manifested an extreme and reckless indifference for human life and resulted in death." H.R. Rep. 103-466 at 15.

about the specific act of violence so as to be responsible for the act committed, and it ensures the defendant possesses the mental state of reckless disregard as to its consequences.  It would be inconsistent with the relevant case law and the legislative history of the FDPA to limit the application § 3591(a)(2)(D) to cases where a defendant personally commits the act of violence or is in close proximity to the act of violence.  Accordingly, this court concludes that it is legally possible that a defendant, who was in prison at the time of the killing but ordered the act of violence resulting in death, could "intentionally and specifically engage[]" in an act of violence as required by § 3591(a)(2)(D).

This, however, does not end the matter.  At oral argument, the Government conceded that "the theory of the case, defense counsel correctly notes, is not a reckless-disregard theory, but rather an intent theory."  (Arg. Tr. at 78.)  The Government further conceded that since the Ggovernment is not arguing a reckless-disregard theory, there is a "risk of confusion to the jury" by "inserting a notion" of reckless-disregard theory.  (Id.)  Since the Government concedes that a reckless-disregard theory is not consistent with its theory of the case, the risk of confusing the jury outweighs the minimal benefit of allowing the jury to consider this theory.  Though the Government is not precluded as a matter of law from pursuing both theories of culpability, given the Government's concession, the court finds it appropriate to strike the Gateway Factor under § 3591(a)(2)(D).  Should the Government's theory of the case change before the penalty phase, it can apply for reconsideration of this decision in light of that change.  Basciano's motion is GRANTED.

2.      Request to Strike Statutory Aggravators

Basciano asks the court to strike both of the Statutory Aggravating Factors that have been noticed by the Government.  As this court has previously observed, "[t]he court's screening of

aggravating factors is essential in directing and limiting the sentencing jury's discretion to prevent arbitrary and capricious imposition of the death penalty. Wilson, 493 F. Supp. 2d at 385. Aggravating factors should be neither unduly vague nor overbroad. See United States v. Bin Laden, 126 F. Supp. 2d 290, 298 (S.D.N.Y. 2001). The court in Bin Laden found that,

> First, the aggravator must not be so vague as to lack some common-sense core meaning that criminal juries are capable of understanding. Second, the aggravator cannot be overbroad such that a sentencing juror fairly could conclude that the aggravating circumstance applies to every defendant eligible for the death penalty. Third, the aggravator must be sufficiently relevant to the question of who should live and who should die. Fourth, even if relevant, the aggravator may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

Id. (internal citation and quotation marks omitted)

Basciano moves to strike: (1) Statutory Aggravating Factor of Substantial Planning and Premeditation; and (2) each of the prior convictions the Government intends to rely on in support of the Statutory Aggravating Factor of Previous Conviction of Violent Felony Involving Firearm.

a.     Substantial Planning and Premeditation

Basciano moves to strike the Statutory Aggravating Factor of Substantial Planning and Premeditation under § 3592(c)(9). (See S-9 Indictment ¶ 74(e).) He argues that the statutory text requiring a determination of whether the planning was "substantial" is too vague and imprecise to meet constitutional standards of notice, and must therefore be stricken. (Def. Death Penalty Mem. at 120-22.)

Numerous courts have rejected constitutional challenges to the Substantial Planning Factor under § 3592(c)(9). See, e.g., United States v. Bourgeois, 423 F.3d 501, 511 (5th Cir. 2005) (ruling that § 3592(c)(9) adequately narrows the class of defendants eligible for the death penalty and is not unconstitutionally vague); Williams, 2004 WL 2980027, at *17 ("Defendants argue that the term 'substantial' is unconstitutionally vague. This argument has been rejected by

numerous other courts."); <u>United States v. Bin Laden</u>, 126 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2001) (summarily rejecting a challenge to, among others, this Statutory Aggravating Factor, because it had been "subject to thorough analyses and rejection by other courts") (citing cases). This court joins these other courts and adopts their reasoning. Accordingly, Basciano's motion to strike the Substantial Planning and Premeditation Factor is DENIED.

        b.    <u>Previous Conviction of Violent Felony Involving Firearm</u>

The Government has noticed its intent to rely on the Statutory Aggravating Factor of Previous Conviction of Violent Felony Involving [a] Firearm under 18 U.S.C. § 3592(c)(2). (S-9 Indictment ¶ 74(d).) In its September 22, 2008 disclosure regarding the Statutory Aggravating Factors, the Government stated its intention to rely upon two of Basciano's previous convictions in support of this Statutory Factor: convictions on June 19, 1987 ("1987 Conviction") and April 8, 2008 ("2008 Conviction"). (<u>See</u> Gov't's Letter of Sept. 22, 2008 ("Voluntary Disclosure") (Docket Entry # 528).) As the Government points out, the 2008 Conviction reflects jury verdicts of guilty for the attempted murder of David Nunez and for the murder of Frank Santoro. (<u>See</u> Gov. Pretrial Opp. at 46-47.) According to the Government, evidence was presented at the <u>Basciano I</u> trial regarding these murders showing that Basciano and another individual "shot David Nunez several times and were arrested in possession of their firearms by law enforcement officers as they tried to escape from the scene of the shooting," and that "Basciano shotgunned Santoro to death outside Santoro's home in the Bronx, New York." (<u>Id.</u> at 47.) The Government also points to Basciano's 1987 Conviction for criminal possession of a firearm in the third degree; the 1987 Conviction was used as part of the evidence against Basciano with respect to the Nunez attempted murder. (<u>Id.</u>) The Government thus contends that these convictions constitute violent felonies involving firearms.

