UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**

05-CR-060 (NGG)

-against-

VINCENT BASCIANO,

Defendant.
------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Vincent Basciano ("Basciano") is charged in a superseding indictment with various crimes, including murder and solicitation to murder in aid of racketeering, stemming from his alleged participation in the activities of the Bonanno organized crime family. (See S-12 Superseding Indictment ("S-12 Indictment") (Docket Entry # 1075).) The Government seeks the death penalty. On February 15 and 16 and March 1, 2011, the court, in the presence of the parties, distributed a detailed jury questionnaire consisting of 67 pages and 124 questions to over 650 jurors. On March 2, 2011, the court began conducting in person voir dire, questioning jurors individually, outside the presence of other jurors. Defendant has moved to strike potential Jurors 16 and 52. The Government has moved to strike potential Juror 3. The court grants in part and denies in part these motions.

**I.      LEGAL STANDARD**

In order to serve on a jury in a death penalty case, a juror must be both "death qualified" and "life qualified." These terms refer to a juror's ability to follow the instructions of the court and the juror's oath—being open to both implementing the death penalty or a sentence of life in prison in appropriate circumstances. See Morgan v. Illinois, 504 U.S. 719, 735-39 (1992)

1

(holding that a juror is not qualified to serve in a death penalty case if he would automatically impose a death sentence after a guilty verdict, without considering mitigating factors[1]);

Wainwright v. Witt, 469 U.S. 412, 424 (1985) (setting forth the standard for death qualification). In determining whether a juror is qualified,

> a prospective juror may be excluded for cause because of his or her views on capital punishment [when that] juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. That impairment occurs when those views "create an obstacle" to a prospective juror's impartial consideration of the law and the facts.

United States v. Fell, 531 F.3d 197, 210 (2d Cir. 2008) (quoting Wainwright v. Witt, 469 U.S. 412, 424, 434 (1985)) (internal citations and punctuation omitted).

In ruling on a motion to strike for cause, "voir dire need not establish juror partiality with unmistakable clarity. Rather, it must be sufficient to permit a trial judge to form a definite impression that a prospective juror would be unable to faithfully and impartially apply the law." United States v. Fell, 531 F.3d 197, 211 (2d Cir. 2008) (internal quotations omitted). This standard is required because,

> [m]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. This is why deference must be paid to the trial judge who sees and hears the juror.

United States v. Fell, 531 F.3d 197 (2d Cir. 2008) (quoting Wainwright v. Witt, 469 U.S. 412, 424-26 (1985)) (internal punctuation omitted). This impression is formed through an assessment

---

[1] Federal law provides that "[i]n determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including . . . factors in the defendant's background, record, or character or any . . . circumstances of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).

2

of both a juror's answers to the court's questions and the juror's demeanor, in addition to other factors that cannot be reduced to a court transcript and a written questionnaire. See Uttecht v. Brown, 551 U.S. 1, 7 (2007) ("[W]hen there is ambiguity in the prospective juror's statements, the trial court, aided as it undoubtedly is by its assessment of the venireman's demeanor, is entitled to resolve it in favor of the State" (internal quotation and punctuation omitted).).

The Supreme Court has "decline[d] to require the judge to write out in a separate memorandum his specific findings on each juror excused," noting that "[a] trial judge's job is difficult enough without senseless make-work." Witt, 469 U.S. at 430. The court, nonetheless, will provide written opinions for particular motions to strike where it deems appropriate.

## II. DISCUSSION

### A. Juror 3

Basciano moved to exclude Juror 3 for cause on the ground that he is not life qualified. The court agrees. The answers that this juror provided on his questionnaire, in addition to his testimony and demeanor in court, left the definite impression that he believes the death penalty is the only appropriate sentence in cases of intentional murder.

On his questionnaire, Juror 3 answered "yes" to the following question: "In your opinion is the death penalty the only appropriate sentence for a defendant who has been proven guilty beyond a reasonable doubt of deliberately and intentionally killing another person if, as here, the alternative sentence is life imprisonment without the possibility of release?" (Question # 87.) When asked in court if the death penalty is "the only appropriate sentence for someone who has been proven guilty of deliberate murder," the juror again answered "yes." (Mar. 2, 2011 Tr. at 31.) His demeanor throughout the court's examination indicated that he held this view unequivocally.

When the court asked the juror if he would "always vote for the death penalty in that case [of intentional murder]," the juror replied, "I couldn't—I wouldn't say always." (Id.) However, the juror was hesitant in this response. And, when questioned about circumstances in which he would be able to find life in prison—as opposed to the death penalty—a sufficiently harsh sentence, the juror cited cases of "accidental murder" (id. at 24) and mental illness (id. at 32.). From the context of the statements, the court finds it likely that the juror was referring to cases in which a defendant could not even be found guilty of a death eligible crime, let alone receive a death sentence. Although the juror stated that he could consider aggravating and mitigating factors in the penalty phase, the totality of his answers and his demeanor convinced the court that he would not be able to meaningfully consider a sentence of life in prison in cases of intentional and deliberate murder. Accordingly, this juror is not life qualified. The court, therefore, GRANTS Basciano's motion to strike Juror 3 for cause.

### B.   Juror 16

The Government moved to exclude Juror 16 for cause on the ground that he is not death qualified, and Basciano objected. The court grants the Government's motion.

While Juror 16 left much ambiguity as to his position on the death penalty in his questionnaire answers, his in-court questioning did not. To begin, Juror 16 answered "yes" to the following questionnaire question: "under the law, the question of punishment, if any, should not enter your deliberations on guilt or innocence. Would you have any difficulty following this rule?" (Question # 83.) He explained that, "I am not sure if I can give some[one] the Death penalty." (Id.)

