UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA

        -against-

VINCENT BASCIANO,

                    Defendant.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**05-CR-060 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Defendant Vincent Basciano ("Basciano") is charged in a superseding indictment with various crimes, including murder and solicitation to murder in aid of racketeering, stemming from his alleged participation in the activities of the Bonanno organized crime family.  (See S-12 Superseding Indictment ("S-12 Indictment") (Docket Entry # 1075).)  The Government seeks the death penalty.  On February 15 and 16 and March 1, 2011, the court, in the presence of the parties, distributed a detailed jury questionnaire consisting of 67 pages and 124 questions to over 650 jurors.  On March 2, 2011, the court began conducting in person voir dire, questioning jurors individually, outside the presence of other jurors.  Basciano has moved to strike Jurors 64, 68, and 110 for cause.  The court grants in part and denies in part these motions.

**I.     LEGAL STANDARD**

      In order to serve on a jury in a death penalty case, a juror must be both "death qualified" and "life qualified."  These terms refer to a juror's ability to follow the instructions of the court and the juror's oath—being open to implementing the death penalty or a sentence of life in prison in appropriate circumstances.  See Morgan v. Illinois, 504 U.S. 719, 735-39 (1992) (holding that a juror is not qualified to serve in a death penalty case if he would automatically

1

impose a death sentence after a guilty verdict, without considering mitigating factors[1]);

Wainwright v. Witt, 469 U.S. 412, 424 (1985) (setting forth the standard for death qualification).

In determining whether a juror is qualified,

> a prospective juror may be excluded for cause because of his or her views on capital punishment [when that] juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. That impairment occurs when those views "create an obstacle" to a prospective juror's impartial consideration of the law and the facts.

United States v. Fell, 531 F.3d 197, 210 (2d Cir. 2008) (quoting Wainwright v. Witt, 469 U.S. 412, 424, 434 (1985)) (internal citations and punctuation omitted).

In ruling on a motion to strike for cause, "voir dire need not establish juror partiality with unmistakable clarity. Rather, it must be sufficient to permit a trial judge to form a definite impression that a prospective juror would be unable to faithfully and impartially apply the law." United States v. Fell, 531 F.3d 197, 211 (2d Cir. 2008) (internal quotations omitted). This standard is required because,

> [m]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. This is why deference must be paid to the trial judge who sees and hears the juror.

United States v. Fell, 531 F.3d 197 (2d Cir. 2008) (quoting Wainwright v. Witt, 469 U.S. 412, 424-26 (1985)) (internal punctuation omitted). This impression is formed through an assessment of both a juror's answers to the court's questions and the juror's demeanor, in addition to other factors that cannot be reduced to a court transcript and a written questionnaire. See Uttecht v.

---

[1] Federal law provides that "[i]n determining whether a sentence of death is to be imposed on a defendant, finder of fact shall consider any mitigating factor, including . . . factors in the defendant's background, record, or character or any . . . circumstances of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).

2

Brown, 551 U.S. 1, 7 (2007) ("[W]hen there is ambiguity in the prospective juror's statements, the trial court, aided as it undoubtedly is by its assessment of the venireman's demeanor, is entitled to resolve it in favor of the State" (internal quotation and punctuation omitted).).

The Supreme Court has "decline[d] to require the judge to write out in a separate memorandum his specific findings on each juror excused," noting that "[a] trial judge's job is difficult enough without senseless make-work." Witt, 469 U.S. at 430. The court, nonetheless, will provide written opinions for particular motions to strike where it deems appropriate.

## II.    DISCUSSION

### A.    Juror 64

Basciano moved to strike Juror 64 for cause on the ground that she is not life qualified. While the court agrees that some of the answers Juror 64's provided at the beginning of her in-court questioning were potentially concerning, at the end of questioning, the court was left with the impression that Juror 64's earlier answers were the result of confusion about the law surrounding the death penalty. The record, informed by the court's assessment of the juror's demeanor, shows that once Juror 64 was more fully and accurately instructed on the law, she is not substantially impaired in her ability to serve as a juror in this case.

Juror 64 wrote in the questionnaire that she "strongly agree[s] with [the] death penalty" (question # 85(a)), and she identifies herself as a ten on a scale of one to ten—strongly favoring the death penalty (question # 85(a)). However, her statement that she favors the death penalty does not, in itself, indicate the circumstances in which she would vote to implement the death penalty nor does it show whether the juror could follow the court's instructions with regard to the death penalty. At the beginning of Juror 64's questioning, she indicated that she would impose the death penalty as long as a defendant was convicted of intentional murder, saying "[a]s long

3

as we have proof, enough evidence, and if that's the case, I'll go for it." (Mar. 7, 2011 Tr. at 449.) Juror 64 answered the court's question "would you always vote for the death penalty in a case where someone has been murdered" by saying "yes, strongly. . . . No exceptions." (Id. at 452.) Shortly after making this statement, however, Juror 64 testified that her position was not absolute, stating a willingness to consider mitigating factors such as whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." (See Id. at 450-51.)

      The court's subsequent questioning revealed that the juror's earlier statements and questionnaire answers reflected confusion about what the law required. To remedy this confusion, the court instructed that "[n]o juror ever has to vote for the death penalty, no matter what the case is. . . . Do you understand that in order to impose the death penalty, all twelve jurors must agree to vote for the death penalty before the death penalty can be imposed?" (Id. at 455.) Juror 64 replied that she did not know this, stating that she had "just found out." (Id.) She further answered "yes" to understanding the court's instruction that "just because someone has been found guilty of intentional murder, you are under no obligation to vote for the death penalty as a juror." (Id.) Juror 64 then answered "yes," she would be "able to follow the Court's instructions and consider life without the possibility of release." (Id. at 456.)

      The court followed up about the juror's earlier answers, asking "Now, when you told me earlier that you would always impose the death penalty for murder, did you understand that what I just told you is the case, that you have to make a decision for yourself and that you have the option, no matter what, of imposing a penalty of life in prison?" (Id. at 457.) Juror 64 answered, "Let me explain it this way. I don't mind death penalty because as long as it's what is enforced. In the meantime, if the case is for life in prison I'll go for it. So in both ways, both ways, I don't

4

mind. As long as you know, it's done accordingly to the case." (Id. at 457.) When asked whether she would always vote for the death penalty, Juror 64 responded "I believe I will have to listen to the evidence first, to the story first before I can decide that." (Id. at 458.) Then, the juror answered that she could vote for both life in prison or death, adding "Depends. After I listen to the facts." (Id.) In an abundance of caution, the court asked "If the government presents the aggravating factors at a penalty phase, if they don't provide you with sufficient evidence for you to conclude beyond a reasonable doubt that the death penalty is appropriate, even if the defense does nothing during the penalty phase, would you impose the death penalty anyway?" (Id. at 459.) Juror 64 answered, "No. No. . . . We don't have enough evidence, not sufficient facts for this type of penalty." (Id.)

After this rigorous questioning, defense counsel asked the court to follow-up into the "specific aggravators of future dangerousness, if he's found to be a future danger. Organized crime. Already serving a sentence for a separate murder. Evidence of seeking the death of a prosecutor and cooperating witnesses. The effect that that would have on her views." (Id. at 461-62.) The court declined to ask these follow-up questions. Defense counsel's proposed questions would be impermissible stakeout questions given that Juror 64 already stated in her questionnaire that these factors would not render her "unable to consider a sentence of life." (See Question ## 114-18.)

Quite simply, Juror 64's initial confusion about the complex law that applies to death penalty trials is understandable. Once instructed on the law, however, Juror 64 demonstrated an ability and a willingness to consider both life in prison and death. She repeatedly demonstrated a desire and intention to do as instructed by the court. She answered various questionnaire questions, "I go according with the law" (question # 92), "again I go with the law" (question #

5

94), "I'll go with what is lawful" (question # 95(a)), and "if the law finds that is better" (question # 110(b)). The record establishes insufficient reason for the court to doubt that Juror 64 will listen to the facts at the penalty phase and apply the law as instructed. Juror 64's demeanor and the totality of her answers in the questionnaire and in court demonstrates that she is willing to follow the court's instructions. Once she was instructed on the proper legal standard that would apply at the penalty phase, her consistent and appropriate answers left the court with the impression that Juror 64 is not substantially impaired. See United States v. Fulks, 454 F.3d 410, 427-28 (4th Cir. 2006).

The court further notes that defense counsel's argument that the court's decision not to ask "that the follow-up questions that [defense counsel] asked at the last round make it difficult to exercise Mr. Basciano's right to a fair and impartial juror with respect to this juror" is meritless. (Mar. 7, 2011 Tr. at 463.) Juror 64 answered the 124 question questionnaire and underwent extensive individual questioning by the court. This process far exceeds that required by the Constitution. Furthermore, the court acted well within its discretion in refusing to ask follow-up questions that it deemed inappropriate. The court thus rejects Basciano's assertion that the questioning of Juror 64 was insufficient. Consequently, Basciano's motion is DENIED.

### B.     Juror 68

Basciano moved to strike Juror 68 for cause on the ground that she is not life qualified. The court disagrees.

During in-court questioning, Juror 68 indicated that she would be inclined to vote for the death penalty if she learned that a defendant had been convicted of a previous murder. (See Mar. 8, 2011 Tr. at 605.) However, Juror 68 said that, even if this aggravator were proven beyond a reasonable doubt, she would be willing to consider and weigh mitigating factors:

> I have to hear like the whole set of things to make me change my mind. I have to hear what was the reason or, you know, what evidence were found. I mean, I have to hear more in order to change my head. I mean, if you say like with nothing else around, I would say, no. He did it twice, I mean, that's a bad thing.

(Id. at 608.) When asked whether a showing "that the prison system can adequately deal with future dangerousness . . . would enter into [her] consideration as to what the penalty should be," the prospective juror answered, "Yes. They have it for a reason. They have that—If they could accommodate the person and they have other people there that were like that, yeah. I could." (Id. at 615.) Juror 68 then answered "yes" when the court inquired into whether she could consider a life sentence in that situation. (Id.) Juror 68 also expressed willingness to consider other background evidence about a defendant as mitigation evidence, saying that she would "want to know what people [a defendant] having around before. What was their routine, like their job. I don't know, what are their values, what are their family things." (Id. at 606-08.)

The court asked Juror 68, "Do you understand that the sentence of life is the sentence that we presume is going to be imposed unless it can be proven by the government beyond a reasonable doubt that the aggravators justify a sentence of death?" (Id. at 616.) The juror answered, "Yes, I understand that. . . . Yes, I can accept that." (Id.) The court then inquired into Juror 68's earlier answers:

> I'm going to return to an issue where there may be a possible aggravator and ask you this. If at the time of the sentencing of the defendant you hear evidence that the defendant has already been convicted of a separate intentional murder, would you be able to consider mitigating evidence and arguments by defense counsel that a sentence of death is not appropriate in this case and therefore could you consider a life sentence in that circumstance?

(Id. at 617-18.) Juror 68 answered, "Yes, I could consider. I could consider. . . . The mitigation—you say that the defense will provide information for me to reconsider and they saying the death penalty is not what they believe is correct, so I would reconsider." (Id.) The

7

court further inquired, "Is it possible in that situation if you received that mitigating evidence that you could vote in that circumstance for a life sentence?" (Id.)  Juror 68 answered, "[y]es. I believe that everything is possible. You should have to hear everything around it." (Id.)

Based on Juror 68's answers in court and her demeanor, the court cannot conclude that she is substantially impaired in her ability to follow the court's instructions and her oath as a juror.  Specifically, the court believes that she will be able to follow the law, which requires her to consider both aggravating and mitigating circumstances.  This juror has indicated that even under circumstances in which there are sufficient aggravating factors to justify the death penalty, she will consider mitigating factors and be open to imposing a sentence of life in prison rather than the death penalty.  While Juror 68 gave some troubling answers, the court was left with the impression from both the totality of her answers and her demeanor that these answers were the result of confusion about the law, rather than set views that would impair her ability to follow the court's instructions and her oath.  At the end of her questioning, once Juror 68 appeared to have a better understanding of the law, she gave permissible and seemingly sincere answers.  The court is not left with the impression that this potential juror is substantially impaired.  Consequently, Basciano's motion to strike Juror 68 for cause is DENIED.

### C.     Juror 110

Basciano moved to exclude Juror 110 for cause on the ground that she is not life qualified.  The court agrees that this juror is substantially impaired in her ability to follow the court's instructions and her oath, and Basciano's motion is granted.

While Juror 110's questionnaire answers raised no serious issues, her in-court questioning left the court with a definite impression that she will be unable to follow the court's instructions with regard to the need to consider mitigating factors at sentencing.

The court asked Juror 110, "Are there any factors or is there any information that you think might act as a mitigation that would overcome some of these aggravating factors? Is there something that you would want to know about the person's background that might help you in balancing out the aggravators as against the mitigators?" (Mar. 8, 2011 Tr. at 745-46.) Juror 110 answered that she could not think of anything that would act as mitigating factor, saying, "Not that I can think of." (Id. at 746.)

When asked whether she would "always impose the death penalty" if "the government presents evidence in the penalty phase that the defendant is currently serving a life sentence for committing another murder," Juror 110 answered, "Always? That's hard to say 'always.'" (Id. at 750-51.) She went on to say that it was "very likely" that she would impose the death penalty. (Id. at 751.) The court followed up, asking, "Do you believe it's possible that you would learn about—let me put it this way: If you learned about certain mitigating factors, is it possible that those mitigating factors would counterbalance and overcome the likelihood that you would impose the death penalty for that aggravating factor that I just described?" (Id.) Juror 110 answered that it was "[p]robably not likely, but possible." (Id. at 752.) Juror 110's demeanor in answering the court's questions spoke more clearly than her words and indicated that she could not consider mitigating factors as is required under the Federal Death Penalty Act. See 18 U.S.C. § 3592(a); Fulks, 454 F.3d at 427 ("[I]n a capital sentencing proceeding, a juror's duties include giving meaningful consideration to any mitigating evidence that the defendant can produce.") It was apparent that she understood exactly what the law required of a juror at the penalty phase, yet she provided the court with little assurance that she would act accordingly.

From this questioning, the court was left with the definite impression that Juror 110 is substantially impaired in her ability to follow the court's instructions and her oath as a juror at a

9

potential penalty phase.  See Morgan, 504 U.S. at 735-39; Fulks, 454 F.3d at 427 ("[W]here voir dire examination reveals that a juror will fail in good faith to consider the evidence of mitigating circumstances as the instructions require him to do, he is excludable for cause.") (internal citation, quotation marks, and punctuation omitted).  Consequently, Basciano's motion to strike Juror 110 for cause is GRANTED.

## II.  CONCLUSION

As set forth above, the court GRANTS Basciano's motion to strike Juror 110 and DENIES his motions to strike Jurors 64 and 68.  Consequently, Jurors 64 and 68 are deemed qualified to serve as jurors in this case.

SO ORDERED

|  |  |
|---|---|
| Dated: Brooklyn, New York<br>March 11, 2011 | /s/ Nicholas G. Garaufis<br>NICHOLAS G. GARAUFIS<br>United States District Judge |