TM:JD/NMA
F.#2005R0060

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                05 CR 060 (S-12) (NGG)

VINCENT BASCIANO,

        Defendant.

- - - - - - - - - - - - - - - -X

GOVERNMENT'S MEMORANDUM OF LAW REGARDING
THE RELIABILITY AND STANDARD OF REVIEW
<u>OF UNCHARGED PENALTY PHASE EVIDENCE</u>

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Taryn A. Merkl
Nicole M. Argentieri
Jack Dennehy
Stephen E. Frank
Assistant United States Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in advance of the penalty phase, and in accordance with the Court's January 12, 2011 Order.  (Docket Entry No. 1018, at 83).  For the reasons more fully set forth below, the Court should admit, as sufficiently reliable, the specified acts of uncharged conduct on the part of the defendant at the penalty phase, and instruct the jury in the manner set forth below regarding the applicable standard of review of this evidence.

INTRODUCTION

On May 7, 2007, the government provided notice to defendant Vincent Basciano that in the event he is convicted of of the murder in aid of racketeering of Randolph Pizzolo, as charged in the Twelfth Superseding Indictment (Count Two), a sentence of death is justified and the United States will seek the death penalty.  Additionally, in its February 19, 2009 Voluntary Disclosure, the government provided additional notice of the following non-statutory aggravating factors: 1) future dangerousness of the defendant; 2) obstruction of justice; and 3) participation in additional uncharged homicides, attempted homicides and other serious crimes of violence.

In its January 12, 2011 order on pretrial motions, the Court directed the government to provide: (1) details regarding the specific offenses it intends to present to the jury,

-1-

including the expected testimony and evidence that will prove the
uncharged conduct; and (2) legal authority setting forth (a) the
applicable standard of review to determine the reliability of
such evidence, and (b) the applicable standard of review to be
applied by the jury to the uncharged conduct and the related
aggravating factor.

ARGUMENT

I.   Other Specific Acts of Violence

As set forth below, the government intends to prove the following acts of violence in support of the non-statutory aggravating factors of future dangerousness of the defendant, obstruction of justice and participation in additional uncharged homicides, attempted homicides, and other serious crimes of violence.

A.   Attempted Murder of David Nunez

The defendant has previously been convicted by a jury of the conspiracy to murder and attempted murder of David Nunez as a predicate act of racketeering.  See United States v. Basciano, 03 CR 929 (NGG).  The government intends to introduce the indictment and verdict form related to this conviction, as well as witness testimony and other evidence related to the defendant's participation in the Nunez attempted murder and murder conspiracy.  Former NYPD Officer Keith Garley will testify, consistent with his prior testimony, regarding his pursuit and arrest of Basciano on November 14, 1985.  (See United States v. Basciano, 03 CR 929 (NGG), 2007 Trial Tr. 2830-2839 (hereinafter "2007 Trial Tr."); see also United States v. Basciano, 03 CR 929 (NGG), 2006 Trial Tr. 8278-8306 (hereinafter "2006 Trial Tr.")).  Garley will testify that he observed Basciano, DeFilippo and Donato in a vehicle fleeing the general

-3-

vicinity of the shooting of David Nunez, that Garley pursued them and then followed Basciano on foot after Basciano fled the vehicle.  (See 2006 Trial Tr. 8286:12-8291:25).  Garley will further testify that he arrested Basciano after Basciano attempted to get rid of a firearm while running away from Garley. (Id.)  The government will also introduce the defendant's and DeFilippo's state conviction and plea allocutions related to their possession of firearms on November 14, 1985.

Additionally, the government will introduce through Joseph Massino a portion of the January 3, 2005 consensual recording, during which Basciano stated, "You got faith in me Joe.  I'm gonna beat all these charges.  I'm gonna beat all these, I'm gonna beat the murder charge.  I'm gonna beat these other charges, okay?  I gotta worry about the attempted murder in '85."  The government will also present evidence including Nunez's certified medical records documenting the nature and severity of the wounds suffered by Nunez as a result of the shooting, as well as photographs of the defendant, DeFilippo and Donato related to their 1985 arrest.  Dominick Cicale will also testify that Basciano told him that he had participated in the attempted murder of a Spanish guy in a cab, along with DeFilippo and Donato.  Basciano told Cicale that during the incident, Basciano tried to evade law enforcement by jumping over a fence and getting rid of his firearm.

-4-

B.   <u>Murder of Anthony Colangelo, Sr.</u>

The government intends to prove during the penalty phase that between May 1987 and July 1987, the defendant, together with others, conspired to murder and murdered Anthony Colangelo, Sr.  Colangelo's son Anthony Colangelo, Jr., is expected to testify, consistent with his prior testimony, that in the 1980s, his father shared a financial interest in illegal gambling businesses with Dominick "Big Trin" Trinchera, Vincent Basciano, Alfred Bottone and Anthony Donato.  (<u>See</u> 2007 Trial Tr. 2996:1-3002:3).  Colangelo will testify that after the arrest of Basciano, Patrick DeFilippo and Donato for the attempted murder of David Nunez, Colangelo had a discussion with his father about the threat Basciano posed to his father's life, based in part upon their shared financial interest in illegal numbers locations.  Colangelo will further testify that after his father's murder in 1987, Basciano and Donato took control of his father's lucrative illegal gambling operation, and stopped providing proceeds from that business to his father's girlfriend Ann Caruncho.  (<u>See</u> 2007 Trial Tr. 3005:12-21).  Colangelo will testify that at the time of his father's disappearance, he spoke to Ann Caruncho, his father's girlfriend, and that Caruncho advised him that during her last conversation with Colangelo, Sr., he told her that there was some sort of trouble, but not to worry because he had the "kids" with him, which Colangelo

-5-

understood to be a reference to Donato and Basciano.  Colangelo
will testify that his father's car was recovered from the
vicinity of First Avenue and East 115th Street in Manhattan, New
York, in proximity to a location where the defendant and
Colangelo, Sr., had a business together.  The government also
intends to introduce Ann Caruncho's prior sworn testimony that
prior to Colangelo, Sr.'s death, he had an illegal numbers
business with the defendant and Anthony Donato.  (See 2007 Trial
Tr. 8094:7-19).[1]

Additionally, the government intends to introduce
(1) prison records for Colangelo, Sr., which indicate that
Basciano, Caruncho and Donato were on Colangelo, Sr.'s visitor
list, (2) the missing persons report filed by Colangelo, Jr.,
after his father's disappearance, (3) testimony by law
enforcement officials present at the crime scene where Colangelo
Sr.'s body was discovered in Westchester County, and (4) other
evidence of the gunshot wounds suffered by Colangelo, Sr.

C.   Queens Club Murder

During the penalty phase, James Tartaglione will
testify, consistent with his prior testimony, about a meeting
between Tartaglione, Patrick DeFilippo, Sal Vitale and Joseph

---

[1]  Ann Caruncho died on July 20, 2009.  The government
intends to introduce Caruncho's prior sworn testimony pursuant to
Federal Rule of Evidence 804(b)(1), as the former testimony of an
unavailable witness.

Massino that occurred in the mid-nineties.  Tartaglione will testify that he observed Massino arguing with DeFilippo and heard Massino asking DeFilippo with reference to Basciano, "did you give Vinny permission to kill this guy."  (See 2007 Trial Tr. 2314:6-2316:1).  Tartaglione will further testify that after that meeting, Vitale told Tartaglione that Massino was upset because the defendant had killed an individual inside a social club, along with Chubby Maiorino, Michael Mancuso and Anthony Frascone. (Id.)

Additionally, Joseph Massino will testify that in the late nineties, Basciano, Johnny Joe Spirito, Michael Mancuso and Anthony Frascone murdered an individual inside a social club. Massino will further testify that first Vitale advised Massino of the murder and that later, DeFilippo told Massino that the individual arrived at the meeting, which was supposed to relate to a dispute about gambling in the Bronx, armed with a firearm. Massino then spoke about the murder with the defendant, who told Massino that he shot the individual.  Dominick Cicale will testify that Basciano told him that Basciano participated in the murder of an individual, along with Michael Mancuso, Johnny Joe Spirito and Anthony Frascone.

D.   Murder of Frank Santoro

The defendant has previously been convicted by a jury of the conspiracy to murder and murder of Frank Santoro as a

-7-

predicate act of racketeering.  See United States v. Basciano, 03
CR 929 (NGG).  During the guilt phase, the government introduced
evidence of the defendant's role in the 2001 murder of Frank
Santoro through the testimony of Dominick Cicale, Joseph Massino,
James Tartaglione and NYPD Detective Joseph Noya.  Cicale
testified in detail about the defendant's role in ordering Cicale
and others to murder Santoro, and the defendant's fatal
shotgunning of Santoro on February 15, 2001.  (T. 6941:25-
6961:19).  Massino testified that he discussed Basciano's
participation in the murder of Frank Santoro with Sal Vitale,
Patrick DeFilippo, Anthony "Bruno" Indelicato and Basciano
himself.  (T. 4815:15-4821:14).  Detective Noya testified that on
February 15, 2001, he recovered four discharged shotgun shell
casings from the Santoro murder crime scene.  (T. 6358:22).
Finally, the government introduced a December 21, 2003 consensual
recording of the defendant made by cooperating witness James
Tartaglione, during which Basciano discussed his role in the
Santoro murder.  (T. 5838:3-5846:24, 5856:20-5860:21).  At
penalty phase, the government will offer the Santoro autopsy
report, autopsy photographs and other evidence to establish
Santoro's cause of death, namely gunshot wounds.

E.   Solicitation and Conspiracy to Assault Dominick
     ("Donny Boy" Martino)/Solicitation and Conspiracy to
     Murder Dominick Martino

The defendant has previously been convicted by a jury

of the solicitation to murder Dominick "Donny Boy" Martino as a

predicate act of racketeering.  See United States v. Basciano, 03

CR 929 (NGG).  The government intends to introduce the indictment

and verdict form related to this conviction.  Additionally,

during the guilt phase, the government adduced evidence regarding

the defendant's participation in the solicitation and conspiracy

to assault and later murder Donny Boy Martino.  Specifically,

Dominick Cicale testified that the defendant advised him that

Martino had a physical altercation with Anthony Donato, who was

an inducted member of the Bonanno family.  Cicale further

testified that as a result of this altercation, the defendant

ordered Cicale to wait for Martino to get off the train after

work and "baseball bat" him and "break his legs."  (T. 7023:17-

7024:16).  Cicale testified that after he failed to find Martino

on two occasions, the defendant told Cicale that instead of

assaulting Martino, they would kill Martino.  (T. 7024:23-

7025:5).  Cicale further testified that even though Massino later

denied Basciano's request to kill Martino because Martino was

related to a member of the Genovese crime family, Basciano stated

that if Martino did not apologize to Donato, Basciano would wait
until Martino had a problem with someone else and then kill him.
(T. 7025:22-7026:23).[2]

During the guilt phase, the government also presented
evidence of Basciano's admissions on the Tartaglione consensual
recordings about the Martino murder conspiracy.  Cooperating
witness James Tartaglione testified that during the December 21,
2003 consensually recorded meeting with Basciano, he presented
Basciano with an FBI 302 report related to the Martino murder
solicitation.  (T. 5837:2-8).  Tartaglione also testified during
the guilt phase as follows:

> Q:  Directing your attention to lines 20 and 21, Basciano
>     says, "I knew who that was.  That was um – how the F
>     did it get back to Sal?  You know who that is?  It's
>     Joe Martino, he's a friend with the West Side.  His
>     brother hit Anthony, kid around me.  Okay, they had a
>     fight in the club and he hit Anthony, and I wanted to
>     clip him.  I wanted to clip him but he wouldn't let me
>     clip him.  It was two different incidents."  When
>     Basciano says "I knew who that was.  You know who that
>     is?  It's Joe Martino."  What was your understanding
>     of what he was telling you?
>
> A:  He was saying that, that was the guy that was a
>     friend.

(T. 5843:25-5844:11).

---

[2]  While the government does not intend to re-examine each
cooperating witness about his testimony during the guilt phase
regarding these uncharged acts of violence, the government does
intend to elicit briefly the relevant testimony regarding the
noticed statutory and non-statutory aggravating factors.

-10-

In addition to this evidence, Joseph Massino will testify during the penalty phase that the defendant asked Massino for permission to kill Jimmy Calabrese's brother, a reference to Donny Boy Martino, because Martino had hit Donato.  Massino denied the defendant permission to kill Martino.

F.   Conspiracy to Murder/Solicitation to Murder Patrick DeFilippo

During the guilt phase, the government introduced evidence of the defendant's role in soliciting the murder of and conspiring to murder Patrick DeFilippo through the testimony of Dominick Cicale, FBI Special Agent Michael Breslin, the Massino consensual recordings and the testimony of Joseph Massino.  At trial, Cicale testified that in approximately 2001, Basciano told Cicale that he wanted to kill DeFilippo because he felt DeFilippo tried to have Donato killed by falsely advising Massino that Donato took credit for murdering the Uvas.  (T. 7008:22-7009:14). Thereafter, Basciano and Cicale plotted to alter a car to resemble a police car so that they could pull over DeFilippo and murder him.  (T. 7010:1-7014:22).  Some time later, Basciano sent a message to Massino (who was incarcerated at the time) through attorney Tommy Lee, seeking permission to murder DeFilippo. (Id.)  Cicale also testified that after Massino denied Basciano permission to murder DeFilippo, Basciano said that he would "sneak" DeFilippo.  (T. 7014:8-21, GX457A-G).  During the penalty phase, Cicale will testify that after Basciano's incarceration,

-11-

he advised Cicale that if Cicale and DeFilippo were ever both out of prison, Cicale should murder DeFilippo.

At trial, SA Breslin testified about his examination of a Chevy Impala registered to Cicale's girlfriend Lynette Ayuso, which appeared to have been altered to resemble a law enforcement vehicle. (T. 6446:16-6452:9). Additionally, Massino testified that he received a message from Tommy Lee that Basciano believed DeFilippo was cooperating with the government, and that Massino sent back a message, "give me facts, not opinions." (T. 4942:21-4945:5). Massino testified that Basciano asked for permission to kill DeFilippo through Lee using the coded term "jocko." (T. 4946:13-4948:12). Additionally, Massino testified that during the January 3, 2005 consensual recording, Basciano again told Massino he wanted to kill DeFilippo, stating "this guy in the fucking street is a problem to you and me." (T. 5014:6-13).

G.   Conspiracy to Murder Salvatore Vitale

During the guilt phase, the government introduced evidence of the defendant's role in soliciting the murder of cooperating witness Sal Vitale through the testimony of Joseph Massino and Dominick Cicale. Specifically, Massino testified about his participation in a 2003 meeting with Basciano and Anthony "Bruno" Indelicato, during which Basciano asked Massino for permission to murder Vitale because Basciano believed that Vitale would cooperate with the government. (T. 4851:15-4852:1).

Cicale testified that in 2002, Basciano asked him to be available for "a piece of work," and later advised Cicale that the target was Sal Vitale.  (T. 7050:1-17).

H.   Solicitation to Murder Lynette Ayuso

Between 2001 and 2003, the defendant solicited others to murder Lynette Ayuso, the girlfriend of Dominick Cicale. Cooperating witness Dominick Cicale testified at trial that Lynette Ayuso is the mother of his child.  (T. 7267:25-7268:1). During the penalty phase, Cicale is expected to testify that between 2002 and 2003, Basciano told Cicale that Basciano wanted to kill Ayuso because, among other reasons, Basciano believed Ayuso advised Basciano's wife Angela Basciano of Basciano's relationship with his girlfriend Deborah Kalb.[3]  Cicale will further testify that the defendant told Cicale on numerous occasions that he intended to kill Ayuso.  Cooperating witness Joseph Massino is expected to testify that between 2001 and 2003, Basciano requested permission from Massino to murder the girlfriend of Dominick Cicale because Basciano believed that the girlfriend told Basciano's wife about Deborah Kalb and the baby Basciano had with her.  Massino will testify that he did not give the defendant permission to murder Cicale's girlfriend.

_____

[3]  Cicale has previously testified about this matter.  (See 2007 Trial Tr. 1209:6-1210:14).

I.   <u>Solicitation to Murder the Parents of Joseph D'Amico</u>

During the penalty phase, Joseph Massino will testify that in approximately 2004, prior to Basciano's arrest, Basciano requested permission from Massino to murder the parents of Joseph D'Amico, a cooperating witness for the government.  Massino will testify that the defendant and Anthony Indelicato had observed D'Amico's parents eating in a restaurant in Little Italy, as they did every week.  Massino did not grant the defendant permission to murder D'Amico's parents.

J.   <u>Solicitation to Murder Frank Coppa, Jr. and Joseph Lino</u>

During the penalty phase, Joseph Massino will testify that after Frank Coppa and Frank Lino started to cooperate with the government, Basciano sent a message through Tommy Lee that he wanted to kill Coppa's son, a reference to Frank Coppa, Jr., and Lino's son, a reference to Joseph Lino.  Massino did not grant the defendant permission to murder Frank Coppa Jr., and Joseph Lino.

K.   <u>Conspiracy and Solicitation to Murder AUSA Andres</u>

The government will prove the defendant's participation in the conspiracy and solicitation to murder Assistant United States Attorney Greg Andres through the testimony of Joseph Massino, the Massino consensual recordings and the testimony of Generoso Barbieri.

First, Massino will testify that in late 2004, while Massino and the defendant were both in a "bullpen" at the Eastern District courthouse, Basciano asked Massino for permission to murder Assistant United States Attorney ("AUSA") Greg Andres.  At the time, AUSA Andres was the lead prosecutor in the then-pending federal cases against both Massino and Basciano, and had been the lead prosecutor in the government's indictment and conviction of dozens of other Bonanno members and associates in the immediately preceding years.  Massino is also expected to testify that he learned from an attorney at a co-defendant meeting, at which Johnny Joe Spirito was in attendance, that AUSA Andres ate dinner at an Italian restaurant with his boss.  The government plans to introduce additional evidence that AUSA Andres, in fact, spoke to an attorney for Johnny Joe Spirito at that restaurant in 2003.

Additionally, evidence of Basciano's solicitation to kill AUSA Andres was also captured on the Massino recordings. For example, on January 3, 2005, Massino and the defendant discussed on the recording the defendant's prior bullpen request for permission to murder AUSA Andres:

MASSINO:   . . . As far as the last time when I spoke with you at the bullpen, remember?  We spoke in the bullpen?

BASCIANO: Yeah.

MASSINO:   And you want to take the prosecutor out.  What are we gonna gain by?  What are you gonna gain if we take the prosecutor out?

-15-

BASCIANO: Nothing.

MASSINO:   What are you going to gain?

BASCIANO: Forget about it.

MASSINO:   No, that's no good.  That's off limits.

BASCIANO: Forget about it.  Forget about that.

(Jan. 3, 2005 Massino Tr. at 13).

This topic was raised again later in the conversation:

MASSINO:   And I thought about what you said with the with
           the prosecutor, right?  What are we going to gain?

BASCIANO: No.  Forget about it.  Forget about it.  Let's not
           even discuss it again.

MASSINO:   No, you understand what I'm saying?

BASCIANO: Yeah, forget about it.  Forget about it.

MASSINO:   What are you going to gain?  You make no sense.

BASCIANO: Forget about it.

MASSINO:   I thought about it like I said let me think about
           it.  I don't want to talk.  Downstairs.

BASCIANO: Right.  Right.

MASSINO:   In - the in that room there.

BASCIANO: Okay.

MASSINO:   But I said to myself what are we going to gain by
           hurtin' him?

BASCIANO: No.

MASSINO:   That don't make any sense.  And the more people
           that get hurt the more heat is gonna come down.

BASCIANO: Yeah, I know that.

(Jan. 3, 2005 Massino Tr. at 19).

-16-

Later in the conversation, Basciano again acknowledged that he had raised the prospect of murdering AUSA Andres with Massino:

MASSINO:   Did I see you in the bullpen?

BASCIANO: Yeah.

MASSINO:   <u>You talked about the prosecutor</u>.

BASCIANO: <u>Right</u>.

MASSINO:   <u>And I said give me time, I want to think about it</u>. And I got nothing but time up here.  Think, think, think.

BASCIANO: <u>Right.  Right</u>.

MASSINO:   We ain't going to benefit nothin'.

BASCIANO: No.  No.  No.  Forget it.

(Jan. 3, 2005 Massino Tr. at 77-78 (emphasis added)).

In a second consensually recorded conversation between Massino and Basciano on January 7, 2005, the subject of Basciano's solicitation to murder AUSA Andres was again discussed, in conjunction with a discussion of Basciano's ordering of Pizzolo's murder:

MASSINO:   So, I mean, they can't throw, I don't see them throwin' me, the only thing I figure, it was Randy or the, or, or the prosecutor.

BASCIANO: No, no, no, no, no.

MASSINO:   Alright.

BASCIANO: No.

MASSINO:   You tell me that, okay.

-17-

BASCIANO:  No, absolutely not.

MASSINO:  I don't want me and you.

BASCIANO:  No, Bo.  Yeah, but let them do what the fuck, listen, this prosecutor, I can't underestimate him because he's a dirty, rotten, cocksucker, okay? But as far as Randy, nobody fuckin' knows.

MASSINO:  No, I know that, I know that, but I don't, but you gotta remember one thing, Vin.  I know you told, listen to me, I know you told me in the bullpen, I said let me think about it.  But I don't know who you told.

BASCIANO:  Nobody, Bo.

MASSINO:  But I don't know that . . .

BASCIANO:  No!

MASSINO:  . . . until just now.

BASCIANO:  Joe, you're my guy.

MASSINO:  I understand.

BASCIANO:  Come on, I'm the guts (UI).

MASSINO:  But how, do I know, maybe you said somethin' to Dominick.

BASCIANO:  No, nobody!

MASSINO:  Do I gotta ask ya?

BASCIANO:  Yeah.

MASSINO:  Okay.

BASCIANO:  Never.

MASSINO:  I gotta ask ya.

BASCIANO:  Come on, I gotta be a fuckin' dope.  I mean, you know, everything else here that I did, I'll take the blame for or I take the credit for.  That's it.  There was guys out there that I think

-18-

> deserved it, we were in a wartime situation, this
> family was falling apart and guess what?  I had
> them all.

MASSINO:   We was okay until I got pinched.

BASCIANO: Yeah, no.

MASSINO:   We was on top of the world.

BASCIANO: We were terrific, terrific, and we're gettin', got
> news for you, those subsequent months over there?
> We fell apart.  We fell apart, and I took the bull
> by the horns, Bo.

(Jan. 7, 2005 Massino Tr. at 52-54 (emphasis added)).

Additionally, Generoso Barbieri will testify that while
incarcerated at the MDC with Basciano, Basciano told Barbieri, in
substance, that Basciano knew where to find AUSA Andres and that
Basciano had a crew of capable enforcers.  In context, and in
light of Barbieri's decades of experience in organized crime and
his familiarity with Basciano's manner of speaking, Barbieri
understood Basciano's statement to mean that Basciano was
planning to kill AUSA Andres.  Barbieri is also expected to
testify that one of his principal motivations for agreeing to
cooperate with the government was to prevent Basciano from
carrying out the murder.

II.  These Uncharged Acts of Violence are Relevant
     and Admissible During the Penalty Phase

The Federal Death Penalty Act ("FDPA") specifically
provides that the jury "may consider whether any other
aggravating factor" supports a death sentence, 18 U.S.C.

-19-

§ 3592(c), and states that at the sentencing hearing the Federal Rules of Evidence do not apply.  Instead, "information may be presented as to any matter relevant to the sentence."  18 U.S.C. § 3593(c).  Therefore, information relating to the defendant's continuous pattern of other acts of violence is admissible at the penalty phase if it is relevant to sentencing, reliable, and the probative value outweighs dangers of unfair prejudice, confusing the issues, or misleading the jury.  See 18 U.S.C. § 3593(c). See also United States v. Basham, 561 F.3d 302, 331 (4th Cir. 2009) (noting the FDPA erects "very low barriers" to admissibility of information).  The defendant's participation in a continuous pattern of violent conduct is highly probative.  In fact, the importance of reliable, informed decision-making in the penalty phase actually counsels in favor of admitting evidence of the defendant's other violent acts.

The Supreme Court has held that there is a need for a sentencing body to have as much information as possible in determining whether to impose the death penalty.  See Williams v. New York, 337 U.S. 241, 247 (1949) (holding "the possession of the fullest information possible concerning the defendant's life and characteristics" is "[h]ighly relevant -- if not essential -- to" the selection process); Gregg v. Georgia, 428 U.S. 153 (1976) (reaffirming the same principle).  In Gregg, the Court stated: "[S]o long as the evidence introduced and the arguments

-20-

made at the pre-sentence hearing do not prejudice a defendant, it is preferable not to impose restrictions.  We think it desirable for the jury to have as much information before it as possible when it makes a sentencing decision."  428 U.S. at 203-04.

Accordingly, the Supreme Court has established that the admission of information relating to unadjudicated prior offenses at a capital sentencing hearing is constitutionally permissible and not inherently prejudicial.  See Williams, 337 U.S. at 244, 252 (upholding the trial judge's consideration in imposing the death sentence of evidence that the defendant had committed burglaries for which he had not been convicted); Nichols v. United States, 511 U.S. 738, 747 (1994) (citing Williams with approval for the proposition that the Court has upheld the constitutionality of considering unadjudicated conduct at sentencing).[4]  In fact, the Supreme Court has held that even evidence tending to prove that the defendant engaged in criminal conduct for which he has already been prosecuted and acquitted may be introduced at sentencing in a trial charging a separate offense.  United States v. Watts, 519 U.S. 148, 156-57 (1997) ("[A] jury's verdict of acquittal does not prevent the sentencing

_____

[4]  Although the landscape of death penalty jurisprudence has changed substantially since Williams was decided in 1949 and aspects of the Williams decision have been rejected in more recent capital sentencing decisions, nothing in Nichols indicates that the Court considered the Williams holding to be limited, or that it is no longer good law as to cases involving the death penalty.

court from considering conduct underlying the acquitted charge.").

Circuit and district courts have approved repeatedly of the introduction of information related to unadjudicated conduct during the penalty phase of capital trials. See, e.g., United States v. Lujan, 603 F.3d 850, 860-61 (10th Cir. 2010) (reversing on interlocutory appeal a district court's decision not to allow information relating to defendant's participation in a double murder that had not yet been tried in state court); Basham, 561 F.3d at 316, 334 (upholding introduction of trial record to support non-statutory aggravating factors that defendant committed unadjudicated murder, carjacking, kidnapping, and assaults); United States v. Corley, 519 F.3d 716, 723-25 (7th Cir. 2008) (approving of introduction of unadjudicated murder committed 14 years prior to charged murder); Cummings v. Polk, 475 F.3d 230, 238-39 (4th Cir. 2007) (allowing proof of unadjudicated murder); United States v. Higgs, 353 F.3d 281, 322-23 (4th Cir. 2003) (upholding admission of information related to unadjudicated obstruction of justice offense); United States v. Lee, 274 F.3d 485, 494-95 (8th Cir. 2001) (approving introduction of information related to other bad acts, including assaults and burglaries); United States v. Hall, 152 F.3d 381, 404 (5th Cir. 1998); Devier v. Zant, 3 F.3d 1445, 1464 (11th Cir. 1993) (allowing introduction of evidence of unadjudicated rape

offense); <u>United States v. Umana</u>, 707 F. Supp. 2d 621, 632-33 (W.D.N.C. 2010) (denying MS-13 member's motion to strike aggravating factor relating to unadjudicated murders); <u>United States v. Cisneros</u>, 363 F. Supp. 2d 827, 838-39 (E.D. Va. 2005) (denying MS-13 member's motion to strike unadjudicated conduct, including instances where defendant sold guns, ammunition, or drugs).

Similarly, here, the government submits that the defendant's participation in a pattern of violent acts is highly relevant to the sentencing decision.  Aggravating circumstances must be construed to permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not.  <u>Lewis v. Jeffers</u>, 497 U.S. 764, 776 (1990); <u>see also Arave v. Creech</u>, 507 U.S. 463, 474 (1993) (holding that a relevant factor is "one that assists the sentencer in distinguishing those who deserve capital punishment from those who do not").  Further, a capital sentencing jury should be presented with all relevant evidence so that it may make a principled determination of whether the defendant in fact deserves a sentence of death.  <u>Payne v. Tennessee</u>, 501 U.S. 808, 825-27 (1991).

In light of these constitutional principles, the FDPA sets forth in pertinent part the following evidentiary standard for the penalty phase:

> At the sentencing hearing, information may be presented as
> to any matter relevant to the sentence, including any
> mitigating or aggravating factor permitted or required to be
> considered under section 3592. . . . The government may
> present any information relevant to an aggravating factor
> for which notice has been provided under subsection (a).
> Information is admissible regardless of its admissibility
> under the rules governing admission of evidence at criminal
> trials except that information may be excluded if its
> probative value is outweighed by the danger of creating
> unfair prejudice, confusing the issues, or misleading the
> jury.

18 U.S.C. § 3593(c).  Based on Section 3593(c), therefore, the

threshold limitation on introducing information at a capital

sentencing hearing is that such information must be "relevant" to

sentencing.

Relevance "means [information] having any tendency to

make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than

it would be without the [information]." Basham, 561 F.3d at 332

(quoting Fed. R. Evid. 401).  Relevance typically presents a low

barrier to admissibility. Id.  Information is relevant if it is

"worth consideration by the jury" or has a "plus value." Id.

(finding information showing that Basham engaged in sexually

aggressive and threatening behavior towards female prison

employee was relevant to future dangerousness even where the

employee testified she did not feel she was in danger).

If the Court makes a threshold finding that the

information relating to the defendant's additional acts of

violence is relevant, Section 3593(c) provides that the court

-24-

should admit the information unless it concludes that "its
probative value is outweighed by the danger of creating unfair
prejudice, confusing the issues, or misleading the jury."  Common
sense suggests that information showing that a defendant has
committed criminal acts in addition to the charged capital crime
makes that defendant more deserving of the death penalty than a
capital defendant who has never before committed another criminal
act.  See Cisneros, 363 F. Supp. 2d at 835.  Accordingly, the
defendant's other acts of violence are highly relevant to the
individualized sentencing decision the jury is tasked with making
in this case.

III. Evidence of the Defendant's Participation in Other
     Specific Acts of Violence is Reliable

        Further, while the FDPA's evidentiary standard provides
this Court with greater discretion to exclude evidence than does
Fed. R. Evid. 403, the defendant should not be able to benefit
perversely from the nature of his bad acts by now claiming that
these acts are so heinous that he would be unfairly prejudiced if
these acts are now presented to his capital sentencing jury.  Of
course, to be admissible, information relating to the defendant's
other serious acts of violence must be reliable.  See United
States v. Umana, 2010 WL 1688423, at *4 (W.D.N.C. Apr. 26, 2010)
(noting that "a number of district courts within the Fourth
Circuit have required the government to make a threshold showing
that evidence of unadjudicated conduct bears sufficient indicia

-25-

of reliability before it may be submitted to the sentencing jury"
and providing citations).  In that regard, in order to prove the
violent acts identified above, the government will rely on the
testimony of co-conspirators regarding the defendant's direct
admissions to the crimes, in addition to, in some instances,
eyewitness testimony, public records, photographs and hospital
records, the defendant's recorded admissions and prior plea
allocutions.  Notably, as set forth above, the evidence offered
by the government as to each of the defendant's prior acts of
violence is corroborated.  Therefore, the evidence the government
seeks to offer is reliable and should be presented to the jury
during the penalty phase.

IV.  Each Act of Violence Need Not Be Proven Beyond
     A Reasonable Doubt

          Under the Federal Death Penalty Act the government is
required to prove the existence of each aggravating factor beyond
a reasonable doubt.  18 U.S.C. 3593(c).  However, the statute
imposes no such burden with regard to each item of evidence to be
submitted in support of an aggravating factor.  Accordingly, the
Court should follow the reasoning in United States v. Beckford,
964 F. Supp. 993 (E.D. Va. 1997), where the court held that no
such independent burden of proof is applicable.  Beckford
followed "[n]umerous other district courts and courts of appeals
[in holding] that unadjudicated criminal acts are not per se
inadmissible."  Id. at 999.  After reviewing the relevant

authority regarding the "eligibility" and "selection" aspects of capital sentencing, the court in <u>Beckford</u> declined to impose a burden of proof of beyond a reasonable doubt, or clear and convincing evidence, for individual acts of unadjudicated criminal conduct offered to prove the non-statutory aggravating factor of future dangerousness. <u>Id</u>. at 1006-07. The <u>Beckford</u> court thus concluded that only the actual factor -- future dangerousness -- would be subject to proof beyond reasonable doubt because only that factor would be weighed by the jury.

In addition, the <u>Beckford</u> court found that prior unadjudicated criminal conduct could be admissible provided that it is "reliable." Further, the court found the evidentiary standard contained in 21 U.S.C. § 848(e) -- which is identical to the evidentiary standard contained in 18 U.S.C. § 3593(c) -- is a sufficient measure of that reliability. <u>Beckford</u>, 964 F. Supp. at 1002. Even where the non-statutory aggravating factor at issue is not future dangerousness, but rather "Other Specific Acts of Violence," as defined, that factor alleges a continuing pattern of violent conduct, not a single act of violence. It is the continuing pattern of violent conduct that the jury will be called upon to weigh in penalty, not each individual act of violence. Therefore, only the aggravating factor itself must be proven beyond a reasonable doubt.

The government submits that the approach laid out in
<u>Beckford</u> is well reasoned and adheres to the intent of the
statute.  It was also followed by the court in <u>United States v.</u>
<u>Mills</u>, 446 F. Supp. 2d 1115, 1139-40 (C.D. Cal. 2006).  Based on
the logic and reasoning of these cases, the Court should also
conclude that evidence of unadjudicated criminal acts is
admissible provided that it is reliable, that is, so long as the
government can show the evidence is probative of the defendant's
future dangerousness and other specific acts of violence, and
that the value afforded to that determination is not outweighed
by the danger of creating unfair prejudice, confusing the issues,
or misleading the jury.

CONCLUSION

For the foregoing reasons, the government respectfully submits that the Court should admit, as sufficiently reliable, the specified acts of uncharged conduct on the part of the defendant at the penalty phase, and instruct the jury in the manner set forth herein regarding the applicable standard of review of this evidence.

Dated:     Brooklyn, New York
           May 17, 2011

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

Taryn A. Merkl
Nicole M. Argentieri
Jack Dennehy
Stephen E. Frank
Assistant United States Attorneys
     (Of Counsel)

-29-