Basciano seeks to preclude the Government's reliance on both of these convictions. As set forth below, the court rejects Basciano's arguments. The Government will be permitted to rely on both convictions. In doing so, however, the court observes that a full re-litigation of the underlying convictions is not appropriate. See United States v. Chong, 98 F. Supp. 2d 1110, 1121 (D. Haw. 1999) ("[T]he Court concludes that the Government is entitled to introduce information concerning the underlying circumstances of Defendant's prior convictions. However, the Court cautions both parties that such information should be limited. The Court will not permit either party to relitigate the merits underlying the convictions because of concerns of waste of time, cumulative evidence, and confusion of the issues."). Instead, it is appropriate for the parties to introduce the "appropriate amount of information" about these convictions for the jury to determine whether the Statutory Aggravator is satisfied and "to provide the necessary context for the jury to perform its weighing function." Id. The court reiterates that Basciano *will not* be permitted to relitigate the validity of the convictions. With this being stated, the court turns to Basciano's challenges to the two convictions.

i.    The June 19, 1987 Conviction

Basciano argues that the Government should not be entitled to rely on the 1987 Conviction for criminal possession of a firearm in the third degree. Basciano argues that the elements of the weapon possession offense charged do not include "the use, attempted use, or threatened use of a firearm," and "no admission as to such use, attempted or threatened use was made by the defendant." (Def. Pretrial Mem. at 23.) He argues that the elements of the crime to which he pleaded guilty included only possession, or aiding and abetting possession, of a firearm, and that the court should not look to the facts underlying the conviction to determine whether it was a violent felony. (See id. at 23-25.)

In response, the Government argues that the 1987 Conviction involved the violent use of a firearm. (See Gov. Pretrial Opp. at 48-54.) Namely, Basciano attempted to murder David Nunez by shooting him and was arrested in possession of a firearm fleeing the scene of the crime. (Id.) The Government asserts that jury may appropriately look to the underlying facts, rather than merely the statutory elements, to determine this. (Id.) The Government contends that looking only to the elements of the conviction is inappropriate based upon the language of § 3592(c)(2), which only requires a prior conviction *involving* the use, attempted use, or threatened use of a firearm. (Id. at 49-50.) By contrast, it argues, other statutes define previous convictions by reference to what the *elements* of the offenses of conviction are, and had congress intended to similarly limit 3592(c)(2), it would have done so explicitly. (Id.) The Government urges the court to rely on this interpretation to allow consideration of the facts underlying the conviction. (Id. at 48-54.)

The Statutory Aggravator under § 3592(c)(2) applies when "the defendant has previously been convicted of a Federal or State offense . . . involving the use or attempted or threatened use of a firearm . . . against another person." The issue presented to the court is how to construe the language of § 3592(c)(2) – that an "offense . . . involv[es] the use or attempted or threatened use of a firearm . . . against another person."

The court begins with the approach taken by the Fourth Circuit in United States v. Higgs, 353 F.3d 281, 316-17 (4th Cir. 2003). In Higgs, the defendant had argued, as Basciano does, that, under § 3592(c)(2), the "court must take a 'categorical' approach to determining whether a prior felony conviction involved the use of a firearm, *i.e.*, the court may only look to the fact of conviction and the statutory definition of the crime of conviction to determine whether a firearm was involved, not to the particular facts of the case." Id. at 316. The court focused on the

difference between the language of § 3592(c)(2), which uses the phrase "involving the use or attempted or threatened use of a firearm," and other statutes in which "Congress has specified that a predicate offense have certain elements" that have been interpreted to require a categorical approach. Id. at 316. Such language, according to the Fourth Circuit, "authorizes and likely requires the court to look past the elements of the offense to the offense conduct." Id. Furthermore, the court noted that this approach is consistent with "an individualized determination is required in the death penalty context." Id. at 317

Since the Fourth Circuit decided Higgs, however, the Supreme Court has applied the categorical approach to provisions of the Armed Career Criminal Act ("ACCA") that use the term "involve," rather than referring to the elements of a crime. See James v. United States, 550 U.S. 192, 204-06 (2007). In James, the Supreme Court extended the categorical approach to provisions of the ACCA that referred to crimes that "involve conduct that presents a serious potential risk of physical injury to another." Nijhawan v. Holder, 129 S. Ct. 2294, 2300 (2009) (quoting ACCA). James suggests, therefore, that Congress' use of the term "involve" may not be sufficient on its own to determine the proper interpretive approach to § 3592(c)(2).[34]

In this regard, a recent Eighth Circuit case, United States v. Rodriguez, is instructive. 581 F.3d 775, 806 (8th Cir. 2009). In deciding the proper approach to § 3592(c)(4) – the Statutory Aggravating Factor for having two convictions "involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person" – the Rodriguez court observed that "the meaning of 'involving' does not resolve the issue." Id. at 806. Instead, the court had to "examine[] the structure and language of the [FDPA]." Id.

---

[34] Unlike the provision at issue in James – which contains some language referring to elements of crimes and other language using the term "involving," – § 3591(c) does not contain any subsections referring to the "elements" of crimes, but only uses the term "involving" when referring to the nature of past convictions. Compare 18 U.S.C. § 924(e) with 18 U.S.C. § 3591(c).

Contrasting the ACCA (to which the Supreme Court had applied a categorical approach), the Eighth Circuit thoroughly detailed the features of the FDPA that required a circumstance-specific approach. It explained:

> First, unlike sentence enhancements under the ACCA, a sentence of death does not automatically result if the defendant has qualifying predicate offenses under § 3592(c)(4). Rather, if the jury finds at least one § 3592(c) factor, it may – but does not automatically – impose the death penalty after weighing aggravating factors against mitigating factors. Becoming eligible for a sentence, as opposed to automatically receiving one – an important structural difference between § 3592(c)(4) and the ACCA – counsels against applying <u>Taylor</u> analysis to the screening function of § 3592(c)(4).

> Second, unlike the ACCA, the FDPA mandates a fact-intensive process in death-eligible proceedings. In advance of trial, the government must set forth the aggravating factor or factors that it proposes to prove as justifying a sentence of death. . . . When a defendant is found guilty of a death-eligible offense, no Pre-Sentence Report is prepared. Instead, during the penalty phase, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592.

> Beyond the FDPA, the factual inquiry required in death penalty cases has constitutional significance. Statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.

> Factual inquiry is not permitted under the ACCA. Factual inquiry is required in death penalty sentencing. <u>Taylor</u> prohibits relying on witness testimony in ACCA cases; the FDPA expressly permits witnesses to testify. In <u>Taylor</u> cases, Pre-Sentence Reports are prepared, allowing advance opportunity to dispute prior convictions. PSRs are not prepared in death penalty cases. This court concludes that <u>Taylor</u> analysis is inapplicable to the § 3592(c)(4) factor, which should instead be submitted to the jury.

<u>Id.</u> at 806-07 (internal citations, quotation marks, and alterations omitted).

The court finds that the reasoning of the Eighth Circuit with respect § 3592(c)(4) is well reasoned, is persuasive, and applies equally to § 3592(c)(2). The court is also persuaded by the

approach of the Fourth Circuit in <u>Higgs</u>.[35]  Should a penalty phase be reached in this case, an

individualized determination will be appropriate, and the jury shall have the opportunity to

consider whether the 1987 Conviction "involv[ed] the use or attempted or threatened use of a

firearm . . . against another person."  § 3592(c)(2).  However, the court notes that proving that

the 1987 Conviction "involved the use" of a firearm "against another person" could require the

Government to prove substantial facts in addition to the statutory elements of the crime of

conviction.  Depending upon how the Government intends to prove this aggravator, if a penalty

phase is reached, the court may need to determine whether proof of the facts underling the 1987

conviction, unlike the 2008 conviction, would create a distracting trial within a trial.[36]

Basciano's motion is DENIED.

ii.     The April 8, 2008 Conviction

Basciano argues that the 2008 Conviction cannot be used to support the Statutory

Aggravating Factor under § 3592(c)(2) because it is neither a "final" nor a "previous"

conviction.  (Def. Pretrial Mem. at 26-33.)  He argues that the conviction is not "final" because it

is currently on appeal, and that it is not "previous" because, at the time of the Pizzolo murder he

had not yet been convicted.  (<u>See</u> <u>id.</u>)  Basciano further argues that because Defendant filed

another Rule 33 motion challenging his <u>Basciano I</u> conviction – which this court denied (<u>see</u>

---

[35]     The court thus disagrees with the conclusion in <u>United States v. Smith</u>, 630 F. Supp. 2d 713, 718 (E.D. La. 2007), in which the district court applied the categorical approach and rejected <u>Higgs</u>.  The court is not persuaded that this approach adequately considers the structure of the FDPA and the need for the individualized sentencing, as recognized in <u>Higgs</u>, <u>Rodriguez</u>, and other cases.  <u>See also</u> <u>United States v. Anh The Duong</u>, CR-01-20154 (JF), 2010 WL 275058, at *3 (N.D.Cal. Jan. 14, 2010) (following <u>Rodriguez</u> and <u>Higgs</u> in rejecting the "categorical approach" to § 3592(c)(2)); <u>Chong</u>, 98 F. Supp. 2d at 1120-21.

[36]     While this case would not require relitigation of the merits of the conviction, it would require litigation of a wide range of facts surrounding the conviction, and thus could trigger concerns of waste of time, cumulative evidence, and confusion of the issues.  <u>Chong</u>, 98 F. Supp. 2d at 1121 ("[T]he Court concludes that the Government is entitled to introduce information concerning the underlying circumstances of Defendant's prior convictions. However, the Court cautions both parties that such information should be limited. The Court will not permit either party to relitigate the merits underlying the convictions because of concerns of waste of time, cumulative evidence, and confusion of the issues. However, the Court will permit an appropriate amount of information to provide the necessary context for the jury to perform its weighing function.").

<u>Basciano I</u> Memorandum & Order of Aug. 19, 2010 (Docket Entry # 1157) – this further

supports barring the 2008 conviction from being used at penalty phase.  (Letter of April 8, 2010

(not filed on the public docket).)  In response, the Government argues that § 3592(c)(2) does not

require the 2008 Conviction be "final," because it only speaks of a previous conviction.  (<u>See</u>

Gov. Pretrial Opp. at 54-57.)  The Government also argues that Basciano need not have been

convicted of the 2008 Conviction at the time of the Pizzolo murder; instead, the conviction need

only have occurred prior to sentencing.  (<u>See</u> <u>id.</u> at 57-60.)

The court concludes that the 2008 Conviction is appropriately included in support of

§ 3591(c)(2).  First, § 3592(c)(2) does not explicitly require that his conviction be "final" to be

considered by the jury at the penalty phase.  The provision only requires that Basciano have been

"previously . . . convicted," and makes no mention of the word "final."  This exclusion stands in

contrast to other provisions of the federal code, which specifically use the term "final."  <u>See, e.g.</u>,

18 U.S.C. § 3559(c)(1)(A) (requiring prior conviction for certain felonies to have become "final"

before mandatory life imprisonment applies); 21 U.S.C. § 841(b)(1) (requiring prior convictions

to have "become final" before mandatory minimum applies).  In such circumstances, a

conviction is not "final" until "all avenues of direct appellate review have been exhausted."

<u>United States v. Lovell</u>, 16 F.3d 494, 497 (2d Cir. 1994) (interpreting 21 U.S.C. § 841(b)(1)(B));

<u>see</u> <u>United States v. Glen</u>, 418 F.3d 181, 186 (2d Cir. 2005) (interpreting 21 U.S.C. §

841(b)(1)(A)).  Without such a finality requirement included in § 3592(c)(2), it appears that

Congress did not intend to require the conclusion of direct review before a conviction could be

considered.

Basciano argues, however, that, the Supreme Court has read the word "final" into federal

recidivist statutes, even though these statutes have been silent on the issue of the finality of a

conviction.  (See Def. Pretrial Mem. at 27-29.)  For support, he relies on <u>Custis v. United States</u>, 511 U.S. 485 (1994), in which the Supreme Court held that "with the exception of convictions obtained in violation of the right to counsel, a defendant in a federal sentencing proceeding has no right collaterally to attack the validity of previous state convictions that are used to enhance his sentence under the Armed Career Criminal Act."  <u>United States v. Doe</u>, 239 F.3d 473, 475 (2d Cir. 2001).  Basciano relies upon language in <u>Custis</u> holding that a "prior final conviction" need not be "subject to collateral attack . . . before it may be counted" to imply that a conviction must be a final conviction in order to be counted.  (See Def. Pretrial Mem. at 29.) Basciano contends that a later Supreme Court decision, <u>Daniels v. United States</u>, 532 U.S. 374 (2001), supports his argument.  From these cases, Basciano argues that there is no "apparent reason why a Court would read a finality requirement into 18 U.S.C. § 924(e) (as the Supreme Court did in <u>Custis</u>), but not read a similar requirement into . . . 18 U.S.C. § 3952(c)."  (See Def. Pretrial Mem. at 29-30.)

Basciano, however, misreads <u>Daniels</u> and <u>Custis</u>.  Contrary to Basciano's contention, the <u>Daniels</u> court stated that <u>Custis</u> held that "if, by the time of sentencing under the ACCA, a prior conviction has not been set aside on direct or collateral review, that conviction is presumptively valid and may be used to enhance the federal sentence."  <u>Daniels</u>, 532 U.S. at 382 (2001).  The <u>Daniels</u> Court explained that "[a]fter an enhanced federal sentence has been imposed pursuant to the ACCA, the person sentenced may pursue any channels of direct or collateral review still available to challenge his prior conviction."  <u>Id.</u> at 382.  "If any such challenge to the underlying conviction is successful, the defendant may then apply for reopening of his federal sentence."  <u>Id.</u> This reasoning implicitly recognizes that a previous conviction may be relied upon to enhance a sentence under the ACCA while it is pending upon direct review, and thus is not yet final, so

long as it has not yet been set aside on direct or collateral review.  The court rejects Basciano's

contention that <u>Custis</u> counsels the court to read "final conviction" into the term "conviction"

under § 3592(c)(2).  Accordingly, the court concludes that, under the clear language of §

3592(c)(2), a conviction need not be final in order for it to be considered by a jury at the penalty

phase.

Moreover, the court rejects Basciano's contention that the 2008 Conviction is not a

"previous conviction" under § 3592(c)(2).  The Fourth Circuit addressed this challenge in <u>Higgs</u>,

as it relates to a similarly worded statutory aggravator § 3592(c)(12), and the court follows that

decision here.  In <u>Higgs</u>, the Fourth Circuit reasoned that "[a]lthough it easily could have done

so, Congress did not specify that either the prior offense or conviction had to occur before the

death penalty offense.  On the contrary, the entire section speaks in terms of those things that

must be considered when the death sentencing hearing is conducted and the petit jury begins its

weighing process."  353 F.3d at 318.  Like the Statutory Aggravating Factor considered in <u>Higgs</u>,

§ 3592(c)(2) "does not concern matters directly related to the death penalty offense.  Rather, it is

concerned with the characteristics of the offender as of the time that he is sentenced."  353 F.3d

at 318.  The court is persuaded by the Fourth Circuit's consideration of this issue and concludes

that the 2008 Conviction can properly be presented to the jury in support of the Statutory

Aggravating Factor under § 3592(c)(2).[37]  The court further notes, that because relitigation of the

merits of previous convictions will not be allowed, Basciano will not, as he contends, "have the

right to convince the jury of the unreliability of any prior, but not final, conviction."  (Def.

Pretrial Mem. at 33.)  Basciano's motion is DENIED.

---

[37]     Basciano's citation to *ex post facto* cases dealing with reliance on statutory aggravating factors added to the
death-penalty statute after a defendant's commission of the crime are inapposite.  (See Def. Pretrial Mem. at 30-31.)

3. <u>Request to Strike Non-Statutory Aggravators</u>

Basciano challenges the Government's reliance on the Non-Statutory Aggravating Factors and seeks to have all stricken. First, he challenges the reliance on Non-Statutory Factors as a general matter. (Def. Death Penalty Mem. at 123-25.) The court summarily rejects this argument. As numerous courts have held, "[t]he plain text of the FDPA . . . authorizes the use of factors not specifically enumerated in the statute." <u>United States v. Barnes</u>, 532 F. Supp. 2d 625, 643 (S.D.N.Y. 2008); <u>see also</u> <u>Wilson</u>, 493 F. Supp. 2d at 523.

Basciano also objects to five of the six noticed Non-Statutory Aggravating Factors on the ground that the Factors are impermissibly duplicative. (Def. Death Penalty Mem. at 126-32.) Basciano argues that the Government "should not be permitted to 'ratchet up the number of aggravating factors,' by quintuple-counting allegations premised exclusively on 'other crimes' evidence for which Basciano is not facing the death penalty." (<u>Id.</u> at 128 (quoting <u>Bin Laden</u>, 126 F. Supp. 2d at 300).) Basciano finds support in the fact that the sub-factors of the "future dangerousness" Aggravating Factor are similar to, and rely largely on, the same evidence as the other Aggravating Factors. (<u>Id.</u> at 128.)

As the Second Circuit recently observed, "the circuit courts are split as to whether duplicative aggravating factors are unconstitutional." <u>Fell</u>, 531 F.3d at 235 n. 26. Neither the Supreme Court nor the Second Circuit has resolved the question. <u>Id.</u> at 235-36. Nonetheless, this court has recognized, as other courts have, that "[t]here do exist circumstances in which two non-identical aggravating factors should be deemed impermissibly duplicative." <u>Wilson</u>, 493 F. Supp. 2d at 388 (quoting <u>Bin Laden</u>, 126 F. Supp. 2d at 299). This is because, "[u]nder a weighing death penalty scheme such as the FDPA, an aggravator that is entirely a subset of another 'has a tendency to skew the weighing process and creates the risk that the death sentence

will be imposed arbitrarily and thus unconstitutionally.'" <u>Bin Laden</u>, 126 F. Supp. 2d at 299

(quoting <u>United States v. McCullah</u>, 76 F.3d 1087, 1111 (10th Cir. 1996)).  However, "[t]wo

factors are not duplicative merely because they are supported by the same evidence." <u>Fell</u>, 531

F.3d at 236.

Basciano's argument focuses on the Government's reliance on overlapping evidence to

prove the different Aggravating Factors.  The use of same evidence to prove multiple Factors,

however, is not in itself impermissible.  The focus of the inquiry, rather, is on whether the jury in

finding two Aggravating Factors as a whole "would necessarily have to find one in order to find

the other," regardless of the evidence which proves them.  <u>Fell</u>, 531 F.3d at 236 (quoting <u>Johnson</u>

<u>v. Gibson</u>, 169 F.3d 1239, 1252 (10th Cir. 1999)).  None of the Aggravating Factors here are

duplicative.  While the facts supporting a jury finding that defendant (1) murdered Pizzolo to

increase his standing and leadership in a criminal enterprise, (2) obstruction of justice, (3) had

contemporaneous convictions, (4) or participated in additional uncharged homicides would

possibly support the finding that Defendant poses a threat of (5) "future dangerousness," none of

these aggravators is necessary or sufficient to that finding.  Furthermore, each of these factors

speaks to a different relevant aspect of a defendant's character and his alleged crime.  For

example the jury's consideration of whether a defendant continues to present a danger assesses

what punishment is necessary for incapacitation.  On the other hand, the fact that a defendant has

committed additional homicides and other violent crimes could demonstrate a greater degree of

culpability than another offender with no history of violent crimes.  Consequently, none of the

aggravating factors is impermissibly duplicative of another.

Basciano's general challenges to the Non-Statutory Aggravating Factors are DENIED.

a.    <u>Future Dangerousness</u>

Basciano moves for the Future Dangerousness Non-Statutory Aggravating Factor to be stricken.  (Def. Pretrial Mem. at 35-37.)  He contends that future dangerousness must be considered "as it applies in the context of life in a prison setting."  (Id.)  He argues that the fact that he is designated to serve his life sentence at an "Administrative Maximum (ADX) facility" ("Supermax") effectively nullifies any threat of future dangerousness.  (<u>Id.</u>)  He also argues that his detention under SAMS measures has nullified any risk of future dangerousness.  (<u>Id.</u>)  Accordingly, he contends that evidence of Future Dangerousness will confuse the issues before the jury.  (<u>Id.</u>)

In response, the Government argues that Basciano's long history of engaging in violence, including ordering others to engage in violence while he was incarcerated, support this Factor.  (Gov. Pretrial Opp. at 65-68.)  It argues that this safety risk exists despite his designation at a highly secure Supermax facility.  (<u>Id.</u>)  The Government contends that its evidence will show that other inmates have ordered murders from Supermax facilities and other organized crime leaders have been able to pass messages from those facilities.  (<u>Id.</u> at 66.)  The Government further argues that the SAMS measures have never eliminated the security risk posed by Basciano.  (<u>Id.</u> at 66-67.)  Finally, the Government opposes Basciano's contention that inclusion of a Future Dangerousness Factor will confuse the issues before the jury.  (<u>Id.</u> at 67-68.)

"[L]ower courts have uniformly upheld future dangerousness as a non-statutory aggravating factor in capital cases under the FDPA, including instances where such factor is supported by evidence of low rehabilitative potential and lack of remorse."  <u>Bin Laden</u>, 126 F. Supp. 2d at 303-04.  When a sentence of life in prison would be the alternative to a penalty of death, however, courts have required the future dangerousness inquiry to be considered in the

context of a prison setting.  See, e.g., United States v. Llera Plaza, 179 F. Supp. 2d 464, 487-

88 (E.D. Pa. 2001) ("[I]n the FDPA context, government arguments regarding 'future

dangerousness' should be limited to the dangers posed by the defendants while serving a life

sentence in prison."); see also United States v. Cooper, 91 F. Supp. 2d 90, 111-12 (D.D.C. 2000).

The Government does not argue to the contrary.  The Government's list of evidentiary

support for the Future Dangerousness Factor is substantially directed toward Basciano's conduct

while incarcerated.  For example, the Government will rely upon Basciano's "Membership in an

Organized Criminal Enterprise," specifically stating that it intends to show that he has

"continued participation in that criminal enterprise despite incarceration."  (Notice of Intent at 3.)

Similarly, the Government will rely upon Basciano's "Low Rehabilitative Potential," and has

noticed "his continued participation in criminal activities despite incarceration."  (Id. at 4

(emphasis added).)  The Government also intends to rely on Basciano's "Specific Threats of

Violence While in Prison."  (Id.)  In other words, much of the Government's Notice of Intent

focuses on Basciano's conduct while incarcerated.

The focus of Basciano's challenge is whether the measures taken by the Government to

incapacitate Basciano have effectively nullified his future dangerousness while incarcerated.  In

this regard, Basciano points to the concern stated in United States v. Diaz, that "[i]f . . . the

government's incarceration protocols would nullify [a] defendant['s] dangerousness,

presentation of [future dangerousness] evidence to the jury would not be relevant to the

sentencing determination."  2007 WL 656831, at *23.  The possibility that such protocols or

other measures might serve to limit or undermine the safety threat posed by a defendant does not

require the Future Dangerousness Factor to be stricken in this case.

In the circumstances of this case, the jury's consideration of future dangerousness in the prison context is appropriate. The guilt-phase charges relate, in part, to Basciano's alleged criminal conduct occurring in the prison environment. The death-eligible count specifically concerns the commission of a murder ordered by Basciano that occurred while Basciano was in the confines of prison. The Government also intends to prove other acts committed by Basciano while in prison, and in some cases under SAMS, that show Basciano's continued dangerousness while in pretrial detention. These circumstances support consideration of future dangerousness, in the context of a prison environment, as an Aggravating Factor in this case.

Further, the court need not conclude that the circumstances of Basciano's confinement have already "nullified" Basciano's dangerousness.[38] The parties have both pointed to specific information on each side of the issue, and both Basciano and the Government will have the opportunity to offer appropriate information to the jury. It will then be appropriate for the jury to determine whether Basciano "is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others," as noticed by the Government. (Notice of Intent at 3.)

The court declines to strike the Non-Statutory Factor of Future Dangerousness. In order to ensure the proper consideration of this Factor by the jury, however, the court will ensure that that Jury's consideration is limited to the expected circumstances of Basciano's confinement should the death penalty not be imposed. Basciano's motion to strike the Non-Statutory Factor of Future Dangerousness is DENIED.

---

[38] Since the imposition of SAMS, the court has noted the continuing danger presented by the Defendant. (See, e.g., Particulars Order at 7 ("The risk of danger is a pervasive, omnipresent concern in this prosecution.").)

b.        <u>Murder to Increase Standing in a Criminal Organization</u>

Basciano moves to strike the Non-Statutory Aggravating Factor, Murder to Increase

Standing in a Criminal Organization.  (<u>See</u> Def. Pretrial Mem. at 37-38.)  He argues that, during

the guilt phase, the Government will be required to prove that Basciano committed a murder to

increase his standing in an organized crime family; he therefore argues that, when he enters the

penalty phase, the jury will already have determined this Non-Statutory Aggravating Factor.

(<u>Id.</u>)  Basciano argues that he should not have to enter the penalty phase with one Non-Statutory

Aggravating Factor already determined against him.  (<u>Id.</u>)

This argument was made and rejected in <u>United States v. Frank</u>, 8 F. Supp. 2d 253, 274-

76 (S.D.N.Y. 1998), and the court does so here.  In <u>Frank</u>, Judge Cote considered whether the

Statutory Aggravating Factor that the "homicide occurred during the commission of a

kidnapping" was "unconstitutionally 'duplicative' of the underlying death-eligible offense with

which he is charged – i.e., kidnapping in which a death results."  8 F. Supp. 2d at 274.  First, the

court rejected the argument that the aggravator does not genuinely narrow the class of persons

eligible for the death penalty by holding that "[t]he Eighth Amendment does not require that [a

defendant] be compared to all other defendants found guilty of a kidnapping in which death

results, but rather that he be compared to all other persons who have committed murder," and

thus the Aggravator provides meaningful narrowing.  <u>Id.</u> at 274-75.  Second, the <u>Frank</u> court

rejected the argument that the duplicative aggravator would tip the aggravator-mitigator

weighing process in favor of death because the aggravator would already have been found by the

jury.  <u>Id.</u> at 276.  The <u>Frank</u> court reasoned that "[o]nce the penalty phase has begun, the jury is

asked to consider only once the fact that the murder occurred in the course of the commission of

another crime.  That the jury may find it relatively easy, based on its guilty verdict, to find the

existence of this factor does not unfairly tip the scales toward death." Id. at 276.  Finally, the

Frank court further held that "ignoring the crime at sentencing would be inconsistent with the

Supreme Court's jurisprudence holding that the sentencer must take into account the individual

characteristics of the crime and the defendant." Id. at 277.

The reasoning in Frank applies with equal force to the Non-Statutory Aggravating Factor

in this case of Murder to Increase Standing in a Criminal Organization.  Accordingly, Basciano's

motion is DENIED.

### c.     Obstruction of Justice

Basciano moves the court to strike the Obstruction of Justice Non-Statutory Aggravating

Factor.  (See Def. Pretrial Mem. at 38-46.)  Basciano concedes that Obstruction of Justice is a

"recognized non-statutory aggravator."  (Id. at 39.)  He argues, however, that the evidence the

Government intends to present in support of this Factor is not sufficiently reliable to be

introduced at the penalty phase.  (See id. at 46.)  In its Voluntary Disclosure, the Government

stated its intention to rely upon (1) the "solicitation to murder Salvatore Vitale," (2) the

"solicitation and conspiracy to murder Frank Coppa, Jr., Joseph Lino and the parents of Joseph

D'Amico," and (3) the "solicitation to murder the individuals on the List."  (Voluntary

Disclosure at 3.)  The Government also states that it intends to rely on the "solicitation to murder

AUSA Andres," though this is not mentioned specifically in the Government's Voluntary

Disclosure.  (Gov. Pretrial Opp. at 71.)  Basciano contends that these acts do not meet "the

relevance and heightened reliability components required to assume the significant role played

by a non-statutory factor under the FDPA and the Supreme Court's death penalty jurisprudence."

(Def. Pretrial Mem. at 45 (quoting United States v. Friend, 92 F. Supp. 2d 534, 545 (E.D. Va.

2000).)[39] He asks that, should this Factor not be stricken, the court conduct a reliability hearing with respect to this evidence.

The Government counters that each area of evidence is sufficiently defined, relevant, and reliable. (See Gov. Pretrial Opp. at 71-76.) With respect to the Vitale solicitation, the Government points out that this conduct was proven to a jury during Basciano I. (Id. at 72.) With respect to the List, the Government points to Judge Levy's conclusion, during litigation over the imposition of SAMS, that the Government's evidence on the List strongly indicated that it was intended be a hit list. (See id. at 73 (citing Basciano v. Martinez, No. 07-CV-421(NGG)(RML), 2007 WL 2119908, at *7 (E.D.N.Y. May 25, 2007).) With respect to the Coppa, Lino, and D'Amico solicitations, the Government concedes that this court determined in Basciano I that it had presented no factual basis to admit them, but argues that factual support is now available to substantiate them. (Id. at 72 n.23 (citing Basciano I Feb. 17 Order (Docket Entry # 491) at 11).)

The Vitale solicitation was tried and proven to a jury in Basciano I and the court finds that this establishes sufficient reliability to allow it to be presented to the jury during the penalty phase. The court has ruled to permit the Government to present evidence of the alleged AUSA Andres murder solicitation at the guilt phase of this trial. Accordingly, sufficient evidence of the solicitation will be presented to negate the need for a reliability hearing prior to the penalty phase. Basciano's motion with respect to both the Vitale and AUSA Andres solicitation is DENIED. With respect to the remaining two areas of evidence, each also involve unadjudicated conduct, and the court addresses them below.

---

[39] For example, Basciano argues that these acts were "just talk," and did not involve substantial steps towards obstruction of justice. (Id. at 45.) He also argues that none of these acts were presented by the Government in sentencing in Basciano I, which indicates that it must have been deemed insufficiently reliable by the Government at that time. (Id.) He argues that, without more relevant or reliable evidence, this Aggravating Factor is just duplicative of the Aggravating Factor, Membership in a Criminal Enterprise, and should be stricken. (Id. at 42-43.)

d.      Participation in Additional Uncharged Homicides, Attempted
        Homicides or Other Serious Crimes of Violence

Basciano moves the court to strike this Non-Statutory Aggravating Factor (the "Additional Uncharged Homicides Factor").  (Def. Pretrial Mem. at 47-50.)  Basciano concedes that every circuit to consider the issue has held that unadjudicated criminal conduct may be considered in the process of assessing aggravating factors in a capital case.  (Id. at 47 (citing United States v. Corley, 519 F.3d 716, 724 (7th Cir. 2008)).)  However, Basciano argues that "allegations of murder, murder conspiracy, and solicition to murder" are inflammatory and their admission would undermine the heightened reliability required in capital cases."  (Def. Pretrial Mem. at 47.)

In its Voluntary Disclosures, the Government noticed eleven areas of conduct which it intends to rely on in support of this Factor.  (See Voluntary Disclosure 3-4.)  Each one of these listed areas is also noticed as supporting the "Continuing Pattern of Violence" subsection of the Future Dangerousness Non-Statutory Aggravating Factor.  (See id. at 2.)  Two others also are duplicated in support of other Non-Statutory Aggravating Factors.  (See id. at 3 (listing solicitation to murder individuals on the List and solicitation to murder Coppa, Lino, and the parents of D'Amico in support of two additional Factors).)

Basciano places much emphasis on the "heightened reliability" standard throughout his papers, but never accurately states what is meant by "heightened reliability."  As the Second Circuit held in United States v. Fell, "the Supreme Court has also made clear that in order to achieve such 'heightened reliability,' more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors. . . .  [A] long line of Supreme Court cases [] have emphasized the importance of allowing the sentencing body to have full and complete information about the defendant."  360 F.3d 135, 143 (2d Cir. 2004).  The FDPA

evidentiary standard "permits the jury to have before it all possible relevant information about the individual defendant whose fate it must determine. As a result, the FDPA does not undermine 'heightened reliability,' it promotes it." Id. at 144. Furthermore, "evidence of other acts of violence by a defendant is arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty." United States v. Gilbert, 120 F.Supp.2d 147, 152 (D.Mass. 2000) (internal citation and quotation marks omitted).

Accordingly, other homicides, attempted homicides, or other serious crimes of violence are highly relevant to the jury's determination and this additional evidence furthers the heightened reliability of the penalty phase. To exclude this conduct from the jury, if such conduct can be proven, would frustrate the jury's ability to properly weigh aggravating and mitigating factors. However, the court will require the Government to prove the specific uncharged crimes unanimously and beyond a reasonable doubt, rather than only requiring this standard of proof for the Non-Statutory Aggravating Factor generally. See e.g., Gilbert, 120 F. Supp. 2d at 152 n.2 ("The Government will have to prove the commission of such crimes beyond a reasonable doubt.") (citing United States v. Cooper, 91 F. Supp. 2d 90, 108 (D.D.C. 2000). Further, the jury will be required to identify on the special verdict form which crimes have been proven to that standard.

Basciano's motion to strike the Additional Uncharged Homicides Factor is DENIED.

e.    Unadjudicated Criminal Conduct

In the penalty phase of a capital trial, the Government may rely on unadjudicated conduct in presenting its case to the jury. See United States v. Corley, 519 F.3d 716, 723-24 (7th Cir. 2008). Basciano argues, however, that the evidence the Government intends to present should be subject to a hearing to ensure that it meets the heightened standards of reliability for capital

cases. (See Def. Pretrial Mem. at 46, 48-50.) Some courts facing challenges to the reliability of prior unadjudicated conduct have first made a reliability assessment of the Government's evidence before it is introduced to the jury at the penalty phase. See, e.g., United States v. Corley, 348 F. Supp. 2d 970, 972 (N.D. Ind. 2004) (listing cases making a reliability assessment).

With respect to the List, the court is persuaded that sufficient reliability has been shown to offer this evidence. Judge Levy previously determined that sufficient indicia of reliability suggested that it was a hit list aimed at a judge, federal prosecutor, and cooperating witnesses. See Martinez, 2007 WL 2119908, at *7. The penalty phase is an adversarial proceeding and Basciano will have sufficient opportunity to rebut and counter the Government's evidence. As addressed above, Basciano even sought permission to admit evidence of the list at the guilt phase.

Furthermore, in order to prevent against the undue prejudice that could be caused by having my name, the name of the presiding judge, on the list, the court orders the list to be redacted so as to exclude the title "Judge" and my name from the list. Removing the word judge would remove the Defendant's concern that "if the presiding judge's name is redacted from the 'list,' then the jury speculates as to what judge was to be targeted if – it doesn't make sense to have a Santería procedure performed on a judge who's not the presiding judge." (Arg. Tr. at 103.) Basciano has expressed further concern that "[t]he redaction of Your Honor's name to create a blank between Mr. Andres and the three witnesses will have the effect of actually highlighting Mr. Andres, the alleged subject of the charged murder solicitation" and that "[i]f the jury is instructed that a name was deleted, we will be prejudiced by undue speculation . . . and

the redaction will be all the more sinister to the jury than submission of the complete list."

(Def.'s Letter of July 13, 2009 (Docket Entry # 726).)

The court finds the risk that the redaction will unduly draw attention to AUSA Andres's name to be entirely speculative and is, nonetheless, far outweighed by the alternatives of presenting the presiding judge's name to the jury or striking the evidence altogether. Even if another judge were to hear this case so that the presiding judge's name was no longer on the list, this court rejects the argument that having the jury consider allegations that Basciano plotted to kill the judge who presided over Basciano's former trial is somehow less prejudicial than having no judge named on the list at all. Furthermore, the concern that Basciano will be prejudiced by "undue speculation" can be remedied by providing the jury with an appropriate instruction. Consequently, in order to prevent bias against the Defendant pursuant to 18 U.S.C. 3593(c), the court ORDERS the list redacted as specified above.

With respect to the remaining unadjudicated conduct, including the alleged Coppa, Lino and D'Amico murder solicitations, the Government has identified numerous factual areas that it intends to rely upon. (See Voluntary Disclosure at 3-4.) The Government has provided additional details about this conduct in its Particulars Production, including allegations of numerous solicitations to murder, conspiracies to murder, and murders committed by Basciano. (See Gov't's Letter of Feb. 19, 2009 ("Particulars Production") (Docket Entry # 639).) These charges are numerous and vague. For example, they allege crimes against unnamed "John Doe" defendants and the "Murder of thirteen individuals" who are unnamed. (Id. at 2, 3, 5.) While this information was sufficient to satisfy the bill of particulars order, this showing is not sufficient for the court to ensure that the penalty phase evidence is sufficiently reliable to be introduced to the jury.

Should a penalty phase be necessary, the Government will be required to submit an affirmation to the court detailing the specific offenses it intends to present to the jury, including the expected testimony and evidence that will prove this uncharged conduct, so that the court may assess the reliability and sufficiency of this evidence.[40]  Once the Government has made this proffer, Basciano will have the opportunity to move to exclude particular evidence or for a reliability hearing.  The Government should be prepared to provide this affidavit upon completion of the guilt phase, so that the court can move forward expeditiously with a penalty phase, if necessary.  The parties should also prepare memoranda in advance of the completion of the guilt phase, that can be provided to the court should a penalty phase be reached, briefing the court on the applicable standard of review for the court to apply in determining the reliability of the evidence, the standard of review to be applied by the jury to the uncharged conduct, and how this standard depends upon the aggravating factor to which it will be applied.  At this time, Basciano has sufficient notice of the areas of evidence which the Government may rely upon. The court will assess reliability following the guilt phase, should it become necessary.

While the court need not decide the issue, the court is concerned with the number of alleged acts of uncharged crimes that the Government is considering introducing and with the limited evidence that appears to support some of these alleged crimes.[41]  The penalty phase, if one is reached, should be focused on those acts relevant to the jury's decision and will not be

---

[40]      The court declines to require a full hearing with witnesses, as the <u>Corley</u> court did, because given the amount of uncharged conduct at issue in this case, a reliability hearing like that in <u>Corley</u> would essentially require the penalty phase to be conducted twice – once before the court and once before a jury.  <u>See</u> 348 F. Supp. 2d 970. However, the court notes that the "screening of aggravating factors is essential in channeling, directing and limiting the sentencer's discretion to prevent arbitrary and capricious imposition of the death penalty."  <u>United States v. Cisneros</u>, 363 F. Supp. 2d 827, 833 (E.D. Va. 2005).

[41]      "In deciding whether to admit information regarding aggravating factors at sentencing, the Court must ensure that it is relevant, reliable and less prejudicial than probative.   At the same time, it should lean in favor of admitting as much information as possible to allow the jury to make an individualized determination of whether the defendant merits the death penalty."  <u>Cisneros</u>, 363 F. Supp. 2d at 833.

permitted to become a forum to try dozens of alleged, past, uncharged crimes.  The court further

notes that to be relevant, the government must have proof that this uncharged conduct rose to the

level of a sufficiently serious crime to be considered by a death penalty jury.  See United States

v. Gilbert, 120 F. Supp. 2d 147, 150 (D. Mass. 2000) ("[I]t is clear that to be a relevant

aggravating factor in favor of the death penalty, prior misconduct must at least be a crime, and a

grave one at that.").  Furthermore, while the court announces no decision at this time, some of

the alleged uncharged conduct, such as some of the arson-related or assault-related charges, may

not even rise to the level of sufficient seriousness to be introduced to a death penalty jury.  See

id. at 150 ("For a nonstatutory aggravating factor to be 'relevant' within the meaning of the

statute, it must be sufficiently relevant to the consideration of who should live and who should

die. . . .  [A]ggravating factors in death penalty cases must be particularly relevant to the

sentencing decision, not merely relevant, in some generalized sense, to whether defendant might

be considered a bad person.")  (internal citations and quotation marks omitted).

Basciano's motion DENIED as not ripe for review.

**D.    Motions for Particulars**

1.    Motion for Aggravator Particulars

Although the Government is not required to provide specific evidence in its Notice of

Intent, "courts have recognized that, 'at a minimum, due process requires a defendant to receive

sufficient notice of aggravating factors to enable him to respond and to prepare his case in

rebuttal.'"  Wilson, 493 F. Supp. 2d at 377 (quoting Llera Plaza, 179 F. Supp. 2d at 471).

Accordingly, this court has previously recognized judicial authority to order "bills of particulars

in connection with aggravating factors in the sentencing phase of a death penalty case."  Id. at

375.  A bill of particulars is not a discovery device, however, and should be ordered only as

necessary "to apprise the defendant of the charges against him with sufficient precision."  Id. at 369-70 (internal quotation marks omitted).

Basciano moves for particulars from the Government with respect to three facets of the Non-Statutory Aggravators of Future Dangerousness:  "Membership in an Organized Criminal Enterprise," "Low Rehabilitative Potential," and "Lack of Remorse."  (Def. Pretrial Mem. at 51-53.)  The Government has pointed to the following particulars that it will rely upon, citing to: evidence offered at previous trials, evidence produced during the SAMS litigation, as well as disclosures made in its Voluntary Disclosures and Particulars Production.  (See Gov. Pretrial Opp. at 84-87.)  The Government's briefing details the particular conduct that it will rely upon with respect to each of these areas.  (See id.)

Based on the particulars provided in the Government's briefing, relaying the specific conduct and evidence that the Government intends to rely upon – along with the Notice of Intent, the Notice of Special Findings, the Particulars Production, and the S-9 Indictment – further particulars with respect to these facets of future dangerousness are not required.  See Wilson, 493 F. Supp. 2d at 377.  Basciano's request for particulars is DENIED.

2.    Request for Victim Impact Evidence

In his briefing, Basciano moves for production of victim impact evidence that would be used at a penalty phase.  (Def. Pretrial Mem. at 50-51.)  The Government indicated that it would provide a written statement of proposed victim impact testimony before trial.  (Gov. Pretrial Opp. at 83 (citing United States v. Wilson, 493 F. Supp. 2d 491, 506 (E.D.N.Y. 2007)).)  On September 30, 2009, the Government provided Basciano with a summary of expected victim testimony.  (See Docket Entry # 791.)  The request is, therefore, DENIED as moot.

**V.      CONCLUSION**

As set forth above, the court GRANTS in part and DENIES in part Basciano's pretrial

motions.  To the extent that the court does not address arguments raised by Defendant in his

many submissions, the court has considered them and deems them to be either moot or without

merit.

SO ORDERED

                                                              /S/ Nicholas G. Garaufis
Dated:  Brooklyn, New York                  NICHOLAS G. GARAUFIS
        January 12, 2011                            United States District Judge