While it is understandable for a juror to have reservations about such a serious decision, Juror 16 reiterated this position consistently in both his questionnaire answers and his in-court

questioning. For example, he answered the question which asked "Please describe your views on the death penalty," by writing "I beli[e]ve in the Death Penalty but not sure if I can vote for Death on a tr[ia]l." (Question # 85(a).) When asked "Please explain why you hold those views," he answered "I don't know if I can sleep at night knowing I killed someone." (Question # 85(b).) While he repeatedly indicated support for the death penalty in the abstract, in both his questionnaire and in-court questioning, he demonstrated that he could not personally perform the duties of a juror in this case.

In-court questioning cast further doubt upon Juror 16's ability to follow the court's instructions and his oath. Juror 16 stated his position on the death penalty as "I believe in it, but I don't know if I can convict someone of a death penalty." (Mar. 2, 2011 Tr. at 106.) Later, when asked if he could "impose the penalty of death, conceivably" for intentional and deliberate murder he answered, "No. No, I can't do that. . . . I'd just have trouble putting somebody to death." (Id. at 110.) His demeanor—hesitant, somber, and visibly uncomfortable—was as telling of his inability to serve as a juror as his words.

The limited circumstances in which Juror 16 stated that he would be willing to consider imposing the death penalty further demonstrates his inability to serve as a capital juror. When Juror 16 told the court who he thought "would deserve the death penalty" he said,

> [a] mass murderer, you know, like a 9/11 type person; meaning, these people had intentions to kill hundreds of people, innocent people just walking down the street, whatever, that's the type of person. Or killing like 20 or 30 people just for no reason, walking down the street, that's the type of person who should get the death penalty.

(Id. at 114.) As the Second Circuit has held, expressing ability to impose the death penalty only in the most extreme circumstances such as "genocide or mass murder" or, as here, the terrorist attacks of September 11, does not demonstrate a juror's ability to perform his duties in

accordance with his instructions and his oath.  See, e.g., Fell, 531 F.3d 197, 211-13, 215-16 (approving the dismissal of Jurors 64 and 195 who had expressed ability to impose the death penalty for "unforgivable types of war crimes" and a "serial killer or mass murder, say on a mass shooting spree," respectively (internal punctuation omitted)).

The court is left with the definite impression from Juror 16's written and spoken answers and from his demeanor that he is substantially impaired in his ability to follow the law. Consequently, the Government's motion to strike Juror 16 for cause is GRANTED.

### C. Juror 52

Basciano moved to exclude Juror 52 for cause on the ground that he is not life qualified and the Government objected.  Basciano's motion is meritless.

Basciano rests his argument that Juror 52 is substantially impaired on the potential juror's answer to questionnaire question ## 117 and 118.  Juror 52 answered the following questions in the affirmative: whether he "would be unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant is already serving a sentence of life imprisonment" (question # 117) or "was previously convicted of intentional murder" (question # 118).  Juror 52 added the following explanations respectively: "shows. life imprisonment is not enough for this case. Needs [death penalty]" (question # 117) and "Repeated killing and murder. can only be stopped by [death penalty]" (question # 118).  While the court agrees that the answers to these questions, in a vacuum, could be cause for concern, from the totality of Juror 52's questionnaire and his thoughtful, nuanced, and consistent answers in court there are no grounds from which the court could form *any* impression, let alone a definite one, that Juror 52 is substantially impaired in his ability to follow the court's instructions and his oath as a juror.

6

While Juror 52 "supports the death penalty," his answers to the questionnaire demonstrate a nuanced view of when the death penalty is appropriate, stating that "not all cases of killing deserve[] penalty of death [n]eeds to be judged case by case" (question # 88(a)); that "[d]eath penalty is the last resort. [U]se it spar[ingly] . . . otherwise, it would do [more] harm than good" (question # 93); that "[l]ife imprisonment is the right choice for most murderers" (question # 94); and that the "[death penalty] is the last resort.  Needs to be available but carefully applie[d] when it is the right choice" (question # 105). These answers demonstrate an ability to apply the law as instructed at both the guilt and penalty phases of a capital trial.

Juror 52's in-court questioning further demonstrates his suitability as a juror.  Throughout the court's rigorous questioning, Juror 52 gave thoughtful, consistent, and apparently heart-felt answers.  For example, when asked "is there a threshold of a number of murders that someone would have to be shown to have committed in order for you to impose the death penalty for sure" he responded "I don't know what to say because you cannot quantify how many times you consider as a threshold and it is definitely beyond a reasonable doubt and you need to impose death penalty but . . .  [i]t is a very tough question.  I think it should be—my position is that life, you know, imprisonment should not be ruled out, even though he did a killing it should not be ruled out." (Mar. 3, 2011 Tr. at 349.)  Juror 52 later stated that "I never impose a threshold number [of murders] saying which number, five or three, it's enough that he has to be die or something.  I always, you know, if I were at that deliberation of the penalty phase, I would still consider any other mitigation factors before I make a final decision on the capital punishment." (Id. at 352.)  From these answers, and numerous others, Juror 52 left the court with no reasonable basis to conclude that he is in any way impaired in his ability to apply the law as instructed.

Consequently, Basciano's motion to strike Juror 52 for cause is DENIED.

7

**II.    CONCLUSION**

As set forth above, the court GRANTS the motions to strike Juror's 3 and 16 and DENIES the motion to strike Juror 52.  Consequently, Juror 52 is deemed qualified to serve as a juror in this case.

SO ORDERED

Dated:  Brooklyn, New York
       March 8, 2011

    /s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge